**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

_____

BETTYE JONES; LEAGUE OF UNITED LATIN AMERICAN
CITIZENS (LULAC) OF WISCONSIN; CROSS LUTHERAN
CHURCH; MILWAUKEE AREA LABOR COUNCIL,
AFL-CIO; and WISCONSIN LEAGUE OF YOUNG VOTERS
EDUCATION FUND;

       Plaintiffs,

v.                                                         Case No. 2:12-cv-00185-LA

JUDGE DAVID G. DEININGER, JUDGE MICHAEL BRENNAN,
JUDGE GERALD C. NICHOL, JUDGE THOMAS BARLAND,
JUDGE THOMAS CANE, KEVIN J. KENNEDY, and
NATHANIEL E. ROBINSON, all in their official capacities,

       Defendants.

_____

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Penda D. Hair
Kumiki Gibson
Denise D. Lieberman
Advancement Project
Suite 850
1220 L Street, N.W.
Washington, D.C. 20005
Phone: (202) 728-9557
Email: phair@advancementproject.org
  kgibson@advancementproject.org
  dlieberman@advancementproject.org

Charles G. Curtis, Jr.
Arnold & Porter LLP
Suite 620
16 North Carroll Street
Madison, Wisconsin 53703
Phone: (608) 257-1922
Email: Charles.Curtis@aporter.com

John C. Ulin
Arnold & Porter LLP
44th Floor
777 South Figuero Street
Los Angeles, California 90017
Phone: (213) 243-4000
Email: john.ulin@aporter.com

Carl S. Nadler
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
Phone: (202) 942-6130
Email: carl.nadler@aporter.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

TABLE OF ABBREVIATIONS ........................................................................................... ix

INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................................... 1

BACKGROUND .................................................................................................................. 7

    A.    The Dramatic Changes Wrought By Act 23 ............................................... 7

    B.    The Suppressive Effects of Act 23 in Operation ..................................... 10

ARGUMENT ...................................................................................................................... 13

I.    WISCONSIN'S PHOTO VOTER ID LAW IS PRECISELY THE KIND
OF VOTER SUPPRESSION MECHANISM THAT CONGRESS
OUTLAWED IN SECTION 2 OF THE VOTING RIGHTS ACT ....................... 14

    A.    Section 2 Outlaws Minority Voter Suppression Measures ........................ 14

    B.    Act 23 Is the Functional Equivalent of the Jim Crow
Minority Voter Suppression Measures Outlawed By Section 2 ................ 20

II.    ACT 23 IMPOSES DISPROPORTIONATE AND SUBSTANTIAL BURDENS
ON AFRICAN-AMERICAN AND LATINO VOTERS, WITH THE
PREDICTABLE RESULT OF MINORITY VOTER SUPPRESSION ................ 22

    A.    The Burdens of Act 23 Are Disproportionately Borne By Minorities ..... 22

    B.    The Burdens Are Significant and Predictably
Will Suppress Minority Voting ................................................................. 24

III.    THE "TOTALITY OF CIRCUMSTANCES" ANALYSIS CONFIRMS
THAT THE SUBSTANTIAL RACIALLY DISPROPORTIONATE
BURDENS IMPOSED BY ACT 23 VIOLATE SECTION 2 ............................. 29

    A.    Wisconsin's African-American and Latino Voters Bear the Effects of
Discrimination in Housing, Education, Employment, Health, and
Other Areas That Hinder Their Ability To Participate Effectively
in the Political Process and To Surmount the Additional Burdens
Imposed By Act 23 ................................................................................... 30

    B.    There Has Been a Long History of Official Discrimination in
Wisconsin Suppressing the Ability of Minorities To Participate
In the Democratic Process, and Minorities Have Long Been
Underrepresented in Wisconsin Elective Offices ..................................... 34

C.      There Has Been a Significant Lack of Responsiveness on the Part of Wisconsin's Elected Officials To the Particularized Needs of African-Americans and Latinos, Both in General and With Respect To the Passage of Act 23 In Particular.................................................. 35

D.      Voting in Wisconsin Is Racially Polarized, Political Campaigns Have Long Been Characterized By Racial Appeals, and Act 23 Appears To Be Targeted Against Growing Minority Voting Power......................... 37

E.      The Policy Underlying Act 23 Is "Tenuous," Markedly Departs From Historic Wisconsin Practices and Traditions, Lacks "Fairness," and "Needlessly Impairs" the Voting Rights of African-American and Latino Voters..................................................... 39

       1.      Act 23 Markedly Departs From Historic Wisconsin Practices...................... 40

       2.      In-Person Voter Fraud Is Not a Significant Problem in Wisconsin. ................................................. 40

       3.      Act 23 Needlessly Impairs the Voting Power of African-Americans and Latinos.................................................. 41

F.      Act 23 Interacts With These Factors To Cause An Inequality of Voting Opportunities Based On Race. ...................................................... 43

IV.      PLAINTIFFS MEET ALL OTHER REQUIREMENTS FOR THE ENTRY OF PRELIMINARY INJUNCTIVE RELIEF PENDING TRIAL......................................... 44

CONCLUSION ............................................................................................. 45

ii

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACLU v. Santillanes*,
  546 F.3d 1313 (10th Cir. 2008) ............................................................. 42

*Allen v. State Bd. of Elections*,
  393 U.S. 544 (1969) ........................................................................... 14

*Amos v. Bd. of School Directors of City of Milwaukee*,
  408 F. Supp. 765 (E.D. Wis. 1976),
  *aff'd sub nom. Armstrong v. Brennan*,
  539 F.2d 625 (7th Cir. 1976), *rev'd,* 433 U.S. 672 (1977),
  *on remand sub nom. Armstrong v. O'Connell*,
  451 F. Supp. 817 (E.D. Wis. 1978) ....................................................... 32

*Barnett v. City of Chicago*,
  141 F.3d 699 (7th Cir. 1998) ..................................................... 6, 39, 43

*Bay County Democratic Party v. Land*,
  347 F. Supp. 2d 404 (E.D. Mich. 2004) ................................................ 45

*Black v. McGuffage*,
  209 F. Supp. 2d 889 (N.D. Ill. 2002) .................................................... 28

*Brown v. Board of Education*,
  347 U.S. 483 (1954) ..................................................................... 11, 32

*Burton v. City of Belle Glade*,
  178 F.3d 1175 (11th Cir. 1999) ........................................................... 19

*Bush v. Gore*,
  531 U.S. 98 (2000) ............................................................................ 21

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
  324 F. Supp. 2d 1358 (N.D. Ga. 2004),
  *aff'd*, 408 F.3d 1349 (11th Cir. 2005) ................................................... 45

*Chisom v. Roemer*,
  501 U.S. 380 (1991) ..................................................................... passim

*Common Cause v. Jones*,
  213 F. Supp. 2d 1106 (C.D. Cal. 2001) ............................................ 19, 28

*Common Cause/Georgia v. Billups*,
  554 F.3d 1340 (11th Cir.),
  *cert. denied*, 129 U.S. 2770 (2009) ..................................................... 42

iii

*Crawford v. Marion County Election Bd.*,
   472 F.3d 949 (7th Cir. 2007),
   *aff'd*, 553 U.S. 181 (2008) ........................................................................25

*Crawford v. Marion County Election Board*,
   553 U.S. 181 (2008) ...............................................................................6, 41-42

*Garza v. County of Los Angeles*,
   918 F. 2d 763 (9th Cir. 1990) ....................................................................37

*Gonzalez v. Arizona*,
   ___ F.3d ___, 2012 WL 1293149 (9th Cir. Apr. 17, 2012)............................6, 42-44

*Harper v. Va. Bd. of Elections*,
   383 U.S. 663 (1966) .................................................................................20-21

*Hoblock v. Albany Cnty. Bd. of Elections*,
   341 F. Supp. 2d 169 (N.D.N.Y. 2004)........................................................45

*Holder v. Hall*,
   512 U.S. 874 (1994) (Thomas, J., concurring in the judgment).......................26-27

*Lane v. Wilson*,
   307 U.S. 268 (1939) ..................................................................................14

*League of United Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006) ("*LULAC*")..................................................................passim

*League of Women Voters v. Walker*, No. 11 CV 4669, Decision and Order
   Granting Summary Declaratory Judgment and Permanent Injunction
   (Dane Cty. Cir. Ct. Mar. 12, 2012) (Richard G. Niess, J.) ...........................4, 24-25

*Mackey v. Montrym*,
   443 U.S. 1 (1979) .....................................................................................20

*Milwaukee Branch of the NAACP v. Walker*, No. 11 CV 5492,
   Order Granting Motion for Temporary Injunction
   (Dane Cty. Cir. Ct. Mar. 6, 2012) (David Flanagan, J.) ...........................3-4, 24-25

*Otey v. Common Council of City of Milwaukee*,
   281 F. Supp. 264 (E.D. Wis. 1968) .............................................................32

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ..................................................................................44-45

*Shannon v. Jacobowitz*,
   301 F. Supp. 2d 249 (N.D.N.Y. 2003).........................................................45

*Shelley v. Kraemer*,
   334 U.S. 1 (1948) .....................................................................................31-32

iv

*South Carolina v. Katzenbach*,
  383 U.S. 304 (1966) ...................................................................................4, 18, 20

*Spencer v. Blackwell*,
  347 F. Supp. 2d 528 (S.D. Ohio 2004) ...................................................................45

*Stewart v. Blackwell*,
  444 F.3d 843 (6th Cir. 2006) ...............................................................................28

*Sw. Voter Registration Educ. Project v. Shelley*,
  344 F.3d 914 (9th Cir. 2003) (per curiam) ...........................................................28

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ....................................................................................2, 19, 29, 39

*U.S. Student Ass'n Found. v. Land*,
  546 F.3d 373 (6th Cir. 2008) ...............................................................................45

*Whitcomb v. Chavis*,
  403 U.S. 124 (1971) ...........................................................................................20

*White v. Regester*,
  412 U.S. 755 (1973) ...........................................................................................20

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .......................................................................................13-14, 45

*Zimmer v. McKeithen*,
  485 F.2d 1297 (5th Cir. 1973),
  *aff'd*, 424 U.S. 636 (1976) ...................................................................................20


CONSTITUTION, STATUTES, REGULATIONS,
AND LEGISLATIVE HISTORY

U.S. Const. Amend. XIV ....................................................................................32, 41

U.S. Const. Amend. XV, § 1 ...................................................................................14

Voting Rights Act of 1965, § 2, as amended, 42 U.S.C. § 1973 ............................passim

42 U.S.C. § 1973(a) ...........................................................................................passim

42 U.S.C. § 1973(b) ...........................................................................................passim

42 U.S.C. § 1973b ..................................................................................................18

42 U.S.C. § 1973c ..................................................................................................18

42 U.S.C. § 1973h ..................................................................................................18

v

Help America Vote Act ("HAVA"),
   42 U.S.C. §§ 15301-15545 ....................................................................................34

H.R. REP. NO. 439 (1965)...................................................................................passim

S. REP. NO. 89-162 (1965)...................................................................................passim

H.R. REP. NO. 97-227 (1981)...........................................................................16-17, 26

S. REP. NO. 97-417 (1982)...................................................................................passim

*Extension of the Voting Rights Act: Hearings Before the Subcomm.*
   *On Civil and Constitutional Rights of the H. Comm. On the Judiciary*,
   Pts. 1-3, 97th Cong. (1981)..................................................................................17

2011 Wisconsin Act 23..........................................................................................passim

Wis. Stat. § 5.02(6m)....................................................................................................8

Wis. Stat. § 6.87(4).......................................................................................................7

Wis. Stat. § 6.97(3).......................................................................................................8

Wis. Stat. § 6.34(3).......................................................................................................7

Wis. Admin. Code Trans. § 102.15(3)(b)..................................................................12

**OTHER AUTHORITIES**

Frank A. Aukofer, CITY WITH A CHANCE: A CASE HISTORY OF THE
   CIVIL RIGHTS REVOLUTION (1968; repub. 2007) ..............................................30

Michael Barone and Chuck McCutcheon,
   THE ALMANAC OF AMERICAN POLITICS 2012 (2011)...........................33-34, 39

BLACK'S LAW DICTIONARY (8th ed. 2004) ..............................................................26

Greg J. Carman, WALL OF EXCLUSION: THE PERSISTENCE OF
   RESIDENTIAL RACIAL SEGREGATION IN
   METROPOLITAN MILWAUKEE (2011)...........................................................31-32

Robert Booth Fowler, WISCONSIN VOTES: AN ELECTORAL HISTORY (2008)......37

Lawrence Goldstone, INHERENTLY UNEQUAL: THE BETRAYAL
   OF EQUAL RIGHTS BY THE SUPREME COURT, 1865-1903 (2011)..................14

Steven F. Huefner, Daniel P. Tokaji, & Edward B. Foley,
   FROM REGISTRATION TO RECOUNTS: THE ELECTION
   ECOSYSTEMS OF FIVE MIDWESTERN STATES (2007) .................................7, 41

vi

Samuel Issacharoff, Pamela S. Karlan & Richard H. Pildes,
      THE LAW OF DEMOCRACY: LEGAL STRUCTURE
      OF THE POLITICAL PROCESS (rev. 2d ed. 2002) ............................................................14-15

