IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

BETTYE JONES; LEAGUE OF UNITED LATIN
AMERICAN CITIZENS (LULAC) OF
WISCONSIN; CROSS LUTHERAN CHURCH;
MILWAUKEE AREA LABOR COUNCIL, AFL-
CIO; and WISCONSIN LEAGUE OF YOUNG
VOTERS EDUCATION FUND,

        Plaintiffs,

        v.                                  Case No. 12-CV-185

DAVID G. DEININGER, MICHAEL BRENNAN,
GERALD C. NICHOL, THOMAS BARLAND,
THOMAS CANE, KEVIN J. KENNEDY, and
NATHANIEL E. ROBINSON,

        Defendants.

## DEFENDANTS' BRIEF IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

        Defendants David G. Deininger, Michael Brennan, Gerald C. Nichol, Thomas Barland,

Thomas Cane, Kevin J. Kennedy, and Nathaniel E. Robinson (collectively, "Defendants"), by

their undersigned counsel, hereby submit this Brief in Opposition to the Motion for Preliminary

Injunction filed by Plaintiffs Bettye Jones; League of United Latin American Citizens (LULAC)

of Wisconsin; Cross Lutheran Church; Milwaukee Area Labor Council, AFL-CIO; and

Wisconsin League of Young Voters Education Fund (collectively, "Plaintiffs").

## INTRODUCTION

Plaintiffs filed their preliminary injunction motion requesting that the Court enjoin 2011 Wisconsin Act 23 ("Act 23") in light of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 (the "VRA"). (*See* Dkt. #19 at p. 2.)

Plaintiffs lack Article III standing; therefore, this case must be dismissed for lack of subject matter jurisdiction. Plaintiff Bettye Jones has a form of qualifying photo identification for purposes of voting under Act 23, a Wisconsin driver license. Ms. Jones cannot be injured by Act 23 because she can use her driver license to vote. The organization plaintiffs lack standing because they are not injured by Act 23. Act 23 requires no action by these organizations.

If the Court reaches the merits of Plaintiffs' claim, injunctive relief is unnecessary given that the photo identification requirement for voting is enjoined in state circuit court. As to the merits of Plaintiffs' claim, Plaintiffs have not met their burden of persuasion. They have not established a reasonable likelihood of success on the merits of their claim of vote denial under Section 2 of the VRA because they failed to demonstrate that Act 23 causes a prohibited discriminatory result. Plaintiffs also failed to satisfy the remaining preliminary injunction criteria. Plaintiffs' preliminary injunction motion must be denied.

## BACKGROUND

### I.     BACKGROUND REGARDING ACT 23.

Prior to Act 23, an eligible Wisconsin elector voting in person or by absentee ballot was not required to present an identification document, other than proof of residence in certain circumstances. Instead, voters identified themselves by stating their name. Under Act 23, an elector must present documentary proof of identification to vote in person or by absentee ballot.

There are nine forms of acceptable photo identification, including a Wisconsin driver license or state identification card issued by the Wisconsin Department of Transportation ("DOT"). Wis. Stat. § 5.02(6m).

With certain exceptions,[1] Act 23 requires that an elector must present an acceptable form of photo identification to an election official, who must verify that the name on the identification conforms to the name on the poll list and that any photograph on the identification reasonably resembles the elector.[2] Wis. Stat. § 6.79(2)(a). If an elector does not have acceptable photo identification, the elector may vote by provisional ballot pursuant to Wis. Stat. § 6.97. Wis. Stat. § 6.79(2)(d) and (3)(b). The provisional ballot will be counted if the elector presents acceptable photo identification at the polling place before the polls close or at the office of the municipal clerk or board of election commissioners by 4 p.m. on the Friday after the election. Wis. Stat. § 6.97(3)(b). If an in-person voter presents photo identification bearing a name that does not conform to the voter's name on the poll list or a photograph that does not reasonably resemble the voter, the person may not vote. Wis. Stat. § 6.79(3)(b).

To accommodate eligible electors who do not yet possess an acceptable photo identification and to ensure that no elector is charged a fee for voting, Act 23 requires the DOT to issue an identification card to such electors free of charge, if the elector satisfies all other requirements for obtaining such a card, is a U.S. citizen who will be at least 18 years of age on the date of the next election, and requests that the card be provided without charge for purposes of voting. Wis. Stat. § 343.50(5)(a)3.

---

[1] *See* Wis. Stat. § 6.87(4)(a)-(b).
[2] Similar requirements apply to absentee voters. *See* Wis. Stat. § 6.86(1)(ar); Wis. Stat. § 6.87(1); Wis. Stat. § 6.87(4)(b)1.

Case 2:12-cv-00185-LA   Filed 06/04/12   Page 3 of 39   Document 43

II.     STATUS OF THE PHOTO IDENTIFICATION REQUIREMENT FOR VOTING CREATED BY ACT 23.

The photo identification requirement for voting created by Act 23 has been temporarily and permanently enjoined by the Dane County Circuit Court.  (Dkt. #37-3), March 6, 2012, Order Granting Temporary Injunction in *Milwaukee Branch of the NAACP, et al. v. Scott Walker, et al.*, Case No. 11-CV-5492 (Dane Co. Cir. Ct.) (Flanagan, J.), *hereinafter* "*NAACP*"; (Dkt. #37-4), March 12, 2012, Decision and Order Granting Summary Declaratory Judgment and Permanent Injunction in *League of Women Voters of Wisconsin Education Network, Inc., et al. v. Scott Walker, et al.*, Case No. 11-CV-4669 (Dane Co. Cir. Ct.) (Niess, J.), *hereinafter* "*League*."

The defendants in *League* appealed the circuit court's decision and order to the Wisconsin Court of Appeals, District IV.  The defendants filed their opening brief and appendix on May 25, 2012.  The permanent injunction in *League* remains in effect.

A bench trial in *NAACP* concluded on April 19, 2012.[3]  The circuit court ordered post-trial briefing, which will be completed by June 19, 2012.  The temporary injunction in *NAACP* remains in effect.

In light of the pending permanent and temporary injunction orders, the Government Accountability Board (the "GAB") has suspended all implementation of the photo identification requirement for voting and all public educational and informational campaigns associated with photo identification for voting.  (Declaration of Clayton P. Kawski, Ex. A, filed herewith.)

---

[3]In *NAACP*, the Wisconsin Court of Appeals, District II denied the defendants' petition for leave to appeal a non-final order on April 25, 2012.  The court of appeals also denied motions to stay the respective permanent and temporary injunctions in *League* and *NAACP*.  Although the *NAACP* and *League* cases were certified by the court of appeals to the Wisconsin Supreme Court, the Wisconsin Supreme Court refused certification in both cases on April 16, 2012.

## PRELIMINARY INJUNCTION STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted).

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation and internal quotations omitted); *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 870 (7th Cir. 2006) (citing *Mazurek*); *Goodman v. Ill. Dep't of Fin. and Prof'l Regulation*, 430 F.3d 432, 437 (2005) (citing *Mazurek*).

## ARGUMENT

I.     THIS CASE MUST BE DISMISSED BECAUSE THE COURT LACKS SUBJECT MATTER JURISDICTION WHEN NO PLAINTIFF HAS ARTICLE III STANDING.

"Subject matter jurisdiction is, as we know, an issue that should be resolved early but must be considered at any stage of the litigation." *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003).

Article III of the United States Constitution confines the federal courts to adjudicating actual "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. "[T]he requirements of Article III case-or-controversy standing are threefold: (1) an injury in-fact; (2) fairly traceable to the defendant's action; and (3) capable of being redressed by a favorable decision from the court." *Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512, 516 (7th Cir. 2010) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).

Case 2:12-cv-00185-LA   Filed 06/04/12   Page 5 of 39   Document 43

No individual voter plaintiff in this case has Article III standing. Plaintiff Bettye Jones was issued a Wisconsin driver license on April 11, 2012, by the Division of Motor Vehicles ("DMV") of the Wisconsin Department of Transportation. (Kawski Decl., Ex. B (certified record from DMV)). Ms. Jones cannot be inured because she has a sufficient form of ID to vote. Ms. Jones can use her Wisconsin driver license to vote in-person at the poll or by absentee ballot.[4] Thus, Ms. Jones does not possess Article III standing because: (1) she will not be injured by Act 23; (2) her non-injury is not traceable to Defendants' conduct; and (3) there is no redress for her non-injury. *See Parvati Corp.*, 630 F.3d at 516.

