# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

---

BETTYE JONES; LEAGUE OF UNITED LATIN AMERICAN
CITIZENS (LULAC) OF WISCONSIN; CROSS LUTHERAN
CHURCH; MILWAUKEE AREA LABOR COUNCIL,
AFL-CIO; and WISCONSIN LEAGUE OF YOUNG VOTERS
EDUCATION FUND;

      Plaintiffs,

v.                                  Case No. 2:12-cv-00185-LA

JUDGE DAVID G. DEININGER, JUDGE MICHAEL BRENNAN,
JUDGE GERALD C. NICHOL, JUDGE THOMAS BARLAND,
JUDGE THOMAS CANE, KEVIN J. KENNEDY, and
NATHANIEL E. ROBINSON, all in their official capacities,

      Defendants.

---

## REPLY MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Penda D. Hair (admission pending)
James Eichner (admission pending)
Kumiki Gibson
Denise D. Lieberman (admission pending)
Sara Jackson (admission pending)
Advancement Project
Suite 850
1220 L Street, N.W.
Washington, D.C. 20005
Phone: (202) 728-9557
Email: phair@advancementproject.org
 jeichner@advancementproject.org
 kgibson@advancementproject.org
 dlieberman@advancementproject.org
 sjackson@advancementproject.org

Charles G. Curtis, Jr.
Arnold & Porter LLP
Suite 620
16 North Carroll Street
Madison, Wisconsin 53703
Phone: (608) 257-1922
Email: Charles.Curtis@aporter.com

John C. Ulin
Arnold & Porter LLP
44th Floor
777 South Figuero Street
Los Angeles, California 90017
Phone: (213) 243-4000
Email: john.ulin@aporter.com

Carl S. Nadler
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
Phone: (202) 942-6130
Email: carl.nadler@aporter.com

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

TABLE OF ABBREVIATIONS ........................................................................... vii

INTRODUCTION ...................................................................................................1

ARGUMENT IN REPLY ........................................................................................5

I.      PLAINTIFFS HAVE MULTIPLE FORMS OF STANDING TO
        RAISE THEIR SECTION 2 CLAIM. ..........................................................5

        A.      Plaintiffs Have Demonstrated Organizational Standing. ..................5

        B.      Plaintiffs Have Demonstrated Associational Standing. .................10

        C.      Bettye Jones Has Demonstrated Individual Standing. ...................13

II.     THE RESPONSES OF DEFENDANTS AND THEIR AMICI
        REINFORCE PLAINTIFFS' DEMONSTRATION THAT ACT 23 IS
        THE FUNCTIONAL EQUIVALENT OF THE "JIM CROW"
        VOTER SUPPRESSION LAWS OUTLAWED BY SECTION 2 OF
        THE VOTING RIGHTS ACT OF 1965. ....................................................14

III.    ACT 23 IMPOSES DISPROPORTIONATE AND SUBSTANTIAL
        BURDENS ON VOTERS OF COLOR. .....................................................22

        A.      Defendants' Own Evidence Confirms That the Burdens of Act 23
                Are Disproportionately Borne By Voters of Color. .......................22

        B.      Defendants' Criticisms of Leland Beatty's Statistical Analysis Are
                Misplaced, and Beatty's Conclusions Are In Line With All Other
                Studies of Act 23's Impacts. .........................................................25

                1.      Mr. Beatty and Professor Hood's Estimates are Not
                        Significantly Different, and the Differences Result from
                        Mr. Beatty Having Made the More Reasonable Choice
                        on Two Methodical Issues. ................................................25

                2.      Mr. Beatty's Use of Ethnic Technologies Was
                        Reasonable ........................................................................27

        C.      Contrary To Defendants, the Disproportionate Burdens Imposed By
                Act 23 Are Significant and Predictably Will Suppress Minority
                Voting. ............................................................................................29

Case 2:12-cv-00185-LA   Filed 06/27/12   Page 2 of 60   Document 55

IV.     THE "TOTALITY OF CIRCUMSTANCES" ANALYSIS
        CONFIRMS THAT THE SUBSTANTIAL AND RACIALLY
        DISPROPORTIONATE BURDENS IMPOSED BY ACT 23
        VIOLATE SECTION 2. ....................................................................................34

        A.      The Responses of Defendants and Their Amici Reconfirm That the
                Policy Underlying Act 23 Is "Tenuous" In Multiple Respects.............................35

        B.      Defendants and Their Amici Either Ignore Or Mischaracterize
                Many Additional Senate Factors..........................................................................40

V.      IF DEFENDANTS ATTEMPT TO ENFORCE ACT 23,
        PLAINTIFFS WILL MEET ALL REQUIREMENTS FOR THE
        IMMEDIATE ENTRY OF FEDERAL PRELIMINARY
        INJUNCTIVE RELIEF PENDING TRIAL ......................................................49

CONCLUSION...........................................................................................................49

Case 2:12-cv-00185-LA   Filed 06/27/12   Page 3 of 60   Document 55

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Armour v. State of Ohio,*
    775 F. Supp. 1044 (N.D. Ohio 1991) ......................................................................44

*Barnett v. City of Chicago,*
    141 F.3d 699 (7th Cir. 1998) ................................................................4, 35, 38

*Black v. McGuffage,*
    209 F. Supp. 2d 889 (N.D. Ill. 2002) ..................................................................25

*Coalition for ICANN Transparency Inc. v. VeriSign, Inc.,*
    452 F. Supp. 2d 924 (N.D. Cal. 2006) .................................................................11

*Common Cause/Georgia v. Billups,*
    554 F.3d 1340 (11th Cir. 2009) ............................................................6, 14, 38

*Crawford v. Marion Cnty. Election Bd.,*
    472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) ............................................. passim

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) ................................................................................30, 31

*Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors,*
    522 F.3d 796 (7th Cir. 2008) ...........................................................................10, 11

*Doe v. Stincer,*
    175 F.3d 879 (11th Cir. 1999) ............................................................................11

*Fla. State Conf. of the NAACP v. Browning,*
    522 F.3d 1153 (11th Cir. 2008) ...................................................................... passim

*Forum for Academic & Institutional Rights, Inc. v. Rumsfeld,*
    291 F. Supp. 2d 269 (D.N.J. 2003) ......................................................................11

*Freedom From Religion Foundation, Inc. v. Obama,*
    641 F.3d 803 (7th Cir. 2011) ..............................................................................7

*Gomez v. City of Watsonville,*
    863 F.2d 1407 (9th Cir. 1988) ...........................................................................44

*Gonzalez v. Arizona,*
    2012 WL 1293149 (9th Cir. Apr. 17, 2012) (*en banc*) ..............................................38, 41, 49

*Goosby v. Town Bd. Of Town of Hempstead,*
    180 F.3d 476 (2d Cir. 1999) ................................................................................44

Case 2:12-cv-00185-LA   Filed 06/27/12   Page 4 of 60   Document 55

*Greater Indianapolis Chapter of NAACP v. Ballard,*
741 F. Supp. 2d 925 (S.D. Ind. 2010) ...................................................................11

*Guinn v. United States,*
238 U.S. 347 (1915)..............................................................................................22

*Harper v. Virginia Bd. of Elections,*
383 U.S. 663 (1966)..............................................................................................30

*Hastert v. State Bd. of Elections,*
777 F. Supp. 634 (N.D. Ill. 1991) .......................................................................44

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982)............................................................................................5, 7

*Holder v. Hall,*
512 U.S. 874 (1994)..............................................................................................17

*Johnson v. Bush,*
405 F.3d 1213 (11th Cir. 2005) ...........................................................................43

*Lane v. Wilson,*
307 U.S. 268 (1939)..............................................................................................15

*League of United Latin Am. Citizens v. Perry,*
548 U.S. 399 (2006)...........................................................................................4, 47

*NAACP v. City of Kyle, Texas,*
626 F.3d 233 (5th Cir. 2010) .................................................................................8

*New Rochelle Voter Defense Fund v. City of New Rochelle,*
308 F. Supp. 2d 152 (S.D.N.Y. 2003)..................................................................44

*Reno v. Bossier Parish Sch. Bd.,*
520 U.S. 471 (1997)..............................................................................................44

*Reynolds v. Sims,*
377 U.S. 533 (1964)..............................................................................................49

*Simmons v. Galvin,*
575 F.3d 24 (1st Cir. 2009)...................................................................................43

*South Carolina v. Katzenbach,*
383 U.S. 301 (1966)..............................................................................................15

*Thornburg v. Gingles,*
478 U.S. 30 (1986)........................................................................................ passim

iv

*Vill. of Bellwood v. Dwivedi*,
  895 F.2d 1521 (7th Cir. 1990) ...............................................................7

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886).............................................................................49

**STATE CASES**

*State ex rel. McGrael v. Phelps*,
  128 N.W. 1041 (Wis. 1910)..................................................................39

*State ex rel. Small v. Bosacki*,
  143 N.W. 175 (Wis. 1913)....................................................................40

**STATUTES AND RULES**

42 U.S.C. § 1973.....................................................................................1

42 U.S.C. § 1973(a) ...........................................................................2, 16

42 U.S.C. § 1973(b) ...............................................................................16

Fed.R.Evid. 703 ......................................................................................27

Wis. Admin. Code Trans. § 102.15(3)(b) .............................18, 19, 20, 31

**OTHER AUTHORITIES**

1965 H. REP. 8 (internal punctuation and citations omitted).....................18

1965 S. REP. 10 (citations omitted) .........................................................18

83 J. NEGRO HISTORY 229 (1998) (Ex. 82). .........................................32

Act 23 on League of United Latin American Citizens of Wisconsin .................... passim

Greg J. Carman, WALL OF EXCLUSION: THE PERSISTENCE OF RESIDENTIAL
  RACIAL SEGREGATION IN METROPOLITAN MILWAUKEE 2 (2011) ......................32

Gunnar Myrdal, AN AMERICAN DILEMMA: THE NEGRO PROBLEM AND
  MODERN DEMOCRACY 1325 n.34 (1944) (Ex. 70)..........................................18

http://www.ethnictechnologies.com (last visited June 26, 2012) ..................28

J. Morgan Kousser, THE SHAPING OF SOUTHERN POLITICS: SUFFRAGE
  RESTRICTION AND THE ESTABLISHMENT OF THE ONE-PARTY SOUTH,
  1880-1910, at 50 (1974) (Ex. 22)...........................................................18

Kousser, SHAPING OF SOUTHERN POLITICS 48 ...................................20

Patricia Sullivan, *Lift Every Voice: The NAACP and the Making of the Civil Rights Movement* ........................................................................................................10

Paul Geib, *From Mississippi to Milwaukee: A Case Study of the Southern Black Migration to Milwaukee, 1940-70* ...........................................................32

*Triangulating Differential Nonresponse by Race in a Telephone Survey*, by DeFrank, Bowling, Rimer, Giersch, and Skinner, *Preventing Chronic Disease,* Vol. 4 No. 3, July 2007 (Ex. 75)........................................................................................28

Michael J. Klarman, *From Jim Crow to Civil Rights: The Supreme Court and the Struggle for Racial Equality* ...................................................................10

Michael Perman, STRUGGLE FOR MASTERY: DISFRANCHISEMENT IN THE SOUTH, 1888-1908, at 29 (2001) (Ex. 69) ............................................18

Samuel Issacharoff, Pamela S. Karlan & Richard H. Pildes, THE LAW OF DEMOCRACY: LEGAL STRUCTURE OF THE POLITICAL PROCESS 117-20 (rev. 2d ed. 2002) (Ex. 71)...........................................................................18

V.O. Key Jr., SOUTHERN POLITICS IN STATE AND NATION 556 & n.1 (1949, rev. ed. 1984) (Ex. 16) .........................................................................22

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| 1965 H. REP. | H.R. REP. NO. 439 (1965) |
| 1965 S. REP. | S. REP. NO. 89-162 (1965) |
| 1982 S. REP. | S. REP. NO. 97-417 (1982) |
| Alvarado Decl. | Declaration of Jaime Alvarado |
| Barreto & Sanchez Rep. | Marc A. Barreto and Gabriel R. Sanchez, Rates Of Possession Of Accepted Photo Identification, Among Different Subgroups In The Eligible Voter Population, submitted in the Case of *Milwaukee Branch of NAACP v. Walker* (April 23, 2012) |
| Beatty Decl. | Declaration of Leland Beatty |
| Boardman Dep. | Deposition of Kristina Boardman (March 28, 2012) |
| Burden Decl. | Declaration of Barry C. Burden |
| Cochran Decl. | Declaration of Sheila Cochran |
| D. Br. | Defendants' Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction (Dkt. 43) |
| D. *Amici* Br. | Memorandum of Group of Democrat, Republican and Independent Voters as *Amici Curiae* in Opposition to Plaintiffs' Motion for Preliminary Injunction (Dkt. 49) |
| DMV | Division of Motor Vehicles, Wisconsin Department of Transportation |
| DOT | Wisconsin Department of Transportation |
| Fernan Dep. | Deposition of Patrick Fernan (April 2, 2012) |
| GAB | Wisconsin Government Accountability Board |
| Garza Decl. | Declaration of Luis Garza |
| Hood Decl. | Declaration of M.V. Hood III |
| Hutchins Decl. | Declaration of Lorene Hutchins |

| | |
|---|---|
| Jones Decl. | Declaration of Bettye Jones |
| Judd Dep. | Deposition of Lynne Judd (Feb. 21, 2012) |
| Kennedy Dep. | Deposition of Kevin Kennedy (Feb. 20, 2012) |
| Krueger Dep. | Deposition of Jeremy Krueger (March 29, 2012) |
| *LWV* Decision and Order | *League of Women Voters v. Walker*, No. 11 CV 4669, Decision and Order Granting Summary Declaratory Judgment and Permanent Injunction (Dane Cty. Cir. Ct. Mar. 12, 2012) (Richard G. Niess, J.) |
| Mayer Jan. 2012 Rep. | Kenneth R. Mayer, Report on the Effects of Wisconsin Act 23, in the Case of *Milwaukee Branch of NAACP v. Walker* (Jan. 16, 2012) |
| Mayer Apr. 2012 Rep. | Kenneth R. Mayer, Estimate of Voting Eligible Population Lacking Driver's Licenses or State Issued Photo IDs, in the Case of *Milwaukee Branch of NAACP v. Walker* (Apr. 9, 2012) |
| Minnite Decl. | Declaration of Lorraine C. Minnite |
| Montgomery Baker Decl. | Declaration of Jayme Montgomery Baker |
| *NAACP* Order | *Milwaukee Branch of the NAACP v. Walker*, No. 11 CV 5492, Order Granting Motion for Temporary Injunction (Dane Cty. Cir. Ct. Mar. 6, 2012) (David Flanagan, J.) |
| P. Br. | Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction (Dkt. 20) |
| P. *Amici* Br. | Brief of *Amici Curiae* Supporting Motion for Preliminary Injucntion |
| Robinson Dep. | Deposition of Nathaniel Robinson (April 5, 2012) |
| Section 2 | Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 |
| Beatty Rebuttal Decl. | Rebuttal Declaration of Leland Beatty |
| Turja Dep. | Deposition of Janet Turja (April 5, 2012) |

Wheeler Decl.                    Declaration of Kenneth W. Wheeler

# INTRODUCTION

Without a trace of irony, Defendants and their *amici* completely ignore Plaintiffs' detailed demonstration of how Wisconsin Act 23 is the functional equivalent of the Jim Crow-era voter suppression laws that were outlawed by the Voting Rights Act of 1965, 42 U.S.C. § 1973 — and then turn around and defend Act 23 by making the very same kinds of arguments that were used to defend the voter suppression laws of earlier generations.