Patrick D. Jones, THE SELMA OF THE NORTH:
      CIVIL RIGHTS INSURGENCY IN MILWAUKEE (2009) ........................................................30

V.O. Key Jr., SOUTHERN POLITICS IN STATE AND NATION
      (1949, rev. ed. 1984)..............................................................................................................14-16

Michael J. Klarman, FROM JIM CROW TO CIVIL RIGHTS:
      THE SUPREME COURT AND THE STRUGGLE
      FOR RACIAL EQUALITY (2004)............................................................................................15

J. Morgan Kousser, THE SHAPING OF SOUTHERN POLITICS:
      SUFFRAGE RESTRICTION AND THE ESTABLISHMENT
      OF THE ONE-PARTY SOUTH, 1880-1910 (1974) ..............................................................15-17

Douglas S. Massey & Nancy A. Denton, AMERICAN APARTHEID:
      SEGREGATION AND THE MAKING OF THE UNDERCLASS (1993)....................................31

MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2000) ......................................26

Lorraine C. Minnite, THE MYTH OF VOTER FRAUD (2010)......................................................40

Gunnar Myrdal, AN AMERICAN DILEMMA:
      THE NEGRO PROBLEM AND MODERN DEMOCRACY (1944) ......................................15-16

National Center for Health Statistics, WHERE TO WRITE FOR
      VITAL RECORDS (UPDATED NOV. 2011)........................................................................10-11

John Pawasarat, THE DRIVER LICENSE STATUS OF THE
      VOTING AGE POPULATION IN WISCONSIN
      (University of Wisconsin–Milwaukee Employment and
      Training Institute, June 2005)................................................................................................23

Rick Perlstein, BEFORE THE STORM: BARRY GOLDWATER AND THE
      UNMAKING OF THE AMERICAN CONSENSUS (2001) ........................................................38

Michael Perman, STRUGGLE FOR MASTERY:
      DISFRANCHISEMENT IN THE SOUTH, 1888-1908 (2001) ...................................................14

Frances Fox Piven, Lorraine C. Minnite, and Margaret Croarke,
      KEEPING DOWN THE BLACK VOTE: RACE AND THE
      DEMOBILIZATION OF AMERICAN VOTERS (2009) ......................................................14-15

Joseph A. Ranney, *Looking Further Than the Skin:*
      *A History of Wisconsin Civil Rights Law*
      (State Bar of Wisconsin website) .............................................................................................32

vii

S. Shapiro, *Development of Birth Registration and Birth Statistics in the United States*, 4:1 POPULATION STUDIES: A JOURNAL OF DEMOGRAPHY 86 (1950) ........................................................... 11

VI William F. Thompson, THE HISTORY OF WISCONSIN: CONTINUITY AND CHANGE, 1940-1965 (1988) .................................................. 30

Joe William Trotter Jr., BLACK MILWAUKEE: THE MAKING OF AN INDUSTRIAL PROLETARIAT, 1915-45 (2006) ............................................. 30

Anders Walker, *Legislating Virtue: How Segregationists Disguised Racial Discrimination as Moral Reform Following Brown v. Board of Education*, 47 DUKE L. J. 399 (1997) ....................................................................................... 11

Theodore H. White, THE MAKING OF THE PRESIDENT — 1964 (1965) .................................. 38

viii

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| 1965 H. REP. | H.R. REP. NO. 439 (1965) |
| 1965 S. REP. | S. REP. NO. 89-162 (1965) |
| 1981 HOUSE HEARINGS | *Extension of the Voting Rights Act: Hearings Before the Subcomm. On Civil and Constitutional Rights of the H. Comm. On the Judiciary*, Pts. 1-3, 97th Cong. (1981) |
| 1981 H. REP. | H.R. REP. NO. 97-227 (1981) |
| 1982 S. REP. | S. REP. NO. 97-417 (1982) |
| 2012 ALMANAC | Michael Barone and Chuck McCutcheon, THE ALMANAC OF AMERICAN POLITICS 2012 (2011) |
| Alvarado Decl. | Declaration of Jaime Alvarado |
| Beatty Decl. | Declaration of Leland Beatty |
| Burden Decl. | Declaration of Barry C. Burden |
| Callazo-Santiago Decl. | Declaration of Nicole Callazo-Santiago |
| Cochran Decl. | Declaration of Sheila Cochran |
| DMV | Division of Motor Vehicles, Wisconsin Department of Transportation |
| DOT | Wisconsin Department of Transportation |
| GAB | Wisconsin Government Accountability Board |
| Garza Decl. | Declaration of Luis Garza |
| Hutchins Decl. | Declaration of Lorene Hutchins |
| Johnson Decl. | Declaration of Anita Johnson |
| Jones Decl. | Declaration of Bettye Jones |
| Judd Dep. | Deposition of Lynne Judd (Feb. 21, 2012) |
| Kennedy Dep. | Deposition of Kevin Kennedy (Feb. 20, 2012) |

ix

| | |
|---|---|
| Lumpkin Decl. | Declaration of Kenneth Lumpkin |
| *LWV* Decision and Order | *League of Women Voters v. Walker*, No. 11 CV 4669, Decision and Order Granting Summary Declaratory Judgment and Permanent Injunction (Dane Cty. Cir. Ct. Mar. 12, 2012) (Richard G. Niess, J.) |
| Mateo Decl. | Declaration of Domingo Mateo |
| Mayer Jan. 2012 Rep. | Kenneth R. Mayer, Report on the Effects of Wisconsin Act 23, in the Case of *Milwaukee Branch of NAACP v. Walker* (Jan. 16, 2012) |
| Mayer Apr. 2012 Rep. | Kenneth R. Mayer, Estimate of Voting Eligible Population Lacking Driver's Licenses or State Issued Photo IDs, in the Case of *Milwaukee Branch of NAACP v. Walker* (Apr. 9, 2012) |
| Minnite Decl. | Declaration of Lorraine C. Minnite |
| Montgomery Baker Decl. | Declaration of Jayme Montgomery Baker |
| *NAACP* Order | *Milwaukee Branch of the NAACP v. Walker*, No. 11 CV 5492, Order Granting Motion for Temporary Injunction (Dane Cty. Cir. Ct. Mar. 6, 2012) (David Flanagan, J.) |
| Posey Decl. | Declaration of Eddie Posey |
| Santos Adams Decl. | Declaration of Yolanda Santos Adams |
| Section 2 | Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 |
| Wheeler Decl. | Declaration of Kenneth W. Wheeler |

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Voting is about dignity, about promise, about civic participation. For the members of my community, this is a matter of life and death, and a matter of basic dignity. The right to vote is at the core of our citizenship, and should be open to all who are eligible. We should not be placing additional barriers in the path of civic participation; we should be facilitating it. We're already facing extreme economic constraints, debilitating poverty, and social exclusion. This law only exacerbates the level of exclusion we face. Simply put, it devastates us. . . . Voting gives people hope. We have to underscore the right to vote as a sacred right.

— Kenneth W. Wheeler
Pastor, Cross Lutheran Church
(*See* Wheeler Decl. ¶¶ 12-13)

By this motion, Plaintiffs seek a preliminary injunction prohibiting the enforcement of the voter ID requirements of 2011 Wisconsin Act 23 ("Act 23") (Ex. 1[1]) because they violate Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. Act 23 is a classic voter suppression law. It is intended to prevent people from voting and that is exactly what it does. In passing Act 23, the Wisconsin Legislature plainly intended to exclude people who cannot show state-issued photo IDs at the polls from voting. During its consideration of the proposed law, the Legislature was fully informed that African-Americans and Latinos would be disproportionately prevented from voting by the measure because they disproportionately lack the IDs needed to vote and face greater burdens in obtaining such identification. As one African-American representative testified, "[e]veryone sitting in this room knows what this bill does and knows who it will harm. . . . To be candid, this bill targets people like me and the constituents I represent. It targets people of color." Ex. 2 at 1 (Rep. Tamara D. Grigsby). Notwithstanding these admonitions, Act 23 was enacted over the objection of every African-American and Latino member of the Legislature.

_____

[1] All citations to "Ex. __" are to the numbered exhibits attached to the accompanying Declaration of Charles G. Curtis, Jr. ("Curtis Decl."). Sources cited in abbreviated format are identified in full in the Table of Abbreviations, *supra.*

The State claims that Act 23's voter ID requirements are necessary to prevent voter impersonation at the polls, but even its own witnesses admit that Wisconsin has virtually no problem with in-person voter fraud and never has. With the sole purported basis for the law exposed as false, the only evidence of Act 23's true purpose is its actual effect — the disproportionate disfranchisement of African-Americans and Latinos through the artifice of an unnecessary voter identification law. Regardless of whether passing an election law with known racially discriminatory impacts under these circumstances rises to the level of intentional race discrimination — and it may — it certainly represents a "troubling blend of politics and race" that "cannot be sustained" under Section 2 of the Voting Rights Act. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 442 (2006) ("*LULAC*").

Section 2 forbids state and local governments from imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," or membership in a language minority group. 42 U.S.C. § 1973(a). The statute is violated when a challenged voting requirement or procedure results in minority voters having "*less opportunity than other members of the electorate to participate in the political process* and to elect representatives of their choice." *Id.* § 1973(b) (emphasis added). It is immaterial whether proponents of Act 23 intended to discriminate against African Americans and Latinos or simply did care not about the impacts they knew the measure would have on those groups. Section 2 has no "intent" requirement and focuses instead on an objective "results test": a "challenged election law or procedure" is illegal if, "'on the basis of objective factors,'" it *results* in minority voters having "unequal access to the electoral process." *Thornburg v. Gingles*, 478 U.S. 30, 44, 46 (1986) (citations omitted).

Case 2:12-cv-00185-LA   Filed 04/23/12   Page 13 of 57   Document 20

Act 23 has been described by one Wisconsin judge as "*the single most restrictive* voter eligibility law in the United States." *NAACP* Order at 2 (Ex. 3) (emphasis added). The record before this Court establishes, based on "objective factors," that plaintiffs are likely to succeed in demonstrating that Act 23 is a voter suppression law that burdens African-American and Latino voters in Wisconsin more heavily than Whites, thereby denying and abridging their right to vote in violation of Section 2. Specifically:

1. An analysis of Wisconsin driver's license, state ID, and voter registration data subpoenaed from the Wisconsin DOT and GAB in this litigation demonstrates that, to an even greater extent than in many other parts of the country, Wisconsin's African-American and Latino registered voters are far less likely than Whites to possess a driver's license or state ID. "The State's data show a disparate impact that is stark and clear, bearing out what earlier analyses showed: minority voters are at a substantial disadvantage under Wisconsin's voter ID law, and the effect of that law imprints an unavoidable disparate impact on minority election participation." Beatty Decl. ¶ 4. Other studies using other methodologies confirm these large Wisconsin racial gaps.

2. The racially disparate burdens imposed by Act 23 range along a spectrum from the inconvenient to the insurmountable. The best-case scenario for a voter who lacks a Wisconsin driver's license or state ID is to spend $20 for a Wisconsin birth certificate (if she does not already have one) and then go to the DMV during weekday business hours to obtain the required ID. At the other end of the spectrum are registered voters who literally have no birth certificate, and who therefore cannot vote unless they know about and successfully navigate an unpublicized "extraordinary relief petition process," which adds even more pointless expense, effort, delay, and bureaucratic red-tape. In between these two ends of the spectrum, the

3

evidence "offer[s] a picture of carousel visits to government offices, delay, dysfunctional computer systems, misinformation and significant investment of time to avoid being turned away at the ballot box."[2]  The GAB's Executive Director, Kevin Kennedy, has acknowledged that this is "a fairly difficult process" for many people and "not a simple, straightforward task." Ex. 5 at 43-44.

3.  Act 23 in its operation and results is functionally indistinguishable from the laws employed during the Jim Crow era to suppress the African-American vote, and which the Voting Rights Act of 1965 and its 1982 amendments were enacted to prohibit.  Like those disfranchisement laws of earlier generations, Act 23 imposes "vague, arbitrary, hypertechnical [and] unnecessarily difficult" requirements and a variety of bureaucratic "procedural hurdles" in a disproportionate manner on African-Americans, Latinos, and other minority voters, turning the voting process for them into a "test of skill" and the "engine of discrimination," with the predictable result of suppressing the minority vote.  1965 H. REP. 10, 13 (Ex. 6).  Act 23 is the modern-day functional equivalent of the poll tax, property requirements, literacy and "understanding" tests, and other "contrivance[s]," "stratagem[s]," and "maneuver[s]" that were outlawed by the Voting Rights Act.  *Id.* at 12; *South Carolina v. Katzenbach*, 383 U.S. 304, 335 (1966); *see LULAC*, 548 U.S. at 439-40.

4.  The "totality of circumstances" analysis described in Section 2(b), though not necessary in a vote denial case like this, reconfirms that Act 23 interacts with social and historical conditions to cause substantially disparate burdens on the ability of African-Americans and Latinos to vote in Wisconsin elections, in violation of Section 2.  Wisconsin's

---

[2]  *NAACP* Order at 4.  Another state judge has concluded that the evidence "demonstrat[es] the very real disenfranchising effects of Act 23's photo ID requirements" and the "insurmountable burdens facing many of our fellow constitutionally qualified electors." *LWV* Decision and Order at 6-7 (Ex. 4) (emphasis added).