Likewise, no organization plaintiff has standing. The organization plaintiffs, League of United Latin American Citizens (LULAC) of Wisconsin, Cross Lutheran Church, Milwaukee Area Labor Council, AFL-CIO, and Wisconsin League of Young Voters Education Fund, have not made allegations in their complaint that are supported by evidence to establish any injury to their members or themselves.

An organization has associational standing and may bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claims asserted, nor the relief requested, requires participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *see also Disability Rights Wis., Inc. v. Walworth County Bd. of Supervisors*, 522 F.3d 796, 801-02 (7th Cir. 2008).

---

[4]Ms. Jones can obtain absentee ballots to vote in the remaining 2012 elections, including the August 14, 2012, fall primary election and the November 6, 2012, general presidential election, without showing photo identification. *See, e.g.*, *http://gab.wi.gov/elections-voting/voters/absentee* (last visited May 31, 2012) (linking to GAB Form 121, the absentee ballot application, which includes a box to check to request absentee ballots for "All elections from today's date through the end of the current calendar year (ending 12/31)."); *see also* Wis. Stat. § 6.86(2m).

No organization plaintiff has standing. The organization plaintiffs make the following allegations in their complaint:

> 4. . . . LULAC of Wisconsin's members and constituents include voting-age Latino citizens of Wisconsin who are far more likely than other members of the electorate to be discouraged, burdened, deterred, harassed, and in many instances prevented by Act 23 from casting a ballot that is counted.

> 5. . . . Over 70% of [Cross Lutheran Church's] members are African-Americans, many of whom are voting-age citizens of Wisconsin who are far more likely than other members of the electorate to be discouraged, burdened, deterred, harassed, and in many instances prevented by Act 23 from casting a ballot that is counted.

> 6. . . . Many of the members and constituents of the Milwaukee Area Labor Council are voting-age African-American and Latino citizens of Wisconsin who are far more likely than other members of the electorate to be discouraged, burdened, deterred, harassed, and in many instances prevented by Act 23 from casting a ballot that is counted.

(Dkt. #1 at ¶¶ 4-6.) The Wisconsin League of Young Voters Education Fund makes no allegations in the complaint regarding alleged injuries that its members or constituents face due to the photo identification requirement for voting created by Act 23. (*Id.*, ¶ 7.) The organization plaintiffs lack standing because they will not be injured by Act 23.

First, the organization plaintiffs are not qualified electors; they cannot vote. Since these organizations have no right to vote, they cannot be injured by a requirement that applies only to voters.

Second, the organization plaintiffs have not alleged facts to establish associational standing based upon injuries to their members. LULAC, Cross Lutheran Church, and Milwaukee Area Labor Council, AFL-CIO assert that their "members and constituents . . . are far more likely than other members of the electorate to be discouraged, burdened, deterred, harassed, and in many instances prevented by Act 23 from casting a ballot." (Dkt. #1 at ¶¶ 4-6.) None of these

allegations establish that any member of any of these organizations lacks a form of photo ID sufficient for purposes of voting under Act 23. The Wisconsin League of Young Voters Education Fund also has not alleged that any of its members lack sufficient ID for purposes of voting under Act 23. (*Id.*, ¶ 7.) There are no allegations in the complaint that the members of any of these four organizations would have a right to sue because they lack photo ID sufficient for voting under Act 23—there is no alleged injury to any member of these organizations. *See Hunt*, 432 U.S. at 343; *Disability Rights Wisconsin, Inc.*, 522 F.3d at 801-02.

Likewise, there has been no evidence submitted by Plaintiffs to show that a member of any of the organization plaintiffs lacks a photo ID sufficient for purposes of voting under Act 23. Plaintiffs have filed declarations from individual voters, (*see* Dkt. #29, #33, 35), but none demonstrates that a member of one of the plaintiff organizations lacks qualifying ID.

Third, the organization plaintiffs have not demonstrated injury-in-fact to establish their standing independent of their members. The organizations make allegations in the complaint regarding their resources being diverted towards anti-Act 23 and voter assistance activities, but they do not indicate in their complaint what particular activities in which they would otherwise have engaged were eliminated or diminished due to their Act 23-related efforts. (Dkt. #1 at ¶¶ 4-6.) The declarations that Plaintiffs have filed in support of the organizations' standing seek to outline the programs from which resources "had to" be diverted, were "required" to be diverted, or were "caused" to be diverted, due to Act 23. (Dkt. #22, ¶ 2; #23, ¶ 5; #27, ¶ 9; #28, ¶ 2; #36, ¶ 7.) None of these declarations explains why these organizations "had to" undertake any of the activities that they now claim diverted their resources. Act 23 requires no action by these organizations whatsoever.

"Not every diversion of resources to counteract the defendant's conduct, however, establishes an injury in fact." *NAACP v. City of Kyle, Texas*, 626 F.3d 233, 238 (5th Cir. 2010). "[T]he mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *Id.* (citation and internal quotation marks omitted). The organization plaintiffs' declarations filed in this case do nothing more than suggest "simply a setback to the organization[s'] abstract social interests," which is insufficient to establish standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

The bottom line is that no organization plaintiff was compelled to act in response to Act 23. Unilateral action where none is required by law does not result in injury-in-fact for purposes of standing. If there is any impact on these organizations, it is due to their unilateral choices to invest time and resources to publicly oppose Act 23 and to reach out to voters. Act 23 certainly did not require these organizations to do anything. Chief Judge Easterbrook's logic from *Freedom From Religion Foundation, Inc. v. Obama* must be applied here to conclude that the organization plaintiffs here lack standing:

> [Act 23] imposes duties on [eligible Wisconsin voters] alone. It does not require any [organization] to do anything—or for that matter to take any action in response to whatever [law] the [Wisconsin Legislature enacts]. . . . *No one has standing to object to a statute that imposes duties on strangers.*

641 F.3d 803, 805 (7th Cir. 2011) (Easterbrook, C.J.) (emphasis added).

The organization plaintiffs lack Article III standing, just as Ms. Jones lacks standing. Accordingly, the Court lacks subject matter jurisdiction, and this case must be dismissed.

II.     INJUNCTIVE RELIEF IS UNNECESSARY BECAUSE ACT 23 IS ENJOINED.

Plaintiffs have requested that Act 23 be enjoined.  (Dkt. #1 at p. 14; Dkt. #19 at p. 2.) Act 23 is already enjoined, and it is likely to be enjoined for some time.  The *League* case is pending in the Wisconsin Court of Appeals, and that court has refused to stay the permanent injunction entered by the Dane County Circuit Court.  Likewise, the temporary injunction in the *NAACP* case is pending as the parties complete post-trial briefing, which is due by June 19, 2012. There is no reason for this Court to grant Plaintiffs any relief now because Act 23 is enjoined.

III.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM BECAUSE THEY HAVE NOT DEMONSTRATED A CAUSAL CONNECTION BETWEEN ACT 23 AND A PROHIBITED DISCRIMINATORY RESULT.

A.     To Prevail On A Section 2 Voting Rights Act Claim, Plaintiffs Must Demonstrate A Causal Connection Between Act 23 And The Denial Or Abridgement Of Minority Voters' Opportunity To Participate In The Electoral Process.

Section 2 of the VRA states:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

42 U.S.C. § 1973(a).

A violation of Section 2 of the VRA is established "if, based upon the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of a protected class, "in that its members have less opportunity than other members of the electorate [1] to

participate in the political process and [2] to elect representatives of their choice." 42 U.S.C. §

1973(b). Thus "a plaintiff can prevail in a section 2 claim only if, based on the totality of the

circumstances, . . . the challenged voting practice results in discrimination on account of race."

*Gonzalez v. Arizona*, --- F.3d ----, 2012 WL 1293149, at *13 (9th Cir. Apr. 17, 2012) (*en banc*)

(citations and internal quotation marks omitted). A copy of *Gonzalez* has been filed herewith as

Exhibit C to the Declaration of Clayton P. Kawski.