Thus, we are asked to believe that any racially disproportionate impacts of Act 23 are not the result of "racial bias," but of other factors such as "socioeconomic status," "partisan politics," and "interest-group politics." D. *Amici* Br. 14; *see also* D. Br. 21 ("Act 23 does not *cause* such disparities") (emphasis in original). In the most troubling echo of the Jim Crow era and the invidious racial stereotypes that were used to justify discrimination, it is even suggested that voters of color might themselves be to blame for the racial disparities, due to "*differences in motivation, or a lack thereof*." D. *Amici* Br. 15 (emphasis added, internal quotations and citations omitted); *see also id.* at 37 ("when African-Americans wish to participate in the electoral system, there is no impediment to their doing so at rates equal to Caucasians").

We also are told that the disproportionate numbers of voters of color affected by Act 23 are only being asked to submit "to the same inconveniences, delays, and bureaucracies" to which current holders of driver's licenses and state IDs "previously were subject," D. *Amici* Br. 34-35 — even though current holders of driver's licenses and state IDs are indefinitely exempted ("grandfathered") from Act 23's newly imposed "certified birth certificate" and other "proof of identity" requirements. In these and many other ways, the submissions of Defendants and their *amici* reinforce Plaintiffs' demonstration that Act 23 is a modern-day functional equivalent of the Jim Crow laws outlawed under Section 2 of the Voting Rights Act.

1

This Court should enter preliminary injunctive relief pending trial for the following reasons:

*First*, Plaintiffs collectively have Article III standing on multiple grounds, any one of which as to any single Plaintiff is sufficient to support the requested injunctive relief.

*Second*, although Defendants and their *amici* ignore the historical and functional analyses in Plaintiffs' opening brief, their responses help underscore that Act 23 is the modern equivalent of the voter suppression measures of earlier generations that were outlawed under the 1965 Voting Rights Act and its 1982 amendments. The language, structure, purposes, and legislative history of the Voting Rights Act all support the conclusion that Act 23 illegally denies and abridges the constitutionally protected right to vote "on account of" race, color, and minority language status, because it results in voters of color having "*less opportunity than other members of the electorate* to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(a)-(b) (emphasis added).

*Third*, Defendants' own evidence conclusively demonstrates that Act 23 falls disproportionately on voters of color in a "statistically significant" (D. *Amici* Br. 18) manner. Defendants have now disclosed that, although African-Americans and Latinos make up only 7.4% of the voting age population ("VAP") in Wisconsin, they have received 45.7% — *nearly half* — of all "free" photo IDs that have been obtained since Act 23 took effect. D. Br. 15-16. Moreover, even using the under-inclusive methodology of Defendants' own expert, voters of color are still 2.68 times as likely as White voters to lack a Wisconsin driver's license or state ID. These are simply additional data points confirming what many other studies, using many different methodologies, have repeatedly found: a statistically significant racial disparity in the possession of driver's licenses and state IDs in Wisconsin.

Case 2:12-cv-00185-LA   Filed 06/27/12   Page 12 of 60   Document 55

*Fourth*, although Defendants deny that Act 23 imposes any significant burdens on voters who lack the required IDs, the unrebutted record evidence demonstrates otherwise. At the very least, such voters must deal with what *amici* concede can be "frustrating burdens and inconveniences." D. *Amici* Br. 34. Those "burdens and inconveniences" often turn into what plaintiff Bettye Jones described as "extraordinary hurdles," "a wild goose chase," and "a harrowing, expensive and multi-month ordeal." Jones Decl. ¶¶ 8, 15. One Wisconsin state court has found those "burdens and inconveniences" (D. *Amici* Br. 34) to include "carousel visits to government offices, delay, dysfunctional computer systems, misinformation and significant investment of time to avoid being turned away at the ballot box." *NAACP* Order at 4 (Ex. 3)[1]. There is ample, unrebutted evidence in the record that the process of obtaining a birth certificate and then a photo ID can often impose substantial and sometimes insurmountable burdens on many people. Those burdens fall disproportionately on people of color, including elderly African-Americans and Latinos who were born elsewhere and must track down ancient records from distant bureaucracies.

*Fifth*, the State's justifications for these disproportionately imposed burdens are extremely "tenuous." 1982 S. REP. 29 & n.117 (Ex. 7). Neither Defendants nor their *amici* offer *any* evidence of actual voter fraud in Wisconsin — supposedly the compelling justification for this harsh and discriminatory voter ID measure. Nor do they explain why the *specific* provisions of Act 23 — the strictest voter ID law in the nation, with provisions far more onerous than other voter ID laws that have been reviewed by the courts — are necessary to deter voter

---

[1] All citations to Exhibits 1-65 are to the numbered exhibits accompanying the Declaration of Charles G. Curtis, filed in support of Plaintiffs' opening brief. All citations to Exhibits 66-84 are to the numbered exhibits accompanying the Declaration of John C. Ulin. Unless otherwise specified, all citations to witness declarations refer to declarations filed in connection with Plaintiffs' opening brief.

fraud.  Act 23 "impairs the voting power of minorities *more than it has to*" and "*needlessly impairs*" their opportunities to participate in the political process, and thus violates Section 2. *Barnett v. City of Chicago*, 141 F.3d 699, 701, 702 (7th Cir. 1998) (emphasis added).

*Sixth*, Defendants and their *amici* misapply Section 2's "totality of circumstances" analysis, arguing that Act 23 did not *itself* cause the many racial disparities in Wisconsin employment, income, education, health, and other areas (indeed, they do not even concede that such disparities exist).  *See* D. Br. 18-38; D. *Amici* Br. 35-42.  The issue is not whether Act 23 *caused* these conditions, but rather whether it "*interacts* with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (emphasis added).  The evidence of such a prohibited "interact[ion]" is compelling.  Act 23 reflects a "troubling blend of politics and race," in which the incumbent party has imposed significant voting restrictions that fall disproportionately on voters of color, who tend overwhelmingly to vote for the other party.  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 442 (2006).  This "incumbency protection" measure "undermine[s] the progress of . . . racial group[s] that ha[ve] been subject to significant voting-related discrimination and that [are] becoming increasingly politically active and cohesive." *Id.* at 403, 439.  Such an abuse of voting requirements "*cannot be sustained*" under Section 2.  *Id.* at 442 (emphasis added).

*Seventh*, if Defendants attempt to enforce Act 23, all other requirements for the entry of a federal preliminary injunction pending trial will be met.  Enforcing Act 23's photo ID requirements would inflict irreparable injury upon a disproportionate number of voters of color, and the public interest and balance of equities would require entry of a federal preliminary injunction against such enforcement.

4

**ARGUMENT IN REPLY**

**I. PLAINTIFFS HAVE MULTIPLE FORMS OF STANDING TO RAISE THEIR SECTION 2 CLAIM.**

The five Plaintiffs in this action collectively have demonstrated at least three bases for Article III standing: organizational standing, associational standing, and individual standing. Defendants claim that none of the Plaintiffs has standing under any of these bases. Defendants advance this remarkable claim only by ignoring controlling Seventh Circuit authorities and refusing to acknowledge the detailed preliminary injunction record before this Court. Because "[o]nly injunctive relief is sought" in this action, the Court need only conclude that at least one of the five Plaintiffs has at least one of the three types of standing. *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (standing of many different types of plaintiffs in voter ID challenge "need not be addressed" because, for injunctive relief to issue, "only one plaintiff with standing is required"), *aff'd*, 553 U.S. 181, 189 n.7 (2008) (where one plaintiff had standing, "there is no need to decide whether the other petitioners also have standing").

**A. Plaintiffs Have Demonstrated Organizational Standing.**

An organization has Article III standing to challenge an illegal law that causes the organization to divert its attention and resources away from its usual activities in order to "'counteract'" the injuries inflicted by the illegal law on the organization's mission and its constituents. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("the consequent drain on the organization's resources . . . constitutes far more than simply a setback to the organization's abstract social interests"). Defendants claim that such standing does not exist here because "no organization plaintiff was *compelled* to act in response to Act 23," which "certainly did not *require* these organizations to do anything" to help their members and constituents. D. Br. 9 (emphasis added); *see also id.* at 2 ("Act 23 requires no action by these organizations").

5

Defendants' argument is frivolous and completely misapplies the test for organizational standing. The Seventh Circuit and other courts have squarely held that an organization has standing to challenge state election laws that cause the organization to divert its resources away from its usual voter registration and get-out-the-vote ["GOTV"] activities to deal with the adverse effects of the laws on those registration and GOTV activities. *See, e.g., Crawford*, 472 F.3d at 951 (Indiana voter ID law "injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote"), *aff'd*, 553 U.S. at 189 n.7; *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (Georgia voter ID law injured the NAACP by requiring it to "divert resources from its regular [voter registration and GOTV] activities to educate and assist voters in complying with the statute that requires photo identification"; "the NAACP 'cannot bring to bear limitless resources' and the diversion of its resources to address the requirement of a photo identification will cause its 'noneconomic goals to suffer'") (citation omitted), cert. denied 129 S. Ct. 2770 (2009); *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008) (NAACP and other civil rights organizations had Article III standing to challenge Florida's imposition of new voting requirements because they "reasonably anticipate[d] that they [would] have to divert personnel and time to educating volunteers and voters on compliance with [the new requirements] and to resolving the problem of voters left off the registration rolls on election day"). These and many other decisions have repeatedly rejected Defendants' argument that "organizational standing" exists only if the challenged law "*requires*" or "*compel[s]*" the organization to act; such an argument "*finds no support in the law*." *Browning*, 522 F.3d at 1166 (emphasis added).[2]

---

[2] Indeed, the leading Supreme Court decision on organizational standing upheld the standing of

(Footnote continued on next page)

Defendants badly mischaracterize Chief Judge Easterbrook's decision in *Freedom From Religion Foundation, Inc. v. Obama*, 641 F.3d 803 (7th Cir. 2011). They argue that Chief Judge Easterbrook's "logic" in that case "must be applied here to conclude that the organization plaintiffs here" are "strangers" without standing to challenge a law that "imposes duties on [eligible Wisconsin voters] alone." D. Br. 9. Chief Judge Easterbrook did not remotely say any such thing. *FFRF* involved a challenge to a federal statute requiring the President to designate a National Day of Prayer. The law "impose[d] duties on the President alone"; citizens were free to ignore the Day of Prayer without any adverse consequences; and "offense at the behavior of the government . . . differs from a legal injury." *Obama*, 641 F.3d at 805-07. Moreover, FFRF and its individuals members "ha[d] not altered their conduct one whit or incurred any cost in time or money" in response to the statute. *Id.* at 808.

The circumstances in *FFRF* have nothing to do with a law that directly harms eligible voters by making it more difficult for them to vote, and that thereby requires the plaintiff organizations to divert their limited resources from other activities in order to counteract the harms caused by the law to their missions, members, and constituents. As *Crawford* held, these

---

(Footnote continued from previous page)

Housing Opportunities Made Equal (HOME), a nonprofit corporation whose mission was "to make equal opportunity in housing a reality in the Richmond Metropolitan Area." *Havens Realty Corp.*, 455 U.S. at 368. HOME claimed that alleged racial steering practices "frustrated [its] counseling and referral services, with a consequent drain on resources." *Id.* at 369. Although no law "require[d]" or "compelled" HOME "to do anything" — to borrow defendants' words, D. Br. 9 — the Supreme Court held "there can be no question that the organization has suffered injury in fact," including "concrete and demonstrable injury to the organization's activities" and the "consequent drain on the organization's resources." *Id.* at 379; *see also Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) ("deflection" of fair-housing organization's time and money from its usual counseling activities to deal with defendant's illegal activities represented "opportunity costs of discrimination" that conferred Article III standing).

kinds of diversions of resources constitute injuries-in-fact that readily support organizational

standing. *See* 472 F.3d at 951.[3]

Defendants are equally off base in claiming that the plaintiff organizations have not come

forward with any "evidence to establish" an actual diversion of their resources, such as evidence

regarding "what particular activities in which they would otherwise have engaged were

eliminated or diminished due to their Act 23-related efforts." D. Br. 6, 8. Contrary to

Defendants' claims, the plaintiff organizations have submitted detailed declarations

demonstrating how Act 23 has caused them to divert resources from their normal voter

registration, GOTV, and other activities so as to counteract the adverse impacts of Act 23 on

those normal activities. Those declarations are *unrebutted*.