4

African-Americans and Latinos bear the effects of many generations of *de jure* and *de facto* discrimination in housing, education, employment, health, and other areas that render them more likely to be excluded from the political process by a voter ID law like Act 23. Indeed, Milwaukee was widely known as the "Selma of the North" during the 1960s and 1970s, and to this day is viewed by many as one of the "most segregated" cities in this country. *See* pp. 30-31 *infra*. One consequence of this history is that the vast majority of Wisconsin's African-Americans and Latinos live in a few highly urbanized neighborhoods in Milwaukee and other southeast Wisconsin cities. As a result, they tend to take public transportation, drive less, own fewer cars, and disproportionately lack driver's licenses. There also is a history of discrimination against minority participation in the democratic process. Indeed, Spanish-language ballots were not made available in Milwaukee until February 2012, and then only in response to an order by the U.S. Department of Justice. Minorities continue to be underrepresented in Wisconsin state and federal elective offices, and Wisconsin elected officials have been unresponsive to the particularized needs of minorities (including with respect to the barriers imposed by Act 23). Voting in Wisconsin is racially polarized, and political campaigns have been characterized by racial appeals. Although African-Americans and Latinos have striven mightily to overcome these accumulated burdens, Act 23 "undermines[s] the progress of . . . racial group[s] that ha[ve] been subject to significant voting-related discrimination," and thus violates Section 2. *LULAC*, 548 U.S. at 439.

5. An especially important factor in Section 2's "totality of circumstances" analysis is whether the policy reflected by Act 23 is "tenuous," in that it lacks any basis in fact, "markedly departs from past practices," or lacks "fairness" toward minority voters. 1982 S. REP. 29 & n.117 (Ex. 7). Here the policy purportedly underlying Act 23 is not only tenuous, but false. Not

only does Act 23 mark a radical departure from 160 years of steady expansion of the franchise under Wisconsin law, but its sole justification — the specter of potential in-person voter impersonation fraud — has repeatedly been demonstrated in federal, state, local, and private investigations to pose no threat to Wisconsin elections. The State's own witnesses admit that the problem does not exist. Whatever the abstract legitimacy of preventing voter fraud, invoking that justification to abridge minority voting rights when the facts prove the problem is illusory "bears the mark of intentional discrimination." *LULAC*, 548 U.S. at 440. And in any event, Act 23 goes far beyond anything that is reasonably necessary to police against potential voter fraud. It is *the* strictest voter ID law in the country — far more burdensome, rigid, and unforgiving than any other voter ID measure that has been considered by the courts, including the Indiana law that was sustained against a facial constitutional challenge in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008).[3] Without any significant factual basis for its purported underlying policy, Act 23 "needlessly impairs" minority voting power far "more than it has to," and its tenuous policy cannot justify its disfranchising impact on minority voters. *Barnett v. City of Chicago*, 141 F.3d 699, 701-02 (7th Cir. 1998) (Posner, J.); *see also LULAC*, 548 U.S. at 441.

      6. All other factors support preliminary injunctive relief. Denial of the right to vote is *per se* irreparable injury, and the demonstrated risks of minority voter suppression far outweigh the tenuous risks of in-person voter fraud that are claimed to justify this unusually harsh and burdensome law. The public interest favors entry of a preliminary injunction pending trial. The balance of equities weighs decisively in favor of preliminary injunctive relief.

---

    [3] *See also Gonzalez v. Arizona*, ___ F.3d ___, 2012 WL 1293149, *13 & n.31 (9th Cir. Apr. 17, 2012) (upholding Arizona voter ID law that permits use of photo-bearing and non-photo-bearing documents, including utility bills, bank statements, insurance cards, all government-issued IDs, etc.); pp. 41-43 *infra* (analyzing other voter ID laws and court decisions).

## BACKGROUND

### A.  The Dramatic Changes Wrought By Act 23

Notwithstanding Wisconsin's history of racial discrimination, the State has long been a recognized national leader in making registration and voting easy and accessible.  It was a pioneer in adopting same-day voter registration (in 1976), and is still one of the relatively few states that follow this practice.[4]  Prior to Act 23, Wisconsin never required any particular form of identification in order to register or vote.  Though proof of residency is required to register, Wisconsin law recognizes a wide range of documents as acceptable proof, including any license issued by a Wisconsin governmental body; employee identification cards; veteran's benefits cards; library cards; check-cashing cards; real estate tax bills or receipts; residential leases; college identification cards; and gas, electric, and telephone bills.  *See* Wis. Stat. § 6.34(3)(a).  Wisconsin law also traditionally allowed voters without such identification to prove residency through the statement of a corroborating witness.  *See* Huefner *et al.*, n. 4 *supra*, at 118.  Wisconsin traditionally sought to be inclusive and to assure that all eligible Wisconsinites who wanted to vote were able to do so.

Act 23 changed all of that.  As discussed by University of Wisconsin-Madison Political Science Professor Barry C. Burden in his accompanying declaration, Act 23 is "an abrupt departure from a century of voting practices in Wisconsin" — "a dramatic change in practices that moves Wisconsin from being one of the states most accommodating of voter access to one of the least."  Burden Decl. ¶ 56.  Another expert has concluded that the new law imposes "*the most restrictive voting requirements in our state's history*."  Mayer Jan. 2012 Rep. at 9 (Ex. 9)

---

[4]  *See, e.g.,* Steven F. Huefner, Daniel P. Tokaji, & Edward B. Foley, FROM REGISTRATION TO RECOUNTS: THE ELECTION ECOSYSTEMS OF FIVE MIDWESTERN STATES 118 (2007) (Ex. 8).

7

(emphasis added); *see id.* at 7-9 (analyzing state suffrage history). Under the new law, a registered voter must now, with few exceptions,[5] present one of a limited list of official photo identifications in order to cast a regular or absentee ballot. For most voters, the practical effect is that they will need to present either a Wisconsin driver's license (unexpired or expired after the most recent general election), or an official state photo ID card (also unexpired or expired after the most recent general election).[6] A voter without the required ID may cast a provisional ballot, but that ballot will be counted only if the voter presents one of the required forms of ID to election officials before the polls close or to the municipal clerk by the following Friday. *See* Act 23, §§ 50, 88, 90; Wis. Stat. § 6.97(3)(a)-(b).

Under Act 23, a voter who lacks a driver's license or state ID must present a completed application for an ID at a Wisconsin DMV office (none of which have evening or weekend hours, and most of which are only open intermittently during the work week). The voter also must present a series of original documents in order to establish four separate criteria: "Name & Date of Birth," "Legal Presence," "Identity," and "Wisconsin Residency." The proof requirements for each of these criteria are summarized in the GAB voter education chart reprinted on the following page (*see* Ex. 10 at 14):

---

[5] The exceptions are set forth in Act 23, §§ 67-71; *see* Wis. Stat. § 6.87(4)(a)-(b).

[6] Other forms of acceptable official photo ID include a military identification card (unexpired or expired after the most recent general election); a U.S. passport (unexpired or expired after the most recent general election); a certificate of naturalization that was issued not earlier than 2 years before the election at which it is presented; an unexpired driving receipt issued by DOT; an unexpired identification card receipt issued by DOT; an identification card issued by a federally recognized Indian tribe in Wisconsin; and a current identification issued by an accredited university in Wisconsin if it contains the date of issuance, an expiration date of no later than two years after the date of issuance, and the student's signature. Act 23 § 1; Wis. Stat. § 5.02(6m).

8



This chart almost comically demonstrates how cumbersome and unintelligible Act 23's processes are, especially for voters who have had only limited education or whose first language is not English.[7]  As shown in the chart, given the way the proof requirements for each of these criteria have been crafted, the only way most applicants will be able to establish their "Legal Presence" is through presentation of a certified birth certificate.  And unless an applicant has a driver's license from another state, presenting a certified birth certificate usually will be the only way he can establish his "Name & Date of Birth" — even though there are a myriad of other ways by which people routinely are allowed to prove who they are and when they were born.

---

[7]  *See* Callazo-Santiago Decl. ¶ 5 ("The fine-print of the law is incredibly difficult to follow — even for me as a trained organizer working on this issue[.]"); Wheeler Decl. ¶ 6 ("There are members of my [church] community who have been active voters their entire life, but who are so overwhelmed by the multiple steps necessary to obtain a state ID that they are scared to even attempt navigating this process on their own.").

9

**B.      The Suppressive Effects of Act 23 in Operation**

The difficulty of securing the identification required by Act 23 varies widely.  At one end of the spectrum are those who already possess a birth certificate and the other underlying documentation needed to apply for a state ID.  They will need to arrange to go to one of the DMV offices located around the state, in person, during often-limited weekday business hours, complete the necessary application, and obtain their ID (assuming there are no questions or problems regarding their documentation).  The ID is touted as "free" for people who need it to vote, but when Act 23 took effect the DMV instructed its employees to charge the usual $28 fee for this card *unless* the applicant affirmatively requests "free issuance"; "you should refrain from offering the free version to customers who do not ask for it."  Ex. 11.[8]

The burdens go up from there.  Next on the spectrum are those who were born in Wisconsin but lack a certified copy of their birth certificate.  They will need to file a Wisconsin Birth Certificate Application with the State Vital Records Office, submit various identification, and pay a $20 search fee.  If they are able to obtain their Wisconsin birth certificate, these voters then must go through the DMV application process discussed above.

Voters born outside of Wisconsin face even greater potential hurdles.  According to the National Center for Health Statistics, Division of Vital Statistics, the costs and requirements for obtaining a certified birth certificate vary widely from state to state.  Many states charge up to $30 for such a document, often require notarized signatures, and sometimes even require presentation of a valid government-issued photo ID — a real Catch-22 where the applicant is seeking the certified birth certificate precisely because he lacks a valid government-issued photo ID.  *See* National Center for Health Statistics, WHERE TO WRITE FOR VITAL RECORDS

---

[8] *See also* Wheeler Decl. ¶ 6 ("[O]ne woman in my congregation went to the DMV and was able to get a free ID.  However, several others went the next week and were charged a fee."); Garza Decl. ¶ 6; Montgomery Baker Decl. ¶ 9.

10

(UPDATED NOV. 2011) (Ex. 12).  These additional burdens of dealing with distant out-of-state bureaucracies fall far more heavily on Latino and African-American voters.[9]

Plaintiff Bettye Jones is one of many eligible voters who literally cannot obtain an original birth certificate.  Ms. Jones was born at home in 1935 in rural Tennessee and, like many African-Americans of her generation, apparently never was the subject of an officially prepared and recorded birth certificate.[10]  She and her daughter were forced by Act 23 to incur substantial time and expense in a "wild goose chase" in search of such a certificate from Tennessee, but were advised that, after multiple searches, that State has no record of her birth.  *See* Jones Decl. ¶¶ 8-11.  Ms. Jones and her daughter recently tried another DMV office, where the supervisor took pity on her and issued her a voter ID without requiring any birth certificate or apparently even going through the agency's little-known and secretive "extraordinary proof petition procedure."[11]  This generous action by an individual DMV supervisor appears to contravene the

---

[9]  *See* Burden Decl. ¶ 59 (only 40% of Wisconsin Latinos were born in this State, as opposed to 73% of all Wisconsinites); Hutchins Decl. ¶ 11 ("Very few elderly African-Americans were born in Wisconsin.  Most of us moved here from the south for expanded opportunity[.]"); Jones Decl. ¶ 14; Lumpkin Decl. ¶ 7; Garza Decl. ¶¶ 3-5; Johnson Decl. ¶ 7; Wheeler Decl. ¶ 5.

[10]  A 1950 study estimated that 94% of white births were registered nationwide, as opposed to only 81.5% of "nonwhite" births.  Nearly a quarter of nonwhite births in rural areas were unregistered (as opposed to 11.1% of white births).  *See* S. Shapiro, *Development of Birth Registration and Birth Statistics in the United States*, 4:1 POPULATION STUDIES: A JOURNAL OF DEMOGRAPHY 86, 98-99 (1950) (Ex. 13).  Another study asserts that Southern States did not begin to undertake systematic efforts to register African-American births until *after* the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), and then only as "a means of tabulating illegitimacy rates" in African-American births for use in opposing desegregation efforts.  Anders Walker, *Legislating Virtue: How Segregationists Disguised Racial Discrimination as Moral Reform Following Brown v. Board of Education*, 47 DUKE L. J. 399, 416 (1997) (Ex. 14).

[11]  The GAB and DMV have developed an unpublicized "process by which an applicant can document that their vital records office cannot provide a certified birth certificate," which requires a certification from their vital records office along with "multiple secondary forms, like hospital certificates, baptismal certification, and SSA history printouts."  Judd Dep. at 35-36 (Ex.