There are two types of claims under Section 2 of the VRA: vote denial claims and vote

dilution claims. Professor Daniel Tokaji has described these distinct claims:

> [I]t is important to distinguish two analytically distinct types of VRA cases: those
> involving vote denial and those involving vote dilution. "Vote denial" refers to
> practices that prevent people from voting or having their votes counted.
> Historically, examples of practices resulting in vote denial include literacy tests,
> poll taxes, all-white primaries, and English-only ballots. "Vote dilution," on the
> other hand, refers to practices that diminish minorities' political influence in
> places where they are allowed to vote. Chief examples of vote-dilution practices
> include at-large elections and redistricting plans that keep minorities' voting
> strength weak.

Daniel P. Tokaji, *The New Vote Denial: Where Election Reform Meets the Voting Rights Act*, 57

S.C. L. Rev. 689, 691-92 (Summer 2006); *see also id.* at 718 ("Vote denial cases are different

from vote dilution cases. The most obvious difference is that next-generation vote denial cases,

like first-generation vote denial cases, mainly implicate the value of participation; by contrast,

second-generation cases involving vote dilution mainly implicate the value of aggregation.").

This case involves a claim of vote denial under Section 2 of the VRA. (Dkt. #1 at p. 1

("African-Americans and Latinos are far more likely than other Wisconsin citizens to have their

right to vote denied or abridged by Act 23.")); *id.* at ¶ 36 ("Act 23 is likely to disproportionately

deny and abridge the rights of African-American and Latino voters in Wisconsin to participate in

the political process[.]").)  Plaintiffs are claiming that the practice of requiring a voter to show photo identification prior to receiving a ballot denies or abridges his or her right to vote.

Plaintiffs must establish causation to prove their vote denial claim.  *Gonzalez*, 2012 WL 1293149, at *13 (citation omitted).  "Although, proving a violation of § 2 does not require a showing of discriminatory intent, only discriminatory results, proof of a causal connection between the challenged voting practice and a prohibited discriminatory result is crucial."  *Id.* (citations and internal quotation marks omitted).

"[A] bare statistical showing of disproportionate *impact* on a racial minority does not satisfy the § 2 'results' inquiry."  *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 595 (9th Cir. 1997) (emphasis in original); *see also Ortiz v. City of Philadelphia Office of the City Comm'rs*, 28 F.3d 306, 315 (3d Cir. 1994) (rejecting the contention that Pennsylvania's voter-purge statute violated Section 2 of the VRA simply because more minority members than whites were inactive voters); *Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352, 1358-59 (4th Cir. 1989) (upholding Virginia's appointment-based school board system against a Section 2 VRA challenge despite a statistical disparity between the percentage of blacks in the population and the percentage of blacks on the school board); *Salas v. Sw. Tex. Junior College Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992) (rejecting a Section 2 VRA challenge to an at-large voting system based exclusively on a statistical difference between Hispanic and white voter turnout); *Wesley v. Collins*, 791 F.2d 1255, 1262 (6th Cir. 1986) (rejecting a Section 2 VRA challenge to Tennessee's felon-disenfranchisement law that rested primarily on the statistical difference between minority and white felony-conviction rates).  A Section 2 claim "based purely on a showing of some relevant statistical disparity between minorities and whites, without any evidence that the challenged voting qualification causes the disparity, will be

rejected." *Gonzalez*, 2012 WL 1293149, at *13 (citation and internal quotation marks omitted). This approach applies to both vote denial and vote dilution claims. *Id.*, at *13 n.32. (citation omitted).

B.     Plaintiffs Have Not Demonstrated That Act 23 Causes A Prohibited Discriminatory Result.

Plaintiffs assert that "there can be no genuine, credible dispute that the burdens of Act 23 fall much more heavily on African-Americans and Latinos than on Whites." (Dkt. #20 at p. 22.) They assert that "[n]umerous national and individual state studies have repeatedly shown that there are significant racial disparities in rates of driver's license and photo ID possession, as well as in the administration and enforcement of voter ID laws." (*Id.*) Plaintiffs have submitted the declaration of Leland Beatty, which states that "9.5% of registered White voters lack a matching driver's license or state ID, as opposed to 16.2% of registered African American voters and 24.8% of registered Latino voters." (*Id.* (citing Beatty Decl., ¶ 7 (Dkt. #24)). Mr. Beatty concludes that "[o]verall, some 11.1% of Wisconsin registered voters do not have a matching driver's license or state identification." (Beatty Decl., Dkt. #24, ¶ 8.)

Based upon his analysis of certain GAB and DOT data, Mr. Beatty finds that 280,396 White voters, 32,373 voters of "Other" races, 27,938 Black voters, 12,879 Hispanic voters, 5,929 Asian voters, and 872 Indian voters have no matching driver's license or state ID card. (Dkt. #24 at ¶ 45 and accompanying table.) Mr. Beatty concludes that "African American registered voters are 1.7 times as likely as White registered voters to be without a matching driver's license or state identification." (Dkt. #24 at ¶ 8.) He concludes that "Hispanic registered voters are 2.6 times as likely as White registered voters to be without a matching driver's license or state identification." (*Id.*)

Plaintiffs' estimate of the number of registered voters in Wisconsin that lack qualifying identification is unreliable. Defendants' expert witness, Professor M. V. (Trey) Hood, III, is a tenured associate professor at the University of Georgia with an appointment in the Department of Political Science. (Declaration of M. V. Hood, III, ¶ 1, filed herewith.) Professor Hood is an expert in American politics, specifically the area of electoral politics, racial politics, election administration, and Southern politics. (*Id.*) Professor Hood, like Mr. Beatty, analyzed data provided by the GAB and DMV to determine an estimate of the number of registered voters that lack either a Wisconsin driver license or state photo identification card. (*Id.*, ¶¶ 4-17 and accompanying Table 1.)

Using a matching analysis of GAB and DMV data, Professor Hood concludes that between 200,069 and 306,894 registered voters in Wisconsin lack a Wisconsin driver license or Wisconsin state photo identification card. (Hood Decl. at Table 1.) This amounts to between 6.15% and 9.43% of registered Wisconsin voters without a driver license or state photo identification card. (*Id.*, ¶¶ 11-12, Table 1.) Mr. Beatty's figure of 356,512 unmatched registrants, or 11.1% of Wisconsin registered voters, is too large because he apparently failed to make use of driver license numbers to perform his matching analysis. (*Id.*, ¶ 14.)[5]

Mr. Beatty submitted his unmatched voter records to "Ethnic Technologies, a company that maintains proprietary data on race and ethnicity" to "identify the race of individuals based on identifying data such as that contained in the Wisconsin voter registration data." (Beatty Decl., Dkt. #24 at ¶ 43.) However, there is no explanation of the methodology this firm used to

_____

[5] Mr. Beatty's conclusion that 11.1% of Wisconsin registered voters lack a driver license or state photo identification card is also inconsistent with the 9.3% estimate that Plaintiffs' expert witness Professor Kenneth R. Mayer calculated in *NAACP*. (Hood Decl., ¶ 15); (*see* Dkt. #37-65 at p. 3.)

produce its estimates, making it impossible to determine the validity of the techniques used as it may apply to estimating the racial and ethnic breakdown of the unmatched voter records. (Hood Decl., ¶ 16.) Given that Mr. Beatty's calculation of unmatched records is inordinately high and the fact that he relies upon a third-party to produce part of his analysis with no explanation of the methodology used, "there is good reason to call the results of his expert report into question." (Hood Decl., ¶ 17.)

Even if the Court could presume that all of Mr. Beatty's data analysis is factually accurate, based upon reliable principles and methodology, and is otherwise admissible, have Plaintiffs' shown a reasonable likelihood of success on their Section 2 vote denial claim when a larger proportion of African-American and Latino voters lack a Wisconsin driver license or state ID card as compared to White voters? They have not.