The League of Young Voters, for example, is a "not-for-profit organization committed to

mobilizing young people of color, non-college youth, and low-income youth to vote in elections

and to become civically engaged around issues that matter to young people." Montgomery

Baker Decl. ¶ 2. Its Wisconsin State Director, Jayme Montgomery Baker, has testified in detail

regarding the League's diversion of "significant staff time and organizational resources" in

attempting to help its constituents overcome the "significant logistical and financial challenges"

imposed by Act 23. *Id.* ¶ 3. These activities have included "conducting surveys of our

---

[3] Defendants' reliance (D. Br. 9) on *NAACP v. City of Kyle, Texas*, 626 F.3d 233 (5th Cir. 2010), is also badly misplaced. That decision rejected organizational standing where the actions supposedly undertaken by the organization in response to the illegal law did not "differ from [its] routine lobbying activities," and where the organization failed to identify "any specific projects that [it] had to put on hold or otherwise curtail in order to respond to" the challenged law. *Id.* at 238. Here, the organizational plaintiffs have presented detailed evidence as to the additional activities they have had to undertake in response to Act 23 as well as the specific activities from which staff time and financial resources have been diverted to deal with Act 23. *See* pp. 8-9 & n.4 *infra*. Indeed, the Fifth Circuit in *NAACP v. City of Kyle, Texas* pointed to the diversion of resources away from normal voter registration and GOTV activities as an example of the kind of organizational injuries that would be sufficient to confer Article III standing — precisely the situation here. 626 F.3d at 239, *citing Fla. State Conf. of NAACP v. Browning*, discussed on p. 6 *supra.*

constituent populations" to ascertain Act 23's impacts on them; organizing a community coalition "devoted to addressing the impact of Photo ID in Milwaukee County"; creating and distributing 15,000 "Voter ID flyers" to educate young voters about Act 23; "rent[ing] 15-passenger vans" on numerous occasions to provide transportation to the DMV for those who needed to obtain a state ID to vote; helping voters to obtain birth certificates where required by Act 23; providing liaison and advocacy services in dealing with the DMV and other government agencies; and other extensive speaking and educational activities. *Id.* ¶¶ 5-8, 11-12. Ms. Montgomery Baker's testimony details and quantifies the additional League expenses and diversions of League resources caused by Act 23, as well as the League activities that otherwise would have been funded. *See id.* ¶¶ 3, 5, 7-8, 10-11, 13-14. As she concludes (*id.* ¶ 15):

> The voter ID law has taken a tremendous toll on our organization and our ability to carry out our normal election year work. We've spent at least an additional $80,000 on voter ID related activities, ranging from staff time to printing flyers to renting vans to traveling across the county and state to educate people about ID requirements and help them obtain IDs. We didn't get to conserve our resources during 2011 like we usually do in an off election year, or engage in advocacy and base-building work around the issues our constituencies want to focus on. Instead, voter ID became our primary focus, which is unfortunate given all of the things we normally undertake, and particularly unfortunate given the significant need for these services among our constituent groups.

Given this detailed and unrebutted testimony, Defendants' claims that the League of Young Voters' standing is not "supported by evidence" are spurious. *See* D. Br. 6. Defendants have similarly ignored the detailed testimony offered on behalf of the other three plaintiff organizations demonstrating why and how they have diverted their limited resources away from other missions to deal with Act 23's adverse impacts on their members and constituents.[4]

---

[4] *See, e.g.,* Alvarado Decl. ¶ 2 ("Time and resources that would otherwise have been devoted [by LULAC of Wisconsin] to registering voters and educating them about issues of significance to the Latino community have been used in helping them to understand and to comply with Act 23."); Garza Decl. ¶ 2 (discussing how LULAC of Wisconsin has had "to turn its attention,

(Footnote continued on next page)

9

**B.     Plaintiffs Have Demonstrated Associational Standing.**

An organization also has Article III standing to challenge a law that harms one or more of its individual members.  Under principles of "associational standing," an organization has standing "when (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claims asserted, nor the relief requested, requires the participation of individual members in the lawsuit."  *Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors,* 522 F.3d 796, 801 (7th Cir. 2008).  Defendants do not claim that the second and third requirements are not satisfied here — nor could they.[5]  Instead, they claim that "there has been no evidence submitted" by any of the four organizations that any of their members "lacks qualifying ID."  D. Br. 8.

To the extent Defendants mean to suggest that an organization must actually name specific members who have been harmed by Act 23, the Seventh Circuit and other courts have

---

(Footnote continued from previous page)

resources and efforts" away from prior voter education and GOTV activities and direct them "toward ensuring that Latino voters understand the new requirements under [Act 23] and that Latino voters are able to obtain the required photo ID"); Cochran Decl. ¶¶ 6-7 (detailing how Milwaukee Labor Council has had to divert funds and staff time away from other programs to deal with the problems caused by Act 23, including having to "spend significant time explaining the law's confusing new requirements to our staff and to our affiliated and member organizations"; "field[] calls from members with questions about the law and what documents they need in order to vote"; produce and distribute a significant amount of printed and website educational materials, including 10,000 copies of a special guide to Act 23's requirements; and "bring together other community coalition partners to collectively address the adverse impact of photo ID requirements"); Wheeler Decl. ¶¶ 7-9 (detailing the "significant efforts" undertaken by Cross Lutheran Church in response to Act 23, including conducting educational programs on the law's requirements; working to "connect community organizations to our congregants who lack IDs or underlying documents"; and helping congregants and community members to locate or obtain necessary documents, all of which have caused Cross Lutheran to divert resources away from other priorities).

[5] Voting rights issues have long been highly "germane" to the missions of churches, unions, and civil rights organizations, all of which have played crucial roles in the fight to obtain and preserve the franchise for all Americans. *See, e.g.,* Michael J. Klarman, *From Jim Crow to Civil Rights: The Supreme Court and the Struggle for Racial Equality*, passim (2004); Patricia Sullivan, *Lift Every Voice: The NAACP and the Making of the Civil Rights Movement*, passim (2009).

held just the opposite. The requirement that "'an organization suing as representative [must] include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association' . . . *still allows for the member on whose behalf the suit is filed to remain unnamed by the organization*." *Disability Rights Wis.,* 522 F.3d at 802 (emphasis added), citing *Doe v. Stincer*, 175 F.3d 879, 882, 884 (11th Cir. 1999) ("Nor must the association name the members on whose behalf suit is brought. . . . [W]e have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought and we decline to create such a requirement . . . .")[7]

Three of the four plaintiff organizations have submitted abundant, *unrebutted* evidence that they have members who have been injured by Act 23, and who will be injured in the future if the voter ID requirements are allowed to go back into effect. Consider, for example, the testimony of Pastor Kenneth W. Wheeler, who for seven years has served as head Pastor of Cross Lutheran Church, located at 1821 North 16th Street in Milwaukee. *See* Wheeler Decl. ¶ 1.

---

[6] *See also Greater Indianapolis Chapter of NAACP v. Ballard,* 741 F. Supp. 2d 925, 932 (S.D. Ind. 2010) ("a member on whose behalf suit is brought may be 'unnamed by the organization'") (citations omitted). What is required, instead, is that the organization establish that one or more of its members "have sustained their own injury in fact, caused by the [challenged law], and able to be redressed by a favorable decision." *Disability Rights Wis.*, 522 F.3d at 802; *see also Forum for Academic & Institutional Rights, Inc. v. Rumsfeld,* 291 F. Supp. 2d 269, 289 (D.N.J. 2003) (rejecting "blanket rule that associations seeking to bring suit on behalf of their members must identify their membership"; instead, the evidence in a "given context" must "sufficiently demonstrate that an association indeed has members that have suffered an injury-in-fact").

[7] Some courts outside the Seventh Circuit have held that organizations must in certain circumstances disclose the individual identities of allegedly injured members, but these cases typically have involved situations in which there were grounds to be suspicious whether the organization truly had members who had been injured by the challenged action. *See, e.g., Coalition for ICANN Transparency Inc. v. VeriSign, Inc.*, 452 F. Supp. 2d 924, 934 (N.D. Cal. 2006) (rejecting standing when the organization's complaint "contain[ed] a single cryptic sentence about its members' identities," and no allegations about how those members had been injured). Here, on the other hand, three of the organizational plaintiffs — Cross Lutheran Church, the Milwaukee Labor Council, and LULAC of Wisconsin — have submitted extensive testimony explaining how Act 23 has harmed their members, and there are no grounds to suspect that these organizations might not include voters of color affected by Act 23. The Seventh Circuit does not require the disclosure of members' identities in such circumstances. *See Disability Rights Wis.*, 522 F.3d at 801.

Cross Lutheran has "approximately 400 members, about 78% of whom are African American, and we serve thousands more in the community." *Id.* ¶ 2. "[T]he zip code in which we are located, and which we predominantly serve, has the highest rates of poverty, homelessness and unemployment in the city of Milwaukee, and is comprised overwhelmingly of people of color." *Id.* Pastor Wheeler has testified in detail about how Act 23 has harmed his congregants (*id.* ¶¶ 4-6, emphasis added):

> My congregation stands to be heavily impacted by Wisconsin Act 23. I have talked to many members of my congregation who are confused, afraid and angry about the law and who stand to be affected and may lose their right to vote under the law. Many of them have received misinformation about Act 23 and how it affects them. Others view the ID requirement as a modern day 'poll tax' because of the costs and difficulties required to obtain the ID that the new law requires in order to vote.

> Many of my older parishioners who migrated to Milwaukee from the rural South do not have copies of their birth certificates and would have to obtain one from another state in order to get the ID required to vote under Act 23. Some of them simply have no birth certificate because they were born at home at a time when that practice was common for African Americans in the South and no formal record of their birth even exists. . . .

> . . . [M]any people in my congregation lack state licenses or IDs needed to vote under Act 23, or lack the underlying documents necessary to get an acceptable ID, such as a certified birth certificate, so even when they go to the DMV to apply for a Wisconsin ID, they are unable to obtain one. . . . There are members of my community who have been active voters their entire life, but who are so overwhelmed by the multiple steps necessary to obtain a state ID that they are scared to even attempt navigating this process on their own.

How precisely do Defendants claim that this sworn testimony by a Lutheran Pastor about his own congregants is untrustworthy? They don't — they simply ignore Pastor Wheeler's testimony and claim that Cross Lutheran Church has submitted "*no* evidence" regarding Act 23's impacts on "*any* member" of its parish. *See* D. Br. 8 (emphasis added).[8] Defendants similarly

---

[8] In addition to the testimony of Pastor Wheeler, plaintiffs are prepared to call numerous congregants of Cross Lutheran Church to testify how Act 23 has burdened and interfered with

(Footnote continued on next page)

ignore detailed evidence submitted on behalf of the Milwaukee Labor Council and LULAC of Wisconsin demonstrating the numerous concrete ways in which Act 23 harms the ability of their members to exercise their constitutionally protected right to vote.[9]

### C.    Bettye Jones Has Demonstrated Individual Standing.

Defendants do not contend that Plaintiff Bettye Jones lacked individual Article III standing to challenge Act 23 at the time this action was commenced in February 2012, nor could they. Mrs. Jones has provided detailed, unrebutted testimony explaining how her application for a state ID was rejected by the DMV because of her inability to provide a certified birth certificate from Tennessee and how she and her daughter then had to spend "four months, more than $100 in fees, and approximately 50 hours of time" in trying to obtain a birth certificate or acceptable substitute. Jones Decl. ¶¶ 7, 11. Mrs. Jones described this as "a wild goose chase" that "turned into a harrowing, expensive and multi-month ordeal." *Id.* ¶ 8. She and her daughter had to make multiple trips to the DMV; call and write repeatedly to "multiple state offices and agencies in both Ohio and Tennessee" in search of required records; and pay various fees for multiple records searches, notarizations, applications, and reapplications. *See id.* ¶¶ 9-10.

As Mrs. Jones explains in her declaration, she ultimately was able to obtain a Wisconsin driver's license in April 2012 after her daughter took her to a different DMV office and

---

(Footnote continued from previous page)

their efforts to vote. The supplemental declarations of three such congregants, Billy McKinney, Jacqueline Johnson and Jemmie Lee Randale, accompany this reply brief.

[9] *See, e.g.*, Alvarado Decl. ¶¶ 3, 6 (discussing adverse effects of Act 23 on LULAC of Wisconsin's members and constituents, many of whom "do not have the state-issued IDs that are required to vote," the underlying documents necessary to obtain such IDs, "or the time or money to obtain the documents needed to get the required ID"); Garza Decl. ¶¶ 3-6, 8 (detailing adverse effects of Act 23 on LULAC of Wisconsin's members and constituents); Cochran Decl. ¶¶ 3, 5 (discussing Act 23's adverse impacts on the 52,000 union members represented by the Milwaukee Labor Council, more than half of whom are African-American or Latino, including "widespread confusion" and "difficulty overcoming the cost, time, and transportation hurdles to getting all the underlying documents necessary to get a state ID").

convinced a sympathetic supervisor in that other office to issue Mrs. Jones a Wisconsin driver's license, despite her lack of an acceptable Tennessee birth certificate. *Id.* ¶ 12. Defendants argue that, as a result, "Ms. Jones cannot be inured [*sic*] because she has a sufficient form of ID to vote," and thus cannot be harmed by Act 23. D. Br. 6. But the Eleventh Circuit has squarely held that "the lack of an acceptable photo identification is not necessary to challenge a statute that requires photo identification to vote," because the cognizable injury caused by such a law consists not simply in having to *obtain* acceptable photo ID, but also in being "required to *present* photo identification to vote." *Common Cause/Georgia*, 554 F.3d at 1352 (emphasis added); *see also id.* at 1351 (a complainant has standing to challenge an illegal government requirement "even when the complainant is able to overcome the challenged barrier"). Thus, Mrs. Jones was injured and continues to be injured by being compelled to comply with what she considers to be an offensive and illegal requirement that she present photo ID before being allowed to vote. *See* Jones Decl. ¶¶ 14-15.