11

plain language of Act 23 and the governing DOT regulations.  The records in this action and in the other cases challenging Act 23 are full of similar stories of delay, expense, pointless procedural hurdles, and arbitrary and inconsistent results.[12]

The other plaintiffs in this action — the League of United Latin American Citizens ("LULAC") of Wisconsin, Cross Lutheran Church, Milwaukee Area Labor Council, AFL-CIO, and Wisconsin League of Young Voters Education Fund — all have members and constituents who have been similarly discouraged, burdened, deterred, harassed, and in many instances prevented by Act 23 from voting.  These Plaintiffs have witnessed the adverse effects of Act 23 on their members and constituents, and have been required to divert substantial resources away from their other work to assist these individuals in attempting to overcome the new obstacles and barriers imposed by Act 23.[13]  Like so many of the plaintiffs and witnesses in the three

15); *see also* Wis. Admin. Code Trans. § 102.15(3)(b).  The State concedes that this "extraordinary proof petition procedure" is delegated to the individual supervisors at the local DMV service centers, with these "extraordinary" petitions being "approved on a case by case basis."  Judd Dep. at 34-39.  This process is not even mentioned on the GAB or DMV websites, and the required form — MV3002 — is only available in hard copy through DMV offices, to be given out in person or by mail at the discretion of individual DMV supervisors.  Many prospective voters have been forced to spend substantial time and money in search of their birth records, only to give up if they are unsuccessful without ever being told about this "extraordinary proof petition procedure" and Form MV3002.  It is unclear whether this process is even allowable under Act 23.  What is clear is that the process is arbitrary, inconsistent, and cumbersome — one that predictably results in the suppression of voting by those who are forced to bear its burdens.

[12]  *See also* Hutchins Decl. ¶¶ 3-10 (long-time voter in Milwaukee, born in 1920 in Mississippi, recounts the time-consuming and expensive process of obtaining a birth certificate from Tennessee); Posey Decl. ¶¶ 2-5 (long-time voter in Milwaukee, born in 1946 in Arkansas, recounts his repeated unsuccessful efforts to obtain a birth certificate from Arkansas); Montgomery Baker Decl. ¶ 12 ("I literally saw applicants with the exact types of documentation be denied IDs at one location, but granted them at another.").

[13]  *See* Alvarado Decl. ¶ 2; Garza Decl. ¶ 2; Cochran Decl. ¶¶ 6-9; Wheeler Decl. ¶¶ 9-11; Montgomery Baker Decl. ¶¶ 3-15.

12

other pending lawsuits challenging Act 23 — two of which already have led to preliminary injunctions prohibiting its implementation — Plaintiffs, their members, and their constituents have encountered numerous and significant barriers and challenges, including:

- Inconvenient DMV service center locations and hours of operation, with the resulting challenges in finding transportation, taking time off from work, arranging for childcare, etc.

- Inconsistent application of the rules and requirements for obtaining the necessary ID.

- The need to make multiple contacts with different government agencies, including the GAB, DMV, Wisconsin Vital Records Office, and other States' vital records offices.

- The need to spend money to obtain required birth certificates and other records.

- The lack of Spanish language materials and assistance.

- DMV's mendacious refusal to disclose the availability of "extraordinary" relief from the birth certificate requirement, *see* n. 11 *supra*, instead requiring people to incur great time and effort in quest of documents the DMV ultimately does not need to verify their "legal presence" or "name and date of birth."

- Significant delays, computer system problems, and other hurdles in dealing with the Wisconsin DMV and out-of-state agencies.

- Inconsistent training, supervision, and decisionmaking by DMV employees.[14]

## ARGUMENT

Plaintiffs must demonstrate that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or

---

[14] *See, e.g.,* Garza Decl. ¶¶ 3-6, 8; Montgomery Baker Decl. ¶¶ 7-9, 11-12; Wheeler Decl. ¶¶ 4-6; Cochran Decl. ¶ 5; Santos Adams Decl. ¶¶ 6-9; Alvarado Decl. ¶¶ 3, 6; Lumpkin Decl. ¶¶ 5-9; Callazo-Santiago Decl. ¶¶ 3-5, 8; Hutchins Decl. ¶¶ 3-11; Johnson Decl. ¶¶ 3, 10-12; Jones Decl. ¶¶ 7-15; Mateo Decl. ¶¶ 3-6.

13

withholding of the requested relief.'" *Id.* at 24 (citation omitted). Plaintiffs readily meet these requirements.

I.    **WISCONSIN'S PHOTO VOTER ID LAW IS PRECISELY THE KIND OF VOTER SUPPRESSION MECHANISM THAT CONGRESS OUTLAWED IN SECTION 2 OF THE VOTING RIGHTS ACT.**

   A.    **Section 2 Outlaws Minority Voter Suppression Measures.**

   The Voting Rights Act of 1965 was enacted to enforce the unfulfilled promise of the Fifteenth Amendment to the U.S. Constitution — that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. Amend. XV, § 1.[15] One of the core purposes of this constitutional guarantee was to outlaw "onerous procedural requirements" that, while racially neutral on their face, "effectively handicap exercise of the franchise by [African-Americans] although the abstract right to vote may remain unrestricted as to race." *Lane v. Wilson*, 307 U.S. 268, 275 (1939). "The Amendment nullifies sophisticated as well as simple-minded modes of discrimination." *Id.*

   Despite this constitutional guarantee, southern legislatures and local governments began in the late 19th century to impose a variety of "onerous procedural requirements," *id.*, designed to suppress the African-American vote in what has been labeled the "disfranchisement movement," the "Bourbon Coup D'Etat," the "Struggle for Mastery," the "Restoration," and the "Rebirth of White Rule."[16] Their goal was to find some characteristic other than race itself that

---

[15] *See Chisom v. Roemer*, 501 U.S. 380, 383 (1991); *Allen v. State Bd. of Elections*, 393 U.S. 544, 556 (1969); 1965 H. REP. 2.

[16] V.O. Key Jr., SOUTHERN POLITICS IN STATE AND NATION 531, 533 (1949, rev. ed. 1984) (Ex. 16); Michael Perman, STRUGGLE FOR MASTERY: DISFRANCHISEMENT IN THE SOUTH, 1888-1908, at 10-11 (2001) (Ex. 17); Lawrence Goldstone, INHERENTLY UNEQUAL: THE BETRAYAL OF EQUAL RIGHTS BY THE SUPREME COURT, 1865-1903, at 130 (2011) (Ex. 18). *See generally* Samuel Issacharoff, Pamela S. Karlan & Richard H. Pildes, THE LAW

14

could serve as a proxy for race, so that the burdens and restrictions imposed by the new requirements would fall predominantly on African-Americans, thereby suppressing if not entirely eliminating their vote. As extensively documented in the legislative histories of the Voting Rights Act of 1965 and its 1982 amendments, these measures included:

**Literacy, "understanding," and "interpretation" requirements**. Because of the sharp racial disparities in literacy rates in the late 19th and early 20th centuries, "literacy tests" and similar devices were often imposed as a prerequisite to registration and voting. These included "[r]eading and/or writing" tests, "[o]ral constitutional 'understanding' and 'interpretation' tests," and testing for an "[u]nderstanding of the duties and obligations of citizenship." 1965 H. REP. 12; *see generally id.* at 11-13; 1965 S. REP. 3-4, 9-12 (Ex. 23). These tests were "vague, arbitrary, hypertechnical or unnecessarily difficult, and [had] little (if any) bearing upon the capacity to cast an intelligent ballot." 1965 H. REP. 13. They were rampantly abused and unevenly applied, vesting enormous discretion with individual voting officials who repeatedly exercised that discretion against African-Americans and in favor of Whites. Whites often were excused from such tests altogether through loopholes like "grandfather clauses," "good moral character" provisions, and laws allowing property owners

---

OF DEMOCRACY: LEGAL STRUCTURE OF THE POLITICAL PROCESS 90-102 (rev. 2d ed. 2002) (Ex. 19); Michael J. Klarman, FROM JIM CROW TO CIVIL RIGHTS: THE SUPREME COURT AND THE STRUGGLE FOR RACIAL EQUALITY 28-39 (2004) (Ex. 20); Frances Fox Piven, Lorraine C. Minnite, and Margaret Croarke, KEEPING DOWN THE BLACK VOTE: RACE AND THE DEMOBILIZATION OF AMERICAN VOTERS 1-2, 23-29 (2009) (Ex. 21); J. Morgan Kousser, THE SHAPING OF SOUTHERN POLITICS: SUFFRAGE RESTRICTION AND THE ESTABLISHMENT OF THE ONE-PARTY SOUTH, 1880-1910, at 45-72 (1974) (Ex. 22).

(who were overwhelmingly White) to be exempt from literacy and related requirements.  *Id.* at 2-5, 8.[17]

**Poll tax, property, and employment requirements.**  The "poll tax" was widely used until the 1960s to suppress the African-American vote.  As the 1965 House Report observed, "[i]t is obvious that the poll tax has a heavier economic burden on Negroes than on Whites because Negroes generally have smaller incomes out of which to pay."  *Id.* at 21.[18]  Many jurisdictions also required that prospective voters be "regularly engaged in some lawful employment" or own a minimum amount of property, restrictions that once again fell overwhelmingly on African-Americans.[19]

**Burdensome application requirements, "procedural hurdles," and "bureaucratic monstrosities."**  Many jurisdictions seeking to suppress African-American votes also imposed "burdensome" and "unnecessary" registration and voting requirements.  1981 H. REP. 14 (Ex. 25).  The application process for minority voters became "a test of skill" and the "engine of discrimination" characterized by long delays in service, red tape, the need to make repeated visits to multiple government offices to obtain and maintain voting eligibility, arbitrary and unpublicized agency actions, "procedural hurdles," and other "bureaucratic monstrosities."[20]

---

[17]  *See also* Key, SOUTHERN POLITICS 555-77; Kousser, SHAPING OF SOUTHERN POLITICS 56-62; Gunnar Myrdal, AN AMERICAN DILEMMA: THE NEGRO PROBLEM AND MODERN DEMOCRACY 483-84 (1944) (Ex. 24).

[18]  *See also* 1965 H. REP. 20 ("[T]he poll tax clearly was conceived in discrimination.  Its purpose — to keep Negroes from the franchise — is its fatal infirmity."); Key, SOUTHERN POLITICS 578-618; Myrdal, AMERICAN DILEMMA 481-83; Kousser, SHAPING OF SOUTHERN POLITICS 63-72.

[19]  Key, SOUTHERN POLITICS 558-59; Myrdal, AMERICAN DILEMMA 483-84.

[20]  1965 H. REP. 8 (internal punctuation and citations omitted); 1965 S. REP. 10 (citations omitted); Kousser, SHAPING OF SOUTHERN POLITICS 50; *see also* Kousser at 48 (discussing

16

One contrivance used during the Jim Crow era to turn prospective African-American voters away was to demand particular forms of identification they were unlikely to have (*e.g.,* Social Security cards, voter registration certificates, etc.).[21]

   **Inconvenient locations and hours.** The legislative history of the 1982 amendments documented one particular abuse that persisted even after the 1965 Act had been adopted — the use of "inconvenient location[s] and hours of registration" and voting. 1981 H. REP. 14. Various jurisdictions repeatedly changed times and locations to make it more difficult for African-Americans and other minorities to appear for registration and voting. Officials in one city moved the polling place from the "centrally located" City Hall 10-12 blocks to the north "in a predominantly white area," which imposed "a significant inconvenience to the city's minority voters" who were concentrated elsewhere, with the "effect of deterring participation by some minority voters in elections." *Id.* at 17 (emphasis added). Minority voters in another community described the experience of having to travel to distant White neighborhoods to vote as "like having the polls at a country club." *Id.* [22]

---

"rules and regulations and other barriers to the ballot which make it impossible for poor people and working people to register with ease") (citation omitted); Myrdal, AMERICAN DILEMMA 484 ("A tricky registration blank must be filled out: Whites will be given assistance, and their errors adjusted or overlooked; Negroes will not be allowed even the most trivial incompleteness or error, and are given no assistance."). Kousser concluded (at 48) that "[t]he key disfranchising features of the Southern registration laws were the amount of discretion granted to the registrars, the specificity of the information required of the registrant, the times and places set for registration, and the requirement that a voter bring his registration certificate to the polling place."

   [21]  *See* 1981 HOUSE HEARINGS 775-76 (Social Security cards) (Ex. 26); *id.* at 2014 (requirements to provide registration receipts and "copiously detailed information"); Minnite Decl. ¶ 7 (registration certificates); Kousser, SHAPING OF SOUTHERN POLITICS 49 (registration certificates).

   [22]  *See also* 1981 HOUSE HEARINGS 60-61, 536, 1530-31, 1609-10, 1841, 1949, 1952-54, 2014; Minnite Decl. ¶ 6.

The Voting Rights Act of 1965 and its 1982 amendments were intended to put an end to such contrivances. Among other measures, the 1965 Act suspended the use of literacy tests and similar devices, required additional federal action against the enforcement of poll taxes, and imposed federal "preclearance" requirements on jurisdictions with extremely low levels of voter registration and turnout. *See* 42 U.S.C. §§ 1973b, 1973c, 1973h. Section 2 of the 1965 Act prohibited on a nationwide basis the imposition or application of any "voting qualification or prerequisite to voting, or standard, practice, or procedure . . . to deny or abridge the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973. Congress intended for this prohibition to be broadly and strictly applied, because "[t]he barring of one contrivance has too often caused no change in result, only in methods."[23]

Section 2 was amended in 1982 to make clear that discriminatory *purpose* is not necessary to establish a violation; what matters is whether the procedure or device is "imposed or applied . . . *in a manner which results in* a denial or abridgement" of the right to vote. 42 U.S.C. § 1973(a) (emphasis added). That occurs when the challenged requirement or procedure objectively *results* in minority voters having "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 1973(b). Results, not intentions, control. In the words of the authoritative 1982 Senate Report:

---

[23] 1965 H. REP. 12; *see also Chisom v. Roemer*, 501 U.S. 380, 403 (1991) ("the Act should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination" in voting) (citation omitted); *South Carolina* v. *Katzenbach,* 383 U. S. at 335 ("Congress knew that some of the States . . . had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees" and that "Congress had reason to suppose that these States might try similar maneuvers in the future") (footnote omitted).