Plaintiffs have presented no evidence of African-American or Latino voters' inability to obtain a qualifying ID. While it may be true that certain populations of registered Wisconsin voters does not possess either a Wisconsin driver license or a state ID card, that does not mean that these persons cannot obtain either one of those products or one of the other forms of ID that are sufficient for purposes of voting under Act 23. *See* Wis. Stat. § 5.02(6m). In fact, the DMV has already issued 79,171 free Wisconsin state ID cards for the purposes of voting from July 1, 2011, to May 14, 2012. (Declaration of Kristina H. Boardman, ¶¶ 1-3, filed herewith.)

The percentage of Blacks and Hispanics that are taking advantage of the free state ID program at DMV far exceeds these groups' share of the voting age population in Wisconsin. (Hood Decl., ¶ 33.) While Blacks constitute 5.4% of the voting age population, they comprise 38.2% of those issued free state ID for purposes of voting. (*Id.*) Likewise, the Hispanic share of

free state IDs issued for voting (*i.e.,* 7.5%) exceeds that group's citizen voting age population of 2.0%. (*Id.*)

Plaintiffs' witnesses have completed no studies or analyses regarding whether the population of minority voters that lack a Wisconsin driver license or state ID card possess another form of qualifying ID. Plaintiffs' witnesses also have engaged in no analysis of whether the voters that lack a matching driver license or state ID card also lack the underlying documentation or means to obtain a qualifying ID. Plaintiffs have submitted no evidence regarding whether African-American and Latino voters, while lacking a driver license or state ID, face any barriers to obtaining these DMV products or any of the other forms of acceptable ID.

Plaintiffs' witnesses completed no analysis and offered no expert opinion regarding African-American and Latino voters' alleged lack of underlying documents necessary to obtain a driver license or state ID card, or these voters' alleged burdens associated with obtaining such credentials. For example, Mr. Beatty testified as follows:

> [Counsel]:      In the course of your work on this case, did you do any analysis or inquiry into whether the people who lack a driver's license or ID lack a birth certificate?
>
> [Mr. Beatty]:        I did not research on that.
>
> Q.      Did you look into whether the people who lack a driver's license or ID card lack any of the other underlying documentation necessary to get a driver's license or ID card?
>
> A.      I did not.
>
> Q.      Did you do any analysis of the burdens that some people may or may not face in obtaining a driver's license or ID card?
>
> A.      I did not.

> Q.  Did you draw any conclusions that people of certain races would have more or less difficulty in obtaining a driver's license or ID card if they did not already have one?

> A.  I did not.

(Kawski Decl., Ex. D (Leland Beatty deposition at p. 65, l. 16 to p. 66, l. 9)); (*see also* Kawski Decl., Ex. G (Lorraine Minnite deposition at p. 30, ll. 21-15)); (Kawski Decl., Ex. H (Barry Burden deposition at p. 29, ll. 15-18; p. 30, ll. 7-11).)

Plaintiffs have not demonstrated that Act 23 *causes* a prohibited discriminatory result. While they have submitted proposed expert witness declarations that attempt to establish that a number of eligible African-American and Latino voters do not possess two of the several forms of qualifying ID, Plaintiffs have offered no evidence whatsoever to demonstrate that these voters are unable to procure qualifying photo ID. Plaintiffs have only completed half of the analysis. They have tried to demonstrate that some voters lack either of two forms of qualifying ID, but they have not demonstrated that these individuals are unable to obtain *any* form of qualifying ID.

Plaintiffs have submitted evidence purporting to establish a statistical disparity in rates of possession of driver licenses and state ID cards between White and minority voters, but that is not enough to prove their claim. *Gonzalez*, 2012 WL 1293149, at *13. Plaintiffs have not demonstrated that eligible African-American and Latino voters are unable to obtain qualifying ID. Without that additional showing, Plaintiffs cannot demonstrate that Act 23 causes a prohibited discriminatory result, which is necessary to prove their claim. *Id.* In short, there is insufficient evidence to suggest that implementation of Act 23 will produce any racially disparate impact on the ability of minorities in Wisconsin to fully participate in the electoral process. (Hood Decl., ¶ 47.)

C. A "Totality of Circumstances" Analysis Does Not Indicate That Act 23 Violates Section 2 Of The VRA.

Plaintiffs state a Section 2 vote denial claim. Yet, they assert that the Court should weigh a set of "Senate Factors" factors, as they are known, which are typically used to evaluate the "totality of circumstances" for a claim of vote dilution. *Thornburg v. Gingles*, 478 U.S. 30 (1986); (Dkt. #20 at pp. 29-43). Specifically, the Supreme Court has indicated that these "factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims." *Gingles*, 478 U.S. at 45.

Whether the Senate Factors play any part in the analysis of a vote denial claim is doubtful. Even Plaintiffs acknowledge that addressing the "Senate Factors" is "not required to prove a Section 2 vote denial claim." (Dkt. #20 at p. 30.) Professor Daniel Tokaji distinguishes vote denial and vote dilution claims and explores the reasons why some of the factors that would be considered in a vote dilution case (such as a redistricting case) would not be pertinent to the analysis in a vote denial case:

> Whatever dangers of proportional representation exist in applying a disparate-impact standard to vote dilution cases, they do not exist at all in vote denial cases. For example, allowing a plaintiff to make a prima facie against a voter ID law by showing the law has a more severe effect on black voters than on white voters is a far cry from requiring proportional representation. Thus, the concerns that led Congress to avoid a simple disparate-impact standard in vote dilution cases are not germane to vote denial claims.

Tokaji, *supra*, 57 S.C. L. Rev. at 722-23. *See also Simmons v. Galvin*, 575 F.3d 24, 29 (1st Cir. 2009) (distinguishing between vote denial and vote dilution claims and indicating that the former "refers to practices that prevent people from having their vote counted") (citation omitted).

The Court should not use the *Gingles* "Senate Factors" to analyze Plaintiffs' vote denial claim. This is not a redistricting case involving a claim of vote dilution like *Gingles*. However, for the sake of completeness, this brief will respond to Plaintiffs' analysis of the Senate Factors.

In evaluating the totality of the circumstances in a Section 2 VRA vote dilution claim, "a court must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.'" *Gingles*, 478 U.S. at 44 (quoting S.Rep. No. 97–417, at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 205). In *Gingles*, the Supreme Court cited a list of nine factors (generally referred to as the "Senate Factors" because they were discussed in the Senate Report on the 1982 amendments to the VRA) that courts should consider in making this totality of the circumstances assessment. *Id.* at 44-45. Those factors were stated by the Court:

> The Senate Report specifies factors which typically may be relevant to a § 2 claim: [1] the history of voting-related discrimination in the State or political subdivision; [2] the extent to which voting in the elections of the State or political subdivision is racially polarized; [3] the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; [4] the exclusion of members of the minority group from candidate slating processes; [5] the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; [6] the use of overt or subtle racial appeals in political campaigns; and [7] the extent to which members of the minority group have been elected to public office in the jurisdiction. *Id.,* at 28-29; see also *supra*, at ----. The Report notes also that evidence demonstrating that [8] elected officials are unresponsive to the particularized needs of the members of the minority group and [9] that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value.

*Id.* at 44-45 (brackets added).

The Senate Factors will be addressed in the order in which Plaintiffs presented them. Plaintiffs did not address Senate Factors Three and Four in their brief.

1.      Senate Factor Five.

Senate Factor Five requires an analysis of "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 45. Relying upon the declaration of Professor Barry Burden, Plaintiffs argue that African-Americans and Latinos in Wisconsin suffer from "the effects of discrimination in areas such as housing, education, employment, income, health care, criminal justice, and others that affect their ability to participate in the political process and *result in their disproportionately lacking the identification Act 23 requires in order to vote*." (Dkt. #20 at p. 31 (citing Burden Decl., ¶¶ 19-42) (emphasis added).)