## II. THE RESPONSES OF DEFENDANTS AND THEIR *AMICI* REINFORCE PLAINTIFFS' DEMONSTRATION THAT ACT 23 IS THE FUNCTIONAL EQUIVALENT OF THE "JIM CROW" VOTER SUPPRESSION LAWS OUTLAWED BY SECTION 2 OF THE VOTING RIGHTS ACT OF 1965.

Defendants entirely ignore Plaintiffs' detailed analysis of how Act 23 is the functional equivalent of the "Jim Crow" voter suppression laws that were outlawed by the Voting Rights Act of 1965 and its 1982 amendments — while at the same time making the very same kinds of arguments that historically were advanced in defense of such voter suppression measures. As Plaintiffs have demonstrated, like the disfranchisement laws of earlier generations, Act 23 imposes "vague, arbitrary, hypertechnical [and] unnecessarily difficult" requirements and a variety of bureaucratic "procedural hurdles" in a disproportionate manner on African-Americans, Latinos, and other voters of color. 1965 H. REP. 10, 13 (Ex. 6). It turns the voting process for

these voters into a "test of skill" and the "engine of discrimination," with the predictable result of suppressing the minority vote. *Id.* at 10, 13; *see* P. Br. at 14-22. Act 23 shares the same functional characteristics as the poll tax, property requirements, literacy and "understanding" tests, and other "contrivance[s]," "stratagem[s]," and "maneuver[s]" that were outlawed by the Voting Rights Act. 1965 H. REP. 12; *South Carolina v. Katzenbach*, 383 U.S. 301, 335 (1966).

Rather than respond to this analysis, Defendants and their *amici* make a number of arguments that have a familiar ring from the Jim Crow era:

**No classification by race.** Defendants and their *amici* repeatedly insist that Act 23 does not classify on the basis of race at all, but instead is simply a facially neutral "law regulating the administration of elections" that "appl[ies] equally to members of all races." D. Br. 21; D. *Amici* Br. 34; *see also* D. *Amici* Br. 13-14, 33. These identical arguments were made in defense of the old Jim Crow laws, which also avoided any explicit mention of race (otherwise, they would have been *per se* illegal under the Fifteenth Amendment), and instead focused on other characteristics as a proxy for race, such as literacy, civic "understanding," money, property, or other factors. P. Br. 14-17. As previously shown, neither the Fifteenth Amendment nor Section 2 allows States to impose "onerous" voting requirements and procedures that, while racially neutral on their face, "effectively handicap exercise of the franchise by [voters of color] although the abstract right to vote may remain unrestricted as to race." *Lane v. Wilson*, 307 U.S. 268, 275 (1939); *see also* P. Br. 14, 18-20. The defense briefs are full of such "abstract" arguments that ignore the on-the-ground realities.

**Disproportionate racial impacts.** Defendants and their *amici* argue that, even if Act 23 has "statistically significant" disproportionate impacts on voters of color — which they deny — those impacts are not *caused* by "racial bias," but instead by other factors such as

"socioeconomic status," "partisan politics," "interest-group politics," and "*differences in motivation, or a lack thereof.*" D. *Amici* Br. 14-15, 18 (emphasis added, internal quotations and citations omitted); *see also* D. Br. 21 ("Act 23 has no direct impact whatsoever on disparities in education, income, and health for African-American and Latino voters," and "does not *cause* such disparities") (emphasis in original). These arguments completely misstate Section 2 and the governing inquiry. The issue is not whether the newly enacted Act 23 somehow "*caused*" racial disparities in education, income, health, and other matters — which of course it did not, since such disparities long predated the new law — but whether Act 23 "*interacts* with social and historical conditions to cause an inequality in the *opportunities* enjoyed by [minority] and white voters." *Thornburg*, 478 U.S. at 47 (emphasis added). The issue, in other words, is whether "the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, *results* in minorities being denied equal access to political process." 1982 S. REP. 27. Like the historic voter suppression laws outlawed by Section 2, Act 23 *results* in voters of color having "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). The disfranchising effects of Act 23 will only perpetuate this history of social and political exclusion for communities of color in Wisconsin.

**No outright prevention of voting.** Defendants and their *amici* repeatedly argue that voters of color can obtain the required photo ID if they try hard enough, and that there is "no evidence whatsoever to demonstrate that these voters are *unable* to procure qualifying photo ID." D. Br. 17 (emphasis added); *see also id.* at 20-21 (arguing that nothing shows "that these groups are unable to *obtain* qualifying ID") (emphasis in original). If a voter truly cannot track down her birth certificate, we are told, she can take such steps as (1) applying to her home state for a

"late registration of birth," which requires the payment of fees and submission of various documentary evidence; (2) "*petition the circuit court of [her] alleged county of birth for an order 'establishing a record of the date and place of [her] birth and parentage'*"; and (3) if she still cannot obtain a birth certificate, petition the Director of the DMV or his designee for a special exemption pursuant to a poorly publicized and inconsistently applied DOT regulation. *See* D. *Amici* Br. 10, 27 (emphasis added). *Amici* claim that requiring voters without acceptable ID to jump over these additional hurdles merely "represents an additional step in the process and inconvenience," not an outright denial of the vote. *Id.* at 29.

These arguments were familiar a century ago: If an African-American was prevented from voting by a literacy or "understanding" test, he could study harder so he could pass the test next time. If he was impoverished and unable to pay the poll tax, he could get a job and save his money. If polling times and places were inconvenient, and voting was really important to him, he could find the time, travel further, try harder, and take whatever "additional step[s] in the process" (*id.*) were required of him. *See also id.* at 37 ("when African Americans wish to participate in the electoral system, there is no impediment to their doing so at rates equal to Caucasians"). Section 2 and its 1982 amendments were intended to eliminate these defenses, and to prohibit the disproportionate imposition of "procedural hurdles" and "significant inconvenience[s]" on voters of color, *regardless* whether some, many, or even most of those voters are able to surmount those hurdles and inconveniences if they try hard enough. 1965 H. REP. 10; 1981 H. REP. 17 (Ex. 25); *see Holder v. Hall*, 512 U.S. 874, 917-18 (1994) (Thomas, J., concurring in the judgment).

**"Laments about dealing with government bureaucracies."** Defendants entirely ignore the extensive record evidence that, prior to being enjoined by the state courts, Act 23 had created

what one state judge described as "a picture of carousel visits to government offices, delay, dysfunctional computer systems, misinformation and significant investment of time to avoid being turned away at the ballot box." *NAACP* Order at 4; *see* P Br. 24-29. Defendants' *amici* dismiss all of this evidence as "laments about dealing with government bureaucracies," though *amici* concede that Plaintiffs' "laments . . . ring true." D. *Amici* Br. 4; *see also id.* at 34 (conceding that the evidence demonstrates "frustrating burdens and inconveniences," but claiming that these burdens "apply equally to members of all races").

Here again, history repeats itself: As demonstrated in Plaintiffs' opening brief, many of the voter suppression laws that were outlawed by the 1965 Act had relied heavily on "burdensome" and "unnecessary" bureaucratic procedures and requirements to suppress minority voter turnout. 1981 H. REP. 14 (Ex. 25); *see* P. Br. 16-17. Those laws made the voting process "a test of skill" for voters of color and the "engine of discrimination" characterized by long delays in service, red tape, the need to make repeated visits to multiple government offices to obtain and maintain voting eligibility, arbitrary and unpublicized agency actions, "procedural hurdles," and other "bureaucratic monstrosities."[10] Act 23 is no different in degree or kind from these voter suppression techniques of prior generations.

**Bureaucratic "discretion" and inconsistent application of the law.** *Amici* also argue that voters unable to obtain a birth certificate may petition the DMV for an "exception," and that voters of color should follow this procedure if they cannot track down their birth certificates. D. *Amici* Br. 8, 27, 32, *citing* Wis. Admin. Code Trans. § 102.15(3)(b). As Plaintiffs demonstrated in their opening brief, this unpublicized "extraordinary proof petition procedure" requires an

---

[10]  1965 H. REP. 8 (internal punctuation and citations omitted); 1965 S. REP. 10 (citations omitted); J. Morgan Kousser, THE SHAPING OF SOUTHERN POLITICS: SUFFRAGE RESTRICTION AND THE ESTABLISHMENT OF THE ONE-PARTY SOUTH, 1880-1910, at 50 (1974) (Ex. 22); *see* P. Br. 16 n.20.

applicant to "document that their [home state] vital records office cannot provide a certified birth certificate," which requires a certification from their vital records office along with "multiple secondary forms, like hospital certificates, baptismal certification, and SSA history printouts." Judd Dep. at 35-36 (Ex. 15). The State concedes these determinations are delegated to the individual supervisors at the local DMV service centers, with the "extraordinary" petitions being "approved on a case by case basis." *Id.* at 34-39. This process is not even mentioned on the GAB or DMV websites, and the required form — MV3002 — continues to be available only in hard copy through DMV offices, to be given out only in person or by mail at the discretion of individual DMV supervisors. Many prospective voters have never even been told about this "extraordinary proof petition procedure" and Form MV3002. *See* Krueger Dep. at 42:10-43:14 (Ex. 66); Fernan Dep. 94:7-95:25 (Ex. 67); Turja Dep. at 43:13-61:3 (Ex. 68).[11] In fact, Plaintiff Bettye Jones was not informed of the procedure for requesting an exception at any point in her extended communications with different DMV offices, and it remains unclear whether any sort of exceptions procedure was followed when the DMV finally did provide her with a state ID.

Poorly publicized rules and procedures, and the vesting of broad discretion in the hands of local bureaucrats, were integral features of many voter suppression laws outlawed by the Voting Rights Act and its amendments. These contrivances allowed local officials to go easy on

---

[11] *Amici* do not address, let alone refute, the State's own admissions that the "extraordinary proof petition procedure" is not widely publicized and is inconsistently applied. Instead, they argue that applicants can go read the Wisconsin Administrative Code for themselves, and that, if they do so, they will see that § 102.15(3)(b) "plainly state[s] that a person may apply for this waiver." D. *Amici* Br. 8. Here again, the defense arguments are reminiscent of those made a century ago. Note that, while *amici* rely heavily on § 102.15(3)(b) as the supposed antidote to any racially disproportionate impacts of the photo ID requirement, defendants themselves do *not* rely on this "extraordinary proof petition procedure" — they do not even cite the underlying regulation.

those they liked (for whatever reason) while turning away those they disliked (for whatever reason) — discretion that repeatedly was exercised against voters of color.[12]

Thus, this aspect of the administration of Act 23, far from excusing the harsh and unreasonable rigors of Act 23, is simply another way in which Act 23 functions like the voter suppression measures outlawed by Section 2. The "extraordinary proof petition procedure" is simply another hurdle in the series of hurdles imposed under Act 23.[13]

**The "grandfathering" issue.** Defendants' *amici* make the extraordinary claim that, even if Act 23 falls disproportionately on voters of color, "African-Americans and Latinos who lack photo identification need only follow the same procedures to which electors of all races who

---

[12] One historian of the period concluded that "the amount of discretion granted to registrars" was one of the "key disfranchising factors" of the southern voter suppression laws. Kousser, SHAPING OF SOUTHERN POLITICS 48; *see also id.* at 59 ("When asked whether Christ could register under the good character clause, a leader of the Alabama convention replied, 'That would depend entirely on which way he was going to vote.'"); Michael Perman, STRUGGLE FOR MASTERY: DISFRANCHISEMENT IN THE SOUTH, 1888-1908, at 29 (2001) (Ex. 69) ("registrars were given almost unlimited discretion in interpreting and administering the qualifying tests"); Gunnar Myrdal, AN AMERICAN DILEMMA: THE NEGRO PROBLEM AND MODERN DEMOCRACY 1325 n.34 (1944) (Ex. 70) ("I can keep the President of the United States from registering, if I want to. God, Himself, couldn't understand that sentence. I, myself, am the judge."); *see also id.* at 484 (Ex. 24) ("Even professors at Tuskegee and other Negro universities have been disfranchised by failing to pass these tests."); Samuel Issacharoff, Pamela S. Karlan & Richard H. Pildes, THE LAW OF DEMOCRACY: LEGAL STRUCTURE OF THE POLITICAL PROCESS 117-20 (rev. 2d ed. 2002) (Ex. 71).

[13] *Amici* also claim that, under Wis. Admin. Code § 102.15(3)(b), "African-Americans and Latinos who are too indigent to be able to afford the nominal fee associated with obtaining their birth certificates may seek a waiver of that requirement from the DMV." D. *Amici* Br. 32. That is a serious mischaracterization of this regulation and the record evidence of how it is administered. Kristina Boardman, Director of the DMV's Bureau of Field Services, repeatedly testified that, "[u]nder current law, *we do not have the ability to exempt one from statutory requirements for indigency.*" Boardman Dep. 185:10-12 (Ex. 72) (emphasis added); *see also id.* at 43:20-44:16 (testifying that DMV does not have "any alternative procedures for customers who represent that they can't afford their birth certificate"); Krueger Dep. 45:5-7 (MV 3002 not available for use by those who claim they cannot afford a birth certificate); Robinson Dep. at 27:5-31:25 (Ex. 73). Contrary to the false picture painted by *amici*, the DMV will not give an indigency exemption even to a homeless person who says, "I'm penniless, living on food stamps, I cannot afford even my next meal, I can't afford a certified copy of my birth certificate from Minnesota, which costs 26 bucks, is there an alternative for me?" Boardman Dep. at 185:2-12 (testimony by Ms. Boardman that, even in such a case, the DMV cannot and will not give an indigency exemption).