18

The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system [or] practice in order to establish a violation. Plaintiffs must either prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process . . . . If the plaintiff proceeds under the "results test," then the court would assess the impact of the challenged structure or practice on the basis of objective factors, rather than making a determination about the motivations which lay behind its adoption or maintenance.

1982 S. REP. 27-28 (footnote omitted); *see LULAC*, 548 U.S. at 426 (emphasizing importance of the Senate Report in analyzing Section 2 claims); *Gingles*, 478 U.S. at 44-45 (same). The Senate Report outlined a number of potentially relevant factors in determining the "fairness" of the "impact of the challenged system or practice," including historic discrimination practices, present social and economic disparities between minority voters and other members of the electorate, whether voting is "racially polarized," and whether the challenged policy is "tenuous" and "markedly departs from past practices." *Id.* at 27-29 & n. 117; *see* n. 34 *infra* (quoting relevant factors discussed in 1982 Senate Report). There is no fixed list of relevant factors, "no requirement that any particular number of factors be proved," and no requirement "that a majority of [factors] point one way or the other." *Id.* at 29 (footnote omitted).

Indeed, the Senate Report factors and "totality of circumstances" analysis they support have a limited role, if any, in a case like this one that involves claims of outright *denial* of the right to vote.[24] The purpose of the totality of circumstances test is to determine whether a

---

[24] "[T]wo distinct types of discriminatory practices and procedures are covered under Section 2: those that result in 'vote denial' and those that result in 'vote dilution.'" *Burton v. City of Belle Glade*, 178 F.3d 1175, 1196 (11th Cir. 1999); *see also Common Cause v. Jones*, 213 F. Supp. 2d 1106, 1110 (C.D. Cal. 2001). Vote denial claims challenge voting practices that actually prevent minority voters from casting ballots and having them counted. By contrast, vote dilution occurs where, despite the ability of all citizens to cast ballots that are counted, an election practice results in the dilution of minority voting strength and thus impairs a minority's ability to elect its preferred candidates.

19

voting practice denies minority voters an equal opportunity "to participate in the political process" and "to elect representatives of their choice." 42 U.S.C. § 1973(b). Where each person has an equal opportunity to cast a ballot that is counted, as in a vote *dilution* case that challenges improper efforts to submerge the minority vote in an at-large electoral system or to divide it into multiple districts that diminish a minority group's ability to elect its preferred candidates, consideration of other factors is necessary to make that determination. By contrast, where minority voters are actually *denied* the equal right to cast a ballot, no other circumstances need to be considered: by definition, these voters have been denied an equal opportunity to participate and to influence the outcome of elections. *See Roemer*, 501 U.S. at 397; *id.* at 408 (Scalia, J., dissenting).[25]

### B. Act 23 Is the Functional Equivalent of the Jim Crow Minority Voter Suppression Measures Outlawed By Section 2.

As demonstrated in the balance of this submission, Act 23 in its operation and results is precisely the kind of "contrivance," "stratagem," and "maneuver[]" that is barred by Section 2 — simply a new trick pulled from the same very old bag. 1965 H. REP. 12; *Katzenbach,* 383 U.S. at 335. It is striking how many functional similarities Act 23 shares with the old Jim Crow voter suppression laws of prior generations. Its requirement of a driver's license or state photo ID to vote is a direct descendent of the "property" requirements of earlier generations; a

---

[25] The judicial and legislative history of Section 2(b) further supports the conclusion that, if the totality of circumstances test has any application to a vote denial case, it is far less relevant than in a vote dilution case. The test originally was formulated in a series of 1970s vote dilution cases — *Whitcomb v. Chavis*, 403 U.S. 124 (1971); *White v. Regester*, 412 U.S. 755 (1973); and *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973), *aff'd*, 424 U.S. 636 (1976). When Congress amended Section 2 in 1982 to eliminate the requirement imposed by the Supreme Court that vote dilution plaintiffs prove intentional discrimination, it simultaneously adopted the Senate Report factors and the totality of circumstances test for vote dilution claims, not vote denial claims.

20

"license," after all, is a species of property.[26]  Act 23 imposes a modern-day equivalent of the

poll tax; there is no functional or constitutional difference between a $1.50 "tax" imposed on the

act of voting[27] and the $20.00 "fee" that must be paid for a Wisconsin birth certificate in order

to obtain the "free" state ID required to vote.[28]

Like the voter suppression measures of earlier generations, Act 23 also relies heavily on

slow, cumbersome, time-consuming, and error-prone government bureaucracies that have the

predictable and repeatedly demonstrated result of deterring, discouraging, and even intimidating

citizens who wish to vote.  Act 23 in its daily operation also vests enormous discretion in the

hands of individual government employees, thus increasing the risks that difficult and hyper-

technical rules will be exactingly applied to some individuals and waived as to others — again,

just like the Jim Crow laws of a century ago.  It is also reminiscent, in many respects, of the

"arbitrary and disparate" application of Florida election law that so troubled the Supreme Court

in the presidential election of 2000.  *See Bush v. Gore*, 531 U.S. 98, 105-09 (2000).

Act 23 even has the modern equivalent of a grandfather clause: voters who already hold

a Wisconsin driver's license or state ID may indefinitely renew their licenses and IDs without

ever having to go to the expense and bother of tracking down their birth certificates and other

qualifying documentation that those without current licenses or state IDs must produce.  *See* Ex.

27 (renewal only requires expired license or ID and Social Security number).  Act 23's

---

[26]  Driver's licenses, for example, are a form of "property" for purposes of procedural due
process protections.  *See, e.g.*, *Mackey v. Montrym*, 443 U.S. 1, 10 & n. 7 (1979).

[27]  *See Harper v. Va. Bd. of Elections*, 383 U.S. 663, 666 (1966) (striking down $1.50 poll tax
on equal protection grounds).

[28]  *See* 1965 H. REP. 20 ("voting rights are not to be encumbered by *any* fiscal exaction")
(emphasis added); 1965 S. REP. 33-34 ("the franchise must not be impaired because of economic
status").

21

monetary, bureaucratic, and other burdens thus will be avoided by the vast majority of current

White voters, and instead fall disproportionately on African-American and Latino voters.

## II.     ACT 23 IMPOSES DISPROPORTIONATE AND SUBSTANTIAL BURDENS ON AFRICAN-AMERICAN AND LATINO VOTERS, WITH THE PREDICTABLE RESULT OF MINORITY VOTER SUPPRESSION

### A.     The Burdens of Act 23 Are Disproportionately Borne By Minorities.

There can be no genuine, credible dispute that the burdens of Act 23 fall much more

heavily on African-Americans and Latinos than on Whites.  Numerous national and individual

state studies have repeatedly shown that that there are significant racial disparities in rates of

driver's license and photo ID possession, as well as in the administration and enforcement of

voter ID laws.  *See* Beatty Decl. ¶¶ 54-60; Burden Decl. ¶ 57; Exs. 28-35.

For a variety of historical, geographic, and economic reasons, the racial disparities in

possession of driver's licenses and other state IDs are even *more* pronounced in Wisconsin than

in many other parts of the country.  Plaintiffs subpoenaed current driver's license, state ID, and

voter registration data from the State to produce the most comprehensive available picture of

Act 23's impacts on African-American and Latino voters.  As detailed in the accompanying

declaration of Leland Beatty, a statistician and analyst of minority demographics, the State's

own data demonstrate that the consequences of not having a valid Wisconsin driver's license or

state ID fall much more heavily on African-Americans and Latinos than on Whites.  These data

show that 9.5% of registered White voters lack a matching driver's license or state ID, as

opposed to 16.2% of registered African American voters and 24.8% of registered Latino voters.

This is a racial gap of 6.7 percentage points between Whites and African-Americans, and 15.3

percentage points between Whites and Latinos.  Beatty Decl. ¶ 7.  Put another way, African-

American registered voters are 1.7 times as likely as White registered voters to lack one of these

IDs; and Latinos, 2.6 times as likely.  *Id.* ¶ 8.

22

These numbers likely *understate* the true disproportionate impacts because they measure impacts only on *registered* minority voters — those who already have taken an active role in the electoral process. These data do not measure the impacts on the many *unregistered* though completely eligible voters who will not even bother to register because of Act 23's highly publicized obstacles and barriers to voting.[29]

Mr. Beatty's analyses of the State's own current driver's license, state ID, and voter registration data are consistent with previous studies of the racial gaps in possession of Wisconsin driver's licenses. For example, a widely cited 2005 study by the University of Wisconsin-Milwaukee showed that, while only 13% of voting-age Whites statewide lacked a current driver's license in 2002 (including revoked and suspended licenses), fully 40% of voting-age African-Americans and 44% of voting-age Latinos lacked such ID.[30] Voting-age African-Americans and Latinos in Wisconsin were thus more than *three times* as likely as voting-age Whites to lack a driver's license.[31] The conclusions drawn by Mr. Beatty are consistent with the 2005 U.W.-Milwaukee study, though Beatty's are based on more current data (2012 vs. 2002) and focus more narrowly on *registered* voters, as opposed to the voting-age population.

---

[29] As yet another way to describe the racial gap, although African-Americans represent 5.3% of the registered voters in Wisconsin, they constitute 7.8% of the registered voters who lack a matching driver's license or state ID. Although Latino voters represent 1.6% of the registered voters in Wisconsin, they constitute 3.6% of the registered voters who lack a matching driver's license or state ID. Beatty Decl. ¶ 9.

[30] John Pawasarat, THE DRIVER LICENSE STATUS OF THE VOTING AGE POPULATION IN WISCONSIN (U.W.–Milwaukee Employment and Training Institute, June 2005) (Ex. 38).

[31] The percentages used in the paragraph above have been adjusted from those reported in the 2005 U.W.-Milwaukee study so as to reflect total statewide figures, rather than compare Milwaukee County figures with those for the "Balance of State" that excludes Milwaukee County. These adjustments are discussed in Mayer Jan. 2012 Rep. at 16-21 & esp. n. 5 (Ex. 39).

The U.S. Department of Justice recently determined that there are statistically significant racial gaps in state ID possession in both South Carolina and Texas. The gap is 1.6 percentage points in South Carolina (8.4% of Whites lack approved ID, while 10% of "non-Whites" lack such ID) and 5.9 percentage points in Texas (4.9% of Whites lack approved ID, while 10.8% of Hispanics lack such ID). Based on these racially disproportionate impacts on African-American and Latino voters, the Department of Justice rejected preclearance under Section 5 of the Voting Rights Act for these States' recently enacted photo voter ID laws. *See* Exs. 36 (*re* South Carolina) and 37 (*re* Texas). The racial gaps in Wisconsin (6.7 percentage points between African Americans and Whites, and 15.3 percentage points between Latinos and Whites) are much greater than the gaps in South Carolina (1.6 percentage points) and Texas (5.9 percentage points) that led the Department of Justice to deny Section 5 preclearance,

Multiple analyses and methodologies all lead to the same large racial gap in possession of required IDs, a gap that is even more pronounced in Wisconsin than elsewhere. Mr. Beatty's analyses of current state data and 2010 Census data, the 2005 U.W.-Milwaukee data, and the voter ID studies in other States all combine to leave no credible doubt that Act 23 disproportionately impacts African-American and Latino voters.

**B.    The Burdens Are Significant and Predictably Will Suppress Minority Voting.**

Judge Niess found in his *League of Women Voters* decision that Act 23 has "very real disenfranchising effects," and that the evidence "show[s] that many constitutionally qualified electors from all walks of life will be blocked from voting at the polls by Act 23, involuntarily and occasionally through no fault of their own." *LWV* Order at 6. These "insurmountable burdens" most often will be borne by "those struggling souls who, unlike the vast majority of Wisconsin voters, . . . will lack the financial, physical, mental, or emotional resources to comply with Act 23, but are otherwise constitutionally entitled to vote." *Id.* at 6-7 In Judge Flanagan's

24

words in his *NAACP* decision, the "uncontested" evidence "offer[s] a picture of carousel visits to government offices, delay, dysfunctional computer systems, misinformation and significant investment of time to avoid being turned away at the ballot box." *NAACP* Order at 4.

The evidentiary records in *LWV, NAACP, Frank,* and this case all confirm this picture of a bureaucratic purgatory in which good citizens like Bettye Jones — who has been a regular and lawful voter since 1956 — are forced to spend substantial time and money dealing with various agencies in order to track down the prescribed forms of "proof" of their "legal presence" that they must present to obtain the "free" state IDs that are now required to vote. The GAB's Executive Director candidly acknowledged that this is "a fairly difficult process" for many people and "not a simple, straightforward task." Ex. 5 at 43-44.