Plaintiffs' statement paints an incomplete and misleading picture. Even if minority groups in Wisconsin disproportionately *lack* qualifying ID, Plaintiffs have offered no evidence to show that these groups are unable to *obtain* qualifying ID. With regard to Senate Factor Five, Plaintiffs have not shown that alleged discrimination against minority groups and alleged differing socioeconomic conditions have in fact *resulted in* these groups' inability to obtain Act 23 ID. As discussed above, Plaintiffs must demonstrate that Act 23 causes a prohibited discriminatory result. *Gonzalez*, 2012 WL 1293149, at *13. Merely showing a racial disparity in possession rates of qualifying ID is not enough. *See id.*

Professor Burden does not directly address the issue of causation. He vaguely touches upon the issues of African-American and Latino voters obtaining state photo ID and lacking birth certificates, (*see* Burden Decl., ¶¶ 58-59), but he includes no research or analysis on these points

by which the Court could conclude that these voters face barriers to obtaining qualifying ID. Instead, Professor Burden's declaration addresses: (1) the migration of Blacks and Latinos to Wisconsin, (*Id.*, ¶ 20); (2) the demographic breakdown of Milwaukee compared to other places in Wisconsin, (*Id.*, ¶¶ 21-23); (3) disparities in the use of public transportation, (*Id.*, ¶ 24); (4) past racial segregation in Milwaukee, (*Id.*, ¶¶ 25-27); (5) unemployment, income, and poverty disparities, (*Id.*, ¶¶ 28-32); (6) infant mortality disparities, (*Id.*, ¶ 33); (7) educational disparities, (*Id.*, ¶¶ 34-35); (8) incarceration disparities, (*Id.*, ¶ 36-37); and (9) traffic stop disparities. (*Id.*, ¶ 38.) None of these subjects even remotely addresses whether African-American and Latino voters are able to procure a form of Act 23 ID. Without addressing that issue head on, Plaintiffs cannot prevail. *Gonzalez*, 2012 WL 1293149, at *13.

Professor Burden opines that these "disparities in outcomes have a direct bearing on the impact of state election laws on minority voting." (Burden Decl., ¶ 39.) He posits that educational, income, and health disparities result in decreased voter participation. (*See id.*, ¶¶ 39-41.) Even if such disparities were shown to decrease voter participation generally, Act 23 has no direct impact whatsoever on disparities in education, income, and health for African-American and Latino voters. Act 23 does not *cause* such disparities—it is a law regulating the administration of elections. Voter participation *generally* is not at issue here; this case is about whether Act 23 *causes* a prohibited discriminatory result.

Professor Burden's analysis states that "Wisconsin displays substantial and enduring racial disparities in areas such as education, income, employment, criminal justice, and health." (Burden Decl., ¶ 42.) Without citation to evidence, he concludes that these disparities are "frequently larger than those in the rest of the United States" and that "[b]ecause they bear the effects of discrimination in these areas, Blacks and Latinos in Wisconsin are more likely than

Whites to be deterred from voting by the additional burdens imposed by Act 23." (*Id.*)  Professor Burden has done no research or analysis for his declaration regarding whether Blacks and Latinos will be "deterred from voting" by Act 23.  His ultimate conclusion that Act 23 will deter these groups from voting is unsupported by any research or analysis that he has done regarding minority voter turnout.  In any event, Plaintiffs' other witness, Professor Lorraine Minnite, has written that as to the impact of voter photo identification laws, "the existing science regarding vote suppression [is] incomplete and inconclusive."  Robert S. Erikson and Lorraine C. Minnite, *Modeling Problems in the Voter Identification—Voter Turnout Debate*, 8 Election L. J. 85, 98 (2009), filed herewith as Exhibit E to the Declaration of Clayton P. Kawski.

Professor Hood also evaluated voter turnout for minority groups and concludes that there is no evidence that a historical pattern of lower minority turnout in Wisconsin exists.  (Hood Decl., ¶ 25.)  From 2000 to 2010, Black and White voter turnout rates are statistically the same in all but one election cycle (2006).  (*Id.* and accompanying Figure 2.)  Likewise, in more recent comparisons using the citizen voting age population as a baseline for turnout, Hispanic turnout differed from White turnout in 2008, but not in 2010.  (*Id.* and accompanying Figure 1.)

2.    Senate Factors One and Seven.

Senate Factor One requires an analysis of "the history of voting-related discrimination in the State or political subdivision."  *Gingles*, 478 U.S. at 45.  Senate Factor Seven requires an analysis of "the extent to which members of the minority group have been elected to public office in the jurisdiction."  *Id.*  Plaintiffs have not made a convincing argument as to these Senate Factors.

As to Senate Factor One, Plaintiffs point to an allegedly "long history of election practices that facilitate discrimination" in Wisconsin.  (Dkt. #20 at p. 34 (citation omitted)).

Plaintiffs neglect one important fact. Namely, Wisconsin is not a "covered" jurisdiction under Section 5 of the VRA. Section 5 of the VRA imposes rather substantial burdens on "covered" jurisdictions—nine states (and every jurisdiction therein), plus a host of jurisdictions scattered through several other states. *See* Voting Section, U.S. Dep't of Justice, Section 5 Covered Jurisdictions, *http://www.justice.gov/crt/about/vot/sec_5/covered.php* (last visited May 23, 2012) (listing the covered jurisdictions). The "covered" jurisdictions were singled out in the law because they have historically engaged in discriminatory practices. "Covered" jurisdictions must receive "preclearance" for changes in election procedures from the United States Attorney General or a three judge federal district court in Washington, D.C. *See* 42 U.S.C. § 1973c(a); *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 198-99 (2009). Justice Thomas described the purposes of Section 5 of the VRA as the law relates to "covered" jurisdictions:

> Section 5, however, was enacted for a different purpose: to prevent covered jurisdictions from circumventing the direct prohibitions imposed by provisions such as §§ 2 and 4(a). See *Reno v. Bossier Parish School Bd.,* 520 U.S. 471, 477, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) (explaining that §§ 2 and 5 "combat different evils" and "impose very different duties upon the States"). Section 5 "was a response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down. That practice had been possible because each new law remained in effect until the Justice Department or private plaintiffs were able to sustain the burden of proving that the new law, too, was discriminatory." *Beer v. United States,* 425 U.S. 130, 140, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976) (internal quotation marks omitted).

*Id.* at 217-18 (Thomas, J., concurring in the judgment and dissenting in part).

Wisconsin is not a "covered" jurisdiction under Section 5 of the VRA that has historically engaged in discriminatory practices, and its election procedures are not subject to "preclearance." If Wisconsin had a long history of discriminatory election practices then certainly the state or

specific jurisdictions within the state would be covered by Section 5 of the VRA. (Hood Decl., ¶ 20.)

Plaintiffs highlight two examples of allegedly discriminatory voting practices in Wisconsin. The first example is a Wisconsin registration requirement for those that lived in counties with over 5,000 residents. This requirement is not relevant because, as Plaintiffs point out, the Help America Vote Act of 2002, 42 U.S.C. §§ 15301-15545, now requires a Statewide Voter Registration System (SVRS). Wisconsin's compliance with the HAVA SVRS requirement occurred in 2006. Registration is now required for voters throughout Wisconsin.

The second example of an allegedly discriminatory voting practice in Wisconsin that Plaintiffs cite is that Spanish language ballots were not provided in Milwaukee County until February 2012. (Dkt. #20 at p. 34.) This isolated example hardly establishes what Plaintiffs characterize as a "Long History of Official Discrimination in Wisconsin." (*Id.*)

As to Senate Factor Seven, Plaintiffs provide limited information regarding the number African-American and Latino persons who have been elected to public office in Wisconsin. (Dkt. #20 at p. 34.) In *Gingles*, the Supreme Court addressed the district court's analysis of minority representation in both statewide offices and state legislative offices. *Gingles*, 478 U.S. at 40-41. Plaintiffs have failed to address the fact that there are and have been a significant number of African-American and Latino elected officials in Wisconsin history.

In Wisconsin there are a number of African-American and Latino legislators, including: Gwendolynne Moore (4th Congressional District), Spencer Coggs (6th State Senate District), Lena Taylor (4th State Senate District), Elizabeth Coggs (10th Assembly District), Jason Fields (11th Assembly District), Tamara Grigsby (18th Assembly District), Barbara Toles (17th Assembly District), Robert Turner (61st Assembly District), Leon Young (16th Assembly

District), and JoCasta Zamarripa (8th Assembly District). *Wisconsin Blue Book 2011-12*, Biographies, *available at http://legis.wisconsin.gov/lrb/bb/11bb/Biographies.pdf* (last visited May 29, 2012). In terms of congressional and legislative representation, Blacks are descriptively represented in Wisconsin at levels comparable to, or above, their proportion of the voting age population. (Hood Decl., ¶ 27.) Additionally, the United States Census Bureau reports that from 1970 to 2002 there were 33 Black public elected officials in Wisconsin. (Kawski Decl., Ex. F at page 258 Elections.) Likewise, the Census Bureau reports that there were nine Hispanic public elected officials in Wisconsin from 1985 to 2008. (*Id.* at page 259 Elections.)