20

already possess such identification previously were subject." D. *Amici* Br. 35. *Amici* argue that, since these voters of color are only being asked to submit "to the same inconveniences, delays, and bureaucracies" that all current holders of driver's licenses and state IDs already have dealt with, there can be no violation of Section 2. *Id.* at 34. "The simple fact that many Caucasians already have taken the steps necessary to run this purported bureaucratic gauntlet and obtain photo identification, while a greater proportion of African-Americans and Latinos have yet to do so, does not turn an otherwise permissible requirement into a racially discriminatory one." *Id.*; *see also id.* at 35 ("The alleged racial disparities upon which Plaintiffs rely do not stem from the fact that a substantial number of Caucasians were exempt from, or otherwise able to avoid, the burdens of which Plaintiffs complain.").

This argument is frivolous. As demonstrated in Plaintiffs' opening memorandum, under Act 23 voters who already hold a Wisconsin driver's license or state ID may indefinitely renew their licenses and IDs without *ever* having to go to the expense and bother of tracking down their birth certificates and other qualifying documentation that those without current licenses or state IDs must produce. *See* P. Br. 21-22; Curtis Decl. Ex. 27 (excerpt from DMV website stating that renewal only requires expired license or ID and Social Security number). Accordingly, Act 23's monetary, bureaucratic, and other burdens most certainly will be avoided by the vast majority of current White voters, who already hold driver's licenses and state IDs, and instead fall disproportionately on African-American and Latino voters, who, as discussed previously, are significantly more likely to lack a current and valid state ID.

This is the functional equivalent of the old "grandfather clauses" that exempted many Whites from the requirements of various Jim Crow registration and voting laws, and strongly

21

Case 2:12-cv-00185-LA   Filed 06/27/12   Page 31 of 60   Document 55

*amplifies* the racially discriminatory impacts of Act 23.[14]  Thus, *amici*'s hypothetical about a law

that requires *all* voters to obtain a "special new card" pursuant to uniformly applied

"requirements and procedures" (D. *Amici* Br. 34-35) has nothing to do with this case, in which

current driver's license and state ID holders were indefinitely grandfathered from the new birth

certificate and other proof-of-identity requirements imposed by Act 23.

## III.  ACT 23 IMPOSES DISPROPORTIONATE AND SUBSTANTIAL BURDENS ON VOTERS OF COLOR.

### A.  Defendants' Own Evidence Confirms That the Burdens of Act 23 Are Disproportionately Borne By Voters of Color.

Although Defendants and their *amici* refuse to concede that Act 23 falls

disproportionately on voters of color, the Defendants have now released DOT data

demonstrating that nearly *half* of all of the "free" state IDs issued since Act 23 took effect on

July 1, 2011, have been obtained by African-Americans and Latinos.  Specifically, although

African-Americans constitute 5.4% of Wisconsin's voting age population, they have obtained

38.2% of the photo IDs issued since Act 23 took effect.  Similarly, although Latino voters

constitute 2.0% of our State's voting age population, they have obtained 7.5% of the photo IDs

issued pursuant to Act 23.  D. Br. 15-16.

Defendants appear not to recognize that these data rather obviously demonstrate that the

requirements of Act 23 fall disproportionately on voters of color.  Instead, they point to these

figures as evidence that African-Americans and Latinos can obtain photo IDs if they try hard

---

[14]  "Grandfather clauses" were laws that exempted certain categories of voters from having to comply with newly imposed registration or voting restrictions, such as literacy tests and poll taxes (*e.g.*, if one's grandfather had voted or had served in the Confederate Army, a universe limited almost entirely to Whites).  *See* P. Br. 15-16 & n.17; V.O. Key Jr., SOUTHERN POLITICS IN STATE AND NATION 556 & n.1 (1949, rev. ed. 1984) (Ex. 16).  The Supreme Court struck down the practice of "grandfathering" in *Guinn v. United States*, 238 U.S. 347 (1915).

22

enough, and that those voters of color who lack photo ID should follow the example of the voters who already have successfully run the bureaucratic gauntlet and obtained their IDs. *Id.* That, of course, is not the governing standard. Defendants' own data prove Plaintiffs' claims: if nearly *half* of all people who have obtained the "free" photo ID since Act 23 took effect are African-American or Latino, it is reasonable to conclude that a large, "statistically significant" percentage of the total voting age population who lack acceptable ID are African-Americans or Hispanics — certainly much larger than their combined 7.4% of Wisconsin's voting age population. That is the only plausible conclusion to be drawn from these data.[15] (These data also forcefully rebut the insinuation that any adverse impacts on voters of color might be due to their lack of sufficient "motivation" or because they do not "wish to participate in the electoral system," D. *Amici* Br. 15, 37.)

Defendants' expert, Professor H.V. Hood III, also inadvertently proves Plaintiffs' case. He criticizes Mr. Beatty's analysis of the DOT data on various grounds, and offers his own counter-computation purporting to show that only 5.06% of eligible Wisconsin voters lack a state driver's license or photo ID. But when Professor Hood's own numbers are analyzed using racial identification methods they too show a significant racial disparity. That analysis shows that 4.36% of White voters lack a Wisconsin driver's license or photo ID, but that 11.69% of Non-White voters lack such ID. *See* Beatty Rebuttal Decl. ¶¶ 14-17, filed herewith. Thus, Non-White voters are more than twice as likely as White voters to be without a Wisconsin driver's license or photo ID. *See id.* ¶¶ 15-16.

---

[15] Defendants otherwise must argue that, although nearly half of all "free" photo IDs have been issued to African-Americans and Latinos, it is still somehow possible that Act 23 falls evenly across racial lines, but that African-Americans and Latinos are much *more* successful than Whites in navigating the "bureaucratic gauntlet" and obtaining the required IDs. There is no plausible evidence of such a *reverse* racial impact.

Defendants and their *amici* have a deeply flawed understanding of what constitutes an actionable "statistically significant" disparate racial impact under the Voting Rights Act. *Amici* argue that, even if Mr. Beatty's analysis is correct, the racial disparities he shows are not "statistically significant" given the "relatively small sizes" of these groups. D. *Amici* Br. 18. Thus, although African-Americans constitute 5.3% of all registered voters but 7.8% of voters without photo ID, and although Latinos constitute 1.6% of all registered voters but 3.6% of voters without photo ID, "*the 'extra' 2 - 2.5% of them* who lack" photo ID is not material. *Id.* (emphasis added).

Voting rights violations are not excused, of course, simply because they are borne by a relatively small percentage of the overall voting age population. What matters, instead, is whether the impacts are imposed in a *disproportionate* manner on racial and language minorities, and if so by how much. With respect to the disparate impacts of Act 23 on Latinos, for example, Defendants' *amici* might dismiss the significance of "the 'extra' 2 - 2.5% of them who lack" ID, but those numbers mean that Latino registered voters are 2.6 times as likely as White registered voters to lack a driver's license or state ID. *See* Beatty Decl. ¶ 7-8. Similarly, the so-called "extra" African-Americans who lack such IDs mean that African-Americans are 1.7 times as likely as White registered voters to lack these documents. *Id.*

These are significant racial gaps. The U.S. Department of Justice recently rejected Section 5 preclearance for South Carolina's newly enacted photo ID law because of a statistically significant racial gap of 1.6 percentage points in possession of approved IDs (*i.e.*, 8.4% of Whites lack ID but 10% of non-Whites lack ID). *See* Ex. 36.[16] And as discussed in Plaintiffs'

---

[16] Note that the corresponding racial gaps in Wisconsin (6.7 percentage points between African Americans and Whites, and 15.3 percentage points between Latinos and Whites) are *much*

(Footnote continued on next page)

opening brief, courts repeatedly have found that Section 2 prohibits the disproportionate use of faulty voting technology in voting districts with large minority populations, even where that faulty technology counts the vast majority (*i.e.*, +95%) of minority votes. *See* P. Br. 28-29 & n.33; *see also Black v. McGuffage*, 209 F. Supp. 2d 889, 893 (N.D. Ill. 2002) (Section 2 claim stated where optical scan ballots had "average residual vote rate" of less than 1%, whereas "punch card ballots" used disproportionately in minority areas had rate of over 4%).

B.     **Defendants' Criticisms of Leland Beatty's Statistical Analysis Are Misplaced, and Beatty's Conclusions Are In Line With All Other Studies of Act 23's Impacts.**

Defendants observe that their expert, Professor Hood, came up with a different estimate than Plaintiff's expert, Leland Beatty, of the number of Wisconsin registered voters who lack Wisconsin driver's licenses or state identification cards. *See* D. Br. 13-25; Hood Decl. ¶¶ 5-17 (Dkt. 45). In fact, the two experts' estimates are not significantly different and the differences result from Mr. Beatty having made more reasonable methodological choices. Moreover, Mr. Beatty's reliance on the work of Ethnic Technologies was reasonable given that Ethnic Technologies' methodology is generally accepted in the field and the firm has a proven track record of accuracy.

1.     **Mr. Beatty and Professor Hood's Estimates are Not Significantly Different, and the Differences Result from Mr. Beatty Having Made the More Reasonable Choice on Two Methodological Issues.**

Mr. Beatty concluded that 11.1 percent of registered voters lack a driver's license or state identification card. Beatty Decl. ¶ 8. Professor Hood estimated that between 9.43 and 6.15 percent of registered voters lack such identification. Hood Decl. ¶14. The difference between

---

(Footnote continued from previous page)

greater than the gap in South Carolina that led to the denial of Section 5 preclearance. *See* P. Br. 24.

Mr. Beatty's estimate and Professor Hood's 9.43 percent estimate is only 53,493 registered voters (1.67 percent of the total).

Moreover, virtually *all* of the difference between Mr. Beatty's estimate and Professor Hood's estimate is attributable to two basic methodological differences. *First*, Professor Hood treated an individual as having a Wisconsin driver's license or state identification card if he could match the driver's license number found in that individual's voter registration file (the "GAB" file) with the same number appearing in the DMV files, even if those files contained completely different personal identification for the person in question. As explained in detail in Mr. Beatty's Rebuttal Declaration, this meant that Professor Hood would declare a voter registration record a "match" to the DMV record ***even if GAB and DMV files identified the supposedly "matched" voter as having a different gender, first and last name, birth date, and residence.*** *See* Beatty Rebuttal Decl. ¶¶ 5-6. Mr. Beatty quite reasonably required that there be some minimal matching of the personal information in the DMV and GAB files before declaring them "matched." *Id.* ¶¶ 5-8 & n.1. This methodological issue alone resulted in Professor Hood treating some 85,622 more registered voters (2.6 percent of all such voters) as having proper identification than did Mr. Beatty. *Id.* ¶ 7.

*Second*, Professor Hood treated any individual who had a driver's license number in their voter registration (GAB) file as having proper photo identification, even when there was no current entry for that person or driver's license number in the DMV files. Beatty Rebuttal Decl. ¶¶ 9-12. Even though Professor Hood concedes that these individuals likely do not have a current, unexpired Wisconsin driver's license or state identification, he opined that "the fact that these registrants at one time were in possession of a driver's license or state ID card is an indication that they could obtain one again." *See* Hood Decl. ¶ 12. But Mr. Beatty was trying to

estimate the number of registered voters who lack a current and unexpired form of acceptable photographic identification, and these registered voters concededly do not have one. This second methodological difference resulted in Professor Hood treating an additional 106,825 more registered voters—3.3 percent of the total—as having a valid form of identification as compared to Mr. Beatty. *See* Beatty Rebuttal Decl. ¶ 10.

Between them, these two methodological differences account for Professor Hood having treated 195,599 registered voters as having a Wisconsin driver's license or state identification card that Mr. Beatty did not treat as having such identification. Since the maximum difference in their estimates was 198,578 registered voters (using Professor Hood's "lower" estimate of 6.1 percent lacking proper identification), these two methodological issues are responsible for 98.5% percent of the difference between their two estimates. *See* Beatty Rebuttal Decl.¶ 13.

## 2.     Mr. Beatty's Use of Ethnic Technologies Was Reasonable

Defendants also complain that Mr. Beatty did not explain the methodology Ethnic Technologies used to determine the racial breakdown of Wisconsin registered voters who lack an acceptable form of photographic identification. D. Br. at 14-15; Hood Decl. ¶¶ 16-17. But it is standard practice in the field of election analysis to use a firm like Ethnic Technologies. Beatty Rebuttal Decl. ¶ 19; *cf.* Fed.R.Evid. 703 ("[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted").

Ethnic Technologies determines voters' races based on an analysis of first names, surnames, and middle names as well as by "geocoding," an analysis of where an individual lives

and whether their neighborhood location helps identify their ethnicity.[17]   There is an extensive

body of academic literature that confirms the accuracy of the methods the firm uses.  In 2007,

before Ethnic Technologies implemented its newest version of first-name analysis, the National

Cancer Institute commissioned a study that examined Ethnic Technologies' methodology that

concluded Ethnic Technologies methodology was highly accurate but likely under-identified

African Americans.  *See Triangulating Differential Nonresponse by Race in a Telephone Survey*,

by DeFrank, Bowling, Rimer, Gierisch, and Skinner, *Preventing Chronic Disease,* Vol. 4 No. 3,

July 2007 (Ex. 75).  Other scholarly articles that confirm that accuracy of Ethnic Technologies'

methodology include:  (1) Mateos, P. (2007), *A review of name-based ethnicity classification*

*methods and their potential in population studies*,  Population Space Place, 13 (2007) (Ex. 76);

(2) Mateos, P., Webber, R. & Longley, P (2006) *How segregated are name origins? A new*

*method of measuring ethnic residential segregation*, in:  Priestnall, G. and Aplin, P., (eds.)

*Proceedings of the 14th GI Science Research UK Annual Conference* (GISRUK 2006). (pp. 285-

291) University of Nottingham: Nottingham, UK (Ex. 77); and (3) *Onomastics and Its Uses*, Joel

T. Rosenthal, Journal of Interdisciplinary History, Summer 2005, Vol. 36, No. 1, (pp. 57-62)

(Ex. 78).