Although some of these burdened voters will be able and willing to navigate this bureaucratic maze, a predictable portion will not — they either will fail, give up along the way, or not even bother to try. As Judge Posner observed in *Crawford*, "[t]he benefits of voting to the individual voter are elusive . . . , and even very slight costs in time or bother or out-of-pocket expense deter many people from voting, or at least from voting in elections they're not much interested in." *Crawford v. Marion County Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd,* 553 U.S. 181 (2008).

U.W.-Madison Political Science Professor Barry C. Burden discusses this "calculus of voting" in detail in his accompanying declaration. As Dr. Burden demonstrates:

> [F]or many individuals the decision to vote is made "on the margins." Small changes in benefits or costs may alter the likelihood of voting dramatically. Costs are especially consequential for less educated individuals and non-habitual voters for whom the complications of registering, finding the polling place, finding time to vote are frequently quite costly. . . . A large body of research has demonstrated how costs of voting depress turnout especially for racial and ethnic minorities.

25

Burden Decl. ¶¶ 6-7.  Thus, imposing increased costs and barriers to voting disproportionately on African-Americans and Latinos will predictably depress turnout from these groups.  *See id.* ¶¶ 7-8, 39, 42, 57, 59, 67.  And the evidence is not just predictive:  Several of the accompanying declarations document how Act 23 has *actually* suppressed minority voting not only in Milwaukee, but in communities like Racine and Kenosha as well.  *See* Santos Adams Decl. ¶¶ 6-8; Garza Decl. ¶ 8.

One of the recurrent themes in the State's defense of Act 23 is that potential voters rarely are *absolutely* prevented from obtaining a state ID — if they devote enough time, spend enough money, make enough phone calls, and stand in DMV lines long enough, they probably can track down the documentation necessary to convince a DMV employee to give them the required ID.  But Section 2 does not guard only against those burdens that make it literally *impossible* to cast a vote: it prohibits any burdens that "deny *or abridge*" (defined as "reduce," "diminish," or "shorten"[32]) the right to vote.  Section 2 requires that the voting process be "*equally open*" to minority participation, and prohibits rules and procedures that result in minority voters having "*less opportunity* than other members of the electorate to participate in the political process."  42 U.S.C. §1973(b) (emphasis added).  Section 2 prohibits the disproportionate imposition of "procedural hurdles" and "significant inconvenience[s]" on minority voters, regardless whether any given minority voter might be able to surmount those hurdles and inconveniences if she tries hard enough.  1965 H. REP. 10; 1981 H. REP. 17; *see Holder v. Hall*, 512 U.S. 874, 917 (1994) (Thomas, J., concurring in the judgment).

Two lines of Section 2 precedent make clear that Act 23 is unlawful even if it does not make it *impossible* for a given voter to cast a ballot that is counted on Election Day.  *First*, as

---

[32]  BLACK'S LAW DICTIONARY 6 (8th ed. 2004); MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 4 (10th ed. 2000).

discussed in Part I *supra*, Section 2 and its 1982 amendments were intended to outlaw voter *suppression* techniques — such as setting inconvenient polling places and times, requiring voters to spend extra money, and imposing additional bureaucratic red tape, "procedural hurdles," and "significant inconvenience[s]" — regardless whether voters were capable of overcoming these additional burdens. *See LULAC*, 548 U.S. at 439-40. In the nearly half century since the Voting Rights Act was enacted, these kinds of voter suppression tactics have continued to be universally condemned under Section 2. Although some Justices have taken a more narrow view of Section 2 than others, *all* have agreed that it applies to measures that result in the *suppression* of the vote on a racially discriminatory basis. As Justice Scalia has observed, for example, "[i]f . . . a county permitted voter registration for only three hours one day a week, and that made it *more difficult* for blacks to register than whites, blacks would have *less opportunity 'to participate* in the political process' than whites, and § 2 would therefore be violated[.]" *Chisom v. Roemer*, 501 U.S. 380, 408 (1991) (Scalia, J., dissenting) (emphasis added).

Likewise, although Justice Thomas has opposed the application of Section 2 as a vehicle to address vote dilution, he has strongly endorsed its use "to protect access to the ballot" against a variety of potential voter *suppression* measures, including "all manner of registration requirements, the practices surrounding registration (including the selection of times and places where registration takes place and the selection of registrars), the locations of polling places, the times polls are open, the use of paper ballots as opposed to voting machines, and other similar aspects of the voting process that might be manipulated to deny any citizen the right to cast a ballot and have it properly counted." *Holder*, 512 U.S. at 922 (Thomas, J., concurring in the judgment); *see also id.* at 917 ("Congress was concerned in this section with any procedure,

27

however it might be denominated, that regulates citizens' access to the ballot — that is, any procedure that might erect a barrier to prevent the potential voter from casting his vote").

None of the examples that Justices Scalia and Thomas gave imposed an absolute barrier to voting — they simply made it "*more difficult*." *Chisom*, 501 U.S. at 408 (Scalia, J., dissenting) (emphasis added). Moving polling places to inconvenient neighborhoods and setting polling hours at inconvenient times obviously are not absolute voting prohibitions — if someone really wants to vote, he or she *could* in theory just travel further or take time off from work. Yet all agree that measures like these are fully actionable under Section 2. *See LULAC*, 548 U.S. at 439-40. The "barriers" and "hurdles" imposed by Act 23 are far more onerous than making people take time off from work or travel across town.

*Second*, several courts have concluded in recent years that Section 2 forbids the disproportionate use of faulty voting technology in voting districts with large minority populations, which subjects minority voters to a greater statistical *risk* that their ballots will not be properly counted and thereby "diminishe[s]" their equal opportunity to participate in the political process. *Black v. McGuffage*, 209 F. Supp. 2d 889, 897 (N.D. Ill. 2002). Section 2 is violated by such statistical disparities even where the faulty technology properly counts the vast majority of minority votes (*i.e.*, 95% or more).[33] These cases demonstrate that, even where

---

[33]    *See Black v. McGuffage,* 209 F. Supp. 2d at 893 (Section 2 claim stated where optical scan ballots had "average residual vote rate" of less than 1%, whereas "punch card ballots" — used disproportionately in minority areas — had rate of over 4%); *see also Stewart v. Blackwell*, 444 F.3d 843, 877-79 (6th Cir. 2006) (Section 2 violated by disparate use of faulty punch card technology in minority voting areas, resulting in minority voters being "disproportionately denied the right to have their ballots counted properly"); *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (per curiam) (allegations that "minority voters disproportionately reside in punch-card counties" and thereby face greater risk than White voters that their votes will not be counted state claim for relief under Section 2); *Common Cause v. Jones*, 213 F. Supp. 2d 1106, 1110 (C.D. Cal. 2001) (Section 2 violated where "racial

most minority voters will probably be able to cast ballots that are counted, Section 2 is nevertheless violated if there is a "statistically significant" greater "*risk*" that minority voters will be prevented from doing so, which "*could … significantly diminish[]*" their participation in the political process. *Id.* As shown above, the lessons of history, political science, and modern survey research demonstrate that the significant additional burdens imposed by Act 23 will result in an entirely predictable diminution in voting by those who disproportionately must navigate its requirements to obtain the required state ID. *See* pp. 14-24 *supra*.

III. **THE "TOTALITY OF CIRCUMSTANCES" ANALYSIS CONFIRMS THAT THE SUBSTANTIAL RACIALLY DISPROPORTIONATE BURDENS IMPOSED BY ACT 23 VIOLATE SECTION 2.**

As noted above, in a vote denial case, the very fact that a challenged practice disproportionately denies minority voters the ability to cast a ballot *ipso facto* denies them an equal opportunity to participate in the political process, thereby violating Section 2. *See Roemer*, 501 U.S. at 397; pp. 19-20 *supra*. So it is with Act 23. In vote dilution cases, on the other hand, courts have described the Section 2 inquiry as whether the challenged practice "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters." *Thornburg v. Gingles*, 478 U.S. at 47. This assessment is guided by a series of "objective factors" spelled out in the authoritative 1982 Senate Judiciary Committee majority Report; these considerations are often referred to as the "Senate Factors."[34]

_____

minorities are disproportionately denied the right to vote because their votes are uncounted in disproportionate numbers as a result of the voting mechanism that they are [being] supplied").

[34] The Supreme Court has pointed to the 1982 Senate Report as "the authoritative source for legislative intent" of the 1982 amendments. *Thornburg v. Gingles*, 478 U.S. at 43 n.7; *see id.* at 43-46. The non-exhaustive list of potentially relevant factors spelled out in the 1982 Senate Report include (1) "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process"; (2) "the extent to which voting in the elections of the state or political subdivision is racially polarized"; (3) "the extent to which the

29

Though not required to prove a Section 2 vote denial claim, the "Senate Factors" analysis only reconfirms that Act 23 violates Section 2. As Dr. Burden demonstrates, "[c]onsidering the 'calculus of voting' generally and related research on how election practices affect turnout among Blacks and Latinos in particular, it is clear that multiple 'Senate factors' indicate how Act 23 will predictably and disproportionately depress Black and Latino voting." Burden Decl. ¶ 8; *see id.* ¶¶ 9-57, 67.

A.    **Wisconsin's African-American and Latino Voters Bear the Effects of Discrimination in Housing, Education, Employment, Health, and Other Areas That Hinder Their Ability To Participate Effectively in the Political Process and To Surmount the Additional Burdens Imposed By Act 23.**

There is irony in the fact that this litigation seeking to enforce the Voting Rights Act of 1965 — enacted in the months following the violence in Selma, Alabama, and elsewhere throughout the South in the spring of 1965 — is venued in Milwaukee, which was labeled the "Selma of the North" during the 1960s and 1970s. *See* Patrick D. Jones, THE SELMA OF THE NORTH: CIVIL RIGHTS INSURGENCY IN MILWAUKEE (2009).[35] Wisconsin's African-

---

state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group"; (4) "if there is a candidate slating process, whether the members of the minority group have been denied access to that process"; (5) "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process"; (6) "whether political campaigns have been characterized by overt or subtle racial appeals"; (7) "the extent to which members of the minority group have been elected to public office in the jurisdiction"; (8) "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group"; and (9) "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." 1982 S. REP. 28-29.

[35] *See also* VI William F. Thompson, THE HISTORY OF WISCONSIN: CONTINUITY AND CHANGE, 1940-1965, at 305-400 (1988); Joe William Trotter Jr., BLACK MILWAUKEE: THE MAKING OF AN INDUSTRIAL PROLETARIAT, 1915-45 (2006); Frank A. Aukofer, CITY WITH A CHANCE: A CASE HISTORY OF THE CIVIL RIGHTS REVOLUTION (1968; repub. 2007);

30

American and Latino populations have historically been concentrated in Milwaukee and a few other southeast Wisconsin cities. Nearly two-thirds of all Wisconsin African-Americans live in the City of Milwaukee, and three quarters live in just four cites (Milwaukee, Racine, Kenosha, and Beloit). Milwaukee has often been labeled one of America's "most segregated cities," with one of the lowest rates of African-American suburbanization and one of the highest rates of "hypersegregation" anywhere.[36] Compared to many other cities throughout the United States, where African-Americans live in both urban areas and at least some of the surrounding suburbs, a staggering 90% of African-Americans living in Milwaukee County live in the city itself. Given this unusually heavy degree of urbanization, it is not surprising that Wisconsin's African-Americans and Latinos tend to use public transportation more and to own cars, drive, and possess driver's licenses much less often than other members of the electorate — even more so than in other parts of the country. *See* Burden Decl. ¶ 24. The inevitable result, as Dr. Beatty and other researchers confirm, is that African-Americans and Latinos disproportionately lack the IDs required to vote. *See* pp. 22-24 *supra.*

More broadly, by virtually every measure, African-Americans and Latinos in Wisconsin have suffered from, and continue to suffer from, the effects of discrimination in areas such as housing, education, employment, income, health care, criminal justice, and others that affect their ability to participate in the political process and result in their disproportionately lacking the identification Act 23 requires in order to vote. *See* Burden Decl. ¶¶ 19-42. Wisconsin's

---

Greg J. Carman, WALL OF EXCLUSION: THE PERSISTENCE OF RESIDENTIAL RACIAL SEGREGATION IN METROPOLITAN MILWAUKEE (2011) (Ex. 39).

[36] Burden Decl. ¶¶ 21-23; Carmen, WALL OF EXCLUSION 8; Douglas S. Massey & Nancy A. Denton, AMERICAN APARTHEID: SEGREGATION AND THE MAKING OF THE UNDERCLASS 74-78 (1993) (*re* "hypersegregation") (Ex. 40).

racially segregated residential patterns, for example, are in part the legacy of generations of public and private discrimination. Racially restrictive covenants were used widely throughout Wisconsin, and were not outlawed by the Wisconsin Legislature until 1951, three years after the U.S. Supreme Court had ruled such covenants unlawful under the Fourteenth Amendment in *Shelley v. Kraemer*, 334 U.S. 1 (1948).[37] In 1968, this Court found that race continued to be "a factor of almost transcendent significance" in residential patterns in Milwaukee and its suburbs, and that "racial discrimination on the part of sellers and landlords or those whose opinions influence their actions is responsible for the Negroes' inability, except in rare instances, to leave the inner city."[38] In addition, Milwaukee's suburban communities in the latter half of the last century used various legal tools, such as municipal incorporation standards and racially exclusionary zoning practices, to discourage African-Americans from moving to the suburbs. *See* Burden Decl. ¶ 22; Carmen, WALL OF EXCLUSION 156-203.