### 3. Senate Factor Eight.

Senate Factor Eight requires an analysis of the extent to which "elected officials are unresponsive to the particularized needs of the members of the minority group[.]" *Gingles*, 478 U.S. at 45. Plaintiffs assert that elected officials are not responsive to the needs of Wisconsin's African-Americans and Latinos because of the existence of "severe racial disparities in such areas as housing, education, employment, income, health, criminal justice and others." (Dkt. #20 at p. 35 (citation and internal quotation marks omitted).) Plaintiffs also point to "numerous instances in which federal intervention has been required to remedy state and local government shortcomings in such areas as school and residential segregation, voter registration practices, and (just two months ago) the provision of Spanish-language ballots." (*Id.*) Finally, Plaintiffs assert that a "traditional lack of responsiveness by White elected officials was on particular display during the consideration and enactment of Act 23 itself" because certain alternatives were not incorporated into the version of Act 23 that was enacted. (*Id.* at p. 35-36.)

First, the existence of racial disparities in the areas that Plaintiffs note is not evidence that elected officials are "unresponsive" to the needs of minority groups. On the contrary, such

alleged racial disparities are also equally probative of the fact that programs and laws in place with the goals of eliminating or decreasing racial disparities are ineffective. Plaintiffs neglect to acknowledge that government programs and legislation cannot categorically wipe away racial disparities in housing, education, employment, income, health, criminal justice, and other areas. To point the finger of blame at elected officials as "unresponsive" is to seriously misjudge the power of our policymakers to fashion a wholesale remedy for alleged racial disparities in these areas.

Second, pointing to a handful of instances in which Plaintiffs allege that "shortcomings" have occurred at the state level does not establish that Wisconsin elected officials are "unresponsive" to the needs of minority groups. The isolated examples that Plaintiffs cite do not demonstrate a widespread unresponsiveness of elected officials to the needs of minority groups in Wisconsin.

Finally, in enacting Act 23 the Legislature considered countless competing proposals and policies. Some proposals were ultimately rejected. It does not follow that because the Legislature necessarily made policy choices that did not accommodate the preferences of every group or person that the Legislature was "unresponsive" to those groups or people. Plaintiffs are dissatisfied with the law that was enacted, but that dissatisfaction is best expressed to the Legislature, not to this Court.

### 4. Senate Factors Two and Six.

Senate Factor Two requires an analysis of "the extent to which voting in the elections of the State or political subdivision is racially polarized." *Gingles*, 478 U.S. at 45. Senate Factor Six requires an analysis of "the use of overt or subtle racial appeals in political campaigns[.]" *Id.*

In *Gingles*, the Supreme Court referred to racial polarization as "a consistent relationship

between [the] race of the voter and the way in which the voter votes," or where "black voters and white voters vote differently." *Gingles*, 478 U.S. at 53 n. 21. The Seventh Circuit has also observed that racially polarized voting under this factor of the analysis means "that members of various racial or ethnic groups have a strong preference for a candidate that belongs to their group." *Barnett v. City of Chicago*, 141 F.3d 699, 702 (7th Cir. 1998).

Plaintiffs cite limited examples of allegedly racially polarized voting in Wisconsin, relying primarily upon the voting patterns observed during the 2008 presidential election. (Dkt. #20 at pp. 37-38.) None of Plaintiffs' witnesses conducted primary research regarding the existence of racially polarized voting in Wisconsin. Specifically, other than in the 2008 presidential election, Plaintiffs' witnesses have not analyzed whether African-American or Latino voters consistently vote for candidates of their race. *Barnett*, 141 F.3d at 702. The evidence that Plaintiffs have cited in support of Senate Factor Two is scant at best and inconclusive at worst.

With regard to Senate Factor Six, Plaintiffs point to the "Reuben Lee Mitchell" TV ad run against incumbent Wisconsin Supreme Court Justice Louis Butler, Jr. in 2008 and a 2006 gubernatorial campaign ad criticizing "illegal aliens" who were taking advantage of government programs providing public assistance. (Dkt. #20 at p. 38.) Like Plaintiffs' argument with regard to Senate Factor Two, their "evidence" with regard to Senate Factor Six is scant, and the ads Plaintiffs address are subject to interpretation and debate regarding their merits and whether they were even "racial appeals." Plaintiffs' witnesses have done no primary research regarding the existence of racial appeals in Wisconsin political campaigns, and the two isolated examples cited by Plaintiffs cannot be viewed as typical of Wisconsin politics generally.

5.      Senate Factor Nine.

Finally, Senate Factor Nine requires an analysis of whether "the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous." *Gingles*, 478 U.S. at 45. Plaintiffs assert that the policy underlying Act 23 "markedly departs from historic Wisconsin practices," is "tenuous," "lacks fairness," and "needlessly impairs" the voting rights of African-American and Latino voters. (*See* Dkt. #20 at pp. 39-44.) Plaintiffs are incorrect.

a.      Act 23 Is Consistent With Historic Wisconsin Practices Protecting the Integrity Of The Electoral Process and Confirming That Electors Are Qualified To Vote.

The policy behind Act 23 is not tenuous. Act 23 is consistent with Wisconsin election practices that the Wisconsin Supreme Court has repeatedly upheld. It reflects a desire to preserve the integrity of Wisconsin elections by requiring voters to prove that they are qualified electors prior to being allowed to cast a ballot.

Since the middle of the 19th century our supreme court has consistently held that the right to vote, although fundamental, is nonetheless subject to reasonable legislative regulation designed to protect the integrity of the electoral process. For example, in the early case of *State ex rel. Cothren v. Lean*, 9 Wis. 279, 1859 WL 5133 (1859), the court rejected a claim that a statute allowing election inspectors to challenge the eligibility of individual voters at the polls was unconstitutional because it prescribed qualifications for electors beyond those provided for in the constitution. *Id.* at 283-84. While that *ultra vires* claim is not identical to the constitutional claim here, nonetheless noteworthy for present purposes is the court's holding that

"it is clearly within [the legislature's] province to require any person offering to vote, to furnish such proof as it deems requisite, that he is a qualif[i]ed elector." *Id.*

Sixteen years later in *State ex rel. Wood v. Baker*, 38 Wis. 71, 1875 WL 3541 (1875), the court rejected a claim that procedural errors made by election inspectors in the administration of the state's voter registration law invalidated the votes of individual electors who had voted without awareness of those official errors. Although the court concluded in *Baker* that the individual electors' right to vote could not be impaired by the erroneous official administration of the registration statute, the court's analysis was nonetheless consistent with the principle previously established in *Cothren*. *See id.* at 86-87. The court reasoned that statutes cannot impair the constitutional right to vote, but they can regulate the exercise of that right by requiring reasonable proof of a voter's qualifications. *Id.* at 86. Such proof requirements, "are not unreasonable, and are consistent with the present right to vote, as secured by the constitution. The statute imposes no condition precedent to the right; it only requires proof that the right exists." *Id.* at 87. If a voter is denied the opportunity to vote for failing to provide such proof, the court concluded that he is disenfranchised not by the statute, "but by his own voluntary refusal of proof that he is enfranchised by the constitution." *Id.*