   The accuracy of Ethnic Technologies' work is confirmed, moreover, by the fact that its

results are entirely consistent with the other estimates of the racial breakdown of Wisconsin

registered voters who lack a proper form of photographic identification.   Thus, Mr. Beatty

---

[17]   Ethnic Technologies has a detailed explanation of its methodology for determining ethnicity
on its website.  *See* http://www.ethnictechnologies.com (last visited June 26, 2012), and Ex. 74.
As explained there, Ethnic Technologies uses these indicators of ethnicity in a step-wise fashion.
First, Ethnic Technologies considers whether a person's first name is unique to an ethnicity.  If
so, that ethnicity is assigned to that name.  If the person's first name is not unique to an ethnicity,
but the last name is, an ethnicity is assigned based on the last name.  For names that are common
to one or more ethnicities, Ethnic Technologies uses tiebreakers including middle name and zip
code.

estimated that 9.5 percent of registered White voters lack the required identification, compared to 16.2 percent of registered African-American and 24.8 percent of registered Hispanic voters. *See* Beatty Decl. ¶ 7. Professor Mark A. Barreto's estimates reinforce Mr. Beatty's conclusions about the racial disparities among who lacks photo ID in Wisconsin, finding that in Milwaukee County 7.3 percent of Whites, 13.2 percent of African-Americans, and 14.9 percent of Latino registered voters lack and "accepted, non-expired, photo ID." Barreto & Sanchez Rep. at 34 Table 1 (Ex. 79). Mr. Beatty's conclusions based on the Ethnic Technology data are also consistent with the findings of the 2005 University of Wisconsin-Milwaukee Study. *See* Beatty Decl. ¶¶ 46-57.

Moreover, it bears noting that neither Defendants nor their expert offer any substantive criticism or reason to doubt the accuracy of Ethnic Technology's work.

### C. Contrary To Defendants, the Disproportionate Burdens Imposed By Act 23 Are Significant and Predictably Will Suppress Minority Voting.

Defendants and their *amici* argue at length that a "bare statistical showing" of racially disproportionate impact is insufficient to establish a Section 2 violation. D. Br. 12; *see also* D. *Amici* Br. 13-15, 30. But that is not the argument Plaintiffs advance. Rather, Plaintiffs contend that the racially disproportionate impacts of Act 23 interact with social and historical conditions in such a way as to impose a substantial and unjustified burden on African American and Latino voters, in violation of Section 2. The defense briefs almost entirely ignore Plaintiffs' detailed fact and expert testimony demonstrating that Act 23 imposes *substantial* burdens on those who lack acceptable voting ID, dismissing all of this as "laments about dealing with government bureaucracies" and "frustrating burdens and inconveniences." D. *Amici* Br. 4; *see also id.* at 34. As demonstrated in detail above, these kinds of "frustrating burdens and inconveniences" are *precisely* what Section 2 was intended to outlaw when imposed in a racially discriminatory

manner.  *See* pp. 14-21 above.  The Court should consider the following additional points about the burdens imposed by Act 23:

**The "calculus of voting."**  Defendants have failed entirely to respond to Plaintiffs' demonstration that, under elementary principles involving the "calculus of voting," the imposition of increased costs and barriers disproportionately on voters of color will predictably depress turnout by these groups.  *See* P. Br. 25-26.  These impacts are documented in a "large body of research . . . demonstrat[ing] how costs of voting depress turnout especially for racial and ethnic minorities."  Burden Decl. ¶ 7; *see id.* ¶¶ 7-8, 39, 42, 57, 59, 67.  Nor have Defendants addressed the admission by GAB Executive Director Kevin Kennedy that the process imposed by Act 23 is "fairly difficult" for many people and "not a simple, straightforward task."  Kennedy Dep. 43:8-44:8 (Ex. 5).  Nor have Defendants come to terms with the factual determinations by two Wisconsin state courts that Act 23 imposes "significant," and sometimes "insurmountable," burdens on many eligible Wisconsin voters.  *NAACP* Order at 4; *LWV* Decision and Order at 6-7 (Ex. 4).  Ignoring all of this fact and expert evidence, they simply claim the burdens are not significant.

**Required fee to vote.**  The Supreme Court has emphasized that a State may not "require[] voters to pay a tax or a fee to obtain a new photo identification" in order to exercise their right to vote.  *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008), (citing *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 666 (1966) (State may not "make[] the affluence of the voter or payment of any fee an electoral standard")).  Thus it is important that the State issue the required ID for "free."  *Crawford*, 553 U.S. at 198.  Although the Court acknowledged that having to obtain one's underlying documentation might cost money, *id.* at 198 n.17, these expenses could be completely avoided under the Indiana law by (1) voting

absentee, which did not require a state ID, or (2) casting a provisional ballot followed by the execution of an affidavit of indigency. *See id.* at 185-86 & n.2, 199-201. Thus, an Indiana voter need not pay money to obtain vital records in order to vote.

These "mitigation" provisions in Indiana's law are wholly missing from Act 23, which requires Wisconsin's voters to obtain a birth certificate in order to prove their identity and date of birth. They have no ability to avoid this requirement, either by voting absentee or by petitioning for a special exemption. As demonstrated above, Defendants' *amici* falsely claim that voters of color who are indigent "may seek a waiver of [the birth certificate] requirement from the DMV." D. *Amici* Br. 32. No such waiver based on indigency is available; state officials repeatedly have testified that there are no "alternative procedures for [voters] who represent that they can't afford their birth certificate." Boardman Dep. 44; *see* collected testimony at p. 20 n13 *supra.* Thus, unlike the Indiana statute at issue in *Crawford*, Act 23 conditions the right to vote on payment of a fee for documentation that the voter, by definition, does not otherwise need. This is a significant and illegal burden on the right to vote.[18]

**Impact on senior voters of color born out of state.** Plaintiffs demonstrated in their opening brief that the burdens of Act 23 fall with especially unforgiving force on senior voters of color, most of whom as a matter of historical reality were born outside of Wisconsin. *See* P. Br. 11-12 & nn. 9-12.[19] Many of these voters were never issued a birth certificate, and many are

---

[18] Moreover, in order even to be eligible to *petition* for an exemption under Wis. Admin. Code § 102.15(3)(b), the applicant must first seek to obtain his birth records from his birth state, and then "document that [his] vital records office cannot provide a certified birth certificate." Judd. Dep. at 35:17-20 (Ex. 15). Thus, the applicant must pay search fees, mailing expenses, and other costs before he can even petition for an exemption — assuming he is even told about this procedure. *See* pp. 17-19 *supra.*

[19] Defendants' *amici* question whether a disproportionate percentage of African-Americans and Latinos were really born out of state (*see* D. *Amici* Br. 27-28), but that is the obvious historical reality. Although Milwaukee had a small African-American population prior to 1950, "it did not receive large influxes of African-American population from either of the migrations during or

(Footnote continued on next page)

now ill-equipped to deal with distant out-of-state bureaucracies in tracking down ancient records. Some of these senior voters have been able to overcome substantial, multiple bureaucratic hurdles to obtain their state IDs, but the record evidence demonstrates that there are many others who have not and who will in all likelihood be quietly, politely, but brutally disfranchised if Act 23 is ever allowed to go back into effect.

Consider the testimony of Lorene Hutchins, a 92-year-old African American woman who was born in rural Mississippi and has lived and voted in Milwaukee since 1945. This good citizen describes in detail the multistate bureaucratic process that "took me over three months and approximately $60, in addition to the assistance of multiple other people, for me to get a form of ID that would allow me to vote under Act 23." Hutchins Decl. ¶ 10; *see id.* ¶¶ 2-10. She concludes (*id.* ¶ 11):

> [T]he entire process really troubled me. What if I hadn't had my daughter to help me? What if she had never been able to correct her ID? What if I didn't have two children with birth certificates? I think about how many people won't be able to vote because they don't have IDs or birth certificates, and they don't have anyone to help them get one. Or, they'll run out of patience in the process, or might not have money to pay for the underlying documents. Or, they might not be mobile enough or have transportation to go to the DMV. Very few elderly African-Americans were born in Wisconsin. Most of us moved here from the South for expanded opportunity, and we've been active and engaged citizens ever since. I don't understand why, after so many years of participation and contribution, it should once again be so difficult for us to do something as basic as vote.

---

(Footnote continued from previous page)

immediately after the wars [*i.e.*, World Wars I and II]." Greg J. Carman, WALL OF EXCLUSION: THE PERSISTENCE OF RESIDENTIAL RACIAL SEGREGATION IN METROPOLITAN MILWAUKEE 2 (2011) (Ex. 39). The "explosive growth" and "massive increase" of the African-American population did not occur until the last half of the 20th century, "largely attributable to the migration of southern African Americans to Milwaukee." *Id.* at 45-46 (Ex. 80). This migration of southern African Americans to Milwaukee is documented and analyzed in Carmen, ch. 2 ("The Migration of Southern African Americans to Milwaukee and Their Settlement in the Inner Core"); and Paul Geib, *From Mississippi to Milwaukee: A Case Study of the Southern Black Migration to Milwaukee, 1940-70*, 83 J. NEGRO HISTORY 229 (1998) (Ex. 81). The Latino population did not begin arriving in Wisconsin until even later. *See* Burden Decl. ¶ 20. Thus, most older voters of color in Wisconsin necessarily were born outside of the State.

The lead plaintiff, Bettye Jones, testifies to a similar experience. She is a 77-year-old African American woman who was born in Tennessee, spent most of her adult life in Ohio, and now lives in Brookfield with her daughter. She recounts a "harrowing, expensive and multi-month" bureaucratic "ordeal," one extending across three states. Jones Decl. ¶ 8; *see id.* ¶¶ 6-13. She observes (*id.* ¶ 14):

[T]his entire ordeal is very disturbing, and has me worried about other people like me who don't have the help and resources I did. I couldn't have obtained this ID if I hadn't had my daughter help me, or if we hadn't had the time, money and persistence to keep trying. I worry about all the other people who don't have birth certificates; many African Americans who were born in the South during segregation like I was were likely born at home because hospitals wouldn't take them, and therefore might not have been issued birth certificates like me. I think there are probably many others in my situation who won't have the ability to overcome those hurdles and get an ID.

Defendants respond to this evidence by ignoring it. Defendants' *amici* dismiss it as "lay opinion" that "*does not appear to be probative*." D. *Amici* Br. 27 (emphasis added). To the contrary, the stories of Mrs. Hutchins, Mrs. Jones, and many other senior voters of color powerfully demonstrate the unfair, unjustified, and disparately imposed burdens of Act 23. Plaintiffs have backed this testimony up with demographic evidence demonstrating that nearly 20% of nonwhite births in 1950 went unregistered (as opposed to only 6% of white births). *See* P. Br. at 11 n.10. Defendants' *amici* disparage this evidence because it is "from over 60 years

ago" (D. *Amici* Br. 29), but that is not surprising given that the data involve racial disparities in

the issuance of birth certificates in 1950. *Amici* nowhere question the reliability of these data.[20]

## IV. THE "TOTALITY OF CIRCUMSTANCES" ANALYSIS CONFIRMS THAT THE SUBSTANTIAL AND RACIALLY DISPROPORTIONATE BURDENS IMPOSED BY ACT 23 VIOLATE SECTION 2.

Defendants and their *amici* disagree over the proper role of the "Senate Factors" analysis

in this case. Defendants argue that the Court "should not use" the Senate Factors here, because

this is a vote denial rather than a vote dilution claim, and the Senate Factors are oriented toward

dilution rather than denial claims. D. Br. 19; *see also id.* at 18 ("Whether the Senate Factors play

any part in the analysis of a vote denial claim is doubtful."). Defendants' *amici*, on the other

hand, insist that Section 2 "requires" courts to apply the Senate Factors analysis to vote denial as

well as vote dilution claims. D. *Amici* Br. 35. As discussed in the opening brief, Plaintiffs

believe that the Senate Factors analysis is *not* required to prove their vote denial/suppression

claim, but that a consideration of the Senate Factors strongly reconfirms that Act 23 violates

Section 2. *See* P. Br. 29-30.

In vote dilution cases, courts have used the Senate Factors to analyze whether a

challenged practice "interacts with social and historical conditions to cause an inequality in the

opportunities enjoyed by black and white voters" to exercise their right to vote. *Gingles*, 478

---

[20] We also call the Court's attention to the *amici curiae* brief supporting plaintiffs' motion prepared *pro bono* by Attorney Dean A. Strang, and lodged with the Court on April 23, 2012 at Dkt. No. 18-1. The motion for leave to file that *amici* brief in support of plaintiffs' motion for a preliminary injunction (Dkt. No. 18) has not yet been acted upon by the Court. Plaintiffs respectfully request that the Court grant this *amici* motion, as it has granted the parallel motion of defendants' *amici*. The Strang *amici* brief analyzes U.S. government birth registration data collected between 1940 and 1968 and demonstrates how *millions* of senior citizens nationwide lack birth certificates. Extrapolating, *amici* demonstrate that the number of Wisconsin voters who never were issued a birth certificate may reach 60,000. P. *Amici* Br. 13-16. "Together, these disenfranchised voters would fill every seat in Miller Park and every seat in the Bradley Center, with more spilling onto adjacent sidewalks" *Id.* at 16. And, as *amici* adds, "there is no evidence that any of these people . . . ever engaged in or contemplated voter fraud." *Id.* at 17.

U.S. at 47. Of course, that is the central inquiry under Section 2. In their opening brief, Plaintiffs applied the Senate Factors to their vote denial challenge to Act 23 by demonstrating, principally in reliance on the declaration of their expert witness, Professor Barry C. Burden of the University of Wisconsin, that the burdens imposed by Wisconsin's voter identification law factor negatively into a "calculus of voting" for Black and Latino voters, for whom the benefits of voting are already perceived as lower and burdens higher, in such a way as to render them more likely than white voters to be prevented from voting by the new law. In response, Defendants reveal a fundamental misunderstanding of the manner in which the "totality of circumstances" analysis confirms how Act 23 deprives Black and Latino voters of an equal opportunity to vote, in violation of Section 2.