"Education disparities between Blacks and Whites are substantial and enduring." Burden Decl. ¶ 34. The gaps between White and African-American high school graduation rates and educational achievement scores in Wisconsin are among the largest in the nation. *See id.* ¶¶ 34-35. These gaps are at least in part the legacy of years of official discrimination; the federal courts repeatedly found as late as 1978 that public officials had undertaken a variety of actions and practices "with the intent and for the purpose of creating and maintaining a

---

[37] Joseph A. Ranney, *Looking Further Than the Skin: A History of Wisconsin Civil Rights Law* (State Bar of Wisconsin website) (Ex. 41).

[38] *Otey v. Common Council of City of Milwaukee*, 281 F. Supp. 264, 270 (E.D. Wis. 1968) (footnote omitted).

segregated school system" in Milwaukee — nearly a quarter century after *Brown v. Board of Education*, 347 U.S. 483 (1954).[39]

African-American unemployment is much higher in Wisconsin than nationwide, and there is a much larger racial gap in employment in this State than nationally. Burden Decl. ¶ 28; *see* ALMANAC 1771 (Ex. 42); Cochran Decl. ¶ 5. The poverty rate in Wisconsin is 11% for Whites, 29% for Latinos, and 41% for African-Americans; "[t]his 30-point race gap is eight points greater than the national average." Burden Decl. ¶ 30. There also are "glaring" racial disparities in such indicators as infant mortality, traffic stops, and incarceration rates, all of which are also indicators of discrimination against, and official indifference toward, racial minorities. *Id.* ¶ 39; *see also id.* ¶¶ 33, 36-38, 40-42.

As a result of "substantial and enduring racial disparities" in all of these different areas, *id.* ¶ 42, Wisconsin's African-Americans and Latinos already are less likely to register and vote than Whites. Here again, the racial gap is even greater in Wisconsin than in most other States; there was a "Black-White gap" of 9.4 percentage points in 2010 Wisconsin voter turnout, more than three times the national margin of 2.7 percentage points. *See id.* ¶ 9. For these same reasons, African-Americans and Latinos also will face more challenges than Whites in attempting to deal with the additional hurdles imposed by Act 23 and, given the "calculus of voting," will vote less often as a result of those hurdles. *See id.* ¶ 42.

---

[39] *Amos v. Bd. of School Directors of City of Milwaukee*, 408 F. Supp. 765, 792-93 (E.D. Wis. 1976), *aff'd sub nom. Armstrong v. Brennan*, 539 F.2d 625 (7th Cir. 1976), *rev'd,* 433 U.S. 672 (1977), *on remand, Armstrong v. O'Connell*, 451 F. Supp. 817, 827 (E.D. Wis. 1978).

33

**B.** **There Has Been a Long History of Official Discrimination in Wisconsin Suppressing the Ability of Minorities To Participate In the Democratic Process, and Minorities Have Long Been Underrepresented in Wisconsin Elective Offices.**

"Wisconsin has a long history of election practices that facilitate discrimination" in registration and voting. *Id.* ¶ 14; *see id.* ¶¶ 14-18. For example, from 1913 until 2006, Wisconsin voters were only required to register before voting if they lived in counties with over 5,000 residents, as the vast majority of African-Americans and Latinos always have. As a result, Wisconsin registration requirements disproportionately burdened African-Americans and Latinos, a "system of unequal election practices" that was never addressed by state courts or legislators until it was outlawed by the passage of the federal Help America Vote Act ("HAVA"), 42 U.S.C. §§ 15301-15545, in 2006. Burden Decl. ¶ 17. Similarly, despite the burgeoning Latino population in Milwaukee, ballots in Spanish were never provided until February of this year — 2012 — when the U.S. Department of Justice ordered Milwaukee County to provide such ballots in order to comply with the Voting Rights Act. *Id.* ¶ 18; *see also* Alvarado Decl. ¶ 5; Garza Decl. ¶ 7. Here again, federal intervention was necessary to eliminate a state-imposed barrier to registration and voting. Burden Decl. ¶¶ 18, 55.

African-Americans and Latinos also are underrepresented in both federal and state elective offices in Wisconsin. Wisconsin has never had a U.S. Senator from a racial minority group, nor any minority member of the U.S. House of Representatives until the election of Congresswoman Gwen Moore from the Fourth Congressional District in 2004. *See* 2012 ALMANAC 1770-72. She remains the only racial minority ever elected to Congress from Wisconsin. The only racial minority ever elected to statewide office was Vel Phillips, who served as Wisconsin Secretary of State from 1979-83. Only in recent years did African-Americans achieve significant representation in the State Legislature, but Latinos remain

34

"vastly underrepresented." Burden Decl. ¶ 52. And Milwaukee has yet to elect a minority mayor, although it is a "majority-minority" city. *Id.* "The state's history of underrepresentation of these groups has contributed to their lower levels of electoral participation." *Id.* ¶ 53; *see LULAC*, 548 U.S. at 436-38 (lack of rough proportionality in minority representation supports a finding that a discriminatory voting practice violates Section 2).

     **C.    There Has Been a Significant Lack of Responsiveness on the Part of Wisconsin's Elected Officials To the Particularized Needs of African-Americans and Latinos, Both in General and With Respect To the Passage of Act 23 In Particular.**

The "lack of responsiveness" by elected officials to the "particularized needs" of Wisconsin's African Americans and Latinos, 1982 S. REP. 29, is demonstrated by the "severe" racial disparities discussed above in such areas as housing, education, employment, income, health, criminal justice, and others. Burden Decl. ¶ 54. "Many of these disparities have worsened over time." *Id.* And many of them are far worse in Wisconsin than elsewhere in the nation. In several areas — *e.g.*, the racial gaps in rates of employment, poverty, infant mortality, school test scores, high school graduation rates, and incarceration — Wisconsin ranks near or even at the bottom. *See* pp. 31-33 *supra.* Wisconsin's "lack of responsiveness" also is illustrated by the numerous instances in which federal intervention has been required to remedy state and local government shortcomings in such areas as school and residential segregation, voter registration practices, and (just two months ago) the provision of Spanish-language ballots. *See* pp. 32-34 *supra.*

This traditional lack of responsiveness by White elected officials was on particular display during the consideration and enactment of Act 23 itself. *See* Burden Decl. ¶¶ 62, 65. Legislators repeatedly were advised that Act 23 would disproportionately burden and disfranchise African-Americans, Latinos, and other racial and language minorities. As quoted

35

at the outset of this memorandum, Rep. Tamara Grigsby, an African-American Representative from Milwaukee (18th Assem. Dist.), bluntly testified at one hearing that, "[t]o be candid, this bill targets people like me and the constituents I represent." Ex. 3. "Everyone sitting in this room knows what this bill does and knows who it will harm." *Id.* Legislators repeatedly were presented with statistical and other evidence of the racially disproportionate burdens the legislation would impose, including the findings of the 2005 U.W.-Milwaukee study demonstrating that dramatically larger percentages of eligible minority voters lack a Wisconsin driver's license than do White voters. *See, e.g.*, Ex. 43 at 1, 4; Ex. 44; Ex. 3 at 1; Ex. 45 at 2; Ex. 46 at 1-2. To the best of Plaintiffs' knowledge, no research was introduced in the legislative record to rebut this evidence. As one witness emphasized, "[t]here is no dispute of the fact that the number of African Americans who lack a valid Wisconsin driver's license is very disproportionate to the percentage of African Americans in the population. So, based on statistics, it is certain that the law will have a disproportionate impact on minority populations." Ex. 47 at 1.

Many alternatives were proposed to lessen the needlessly harsh impacts of the legislation. Some changes were adopted. For instance, the bill was amended to add tribal ID cards and certain forms of student ID cards to the acceptable forms of identification, thus responding to concerns raised about voting access by Native Americans and students. *Compare* Ex. 48 *with* Act 23. But proposals to address the articulated concerns of African-Americans and Latinos were consistently rejected.[40] Similarly, proposals for outreach and mitigation measures

---

[40] Kevin Kennedy, on behalf of the GAB, repeatedly recommended adoption of an affidavit-of-identity alternative to the state ID requirement, which would "provide a viable alternative to voters who may have difficulty securing the required identification or who may not have it at the time of voting." Ex. 50 at 8; *see also* Exs. 51 at 6, 52 at 1; Ex. 53 (proposed Assembly Amendment 24, laid on the table). Director Kennedy likewise urged unsuccessfully that the list

36

that might have lessened the unnecessary impacts on African-American and Latino voters were rejected by the legislative majority.[41]

Not surprisingly, every African-American and Latino member of the Wisconsin Legislature voted against Act 23. On the other hand, every member of the Legislature voting in favor of Act 23 was White — the entire GOP caucus joined by two Democratic Assemblymen but no Democratic Senators. *See* Ex. 49.

Thus did minority voters receive the Legislature's dark message of discouragement: that the State of Wisconsin is willing to sacrifice minority votes in the interest of preventing in-person voter fraud that the State's own witnesses admit is not a significant problem (or protecting the incumbency of those who advocate that supposed interest). *See LULAC*, 548 U.S. at 441 (rejecting protection of incumbents as a legitimate justification when it is done by excluding minority voters because they are likely to vote against the office holder); *accord Garza v. County of Los Angeles*, 918 F. 2d 763, 778-79 (9th Cir. 1990).

> **D.** **Voting in Wisconsin Is Racially Polarized, Political Campaigns Have Long Been Characterized By Racial Appeals, and Act 23 Appears To Be Targeted Against Growing Minority Voting Power.**

"Racial polarization in voting patterns is sizable and enduring in Wisconsin," and does not appear to be "dissipating with time." Burden Decl. ¶ 12. The "Black-White gap" in

---

of acceptable IDs be expanded to include any official federal, state, or local government ID. Ex. 50 at 2-3; *see also* Ex. 54.

[41] For example, amendments were introduced that would have required at least one DMV office in each county to keep weekend and evening hours; that would have provided mobile and temporary examining stations with extended hours in impoverished communities; that would have required written disclosure that state ID cards obtained for voting are provided for free; that would have addressed the concerns of homeless voters unable to meet strict residency requirements; and that would have provided for work absences for voters who needed to address ID problems. All of these and similar mitigation proposals were "laid on the table" after introduction. *See* Exs. 55-60.

37

partisan voting was 37 percentage points in the 2008 presidential election, 39 points in the 2004 presidential election, and 44 points in the 2010 Wisconsin gubernatorial election. *Id.* ¶¶ 11-12. The Latino-White gap is also substantial, and larger than elsewhere in the United States. For example, Senator Kerry received 79.8% of the Wisconsin Latino vote in the 2004 presidential general election, "with no sign of the surge of support for [President] Bush that apparently took place in some other Hispanic areas of the country." Robert Booth Fowler, WISCONSIN VOTES: AN ELECTORAL HISTORY 229 (2008) (Ex. 61).

Ever since Alabama Gov. George Wallace's strong showing in the 1964 Wisconsin Democratic Presidential Primary "astounded" national political pundits and demonstrated that "racism could magnetize votes in the North as well as in the South," Wisconsin has been a fertile ground for racially tinged political appeals.[42] More recently, consider the infamous "Reuben Lee Mitchell" TV attack ad run against incumbent Wisconsin Supreme Court Justice Louis Butler in his 2008 campaign — an ad condemned by the Wisconsin Judicial Campaign Integrity Committee and many others as being "in the offensive, race-baiting style reminiscent of the Willie Horton spot from the 1988 presidential race." *See* Burden Decl. ¶¶ 45-48. Similarly, in a blatant appeal to anti-Latino prejudice, one candidate in the 2006 gubernatorial campaign aired TV ads criticizing "illegal aliens" who were taking advantage of "welfare," "subsidized home loans," and "in-state tuition breaks" at UW System schools, "while Wisconsin kids are being turned away." *Id.* ¶ 49. Appeals like these both reflect racial polarization and serve to reinforce it. *Id.* ¶ 50.

---

[42] Theodore H. White, THE MAKING OF THE PRESIDENT — 1964, at 233-34 (1965) (Ex. 62); *see also* Rick Perlstein, BEFORE THE STORM: BARRY GOLDWATER AND THE UNMAKING OF THE AMERICAN CONSENSUS 318-21 (2001) (Ex. 63).

Minority voting strength is rapidly growing in Wisconsin. In particular, the growth in the Latino vote "is creating the most influential shift in Wisconsin politics, an astonishing 74% increase within the decade." Ex. 64; *see also* 2012 ALMANAC 1771. Act 23 on an objective level is highly "suspect" because the incumbent party has adopted new voting restrictions that fall disproportionately on minority voters who tend overwhelmingly to favor the opposition party. *LULAC*, 548 U.S. at 441. The Supreme Court has condemned this kind of "troubling blend of politics and race" and held that it "cannot be sustained" under Section 2. *Id.* at 442; *see also id.* at 440 ("In essence the State took away the Latinos' opportunity because Latinos were about to exercise it."). Section 2 outlaws "incumbency protection" measures like Act 23 that come at the expense of minority voters who only recently have begun to achieve Section 2's goal of "overcoming prior electoral discrimination." *Id.* at 442.