The court repeated the essential holding of *Baker* in *Dells v. Kennedy*, 49 Wis. 555, 6 N.W. 246 (1880). The court in *Dells* held invalid the voter registration requirements of chapter 235 of the Laws of 1879 as an unconstitutional disenfranchisement because it prescribed elector qualifications additional to those found in the Wisconsin Constitution. *Id.* at 556, 560. However, in doing so, the court reiterated that election laws may be sustained "as regulating reasonably the exercise of the constitutional right to vote at an election." *Id.* at 558. The *Dells* court reinforced the holding in *Baker* regarding the fact that a voter may be called upon to prove

that he is a qualified elector: "'The voter may assert his right, if he will, by proof that he has it; may vote, if he will, by reasonable compliance with the law. His right is unimpaired; and if he be disenfranchised, it is not by force of the statute, but by his own *voluntary* refusal of proof that he is enfranchised by the constitution.'" *Id.* at 559 (quoting *Baker*, 38 Wis. 71) (emphasis provided by the *Dells* court).[6]

The same principles were again applied in *State ex rel. Runge v. Anderson*, 100 Wis. 523, 76 N.W. 482 (1898), in which the court rejected a claim that the constitutional right to vote was infringed by a statute providing that a candidate could appear only once on the official ballot in an election, even if the candidate had received the nomination of more than one political party. In upholding the challenged ballot law, the court once more affirmed the view that the right to vote is properly subject to reasonable regulation:

> Manifestly, the right to vote, the secrecy of the vote, and the purity of elections, all essential to the success of our form of government, cannot be secured without legislative regulations. Such regulations, within reasonable limits, strengthen and make effective the constitutional guaranties instead of impairing or destroying them. Some interference with freedom of action is permissible and necessarily incident to the power to regulate at all, as some interference with personal liberty is necessary and incident to government; and so far as legislative regulations are reasonable and bear on all persons equally so far as practicable in view of the constitutional end sought, they cannot be rightfully said to contravene any constitutional right.

*Id.* at 533-34. The same passage was quoted in full in *State ex rel. Van Alstine v. Frear*, 142 Wis. 320, 337, 125 N.W. 961 (1910), in which the court rejected the claim that Wisconsin's

---

[6]*State ex rel. O'Neill v. Trask*, 135 Wis. 333, 338, 115 N.W. 823 (1908), also quoted approvingly the holding of the *Baker* case. *Trask*, which involved the presentation of affidavits offered in lieu of registration by voters who were not on the voter registry, observed that the prevention of fraudulent voting is a legitimate aim of regulations governing the administration of elections. *Id.* ("The object of the statute is to prevent fraudulent voting by persons who assume the right, when, in fact, they are not entitled to it.").

primary election law unconstitutionally interfered with the rights of voters to participate in the selection of candidates for public office.

Another claim that the right to vote was unconstitutionally impaired by the state's primary election laws was considered and rejected in *State ex rel. McGrael v. Phelps*, 144 Wis. 1, 128 N.W. 1041 (1910). In that decision, the court rejected the view that the right to vote was a mere privilege and instead found that right, as guaranteed by article III, section 1 of the Wisconsin Constitution, to be a fundamental and inherent right of the highest character. *Id.* at 14-15. Nonetheless, the court went on to note that the fundamental right to vote "is yet subject to regulation like all other rights." *Id.* at 15. The court further explained:

> It has become elementary that constitutional inhibitions of legislative interference with a right, including the right to vote and rights incidental thereto, leaves, yet, a field of legislative activity in respect thereto circumscribed by the police power. That activity appertains to conservation, prevention of abuse, and promotion of efficiency. Therefore, as in all other fields of police regulation, it does not extend beyond what is reasonable. Regulation which impairs or destroys rather than preserves and promotes, is within condemnation of constitutional guarantees.

*Id.* at 17-18. The court then articulated a rationale for assessing the constitutionality of legislation affecting the right to vote:

> It is further elementary that, the extent to which the legislature may go in the field of police power, is primarily a matter for its judgment. As to the case in hand, the same as others, it could not properly go beyond reasonable regulation. However, what is and what is not reasonable, is primarily for legislative judgment, subject to judicial review. Such review does not have to do with expediency. It only deals with whether the interference, from the standpoint of a legitimate purpose, can stand the test of reasonableness, all fair doubts being resolved in favor of the proper exercise of the law making power.

*Id.* at 18.

In *State ex rel. Small v. Bosacki*, 154 Wis. 475, 475 N.W. 175 (1913), the court, in rejecting a claim that a statute prescribing voter residency requirements violated the voting rights of transient workmen, further elaborated the Legislature's authority to create such laws:

> It is competent for the legislature to prescribe reasonable rules and regulations for the exercise of the elective franchise. To do so infringes upon no constitutional rights. It is because of the sacredness of the lawful use of the ballot, and of its importance in governmental affairs, that the right as well as the duty is vested in the legislature to prescribe reasonable rules and regulations under which it may be exercised. Such rules and regulations tend to certainty and stability in government and render it possible to guard against corrupt and unlawful means being employed to thwart the will of those lawfully entitled to determine governmental policies. Their aim is to protect lawful government, not to needlessly harass or disfranchise anyone.

*Id.* at 478-79. Clearly, the court was of the view that reasonable procedural regulations designed to protect the integrity of elections are not constitutionally suspect and do not violate the fundamental right to vote.

In *State ex rel. Frederick v. Zimmerman*, 254 Wis. 600, 37 N.W.2d 473 (1949), the court rejected a claim that a statute providing for primary and runoff contests in Wisconsin's spring elections for non-partisan state offices unconstitutionally impaired the voting rights of individual electors. In so holding, the court noted that "[w]hile the right of the citizen to vote in elections for public officers is inherent, it is a right nevertheless subject to reasonable regulation by the legislature." *Id.* at 613 (citations omitted). The court continued:

> It is true that the right of a qualified elector to cast his ballot for the person of his choice cannot be destroyed or substantially impaired. However, the legislature has the constitutional power to say how, when, and where his ballot shall be cast[.]

*Id.*

The court repeated this same language from *Zimmerman* seventeen years later in upholding the constitutionality of a statute providing that absentee ballots could not be counted

unless they were properly authenticated by the municipal clerk. *Gradinjan v. Boho*, 29 Wis. 2d 674, 684-85, 139 N.W. 557 (1966) (quoting *Zimmerman*, 254 Wis. 2d at 613).

In the cases discussed above, the Wisconsin Supreme Court has consistently held that the right to vote, although fundamental, is subject to reasonable legislative regulation designed to protect the integrity of the electoral process. The Legislature has the authority to regulate how, when, and where ballots are cast by qualified electors.

The State's interest in requiring photo identification for voting is significant. As the Supreme Court recognized in *Crawford v. Marion County Election Board*, the prevention of voter fraud is unquestionably both legitimate and important. 553 U.S. 181, 196 (2008). By requiring qualified electors to confirm their identity by showing a form of photo identification, Act 23 minimizes the possibility that a person will vote for another registered voter, for a person who is deceased, or for a fictitious person registered through fraud. Votes cast in any of these circumstances constitute vote dilution, which is a diminution of every elector's right to vote. *See Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."). The Supreme Court has also recognized that voter photo identification laws bolster the public's confidence in the integrity of the electoral process. *Crawford*, 553 U.S. at 197. Act 23 and the regulations previously upheld by the Wisconsin Supreme Court thus protect the fundamental right to vote and foster confidence in elections.

        b.      Professor Lorraine Minnite's Analysis Is Inconsistent With *Crawford*, Is Not Based Upon Current Primary Research Regarding Voter Fraud In Wisconsin, And Should Be Given No Weight.

Plaintiffs assert that "in-person voter fraud is not a significant problem in Wisconsin" and rely upon the declaration of Professor Lorraine Minnite, a "nationally recognized expert on the incidence and effect of voter fraud in American elections." (Dkt. #20 at p. 40 (citing Minnite Decl, ¶ 1).) Professor Minnite concludes that "fraud committed by voters either in registering to vote or at the polls on Election Day is exceedingly rare." (*Id.* (citing Minnite Decl., ¶¶ 43-44).) Professor Minnite also asserts that: "allegations [of voter fraud] are motivated by partisan political interests and are designed to make voting harder for certain populations," (Dkt. #34, ¶ 1), and that "stringent photo identification requirements to vote are not justified by claims that such requirements are needed to reduce or prevent voter impersonation forms of election fraud because as the empirical record makes clear, fraud committed by voters either in registering to vote or at the polls on Election Day is exceedingly rare." (*Id.*, ¶ 2.)