A.   **The Responses of Defendants and Their *Amici* Reconfirm That the Policy Underlying Act 23 Is "Tenuous" In Multiple Respects.**

The 1982 Senate Report instructs courts to evaluate "whether the policy underlying" the challenged law is "tenuous" or "markedly departs from past practices or from practices elsewhere," factors "that bear[] on the fairness of [the law's] impact." 1982 S. REP. 29 & n.117. If the challenged law "needlessly impairs a minority group's voting power," that further demonstrates that it violates Section 2. *See Barnett*, 141 F.3d at 702. Act 23 flunks this inquiry on many grounds.

**The specter of voter fraud.** Defendants and their *amici* devote a grand total of only two paragraphs out of their combined 82 pages of briefing to the alleged problem that Act 23 supposedly attacks — voter fraud. *See* D. Br. 33; D. *Amici* Br. 41-42. Neither paragraph cites to any evidence suggesting that voter fraud is now or ever has been a problem in Wisconsin, let alone any evidence suggesting why Act 23's particularly stringent provisions are necessary to deter such fraud. Neither paragraph acknowledges that the GAB's own Executive Director has

testified that voter fraud is not a significant problem in Wisconsin, that Act 23 is needlessly harsh in its proof-of-identity requirements, and that there are multiple less restrictive means of effectively combating potential voter fraud. *See* Kennedy Dep. 25:8-26:24, 28:12-30:9 (Ex. 82), 40:16-25 (Ex. 5); P. Br. 36-37 & n.40, 40-41.

Instead, the two paragraphs in the defense briefs that address the supposedly critical problem of voter fraud simply cite to *Crawford*, which upheld a very different voter ID law against a facial challenge under the Fourteenth Amendment, as opposed to an as-applied challenge under the more stringent provisions of the Voting Rights Act (and the Fifteenth Amendment which it enforces). *Crawford* relied heavily on Indiana's affidavit-of-identity alternative as an important mechanism for "mitigat[ing]" potentially unreasonable impacts. *Crawford*, 533 U.S. at 186 & n.2, 199, 202. The GAB recommended a similar mitigation provision here, but the Legislature rejected it. *See* P. Br. 36-37 & nn. 40-41. Defendants offer no explanation why the especially stringent provisions of Act 23 are reasonably necessary to combat alleged voter fraud.

Instead, Defendants ask this Court to ignore the detailed expert report and testimony of Professor Lorraine Minnite, who demonstrates that voter fraud is not a problem in Wisconsin. Defendants argue that Dr. Minnite's views warrant "no weight" because (1) she has criticized some aspects of the Court's decision in *Crawford*; (2) she "engaged in no *current* primary research regarding voter fraud," given that her 2010 book on the subject examines allegations of voter fraud in Wisconsin and elsewhere prior to 2010; and (3) "she sympathizes with voter ID case plaintiffs." D. Br. 34-36, 38 (emphasis added). These objections are misplaced.

Defendants' objections are simply meritless. *First*, the *only* opinion Professor Minnite offers in this case is whether the extent of voter fraud in Wisconsin is sufficiently large to justify

Act 23's requirements.  The Supreme Court in *Crawford* did not purport to make findings on the extent of voter fraud in Wisconsin, and such findings would not bind the parties here (who did not participate in the *Crawford* litigation), in any event.  Thus, the extent to which Professor Minnite is critical of the *Crawford* decision is entirely irrelevant to the limited opinion that she has set forth here, an opinion not addressed in any way by *Crawford*.

*Second*, Professor Minnite's opinion is based on the research that led to her 2010 book.  This work is hardly outdated, and Defendants' offer no new trend or development since 2010 that might render her opinion suspect.  Moreover, as she explained in her deposition, she did review news reports to see "if there was anything that was inconsistent with the findings that I drew from my original research" before offering an opinion in this case.  Minnite Dep. at 49:2-8.

*Finally,* the suggestion that Professor Minnite is "biased against voter photo identification laws" is a mischaracterization of the record.  To the contrary, Professor Minnite explained that the quoted statement about her "sympathies" lying with plaintiffs simply meant that when she examined the relevant data, she agreed that it tended to show that voter identification laws had a disparate impact on persons of color.  *See* Minnite Dep. at 106-107.  Moreover, she went on to testify under oath that her work is unbiased and objective:

> Q.   Professor Minnite, do you consider your academic work to be unbiased?
>
> A.   What do you mean by "unbiased"?
>
> Q.   That it's objective.
>
> A    Yes.

Minnite Dep. at 106:3-7.

**Availability of less restrictive and/or more inclusive alternatives.**  Even to the extent that the prevention of undetected voter fraud is an important and legitimate state interest, Section

2 imposes a rule of proportionality — a law may not "*needlessly*" harm voters of color or

"impair[] the voting power of minorities *more than it has to*." *Barnett*, 141 F.3d at 701, 702

(emphasis added). The very voter ID cases cited by Defendants and their *amici* demonstrate that

Act 23 needlessly restricts the opportunities of voters of color.

For example, as discussed above, the Indiana voter ID law at issue in *Crawford* allowed a

voter to avoid having to obtain a birth certificate by either voting absentee or completing an

affidavit of indigency. *See* pp. 31, 36 *supra.* Similarly, the Georgia voter ID law touted by

Defendants' expert, Professor Hood, is not remotely comparable to Act 23: It does not even

require a birth certificate to obtain the free state ID. Proof of registration and "swearing an oath

that the voter does not have another acceptable form of identification" are all that is required.

*Common Cause/Georgia*, 554 F.3d at 1346.[21] Likewise, the Arizona law upheld by the Ninth

Circuit does not even require a photo ID, let alone a birth certificate to obtain such an ID: a voter

must present *either* a photo ID *or* two alternative forms of non-photo ID from a long list

including utility bills, bank statements, and insurance cards. *See Gonzalez v. Arizona*, 2012 WL

1293149 at *13 n.31 (9th Cir. Apr. 17, 2012) (*en banc*).

Why are Act 23's stringent provisions — the harshest in the country — *necessary* to

adequately guard against voter fraud? As the 1982 Senate Report emphasized, a challenged

election law is "tenuous" if it "markedly departs . . . from practices elsewhere." 1982 S. REP. 29

& n.117. The defense briefs are deafeningly silent on these issues.

---

[21]  For these reasons, Professor Hood's various studies of the purported impacts of Georgia's
voter ID law on that State (*see* Hood Decl. ¶¶ 35-39) have no relevance to the impacts of the
very different Act 23 in the very different State of Wisconsin. *See* Hood Dep. at 105:5-11 ("the
Georgia ID analysis is only for Georgia."). To reiterate, Georgia does not even require a voter to
attempt to track down her birth certificate as a condition to qualifying for the "free" ID.
*Common Cause/Georgia*, 554 F.3d at 1346. Nor does Georgia require a photo ID for mail-in
absentee voting.

And if these stringent birth certificate restrictions are truly necessary, why are they not

applied to the millions of Wisconsin voters who already held Wisconsin driver's licenses or state

IDs when Act 23 took effect?  As discussed above, those millions of voters never had to submit

birth certificates to obtain their licenses and IDs in the past, and will not be required to do so in

the future — they are indefinitely "grandfathered" from having to meet these proof requirements.

*See* pp. 20-22 *supra.*  Why are new applicants a fraud risk if they do not present their birth

certificates, but not current license or ID holders who, contrary to *amici*'s misstatements (*see* pp.

20-22 *supra*), have never had to satisfy such standards in the past?  This massive under-

inclusiveness — exempting millions of potentially fraudulent voters from the birth certificate

requirements that supposedly are necessary to prevent voter fraud — further reinforces that the

purported anti-fraud justifications for Act 23 are extremely tenuous at best.

**Change in historic practice.**  Plaintiffs demonstrated in their opening brief that Act 23 is

also tenuous because it marks a "dramatic change" in the law and "an abrupt departure from a

century of voting practices in Wisconsin."  Burden Decl. ¶ 56; *see also* Mayer Jan. 2011 Rep. at

9 (Ex. 9) ("Act 23 imposes the most restrictive voting requirements in our state's history."); P.

Br. 40.  In response, Defendants devote a large portion of their brief to a detailed analysis of

eight Wisconsin Supreme Court cases decided between 1859 and 1966, all standing for the

general proposition that "the right to vote, although fundamental, is nonetheless subject to

*reasonable* legislative regulation designed to protect the integrity of the electoral process."  D.

Br. 28 (emphasis added); *see id.* at 28-33.  This includes "*reasonable* proof of a voter's

qualifications."  *Id.* at 29 (emphasis added).  But the very cases Defendants cite emphasize that

this state power "does not extend *beyond what is reasonable*" (*State ex rel. McGrael v. Phelps*,

128 N.W. 1041, 1047 (Wis. 1910) (emphasis added)) or authorize rules that "*needlessly harass*

*or disfranchise any one.*" *State ex rel. Small v. Bosacki*, 143 N.W. 175, 176 (Wis. 1913) (emphasis added).

Act 23 marks a sharp departure from traditional Wisconsin proof-of-identity requirements, thus reinforcing its "tenuous" nature. It violates the case law Defendants invoke, because it goes far "beyond what is reasonable" to prove that one is who he says he is, thus "needlessly harass[ing] or disfranchis[ing]" a substantial number of voters. *Id.* It also goes far beyond anything that Wisconsin ever has done before in terms of limiting the forms of acceptable proof of identity and requiring extra effort in documenting one's date and place of birth. And as discussed above, Act 23 is *the* most rigid and unforgiving voter ID law in the Nation. That marks a *radical* change in our State's political traditions.

> **B.** **Defendants and Their *Amici* Either Ignore Or Mischaracterize Many Additional Senate Factors.**

Defendants' arguments with respect to the remaining Senate Factors frequently ignore or mischaracterize Plaintiffs "totality of circumstances" arguments and the evidence cited and submitted in support of them. Defendants do not attempt to address each of the Senate Factors, but the arguments they do attempt fall far short of rebutting Plaintiffs' showing that, when viewed in the totality of circumstances, Act 23 deprives Black and Latino voters of an equal opportunity to participate in the political process, in violation of Section 2.

**Racial disparities in socioeconomic status.** Defendants do not dispute Professor Burden's conclusion that "Wisconsin displays substantial and enduring racial disparities in areas such as education, income, employment, criminal justice and health," Burden Decl. ¶ 42, which the Supreme Court has recognized, "hinder [minority voters'] ability to participate effectively in the political process." *Gingles*, 478 U.S. at 45. Nor do they dispute his testimony that the disparities in Wisconsin are "frequently larger than those in the rest of the United States," except

to suggest falsely that he does not cite to evidence in support of that point. Indeed, Defendants put on no evidence whatsoever to refute these points. Nor could they. Professor Burden's conclusions, which are supported by extensive evidence that he cites, are indisputable.

In response, Defendants make three arguments, none of which diminishes the force of Professor Burden's conclusions that Wisconsin's African-Americans and Latinos suffer socioeconomic disparities that render them more likely than White voters to be deterred from voting by the additional burdens imposed by Act 23, which also fall more heavily on them. *First*, Defendants argue that Act 23 does not cause any of the socioeconomic disparities that Professor Burden identifies. Of course, that is not the inquiry under Section 2 of the Voting Rights Act. A voting practice violates Section 2 if it interacts with socio-economic conditions in such a way as to deny or abridge minority voters' opportunity to participate in the political process. *Gingles*, 478 U.S. at 45; *Gonzalez*, 2012 WL 1293149, at *13.

*Second*, Defendants challenge Professor Burden's conclusion that the socioeconomic disparities he has identified render Wisconsin African-Americans and Latinos more likely to be deterred from voting by the additional burdens imposed by Act 23. Defendants complain that this conclusion is unsupported by Professor Burden's own research or analysis. Of course, Professor Burden's conclusions are rooted in his analysis of the "calculus of voting," which leads him to conclude that disparities in areas such as income and education increase the costs associated with voting for African-Americans and Latinos and render them more likely to be deterred from voting by Act 23, which further increases its costs. *See* Burden Decl. ¶¶ 39-42. Moreover, Professor Burden's conclusions are supported by several studies he cites, which conclude that voter identification laws depress political participation by voters of color, *id.* ¶ 57.[i]

*Third*, Defendants contend that Professor Burden has not demonstrated that socioeconomic disparities prevent African-American and Latino voters who lack the necessary identification to comply with Act 23 from obtaining a photo ID. But Defendants can only make that argument by ignoring portions of Professor Burden's declaration completely. In fact, he does opine that African Americans and Latinos who lack qualifying ID are more likely to face additional burdens in obtaining it for a variety of reasons, including that they are more likely to have to obtain birth certificates from other states or foreign countries, more likely to have moved frequently, and more likely to be wary of interacting with the state election system. *Id.* ¶¶ 59-61.

*Finally,* Defendant's expert -- M.V. "Trey" Hood III -- opines that there is no evidence of a historical pattern of lower turnout among voters of color in Wisconsin. To reach this remarkable conclusion, he is forced to ignore voter turnout data that Professor Burden cites from Wisconsin's 2000, 2004, 2008 and 2010 elections, which reveals that African- American and Latino voter turnout was consistently lower than White turnout, with the single exception of African-American turnout in 2008, which spiked in Wisconsin, as it did nationally, in the year of the first African-American major party nominee for president of the United States. *See id.* ¶ 9. By 2010, "the Black-White" voter turnout gap in Wisconsin reverted to 9.4% -- "more than three times the national margin . . . ." For his part, Professor Hood rejects this evidence, even though it comes from the U.S. Census Bureau's Current Population Survey (which he uses in his own research, Hood Dep., at 94:24-96:20 (Ex. 83), because it is survey evidence[22] as to which the margins of error for white and minority turnout rates sometimes overlap). For this reason, even

---

[22] In his declaration, Professor Hood questions the reliability of voter turnout surveys because "self-reports of turnout often inflate this measure." Hood Decl. ¶ 21. He fails to mention the conclusion of his own research, however, which is that African-American respondents tend to overstate voter turnout more than white respondents, Hood Dep. at 21:12-23, so if the over-reporting were cured, it would actually increase the disparity between White and African-American voter turnout.

though the Census Bureau's statistics repeatedly show similar disparities in voter turnout by race over a ten year period, Professor Hood considers that to be "no evidence" of a pattern of lower minority turnout in Wisconsin.[23]  Hood Decl. ¶ 25.