E.     **The Policy Underlying Act 23 Is "Tenuous," Markedly Departs From Historic Wisconsin Practices and Traditions, Lacks "Fairness," and "Needlessly Impairs" the Voting Rights of African-American and Latino Voters.**

The Senate Report also instructs courts to consider "whether the policy underlying" the new law is "tenuous" or "markedly departs from past practices or from practices elsewhere," factors "that bear[] on the fairness of [the law's] impact." 1982 S. REP. 29 & n.117. In other words, does the purported policy underlying the challenged voting practice justify the effect on minority voters?, *see LULAC*, 458 U.S. at 441; *Gingles*, 478 U.S. at 45, or does it "impair[] the voting power of minorities more than it has to[?]," *Barnett*, 141 F.3d at 701 (Posner, J.). If the challenged practice "needlessly impairs a minority group's voting power," that further supports the conclusion that it violates Section 2. *Barnett*, 141 F.3d at 702.

39

Act 23 flunks these considerations. The policy underlying the law is illusory and the adverse impact on minority voting is incontestable. Under the circumstances, the law's "troubling blend of race and politics" cannot be sustained. *LULAC*, 548 U.S. at 442.

### 1. Act 23 Markedly Departs From Historic Wisconsin Practices.

Dr. Burden demonstrates in his accompanying declaration that Act 23 is a "dramatic change" in the law and "an abrupt departure from a century of voting practices in Wisconsin." Burden Decl. ¶ 56; *see also* Mayer Jan. 2012 Rep. at 9 ("Act 23 imposes the most restrictive voting requirements in our state's history"); *id.* at 7-9. This departure from longstanding historical tradition is a warning sign that the new law is unfair and has only tenuous justification.

### 2. In-Person Voter Fraud Is Not a Significant Problem in Wisconsin.

Dr. Lorraine C. Minnite demonstrates in her accompanying declaration that, "as the empirical record makes clear, fraud committed by voters either in registering to vote or at the polls on Election Day is exceedingly rare." Minnite Decl. ¶ 2. Dr. Minnite is a nationally recognized expert on "the incidence and effect of voter fraud in American elections." *Id.* ¶ 1. Her most recent book, THE MYTH OF VOTER FRAUD (2010), focuses extensively on allegations of voter fraud in Wisconsin and concludes they are "unsupported by evidence" and have "no basis in fact." *Id.* In her declaration, Dr. Minnite reviews the Wisconsin-related allegations of voting fraud, examines the numerous official investigations that were conducted in response to these allegations, and demonstrates that nearly all these cases involved "data entry errors, typographical errors, procedural missteps, [or] misapplication of the rules by poll workers." *Id.* ¶ 28; *see generally* ¶¶ 21-41. "There is very little available evidence suggesting that voters are intentionally corrupting the electoral process"; "fraud committed by voters either in registering to vote or at the polls on Election Day is exceedingly rare." *Id.* ¶¶ 43-44.

40

Dr. Minnite's conclusions are in accord with many other studies and investigations. Indeed, the GAB's Executive Director, Kevin Kennedy, has testified: "I'm not aware of a single case of identity fraud in voting being prosecuted in Wisconsin" in "more than three decades" of service as a state elections official. Ex. 5 at 40; *see* Burden Decl. ¶ 64; Mayer Jan. 2012 Rep. at 10-16; Huefner *et al.*, FROM REGISTRATION TO RECOUNTS, n.4 *supra*, at 120-22. This absence of any significant instances of fraud makes the Act's *only* justification not just tenuous, but false. And burdening minority voting rights without justification "bears the mark of intentional discrimination." *LULAC*, 548 U.S. at 440.

### 3. Act 23 Needlessly Impairs the Voting Power of African-Americans and Latinos.

Against the backdrop of a non-existent voter fraud problem, the State's sole purported justification for Act 23, Wisconsin did not simply enact a voter ID law. It enacted the strictest law in the nation with provisions far more onerous than other voter ID laws that have been reviewed by the courts, both in the narrowness of its range of acceptable forms of ID and in its nearly complete lack of any safety valve to "mitigat[e]" situations in which the ID requirements "impose a special burden on [some citizens'] right to vote." *Crawford*, 533 U.S. at 199 (Stevens, J.). That may explain why some other States' laws have been upheld principally against Equal Protection Clause challenges, whereas Act 23 already has been struck down (on state constitutional grounds) by the first two courts to have reviewed it. The Indiana voter ID law that the Supreme Court upheld on its face in *Crawford*, for example, allows a voter who is unable to present a required form of ID to cast a provisional ballot and then "execute an appropriate affidavit before the circuit court clerk within 10 days following the election" stating that "the affiant is indigent and unable to obtain proof of identification without paying a fee." *Id.* at 186 & n.2 (citation omitted). This "mitigat[ion]" provision was crucial to the Court's

41

conclusion that the Indiana law did not *on its face* impose "'excessively burdensome requirements' on any class of voters." *Id.* at 199, 202 (citation omitted). The Indiana law also allows for a broader range of acceptable photo IDs, and exempts absentee voting from voter ID requirements altogether — thus providing another means to vote for those lacking the necessary ID. *Id.* at 185.

Other voter ID laws considered by the courts contain similar mitigation provisions, or allow for a much broader range of acceptable proofs of identity:

- The Arizona law upheld by the Ninth Circuit requires voters to present *either* a photo ID *or* two different forms of identification that bear the name and address of the elector, which may include such non-photograph-bearing documents as utility bills, bank statements, or insurance cards. *Gonzalez v. Arizona*, ___ F.3d ___, 2012 WL 1293149, *13 & n.31 (9th Cir. Apr. 17, 2012) (citation omitted).

- The Georgia law upheld by the Eleventh Circuit provides that voters lacking a driver's license or passport can obtain a "Georgia voter identification card" at no charge by "producing evidence that the voter is registered to vote in Georgia and by swearing an oath that the voter does not have another acceptable form of identification." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1346 (11th Cir.), *cert. denied*, 129 U.S. 2770 (2009). Nothing more is required.

- Similarly, the Albuquerque, New Mexico voter ID law upheld by the Tenth Circuit allows for a broad range of acceptable photo identification, and provides for free "voter photo identification cards" upon the presentation of two forms of non-photo ID (including Social Security cards, bank statements, utility bills, and many other forms of proof of identity). Voters unable to present acceptable documentation even from this broadly inclusive list may still obtain their voter IDs simply by filling out an affidavit that they are who they say they are. *ACLU v. Santillanes*, 546 F.3d 1313, 1322-24 (10th Cir. 2008).

Wisconsin's law provides none of these safeguards. Its list of acceptable forms of photo ID is far narrower. A voter who lacks one of these forms of photo ID may cast a provisional ballot, but that ballot will be counted only if she produces an acceptable form of ID within three days. And the "free" state photo ID may only be obtained (with limited exceptions) if the voter knows to ask to receive it for free, *see* n. 10 *supra*, and presents an original certified birth

certificate. No other state ID law that has been upheld by the courts is this strict. *See* Mayer
April 2012 Rep. at 19 (comparative chart) (Ex. 65).

The GAB's Executive Director, Defendant Kevin Kennedy, repeatedly emphasized
during the legislative process that, because of these "stricter" procedures and requirements not
imposed by other states, Act 23 would be "unnecessarily cumbersome," "place[] an unnecessary
strain on the administration of elections," and "put additional stress on an already overburdened
system." Ex. 50 at 1-2; *see also* Ex. 51 at 2; Ex. 52 at 2. Act 23 obviously "impairs the voting
power of minorities more than it has to" and "needlessly impairs" their opportunities to
participate in the political process. *Barnett*, 141 F.3d at 701-02.

### F. Act 23 Interacts With These Factors To Cause An Inequality of Voting Opportunities Based On Race.

There is a direct "causal connection" between Act 23 and the denial and abridgement of
minority voters' "opportunity . . . to participate in the political process." *Gonzalez*, ___ F.3d
___, 2012 WL 1293149, *13 (citation omitted); 42 U.S.C. § 1973(b). The Senate Factors
analyzed above interact with Act 23 in a variety of ways to build upon prior racial
discrimination and then perpetuate that discrimination into the future. The stark racial disparity
in possession of driver's licenses and state IDs results from generations of discrimination
against African-Americans and Latinos, who are much more likely than Whites to live in urban
areas (and thus have less need to drive) and to be poor (and thus unable to afford to drive).

Having been disproportionately subjected to the burdens of Act 23, African-Americans
and Latinos also will face much greater challenges than Whites in overcoming those burdens
and obtaining the required IDs. As the result of the historic and current socioeconomic factors
discussed above, minority voters face greater challenges in being able to afford the additional
costs imposed by Act 23, in obtaining the required birth certificates (often from distant out-of-

43

state sources), and in navigating through multiple agency bureaucracies. *See* Burden Decl. ¶¶ 42, 59-61, 67. These are not minor inconveniences or the necessary burdens of modern life. These pointless burdens merely perpetuate the effects of past discrimination.

The "tenuous" justifications for Act 23, the ready availability of numerous less restrictive alternatives, and the sharp departure from historic practices reinforce the racially discriminatory *results* (if not purpose) of this legislation. The racially polarized voting, continued racial appeals, and growing influence of minority voters also suggest that Act 23 may be more about suppressing their votes than combating real fraud.

Most important, the additional hurdles and burdens imposed by Act 23 predictably will suppress voting by those who are subject to its restrictions, a disproportionate number of whom are African-Americans and Latinos. *Id.* ¶¶ 8, 42, 67. Indeed, they did exactly that in the February 2012 elections in which Act 23 was implemented. *See* pp. 25-26 *supra.* Just like the old Jim Crow laws, Act 23 predictably will suppress minority voter turnout and result in minority voters having "less opportunity than other members of the electorate to participate in the political process." 42 U.S.C. § 1973(b). It is difficult to imagine a stronger, more proximate "causal connection between the challenged voting practice and a prohibited discriminatory result." *Gonzalez,* ___ F.3d ___, 2012 WL 1293149, *13 (citation omitted).

## IV. PLAINTIFFS MEET ALL OTHER REQUIREMENTS FOR THE ENTRY OF PRELIMINARY INJUNCTIVE RELIEF PENDING TRIAL

In addition to demonstrating a likelihood of success on the merits, Plaintiffs readily meet all other requirements for preliminary injunctive relief. The denial and abridgement of the constitutionally protected right to vote is, by definition, an irreparable injury that warrants injunctive relief. The "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative

44

government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Preventing eligible voters like the members and constituents of the organizational plaintiffs from voting inflicts "harms that cannot be recompensed." *Shannon v. Jacobowitz*, 301 F. Supp. 2d 249, 258 (N.D.N.Y. 2003).[43]

The public interest and "balance of equities" also favor preliminary injunctive relief. *Winter*, 555 U.S. at 20. The "competing claims of injury" are not comparable, *id.*; baseless claims of in-person voter fraud cannot outweigh the certain suppression of minority voting that Act 23 will cause. As the Sixth Circuit concluded in analogous circumstances:

> Because the risk of actual voter fraud is miniscule when compared with the concrete risk that [the State's] policies will disenfranchise eligible voters, we must conclude that the public interest weighs in favor of [preliminary injunctive relief]. The preliminary injunction eliminates a risk of individual disfranchisement without creating any new substantial threats to the integrity of the election process.

*U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388-89 (6th Cir. 2008).

## CONCLUSION

For the reasons set forth above and in the accompanying declarations and evidentiary submissions, Plaintiffs respectfully request that this Court enter a preliminary injunction against the implementation and enforcement of Act 23 pending trial, together with the other relief set forth in the accompanying proposed Order.

---

[43] *See also, e.g., Spencer v. Blackwell*, 347 F. Supp. 2d 528, 537 (S.D. Ohio 2004); *Bay County Democratic Party v. Land*, 347 F. Supp. 2d 404, 435-36 (E.D. Mich. 2004); *Hoblock v. Albany Cnty. Bd. of Elections*, 341 F. Supp. 2d 169, 176 (N.D.N.Y. 2004), *remanded on other grounds*, 422 F.3d 77 (2d Cir. 2005); *Charles H. Wesley Educ. Found., Inc. v. Cox,* 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004), *aff'd*, 408 F.3d 1349 (11th Cir. 2005).

Dated:  April 23, 2012                    Respectfully submitted,


Penda D. Hair                              /s Charles G. Curtis, Jr.
Kumiki Gibson                              Arnold & Porter LLP
Denise D. Lieberman                        Suite 620
Advancement Project                        16 North Carroll Street
Suite 850                                  Madison, Wisconsin  53703
1220 L Street, N.W.                        Phone:  (608) 257-1922
Washington, D.C.  20005                    Email:  Charles.Curtis@aporter.com
Phone:  (202) 728-9557
Email:  phair@advancementproject.org       John C. Ulin
  kgibson@advancementproject.org           Arnold & Porter LLP
  dlieberman@advancementproject.org        44th Floor
                                           777 South Figuero Street
                                           Los Angeles, California  90017
                                           Phone:  (213) 243-4000
                                           Email:  john.ulin@aporter.com

                                           Carl S. Nadler
                                           Arnold & Porter LLP
                                           555 Twelfth Street, N.W.
                                           Washington, D.C.  20004
                                           Phone: (202) 942-6130
                                           Email:  carl.nadler@aporter