The Court should give no weight to Professor Minnite's declaration. First, her conclusions regarding the policy justifications for Act 23 are inconsistent with what the Supreme Court has recognized as the legitimacy and importance of the State's interests in voter identification laws in *Crawford*. Specifically, the Supreme Court stated:

> The only kind of voter fraud that SEA 483 addresses is in-person voter impersonation at polling places. The record contains no evidence of any such fraud actually occurring in Indiana at any time in its history. Moreover, petitioners argue that provisions of the Indiana Criminal Code punishing such conduct as a felony provide adequate protection against the risk that such conduct will occur in the future. It remains true, however, that flagrant examples of such fraud in other parts of the country have been documented throughout this Nation's history by respected historians and journalists, that occasional examples have surfaced in recent years, and that Indiana's own experience with fraudulent voting in the 2003 Democratic primary for East Chicago Mayor—though perpetrated using absentee

ballots and not in-person fraud—demonstrate that not only is the risk of voter fraud real but that it could affect the outcome of a close election.

There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.

*Crawford*, 553 U.S. at 194-96 (footnotes omitted).

Professor Minnite also disregards in her declaration what the Supreme Court has recognized as the State's important and legitimate interests in preserving the integrity of elections:

Finally, the State contends that it has an interest in protecting public confidence "in the integrity and legitimacy of representative government." Brief for State Respondents, No. 07–25, p. 53. While that interest is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process. As the Carter–Baker Report observed, the "electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters." *Supra*, at 1618.

*Id.* at 197; *see also Purcell v. Gonzalez*, 549 U.S. 1, 127 S.Ct. 5, 7 (2006) (per curiam) ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised.").

Professor Minnite testified in deposition regarding *Crawford* and expressed doubts regarding the Supreme Court's analysis of in-person impersonation voting fraud, referring to the Court's analysis as "a very careless summary of the history and the research on this subject." (Kawski Decl., Ex. G (Lorraine Minnite deposition at p. 87, ll. 23-25).) Professor Minnite also

showed a fundamental misunderstanding of the Court's analysis of in-person impersonation voter fraud by opining that the *Crawford* Court addressed types of election fraud other than in-person impersonation fraud in its discussion of Indiana's voter photo identification law.  (*See id.* at pp. 83-87); *Crawford*, 553 U.S. at 194 ("The only kind of voter fraud that SEA 483 addresses is in-person voter impersonation at polling places.").

Professor Minnite also questioned the Supreme Court's conclusions regarding public confidence in elections encouraging citizen participation in the democratic process.  (Kawski Decl., Ex. G. (Lorraine Minnite deposition at pp. 91-94)).  Specifically, Professor Minnite testified that it is her opinion that the Supreme Court's discussion at page 197 of *Crawford* regarding public confidence encouraging citizen participation in the democratic process is not consistent with empirical research.  (*Id.* at p. 94, ll. 4-8.)

Second, Professor Minnite engaged in no current primary research regarding voter fraud in Wisconsin to form her opinions.  She conducted no current primary research regarding voter fraud in Wisconsin to prepare her expert report.  (Kawski Decl., Ex. G. (Lorraine Minnite deposition at p. 48, l. 17 to p. 50, l. 13).)  Instead, she relied upon research and analysis that was recycled from her 2010 book *The Myth of Voter Fraud*.  Professor Minnite explained during her deposition:

[Counsel]	Did you take a look at Wisconsin's voter fraud laws in particular?

A.	Yes, I did.

Q.	Where is that reflected in your Declaration?

A.	It's not reflected in the Declaration.

Q.	Why not?

A.	Well, that was, again, part of the research that was done for my book.

> Q.     So we're talking about Wisconsin law in this case and you did not include any discussion of Wisconsin voter fraud statutes in this report?
>
> MR. NADLER:     I object to the question as argumentative and asked and answered. But if you have anything to add, you can add it.
>
> THE WITNESS:     No.

(*Id.* at p. 50, l. 13 to p. 51, l. 7.)

Professor Minnite did not engage in techniques like data mining of available data, such as voter registration rolls, voter history files, death indices, or lists of citizens convicted of a felony. (*Id.* at p. 108, ll. 9-14.) Professor Minnite's conclusions are based on reports of voter fraud, which overlooks fraudulent activity that may have gone unreported. (Hood Decl., ¶ 43.) To fully examine election fraud one must go beyond simply relying on reports of voter or election fraud and actively search for the existence of such activities. (*Id.*)

Finally, the Court should not rely upon Professor Minnite's declaration because she is biased against voter photo identification laws. In a 2009 article in the Election Law Journal, Professor Minnite stated: "It should be evident that our sympathies lie with the plaintiffs in the voter ID cases." Robert S. Erikson and Lorraine C. Minnite, *Modeling Problems in the Voter Identification—Voter Turnout Debate*, 8 Election L. J. 85, 98 (2009); filed as Kawski Decl., Ex. D. This statement does not reflect that Professor Minnite is an unbiased, objective witness. When asked during deposition to explain the statement in her Election Law Journal article, Professor Minnite launched into a lengthy, convoluted statement that did nothing to dismiss her bias. (*See* Kawski Decl., Ex. G. (Lorraine Minnite deposition at p. 106, l. 3 to p. 107, l. 22).) Professor Minnite's statement in her Election Law Journal article suggests that her academic

work and the opinions stemming from that work is skewed against voter photo identification laws because she sympathizes with voter ID case plaintiffs.

IV.     PLAINTIFFS ARE NOT LIKELY TO SUFFER IRREPARABLE HARM BECAUSE ACT 23 IS ENJOINED, AND PLAINTIFFS HAVE NOT SHOWN THAT THEY WILL BE INJURED BY ACT 23.

As discussed above, the injunctive relief requested is unnecessary. Act 23 is enjoined. Setting aside the pending state court injunctions, Plaintiffs have not demonstrated that they will be injured by Act 23. Plaintiff Jones possesses a form of photo identification sufficient for purposes of voting under Act 23. (Dkt. # 31 at pp. 4-5; Kawski Decl., Ex. B.) The organization plaintiffs have not demonstrated that any of their members lack sufficient identification for purposes of voting under Act 23. These organization plaintiffs also have not demonstrated that, as organizations, they will be injured because of Act 23. There is no risk of irreparable harm to Plaintiffs in these circumstances because there is no potential injury.

V.      PLAINTIFFS HAVE NOT DEMONSTRATED THAT THE BALANCE OF EQUITIES TIPS IN THEIR FAVOR OR THAT AN INJUNCTION IS IN THE PUBLIC INTEREST.

Finally, Plaintiffs have not met the third and fourth factors for a preliminary injunction, namely, "that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (2008) (citations omitted). Plaintiffs inappropriately discount the State's legitimate interests in ensuring that laws that are validly enacted by the Legislature are carried out. Act 23 was intended to prevent fraud and to preserve the integrity of elections for all Wisconsin voters. The State and public have a substantial interest in seeing that the policies underlying by Act 23 are enforced.

**CONCLUSION**

Plaintiffs lack standing; therefore, the Court does not have Article III subject matter jurisdiction. This case must be dismissed.

There is no reason for the Court to grant Plaintiffs preliminary injunctive relief because Act 23 is enjoined. If the Court reaches the merits of Plaintiffs' claim, Defendants respectfully request that Plaintiffs' Motion for Preliminary Injunction be denied.

Dated this 4th day of June 2012.

Respectfully submitted,

J.B. VAN HOLLEN
Attorney General

/s/ Clayton P. Kawski

THOMAS C. BELLAVIA
Assistant Attorney General
State Bar # 1030182

CARRIE M. BENEDON
Assistant Attorney General
State Bar # 1055436

CLAYTON P. KAWSKI
Assistant Attorney General
State Bar #1066228

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-8690 (Bellavia)
(608) 266-9231 (Benedon)
(608) 266-7477 (Kawski)
(608) 267-2223(Fax)
*bellaviatc@doj.state.wi.us*
*benedoncm@doj.state.wi.us*
*kawskicp@doj.state.wi.us*

cases\jones - voter id, gab\pleadings\defendants' brief in opposition to plaintiffs' motion for preliminary injunction.doc