**Past racial discrimination in Wisconsin elections.**  Defendants and their expert refuse to acknowledge *any* past racial discrimination in voting in Wisconsin, reasoning as follows:

> Plaintiffs neglect one important fact.  Namely, Wisconsin is not a "covered" jurisdiction under Section 5 of the VRA. . . .  The "covered" jurisdictions were singled out in the law because they have historically engaged in discriminatory practices. . . .  If Wisconsin had a long history of discriminatory election practices then certainly the state or specific jurisdictions within the state would be covered by Section 5 of the VRA.

D. Br. 23-24; *see also* Hood Decl. ¶ 20 ("Had Wisconsin had a long history of discriminatory election practices then certainly the State, or specific jurisdictions within the State, should be covered by Section 5.").

Their reasoning is specious.  When it enacted the Voting Rights Act, "Congress understood that violations of voting rights were not confined to covered jurisdictions."  *Johnson v. Bush*, 405 F.3d 1214, 1243 (11th Cir. 2005).  That is why "it included § 2, a nationwide remedy."  *Id.*; *see Simmons v. Galvin*, 575 F.3d 24, 55 (1st Cir. 2009) (there is nothing illogical about imposing additional safeguards and a preclearance mechanism in covered jurisdictions only, "but also permitting scrutiny of all voting qualifications nationally . . . to ensure that no particular qualification is discriminatory as applied under the particular circumstances.  And that is precisely what Congress did through § 2.").  As the Supreme Court has held, "discriminatory

---

[23] Defendants also complain that Professor Burden relied on voting age population ("VAP") data, instead of citizen voting age population ("CVAP") data (which Professor Hood admits was not reported at this level of detail before 2008) from the Census Bureau to compare White and Latino voter turnout.  D. Br. at 22; Hood Decl. ¶ 24.  As Professor Burden notes, regardless of whether one refers to VAP or CVAP, they both show significant and enduring differences between White and Latino voter turnout in Wisconsin.  Burden Dep., at 74:5-9.

practices are not free from scrutiny under the [Voting Rights] Act just because they need not be precleared under § 5: Such practices might still violate § 2." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 484 (1997).

Nor did Congress make any finding, implicit or otherwise, about the history of official voting-related discrimination in non-covered jurisdictions. It left that inquiry to the courts, to be considered in individual Section 2 challenges, on the basis of a factual record. And courts have repeatedly found that non-covered jurisdictions have a history of voting-related discrimination that is sufficient to support a § 2 violation. *See*, *e.g.*, *Goosby v. Town Bd. Of Town of Hempstead*, 180 F.3d 476, 494 (2d Cir. 1999) (§ 2 violation based, in part, on history of discrimination in Nassau County, New York); *Gomez v. City of Watsonville*, 863 F.2d 1407, 1419 (9th Cir. 1988) (§ 2 violation in Santa Cruz County, California town, where the district court noted a "pervasive discrimination against Hispanics in California, including discrimination committed by the state government, that has touched the ability of California Hispanics to participate in the electoral process"); *New Rochelle Voter Defense Fund v. City of New Rochelle*, 308 F. Supp. 2d 152, 159-60 (S.D.N.Y. 2003) (§ 2 violation based, in part, on "the regrettable history of discrimination in employment, housing and education" in Westchester County, New York); *Hastert v. State Bd. of Elections*, 777 F. Supp. 634, 650 (N.D. Ill. 1991) (recognizing "history of discrimination, both past and recent, against the Chicago Hispanic community and its attendant impact on effective political participation and representation"); *Armour v. State of Ohio*, 775 F. Supp. 1044, 1053-56 (N.D. Ohio 1991) (detailing history of discrimination affecting Black political participation in Ohio, notwithstanding the lack of any allegation that laws "ever prohibited Blacks from voting or registering to vote" and the absence of "election procedures frequently used to discriminate against minorities"). Defendants' argument is simply

not the law.  If it were, a jurisdiction could not successfully be sued under Section 2 unless it were also subject to Section 5 — a bizarre result that would turn the Voting Rights Act on its head.

Turning to the evidence, Defendants complain that Plaintiffs highlight only a few examples of official voting-related discrimination.  What Plaintiffs' evidence reveals, however, is a state that has repeatedly adopted election practices that unfairly burdened voters of color and only abated them when ordered to do so by the federal government.  Most recently, Wisconsin refused to provide Spanish-language ballot materials to its growing Latino electorate until the Justice Department ordered Milwaukee County to provide such ballots *this year*.  *See* Burden Decl. ¶ 18; *see also* Alvarado Decl. ¶ 5; Garza Decl. ¶ 7.  And history appears poised to repeat itself in this case.  In response, Defendants offer nothing -- no evidence at all.  Of course, that is hardly surprising, given that their expert has never done any academic research or writing that relates to voting or election administration in Wisconsin, first visited the state in 2012, and indeed, has only ever been here three times -- to provide testimony in support of the State in this case and one of the pending state court challenges to Act 23.  Hood Dep. at 42:5-43:2.

**Racially Polarized Voting and Racial Appeals in Voting.**  Defendants wrongly claim that Plaintiffs' arguments concerning racially polarized voting "rely primarily on voting patterns observed during the 2008 presidential election."  D. Br. at 27.  In fact, Plaintiffs rely on Professor Burden's analysis of White and minority voting patterns in three presidential elections (2000, 2004 and 2008) and one gubernatorial election (2010).  *See* Burden Decl. ¶¶ 11-13.  That evidence reveals a sustained and consistent relationship between the race of Wisconsin voters and the way they vote.  Racially polarized voting patterns appear in both multi-party elections and party primary elections, in which partisan allegiances cannot explain the differences in

voters' choices. *Id.* ¶ 13. In light of this evidence, it is probably true that analysis of additional election results would reinforce the conclusion that Wisconsin's elections are racially polarized, but the five statewide elections spanning a decade that Professor Burden cites in his declaration are sufficient to establish the point.

Similarly, Defendants attempt to downplay the evidence that Plaintiffs presented of racial appeals in Wisconsin elections, but they cannot deny it. As Plaintiffs have demonstrated, both overt and subtle racial appeals have affected statewide elections in Wisconsin, as recently as 2006 (advertising attacking Governor Doyle for providing "welfare" and "in-state tuition breaks" at UW schools to "illegal aliens," while "Wisconsin kids are being turned away"), 2008 (race-baiting television advertising run against African-American Supreme Court Justice Louis Butler), and more recently (debates in gubernatorial elections over funding a "Milwaukee package" of benefits for the City's Black and Latino residents). *See* Burden Decl. ¶¶ 44-49. These racial appeals are an enduring aspect of Wisconsin politics that have persisted into recent campaigns and served only to reinforce the racial polarization of state politics. *Id.* ¶ 50. Defendants have presented no evidence to the contrary.

**Lack of Minority Political Success.** Plaintiffs demonstrated in their opening brief that people of color in Wisconsin are underrepresented in both federal and state elective office. Wisconsin has never elected an African-American or Latino U.S. Senator and has only ever elected one person of color to the U.S. House of Representatives -- Congresswoman Gwen Moore, who was first elected in 2004. Similarly, the State has only ever elected one racial minority to statewide office and even Milwaukee, which is a majority-minority city, has never elected a non-white mayor. Defendants and their *amici* focus on the recent successes by Blacks and Latinos in electing representatives to the state legislature. But those successes only serve to

underscore the pernicious effects of Act 23, which prevents Black and Latino voters from participating in elections, thereby "undermin[ing] the progress of . . . racial group[s] that ha[ve] been subject to significant voting-related discrimination." *Perry*, 548 U.S. at 439 (finding Section 2 violation, where a redistricting plan threatened to undermine sustained Latino electoral success).

**Unresponsiveness of Elected Officials to Minority Needs.** A lack of responsiveness by elected officials to the particularized needs of voters of color, standing alone, does not necessarily demonstrate that Act 23's voter ID requirement disproportionately prevents Wisconsin's African Americans and Latinos from voting. It does, however, reinforce the notion that voters of color do not obtain the same benefits from voting that white voters do. Defendants do not contest the severe disparities that Wisconsin African-Americans and Latinos suffer in housing, education, employment, health, criminal justice, and other areas, or the fact that they have worsened over time and are often among the worst in the country. *See* Burden Decl. ¶ 54. While they argue that these disparities are not the result of official nonresponsiveness, Defendants offer no other explanation for why Wisconsin has failed to ameliorate conditions that other states have addressed better. The repeated need for federal intervention to remedy state and local shortcomings in such areas as school and residential segregation, voter registration practices, and most recently the provision of Spanish-language ballots, only underscores the lack of responsiveness. So, too, does: (a) the Legislature's enactment of Act 23, with full knowledge of its discriminatory impact on voters of color, over the objection of every single African-American and Latino legislator; and (b) its repeated refusal to adopt alternative provisions that would lessen the needlessly harsh impacts of the law on African-American and Latino voters. *See* Pl. Br. at 36-37. The Legislature thus sent African-American and Latino voters the

unmistakable message that it was willing to sacrifice minority votes in the interest of preventing in-person voter fraud that the State's own witnesses admit is not a significant problem.

**Interaction of Act 23 with the Senate Factors.** For all of the reasons discussed above, the Senate Factors reinforce the conclusion that Act 23 interacts with social and historical conditions to cause substantially disparate impacts on the ability of African-Americans and Latinos to vote in Wisconsin elections, in violation of § 2. Because of longstanding discrimination, African-Americans and Latinos are more likely to live in urban areas (and thus have less need to drive) and to be poor (and thus unable to afford to drive). As a result, they disproportionately lack the drivers' licenses and state IDs needed to vote under Act 23.

The evidence likewise demonstrates that African-Americans and Latinos who lack the necessary IDs will face much greater challenges than Whites in obtaining them. They face greater challenges in affording the costs of obtaining the required birth certificates (often from distant out-of-state authorities), and in navigating multiple agency bureaucracies. *See* Burden Decl. ¶¶ 42, 59-61, 67. The tenuous justification for Act 23, the rejection of numerous less restrictive alternatives and the departure from historically more inclusive voting practices only reinforce the racially discriminatory results of the legislation and the message to African American and Latino voters that the Legislature is willing to sacrifice their votes in order to advance the interests of others -- whether that means preventing in-person voter fraud (of which Defendants have no evidence) or preserving the incumbency of White elected officials.

In sum, the additional burdens and hurdles imposed by Act 23 predictably will suppress voting by those who are subject to its restrictions, a disproportionate number of whom are African-American or Latino. Under the "calculus of voting," Act 23 will interact with social and historical conditions to impose greater burdens on voting by African-American and Latino

voters, who are already bear heavier burdens and derive fewer benefits from voting than White voters. The "totality of circumstances" analysis thus reinforces the conclusion that Act 23 causes voters of color to have less opportunity to participate in the political process -- a prohibited discriminatory result -- in violation of § 2. *See Gonzalez*, 2012 WL 1293149, at *13.

## V. IF DEFENDANTS ATTEMPT TO ENFORCE ACT 23, PLAINTIFFS WILL MEET ALL REQUIREMENTS FOR THE IMMEDIATE ENTRY OF FEDERAL PRELIMINARY INJUNCTIVE RELIEF PENDING TRIAL

If Defendants attempt to enforce Act 23, there can be no question that all requirements for the entry of preliminary and/or permanent injunctive relief will be met. Defendants and their *amici* compare the right to vote to a "wide range of transactions and interactions" like "driving a car," "purchasing alcohol," and "buying sinus medicine." (D. *Amici* Br. 4, 31.) The constitutionally protected right to vote, of course, is not remotely comparable to these "transactions and interactions." Voting is "regarded as a fundamental political right, because preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see also Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society…."). For that reason, enforcing Act 23's photo ID requirements would inflict irreparable injury upon a disproportionate number of voters of color, and the public interest and balance of equities would require entry of a federal preliminary injunction against such enforcement. *See* P. Br. 44-45 & n.43.

## CONCLUSION

For the reasons set forth above, in Plaintiffs' opening brief, and in the supporting declarations and evidentiary submissions, Plaintiffs respectfully request that this Court enter a

preliminary injunction against the implementation and enforcement of Act 23 pending trial,

together with the other relief set forth in the proposed Order filed at Dkt. #19-1.


Dated: June 27, 2012                                    Respectfully submitted,


Penda D. Hair (admission pending)            /s/ Charles G. Curtis, Jr. _____
James Eichner (admission pending)             Arnold & Porter LLP
Kumiki Gibson                                          Suite 620
Denise D. Lieberman (admission pending)     16 North Carroll Street
Sara Jackson (admission pending)              Madison, Wisconsin 53703
Advancement Project                               Phone: (608) 257-1922
Suite 850                                             Email: Charles.Curtis@aporter.com
1220 L Street, N.W.
Washington, D.C. 20005                            John C. Ulin
Phone: (202) 728-9557                             Arnold & Porter LLP
Email: phair@advancementproject.org           44th Floor
  kgibson@advancementproject.org               777 South Figueroa Street
  dlieberman@advancementproject.org           Los Angeles, California 90017
                                                       Phone: (213) 243-4000
                                                       Email: john.ulin@aporter.com

                                                       Carl S. Nadler
                                                       Arnold & Porter LLP
                                                       555 Twelfth Street, N.W.
                                                       Washington, D.C. 20004
                                                       Phone: (202) 942-6130
                                                       Email: carl.nadler@aporter

---

[ii] Several of these studies are subsequent to the 2009 article that Defendants cite in their brief for the proposition that the existing research concerning the suppressive effect of voter identification laws was "inconclusive" as of three years ago. In this developing field of voting rights and election administration, it is hardly surprising that research and scholarship are developing. Notably, Defendants cite no research suggesting that voter identification laws do not have a disproportionately suppressive effect on minority voter turnout.