# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

_____

LEAGUE OF UNITED LATIN AMERICAN CITIZENS
(LULAC) OF WISCONSIN; CROSS LUTHERAN CHURCH;
MILWAUKEE AREA LABOR COUNCIL, AFL-CIO;
and WISCONSIN LEAGUE OF YOUNG VOTERS
EDUCATION FUND;

      Plaintiffs,

v.                                  Case No. 2:12-cv-185-LA

JUDGE DAVID G. DEININGER, JUDGE MICHAEL BRENNAN,
JUDGE GERALD C. NICHOL, JUDGE THOMAS BARLAND,
JUDGE THOMAS CANE, KEVIN J. KENNEDY, and
NATHANIEL E. ROBINSON, all in their official capacities,

      Defendants.

_____

## PLAINTIFFS' POST-TRIAL BRIEF IN SUPPORT OF
## DECLARATORY AND PERMANENT INJUNCTIVE RELIEF

Penda D. Hair
James Eichner
Denise D. Lieberman
Leigh M. Chapman
Advancement Project
Suite 850
1220 L Street, N.W.
Washington, D.C.  20005
Phone:  (202) 728-9557
Email:  phair@advancementproject.org
jeichner@advancementproject.org
dlieberman@advancementproject.org
lchapman@advancementproject.org

Charles G. Curtis, Jr.
Arnold & Porter LLP
16 North Carroll Street, Suite 620
Madison, Wisconsin  53703
Phone:  (608) 257-1922
Email:  Charles.Curtis@aporter.com

John C. Ulin
Marco J. Martemucci
Arnold & Porter LLP
777 South Figueroa Street
Los Angeles, California  90017
Phone:  (213) 243-4000
Email:  john.ulin@aporter.com

Carl S. Nadler
Ethan J. Corson
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
Phone: (202) 942-6130
Email:  carl.nadler@aporter.com

(_Additional counsel listed on signature page_)

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................................................ 1

ARGUMENT ........................................................................................................................... 7

I.    The Four Organizational Plaintiffs Have Article III "Standing" To Sue And
      Are "Aggrieved Person[s]" Under 42 U.S.C. § 1973a. ..................................... 7

      A.    League of United Latin American Citizens (LULAC) of Wisconsin ........................ 7

      B.    Cross Lutheran Church ...................................................................................... 10

      C.    Milwaukee Area Labor Council, AFL-CIO ........................................................ 13

      D.    League of Young Voters Education Fund .......................................................... 14

      E.    The Defendants' Other Continuing "Standing" and Related Objections
            Are Baseless. ................................................................................................... 17

II.   Act 23 Disproportionately Impacts Voters of Color ........................................ 19

      A.    Leland Beatty's "Matching" Analyses of GAB and DOT Data
            Demonstrate Significant Racial Disparities. ...................................................... 20

      B.    Mr. Beatty's Findings Are Corroborated By, and Consistent With,
            Many Other Studies Using a Variety of Methodologies and Involving
            Many Years of Data. ......................................................................................... 27

            1.    The 2012 Barreto survey .......................................................................... 27

            2.    Analysis of 2012 Hood Data. ................................................................... 28

            3.    Other scholarly studies of voter ID impacts outside of Wisconsin. ........... 30

            4.    The 2005 U.W.-Milwaukee study. ............................................................ 30

            5.    2012 American Automobile Association Data. ........................................... 31

      C.    The DMV's Own "Free ID" Data Strongly Reinforce the Racially
            Disproportionate Impacts of Act 23. ................................................................. 32

III.  Act 23 Imposes Substantial Burdens That Disproportionately Deny and
      Abridge the Voting Rights of African-Americans and Latinos .......................... 33

      A.    Section 2 Prohibits the Racially Disproportionate Imposition of
            Measures That Make It More Difficult To Vote, Not Just Those That
            Make It "Impossible" To Vote. ......................................................................... 34

i

B.    The Calculus of Voting and the Spectrum of Costs Imposed Under Act 23. .................................................................................................. 38

C.    Act 23 Imposes Substantial Barriers That Deny and Abridge the Right To Vote. .................................................................................................. 45

    1.    Act 23 Requires Voters To Spend Money To Exercise Their Right To Vote. ............................................................................. 45

    2.    African-Americans and Latinos Face Disproportionate Burdens In Seeking Their Birth Certificates. ................................ 47

    3.    Act 23 Imposes Additional Unique and Unlawful Burdens on Wisconsin's Latino Voters. ........................................... 56

    4.    Act 23 Is Administered In An Arbitrary, Discriminatory, Needlessly Burdensome, and Poorly Publicized Manner. .............................................. 61

    5.    Act 23 Lacks the Many "Ameliorative Provisions" Found In Other Voter ID Laws. ............................................. 65

IV.    The "Totality of Circumstances" Analysis Confirms That the Substantial Racially Disproportionate Burdens Imposed By Act 23 Violate Section 2. ........................ 68

A.    Wisconsin's African-American and Latino Voters Bear the Effects of Discrimination in Housing, Education, Employment, Health, and Other Areas That Hinder Their Ability To Participate Effectively in the Political Process and To Surmount the Additional Burdens Imposed By Act 23. ................................................................................... 68

B.    There Has Been a Long History of Official Discrimination in Wisconsin Suppressing the Ability of Minorities To Participate In the Democratic Process, and Minorities Have Long Been Underrepresented in Wisconsin Elective Offices. ..................................... 73

C.    There Has Been a Significant Lack of Responsiveness on the Part of Wisconsin's Elected Officials To the Particularized Needs of African-Americans and Latinos, Both in General and With Respect To the Passage of Act 23 In Particular. ................................................ 74

D.    Voting in Wisconsin Is Racially Polarized, Political Campaigns Have Long Been Characterized By Racial Appeals, and Act 23 Appears To Be Targeted Against the Growing Voting Power of People of Color. ..................... 78

E.    The Policy Underlying Act 23 Is "Tenuous," Markedly Departs From Historic Wisconsin Practices and Traditions, Lacks "Fairness," and "Needlessly Impairs" the Voting Rights of African-American and Latino Voters. ...................................................................................... 81

    1.    Act 23 Markedly Departs From Historic Wisconsin Practices. ...................... 81

2.      In-Person Voter Impersonation Fraud Is Virtually Nonexistent in Wisconsin. ................................................. 83

3.      Act 23's Harsh and Disproportionate Measures Go Far Beyond What Might Reasonably Be Necessary to Address Concerns About Potential Voter Fraud. ............................................... 91

F.     Act 23 Interacts With These Factors To Cause An Inequality of Voting Opportunities Based On Race ........................................... 92

V.   Act 23 Is the Functional Equivalent of the Jim Crow Voter Suppression Measures Outlawed By Section 2. ........................................... 94

VI.   Plaintiffs Meet All Other Requirements For the Entry of Broad Permanent Injunctive Relief. ................................................. 101

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*ADT Security Services, Inc. v. Lisle-Woodridge Fire Protections Dist.*,
    672 F.3d 492 (7th Cir. 2012) .................................................................... 101

*American Civil Liberties Union of New Mexico v. Santillanes*,
    546 F.3d 1313 (10th Cir. 2008) .................................................................. 67

*Amos v. Bd. of School Directors of City of Milwaukee*,
    408 F. Supp. 765 (E.D. Wis. 1976), *aff'd sub nom. Armstrong v. Brennan*, 539 F.2d
    625 (7th Cir. 1976), *rev'd,* 433 U.S. 672 (1977) .................................. 72

*Armstrong v. O'Connell*,
    451 F. Supp. 817 (E.D. Wis. 1978) .......................................................... 72

*Association of Community Organizations for Reform Now v. Scott*,
    No. 08-cv-4084, 2008 WL 2787931 (W.D. Mo. July 15, 2008) ........................................ 101

*Barnett v. City of Chicago*,
    141 F.3d 699 (7th Cir. 1998) ........................................................... 5, 81, 92

*Bay County Democratic Party v. Land*,
    347 F. Supp. 2d 404 (E.D. Mich. 2004) .............................................. 101

*Black v. McGuffage*,
    209 F. Supp. 2d 889 (N.D. Ill. 2002) ...................................................... 38

*Brown v. Board of Education*,
    347 U.S. 483 (1954) ...................................................................... 48, 72

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
    324 F. Supp. 2d 1358 (N.D. Ga. 2004) .............................................. 101

*Chisom v. Roemer*,
    501 U.S. 380 (1991) ...................................................................... 37, 94

*Common Cause/Georgia v. Billups*,
    554 F.3d 1340 (11th Cir.) .................................................................... 66

*Common Cause Southern Christian Leadership Conference of Greater Los Angeles v. Jones*,
    213 F. Supp. 2d 1106 (C.D. Cal. 2001) .......................................... 38, 95

*Crawford v. Marion Cnty. Election Bd.*,
    472 F.3d 949 (7th Cir. 2007), *aff'd,* 553 U.S. 181 (2008) ............................................ passim

*Davis v. Schnell*,
    81 F. Supp. 872 (S.D. Ala.) .................................................................. 99

Case 2:12-cv-00185-LA   Filed 12/20/13   Page 5 of 117   Document 112

*Day v. Sebelius*,
    227 F.R.D. 668 (D. Kan. 2005) ............................................................ 8

*Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*,
    522 F.3d 796 (7th Cir. 2008) ................................................... 9, 13, 18

*Fla. State Conf. of NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) .......................................................... 18

*Florida v. United States*,
    885 F. Supp. 2d 299 (D.D.C. 2012) .................................................... 37

*Forum for Academic & Institutional Rights, Inc. v. Rumsfeld*,
    291 F. Supp. 2d 269 (D.N.J. 2003) ...................................................... 9

*Garza v. County of Los Angeles*,
    918 F. 2d 763 (9th Cir. 1990) ............................................................ 78

*Gonzalez v. Arizona*,
    677 F.3d (9th Cir. 2012), *aff'd on other grounds*, 133 S. Ct. 2247 (2013) .................... passim

*Greater Indianapolis Chapter of NAACP v. Ballard*,
    741 F. Supp. 2d 925 (S.D. Ind. 2010) .................................................. 9

*Guinn v. United States*,
    238 U.S. 347 (1915) ............................................................ 6, 100-101

*Harman v. Forssenius*,
    380 U.S. 528 (1965) ........................................................................ 35

*Harper v. Virginia Bd. of Elections*,
    383 U.S. 663 (1966) ........................................................................ 45

*Hatchett v. Barland*,
    816 F. Supp. 2d 583 (E.D. Wis. 2011) ............................................ 103

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ........................................................................ 17

*Hoblock v. Albany Cnty. Bd. of Elections*,
    341 F. Supp. 2d 169 (N.D.N.Y. 2004) ............................................. 101

*Holder v. Hall*,
    512 U.S. 874 (1994) ........................................................................ 36

*Hollinger v. Home State Mut. Ins. Co.*,
    654 F.3d 564 (5th Cir. 2011) ............................................................ 69

*Lane v. Wilson*,
    307 U.S. 268 (1939) ........................................ 6, 35, 100, 101

*Lassiter v. Northampton County Bd. of Elections*,
   360 U.S. 45 (1959) ...................................................................... 99, 100

*League of United Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006) ......................................................................... passim

*LULAC of Texas v. Texas*,
   995 F. Supp. 719 (W.D. Tex. 1998) ........................................................ 8

*LULAC v. City of Santa Ana*,
   410 F. Supp. 873 (C.D. Cal. 1976) ........................................................ 8

*LULAC v. Pasadena Ind. School Dist.*,
   662 F. Supp. 443 (S.D. Tex. 1987) ........................................................ 8

*NAACP v. Billups*,
   556 U.S. 1282 (2009) ...................................................................... 66

*Otey v. Common Council of City of Milwaukee*,
   281 F. Supp. 264 (E.D. Wis. 1968) ...................................................... 71

*Rembert v. Sheahan*,
   62 F.3d 937 (7th Cir. 1995) ............................................................. 103

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ....................................................................... 101

*Rodriguez v. California Highway Patrol*,
   89 F. Supp. 2d 1131 (N.D. Cal. 2000) .................................................... 8

*Shannon v. Jacobowitz*,
   301 F. Supp. 2d 249 (N.D.N.Y. 2003) ................................................... 101

*Shelby County v. Holder*,
   133 S.Ct. 2612 (2013) ...................................................................... 37

*Shelley v. Kraemer*,
   334 U.S. 1 (1948) .......................................................................... 71

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ........................................................................ 6

*South Carolina v. United States*,
   898 F. Supp. 2d 30 (D.D.C. 2012) ......................................................... passim

*Spencer v. Blackwell*,
   347 F. Supp. 2d 528 (S.D. Ohio 2004) ................................................... 101

*Stewart v. Blackwell*,
   444 F.3d 843 (6th Cir. 2006) .............................................................. 38

*Sw. Voter Registration Educ. Project v. Shelley,*
    344 F.3d 914 (9th Cir. 2003) (per curiam) ........................................ 38

*Texas v. Holder,*
    888 F. Supp. 2d 113 (D.D.C. 2012),
    *vacated on other grounds,* 133 S. Ct. 2886 (2013) ........................... 47, 96

*Thornburg v. Gingles,*
    478 U.S. 44 (1986) ........................................................................ 68, 81

*U.S. Student Ass'n Found. v. Land,*
    546 F.3d 373 (6th Cir. 2008) ............................................................ 102

*United States v. LULAC,*
    793 F.2d 636 (5th Cir. 1986) ........................... 5, 8, 74, 77, 80, 81

*Yick Wo v. Hopkins,*
    118 U.S. 356 (1886) ..................................................................... 99, 101

*Zessar v. Keith,*
    536 F.3d 788 (7th Cir. 2008) ........................................................... 103


## STATE CASES

*League of Women Voters of Wisconsin Educ. Network, Inc. v. Walker,*
    348 Wis.2d 714, 2013 WI App. 77, 834 N.W.d ............................... 102

*LULAC v. Kasich,*
    No. 10AP-639, 2012 WL 760800 (Ohio Ct. App. Mar. 6, 2012) ........... 8

*State ex rel. McGrael v. Phelps,*
    128 N.W. 1041 (Wis. 1910) ............................................................... 82

*Milwaukee Branch of the NAACP v. Walker,*
    No. 11-CV-5492 , 2012 WL 739553 (Wis. Cir. Ct. Mar. 6, 2012) ....... 102

*State ex rel. Small v. Bosacki,*
    143 N.W. 175 (Wis. 1913) ................................................................ 82


## CONSTITUTION, STATUTES AND RULES

U.S. Const. Art. III ............................................................................. 7-19

U.S. Const. Amend. XV ................................................................... passim

Voting Rights Act of 1965, § 2, as amended, 42 U.S.C. § 1973 ........... passim

42 U.S.C. § 1973(a) ........................................................................ 6, 35

42 U.S.C. § 1973(b)............................................................................................... passim

42 U.S.C. § 1973a............................................................................................... 2, 7

42 U.S.C. § 1973a(a) ........................................................................................... 19

Help America Vote Act ("HAVA"),
    42 U.S.C. §§ 15301-15545 ............................................................................ 73

Fed. R. Civ. P. 65 ................................................................................................. 7

2011 Wisconsin Act 23......................................................................................... passim

Wis. Stats. § 6.79 ................................................................................................. 21

Wis. Stats. § 7.08(12) .......................................................................................... 18

Wis. Admin. Code § 102.15(2)-(4)......................................................................40-41

Wis. Admin. Code § 102.15(3)(b) ........................................................................ 46, 63

Wis. Admin. Code § Trans 102.15(2) (Reg., Jan. 1984, No. 337) ..................... 40

Wis. Admin. Code § Trans 102.15(3)(a) (Reg., Nov. 2002, No. 563) ............... .40

## **OTHER AUTHORITIES**

H.R. REP. NO. 439 (1965) .................................................................................. passim

S. REP. NO. 89-162 (1965) .................................................................................47, 95-97

S. REP. NO. 94-295 (1975) ................................................................................. 19

H.R. REP. NO. 97-227 (1981)..............................................................................35-36, 96-97

S. REP. NO. 97-417 (1982) ................................................................................. passim

*Extension of the Voting Rights Act: Hearings Before the Subcomm.*
    *On Civil and Constitutional Rights of the H. Comm. On the Judiciary,*
    Pts. 1-3, 97th Cong. (1981)............................................................................ 36, 98

AAA Foundation for Traffic Safety, *Timing of Driver's License Acquisition*
    *and Reasons for Delay among Young People*
    *in the United States, 2012* (July 2013) ......................................................... 31

Stephen Ansolabehere & Nathaniel Persily,
    *Vote Fraud in the Eye of the Beholder: The Role of Public Opinion*
    *in the Challenge to Voter Identification Requirements,*
    121 HARV. L. REV. 1737, 1756 (2008) ......................................................... 90

BLACK'S LAW DICTIONARY (8th ed. 2004) ................................................................. 35

Greg J. Carman, WALL OF EXCLUSION: THE PERSISTENCE OF
    RESIDENTIAL RACIAL SEGREGATION IN
    METROPOLITAN MILWAUKEE (2011) ................................................ 48, 69, 71

*Census Scope: Segregation Results from 2010*,
    http://censusscope.org/dev/content/segregation-results-2010. ............................................ 69

Robert Booth Fowler, WISCONSIN VOTES:
    AN ELECTORAL HISTORY (2008) ................................................................. 78

Paul Geib, *From Mississippi to Milwaukee: A Case Study*
    *of the Southern Black Migration to Milwaukee, 1940-70*,
    83 J. NEGRO HISTORY 229 (1998) ................................................................. 48

M.V. Hood III and Charles S. Bullock, *Worth a Thousand Words?*
    *An Analysis of Georgia's Voter Identification Statute*,
    36 AMERICAN POLITICS RESEARCH 555 (2008) ........................................ 30

Samuel Issacharoff, Pamela S. Karlan & Richard H. Pildes,
    THE LAW OF DEMOCRACY: LEGAL STRUCTURE
    OF THE POLITICAL PROCESS (rev. 2d ed. 2002) ............................................ 98

Patrick D. Jones, THE SELMA OF THE NORTH:
    CIVIL RIGHTS INSURGENCY IN MILWAUKEE (2009)..................................... 69

V.O. Key Jr., SOUTHERN POLITICS IN STATE AND NATION
    (1949, rev. ed. 1984)................................................................. 95-96, 100

Michael J. Klarman, FROM JIM CROW TO CIVIL RIGHTS:
    THE SUPREME COURT AND THE STRUGGLE
    FOR RACIAL EQUALITY (2004) ................................................................. 18, 95

J. Morgan Kousser, THE SHAPING OF SOUTHERN POLITICS:
    SUFFRAGE RESTRICTION AND THE ESTABLISHMENT OF THE
    ONE-PARTY SOUTH, 1880-1910 (1974) ................................................ 95-98, 100

Douglas S. Massey & Nancy A. Denton, AMERICAN APARTHEID:
    SEGREGATION AND THE MAKING OF THE UNDERCLASS (1993)................. 69

MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2000) ......................... 35

Lorraine C. Minnite, THE MYTH OF VOTER FRAUD (2010) ..................................... 83

Gunnar Myrdal, AN AMERICAN DILEMMA: THE NEGRO PROBLEM
    AND MODERN DEMOCRACY (1944)................................................ 95-98, 100

Dominique Paul Noth, *Latino Growth Could Flip State Politics —
    But Will It?*, Milwaukee Labor Press (Feb. 13, 2002) ........................................ 80

John Pawasarat, THE DRIVER LICENSE STATUS OF THE
    VOTING AGE POPULATION IN WISCONSIN
    (University of Wisconsin–Milwaukee Employment and
    Training Institute, June 2005).................................................................................. 30

Rick Perlstein, BEFORE THE STORM: BARRY GOLDWATER AND THE
    UNMAKING OF THE AMERICAN CONSENSUS (2001) ...................................... 79

Michael Perman, STRUGGLE FOR MASTERY: DISFRANCHISEMENT
    IN THE SOUTH, 1888-1908 (2001) ...................................................................... 98

Richard A. Posner, REFLECTIONS ON JUDGING (2013) ................................................ 1

Richard A. Posner, *I Did Not "Recant" on Voter ID Laws*,
    NEW REPUBLIC (Oct. 27, 2013), reprinted at
    http://www.newrepublic.com/article/115363/richard-posner-i-did-not-recant-my-
    opinion-voter-id. ...................................................................................................... 1

Joseph A. Ranney, *Looking Further Than the Skin:
    A History of Wisconsin Civil Rights Law*
    (State Bar of Wisconsin website) .......................................................................... 71

S. Shapiro, *Development of Birth Registration and Birth Statistics
    in the United States*, 4:1 POPULATION STUDIES:
    A JOURNAL OF DEMOGRAPHY 86 (1950) ........................................................ 48

Patricia Sullivan, LIFT EVERY VOICE: THE NAACP AND THE MAKING
    OF THE CIVIL RIGHTS MOVEMENT (2009) ...................................................... 18

Anders Walker, Legislating Virtue: How Segregationists Disguised Racial
    Discrimination as Moral Reform Following Brown v. Board of Education,
    47 DUKE L. J. 399 (1997) ...................................................................................... 48

Theodore H. White, THE MAKING OF THE PRESIDENT — 1964 (1965) ..................... 79

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| 1965 H. REP. | H.R. REP. NO. 439 (1965) |
| 1965 S. REP. | S. REP. NO. 89-162 (1965) |
| 1975 S. REP. | S. REP. NO. 94-295 (1975) |
| 1981 HOUSE HEARINGS | *Extension of the Voting Rights Act: Hearings Before the Subcomm. On Civil and Constitutional Rights of the H. Comm. On the Judiciary*, Pts. 1-3, 97th Cong. (1981) |
| 1981 H. REP. | H.R. REP. NO. 97-227 (1981) |
| 1982 S. REP. | S. REP. NO. 97-417 (1982) |
| DMV | Division of Motor Vehicles, Wisconsin Department of Transportation |
| DOT | Wisconsin Department of Transportation |
| GAB | Wisconsin Government Accountability Board |
| GOTV | Get out the vote |
| Section 2 | Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 |

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

This brief summarizes the testimony and exhibits introduced during the Nov. 4-15, 2013 bench trial and demonstrates that the voter ID provisions of 2011 Wisconsin Act 23 violate Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. The Court heard testimony from 43 fact witnesses and 6 expert witnesses, resulting in a 2,145-page trial transcript and the introduction of 272 exhibits into evidence. That record enables this Court to conduct the "searching practical evaluation" and "intensely fact-based and localized" analysis required under Section 2, and leads inescapably to the conclusion that Act 23's voter ID provisions violate Section 2 in many ways. *Gonzalez v. Arizona,* 677 F.3d at 383, 406 (9th Cir. 2012) (citations omitted), *aff'd on other grounds*, 133 S. Ct. 2247 (2013).[1]

The Court should issue broad permanent injunctive relief prohibiting the enforcement of either Act 23 or any subsequently amended version of Act 23 that fails to correct the many illegal features of the statute and its implementing regulations. Some leaders of the Wisconsin Legislature are reportedly awaiting the Court's decision before making any revisions to Act 23, with the apparent intention of keeping any such revisions to the bare minimum necessary to (arguably) remedy the violations of Section 2 that warrant a federal injunction. But Act 23 violates Section 2 in multiple and significant ways that cannot be remedied through a legislative tweak here or additional narrow exemption there. This Court should make clear in its opinion

---

[1]  Judge Richard A. Posner, author of the Seventh Circuit's opinion in *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008), recently cautioned that voter ID laws are "now widely regarded as a means of voter suppression rather than of fraud prevention," and that courts must therefore seek "a better understanding" — through rigorous analysis of the available "empirical data" — of the "likely consequences of deciding the case one way rather than another."  Richard A. Posner, *Reflections on Judging* 85 (2013); Richard A. Posner, *I Did Not "Recant" on Voter ID Laws*, NEW REPUBLIC (Oct. 27, 2013), reprinted at http://www.newrepublic.com/article/115363/richard-posner-i-did-not-recant-my-opinion-voter-id.

and permanent injunction that Act 23 is being enjoined on multiple grounds, and should expressly retain jurisdiction to consider any requests by defendants to lift the injunction on the grounds that future amendments to Act 23 allegedly remedy the varied and significant Section 2 violations established on this record.

Plaintiffs respectfully request the Court to make the following principal rulings, each discussed and annotated in detail below:

**Standing.** Each of the four organizational plaintiffs has both "organizational" and "associational" (derivative) standing, and each is an "aggrieved person" within the meaning of 42 U.S.C. § 1973a. It appears likely that defendants will pursue their various standing defenses on appeal. Thus, although this Court could proceed to the merits simply by finding that at least one of the plaintiffs has at least one type of standing, the Court should find that *all* of the organizational plaintiffs have standing on *both* grounds, so as to minimize any chance of continued litigation over standing issues. *See* Part I *infra*.

**Disproportionate impacts.** The evidence conclusively demonstrates that the burdens of Act 23 fall disproportionately on voters of color. Two different expert studies introduced at trial, using two different sound methodologies, confirm Act 23's substantial racially disproportionate impacts. As plaintiffs' expert Leland Beatty concluded, "Wisconsin minority voters are at a substantial disadvantage under Wisconsin's voter ID law, and … the effect of that law imprints an unavoidable disparate impact on minority election participation." Beatty 2013 Decl. ¶ 1 (LULAC Ex. 817). This expert testimony is both unrebutted by the State, which claims not to have even attempted to assess Act 23's racial impacts, and corroborated by many other studies and a broad array of additional statistical and anecdotal evidence. Indeed, the State's own data demonstrate that African-Americans and Latinos make up nearly *half* of the voters who have

2

been required to obtain an Act 23 "free" ID in order to cast a ballot, even though they make up only 8.1% of Wisconsin's voting age population. *See* Part II *infra.*

**Denial and abridgement of voting rights.** The evidence overwhelmingly establishes that Act 23 imposes substantial and often insurmountable burdens on hundreds of thousands of voters. These burdens — disproportionately borne by voters of color — include having to spend money to purchase certified birth certificates that are not needed for any purpose other than to secure so-called "free" IDs; having to deal with distant, unfriendly, and error-prone bureaucracies in Wisconsin and beyond; having to amend ancient birth records to correct naming errors, omissions, and changes as a condition of being able to vote, with accompanying administrative, court, and legal fees that can range into the thousands of dollars; and having to deal with arbitrary and capricious DMV decisionmaking, including the agency's mendacious refusal to let voters know about its standardless and unchecked "extraordinary proof" petition process.

These burdens are too much to overcome for significant numbers of voters of color, who will be disfranchised by Act 23 because they do not have a birth certificate (an essentially mandatory document to get a state ID) or the financial and other types of resources needed to navigate the obstacles Act 23 puts between them and the voting booth. Act 23 is far more harsh and imposes many more burdens than the South Carolina, Georgia, Indiana, and other voter ID laws relied on by defendants. The evidence demonstrates that Act 23's disproportionately imposed burdens have denied the vote to many citizens of color and abridged the voting rights of many others, and will undoubtedly do so again if Act 23 is allowed to go back into effect. *See* Part III *infra.*

**"Totality of circumstances" analysis.** The "totality of circumstances" analysis set forth in 42 U.S.C. § 1973(b), guided by the so-called "Senate Factors," demonstrates that Act 23 interacts with social and historical conditions to cause substantially disparate burdens on the ability of African-Americans and Latinos to vote in Wisconsin elections. Wisconsin's African-Americans and Latinos bear the effects of many generations of *de jure* and *de facto* discrimination in housing, education, employment, health, and other areas that leave them more likely to be excluded from the political process by Act 23. Indeed, Milwaukee was widely known as the "Selma of the North" during the 1960s and 1970s, and to this day is viewed by many as one of the "most" segregated (or "hyper-segregated") cities in our Nation. *See* pp. 68-73 *infra.*

One consequence of this history is that the vast majority of African-Americans and Latinos live in a few highly urbanized neighborhoods in Milwaukee and other southeast Wisconsin cities. As a result, they tend to take public transportation, drive less, own fewer cars, and disproportionately lack driver's licenses. There is a long history of discrimination against participation by voters of color in the democratic process — indeed, Spanish language ballot materials only became available to Latino voters in Milwaukee County *for the first time in 2012,* and then only by order of the U.S. Department of Justice. *See* pp. 56-57 *infra.* Voters of color continue to be underrepresented in Wisconsin state and federal elective offices, and Wisconsin elected officials have been unresponsive to the particularized needs of voters of color (including with respect to the barriers imposed by Act 23).

Defendants' justifications for Act 23 are not only tenuous, but false. Defendants at trial were unable to show that Act 23 would have prevented a single case of voter impersonation fraud that actually has occurred in Wisconsin. They also failed to explain why the *specific*

provisions of Act 23 — which are far more onerous than voter ID provisions in other States — are *necessary* to deter voter fraud or even that Act 23 would have any deterrent effect on such fraud. Nor did they offer any evidence in support of their new theory that voter ID is somehow necessary to foster voter confidence in the electoral system. If anything, its racially discriminatory impact has just the opposite effect. Act 23 "*needlessly impairs*" the opportunities of voters of color to participate in the political process, and thus violates Section 2. *Barnett v. City of Chicago*, 141 F.3d 699, 701, 702 (7th Cir. 1998) (emphasis added).

Act 23 also reflects a "troubling blend of politics and race," in which the incumbent party has imposed significant voting restrictions that it knew full well would fall disproportionately on voters of color, who tend overwhelmingly to vote for the other party. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 442 (2006). This "incumbency protection" measure "undermine[s] the progress of . . . racial group[s] that ha[ve] been subject to significant voting-related discrimination and that [are] becoming increasingly politically active and cohesive." *Id.* at 403, 439. This is especially true for Wisconsin's Latino voters who are just beginning to flex their political muscle in this State and who are nearly two-and-a-half times more likely than white voters to lack the IDs necessary to vote under Act 23. *See* pp. 23-24 *infra*. Such an abuse of voting requirements "*cannot be sustained*" under Section 2. *LULAC*, 548 U.S. at 442 (emphasis added). *See* Part IV *infra*.

**Functional equivalence to Jim Crow laws.** Act 23 in its operation and results is functionally indistinguishable from the laws employed during the Jim Crow era to suppress the African-American vote, and which the Voting Rights Act of 1965 and its 1982 amendments were enacted to prohibit. Like those earlier disfranchisement laws, Act 23 imposes "vague, arbitrary, hypertechnical [and] unnecessarily difficult" requirements and a variety of bureaucratic

"procedural hurdles" in a disproportionate manner on voters of color, turning the voting process for them into a "test of skill" and the "engine of discrimination," with the predictable result of suppressing the vote of people of color. 1965 H. REP. 10, 13. Act 23 is the modern-day functional equivalent of the poll tax, property requirements, literacy and "understanding" tests, and other "contrivance[s]," "stratagem[s]," and "maneuver[s]" that were outlawed by the Voting Rights Act. *Id.* at 12; *South Carolina v. Katzenbach*, 383 U.S. 301, 334 (1966). Indeed, senior GAB and DOT officials acknowledged at trial that Act 23 functions just like a poll tax. *See* n.91 *infra.*

Moreover, by permanently "carving out" and "shelter[ing]" those who already held driver's licenses and state IDs as of July 1, 2011 from the new proof requirements, Act 23 also functions as an illegal "grandfather" law because it shields the (disproportionately white) existing electorate from the expenses and burdens that will fall disproportionately on African-Americans and Latinos seeking to join the electorate. *Guinn v. United States*, 238 U.S. 347, 364 (1915); *Lane v. Wilson*, 307 U.S. 268, 276 (1939). In all of these multiple ways, Act 23 therefore violates Section 2 because, under the "totality of circumstances," it *results* in voters of color having "*less opportunity than other members of the electorate* to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(a)-(b) (emphasis added); *see* Part V *infra.*

**Permanent injunctive relief.** All other factors support the entry of broad permanent injunctive relief. Denial of the right to vote is *per se* irreparable injury, and the demonstrated risks of the suppression of voters of color far outweigh the tenuous risks of isolated voter impersonation fraud that are claimed to justify this unusually harsh and burdensome law. The public interest and balance of equities weigh decisively in favor of broad permanent injunctive

relief. A proposed Fed. R. Civ. P. 65 permanent injunction accompanies this post-trial brief. *See* Part VI *infra.*

## ARGUMENT

**I. The Four Organizational Plaintiffs Have Article III "Standing" To Sue And Are "Aggrieved Person[s]" Under 42 U.S.C. § 1973a.**

Each of the four organizational plaintiffs demonstrated that it has both forms of Article III standing discussed in this Court's Sept. 17, 2013 Decision and Order (Dkt. 84), and that it is "an aggrieved person" within the meaning of 42 U.S.C. § 1973a. Plaintiffs have "organizational" standing because they established that Act 23 has "caus[ed] them to divert their resources away from their usual … activities to deal with the effects of the Act," and that they will "continu[e] to suffer this form of injury" in the future if Act 23 is allowed to go back into effect. Dkt. 84 at 2-3 & n.2. Plaintiffs also have "associational" ("derivative") standing because they established that they "continue to have members who are being injured by Act 23." *Id.* at 3.

Although this Court need only find that a single organizational plaintiff has one type of standing in order to proceed to the merits,[2] the Court should hold that the evidence establishes that all four plaintiffs have both kinds of standing. *See* p. 2 *supra.* That evidence also demonstrates that all four plaintiffs are "aggrieved person[s]" under § 1973a and within the "zone of interests" protected by the Voting Rights Act. *See* Dkt. 84 at 3-5.

### A. League of United Latin American Citizens (LULAC) of Wisconsin

The Court heard testimony about LULAC-Wisconsin from Luis Garza, its State Director in 2011-12, and Yolanda Adams, another former State Director who currently serves as the

---

[2]  *See Crawford*, 472 F.3d at 951 (standing of many different types of plaintiffs in voter ID challenge "need not be addressed" because, for injunctive relief to issue, "only one plaintiff with standing is required"), *aff'd*, 553 U.S. at 189 n.7 (where one plaintiff had standing, "there is no need to decide whether the other petitioners also have standing").

organization's State Treasurer.  *See* Tr. 136-63, 179-204.  LULAC is a nationwide "grassroots

civil rights organization" advocating on behalf of Latinos in the United States, and consists of

local councils, state boards, regional offices, and a national organization.  *Id.* at 140, 184; *see id.*

at 140-47, 158-59, 182-84.[3]  LULAC-Wisconsin has nine local councils in southeastern

Wisconsin focusing on such issues as civil rights, immigration assistance, women's health, and

education.  *Id.* at 142-43.  It also devotes "a lot of energy" to Latino political involvement,

including voter registration, neighborhood canvassing and "door knocking," poll watching, voter

education, and GOTV activities. *Id.* at 144-45; *see also id.* at 184-85.

After Act 23 was enacted, LULAC-Wisconsin and its local councils "shifted gears" and

diverted their limited volunteer resources toward helping Latino voters deal with the new voter

ID law, an issue that "took a much higher precedence because we were very, very worried that

… we had that big increase in voters from Hispanics and then we were afraid that that was going

to be lost with the new ID requirements."  *Id.* at 147.  Ms. Adams testified that over half of the

individuals she dealt with through LULAC did not have a proper ID card.  *Id.* at 149.  LULAC-

Wisconsin therefore "shifted our focus" (*id.* at 187) to holding information sessions to educate

---

[3]  LULAC is, in fact, the "largest Latino civil rights and advocacy group in the United States."  http://lulac.org/.  Ms. Adams described the organization as a Latino version of the NAACP.  Tr. 140.  And like the NAACP, LULAC has repeatedly been found to have standing in civil rights litigation on its members' behalf.  *See, e.g., United States v. LULAC*, 793 F.2d 636, 642 (5th Cir. 1986); *Day v. Sebelius*, 227 F.R.D. 668, 673 (D. Kan. 2005); *Rodriguez v. California Highway Patrol*, 89 F. Supp. 2d 1131, 1135-36 (N.D. Cal. 2000) (LULAC had associational standing to challenge state practice on behalf of affected members; "no legal authority requires that the names and contact information of individual members" be provided); *LULAC of Texas v. Texas*, 995 F. Supp. 719, 722 n.5 (W.D. Tex. 1998); *LULAC v. Pasadena Ind. School Dist.*, 662 F. Supp. 443, 446 (S.D. Tex. 1987) (LULAC's "membership includes persons who are threatened by Defendants' actions"); *LULAC v. City of Santa Ana*, 410 F. Supp. 873, 886-87 (C.D. Cal. 1976), *modified on other grounds*, 1976 WL 13332 (C.D. Cal. July 6, 1976); *LULAC v. Kasich*, No. 10AP-639, 2012 WL 760800, at *8 (Ohio Ct. App. Mar. 6, 2012) (although LULAC did not identify specific affected members, it was "evident" that it had members who were threatened by new regulatory requirements).

Latino voters about the new voter ID requirements, assisting them in seeking the required birth certificates and ID cards, distributing Spanish-language materials about Act 23's changes, and providing interpretation and translation services. *Id.* at 147-56, 185-90, 201-02. These efforts caused LULAC-Wisconsin to cancel some of its planned activities and postpone others (including several important initiatives on women's health, childhood obesity, and immigration issues). *Id.* at 147, 185-88, 196.

The evidence establishes that LULAC-Wisconsin has "associational" as well as "organizational" standing. Given LULAC's surging demographics and the striking disparities in ID and birth certificate possession rates between Latinos and whites, the only reasonable conclusion is that LULAC-Wisconsin and its nine councils certainly include voting age Latino members who are at risk of being burdened with Act 23's hurdles and barriers to voting if the measure is allowed to go back into effect. *See* pp. 20-33, 56-61 *infra.* Contrary to defendants, there is no requirement for an organization like LULAC to "name names" of burdened members, let alone of members who can "prove" that they "can never, ever obtain a form of Act 23 ID." Tr. 2134.[4]

_____

[4] The requirement that "'an organization suing as representative [must] include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association' . . . still allows for the member on whose behalf the suit is filed to remain unnamed by the organization." *Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors,* 522 F.3d 796, 802 (7th Cir. 2008); *see also Greater Indianapolis Chapter of NAACP v. Ballard,* 741 F. Supp. 2d 925, 932 (S.D. Ind. 2010) ("a member on whose behalf suit is brought may be 'unnamed by the organization'") (citations omitted); *Forum for Academic & Institutional Rights, Inc. v. Rumsfeld,* 291 F. Supp. 2d 269, 289 (D.N.J. 2003) (rejecting "blanket rule that associations seeking to bring suit on behalf of their members must identify their membership"; instead, the evidence in a "given context" must "sufficiently demonstrate that an association indeed has members that have suffered an injury-in-fact"). *See also* the LULAC cases cited in n. 3 *supra.*

### B.    Cross Lutheran Church

The Court heard extensive testimony from both Senior Pastor Michelle Yvette Townsend de Lopez and individual members of Cross Lutheran Church, located at 1821 North 16th Street in Milwaukee. Cross Lutheran, founded in 1870 as a "German immigrant church," currently has a "baptized roll" of approximately 450 "worshipping members," of whom about 75% are people of color and at least a third are "poor and marginalized." Tr. 362, 366, 370, 380, 383-84. Pastor Townsend de Lopez summarized some of the impacts of Act 23 on her members :

> There were a few who talked about they didn't realize that they needed to have, for example, their birth certificate or they had to have an actual state-issued driver's license or state ID as appropriate form of documentation. A number of people had picture IDs but they were not [sure] what was considered appropriate in order to vote.
>
> *   *   *
>
> . . . Some people didn't understand really the means of how to go about getting a birth certificate. Some weren't sure that they actually had one. Some people had a church baptism but they did not have an actual birth certificate and didn't understand that there was a difference. And also the means in order to get that and the paperwork in order to get funds in order to receive those documents.
>
> *   *   *
>
> . . . I would say for people that were older, more seasoned individuals, I would say 50 plus or so that came originally from the South and particularly the deep South. We have a lot of African descent people who come from the areas of Georgia, Alabama, Mississippi, and so forth that didn't have their birth certificates and so forth and didn't necessarily know how to go about getting them. And in some cases because they may have been born with a midwife, certain information was just not recorded accurately so they were incurring some obstacles.

*Id.* at 371-72. Pastor Townsend de Lopez specifically named several African-American parish members who lack the forms of ID required by Act 23, and emphasized that there are others whose names she could not remember on the stand. *Id.* at 373.

Alice Weddle is one member of Cross Lutheran who could not vote if Act 23 were allowed to go back into effect. She is a 59-year-old African-American woman who was born in Mississippi and moved to Wisconsin when she was ten years old. *Id.* at 34. She worked as a nurse's assistant and a cook; has been a regular voter since Jimmy Carter ran for president; worked at the polls in 2012; and has been a voting member and active volunteer at Cross Lutheran for nine years. *Id.* at 34-35. She has never had a Wisconsin driver's license or a state ID card. *Id.* at 36. Ms. Weddle attempted to obtain a birth certificate from Mississippi several years ago, but her application was returned and she was advised that "*there was no such person*." *Id.* at 37 (emphasis added). Ms. Weddle believes there is no record of her birth because she "was born at home by a midwife," not in a hospital. *Id.* at 38. Voting is "[v]ery important" to her, and if the absence of a certified birth certificate kept her from voting she would "be totally lost because I've been voting ever since I was old enough to vote." *Id.* at 39.

Rose Thompson, identified by Pastor Townsend de Lopez as another member of Cross Lutheran, was born in Mississippi in 1933, moved north to Milwaukee in 1974, and has been voting regularly in Wisconsin since 1975. *Id.* at 699-700, 705.[5] She has repeatedly tried to obtain a birth certificate from Mississippi and has several times sent money for such a certificate, only to be told that no such document exists (without getting her money back). *Id.* at 700, 705. She also has repeatedly attempted (with her daughter's help) to obtain a photo ID from the Wisconsin DMV without her birth certificate, never with success. *Id.* at 704. She feels "real bad" that she was able to vote in segregated Mississippi in the 1960s thanks to the Voting Rights

---

[5] Ms. Thompson testified that she did not believe she is a formal "member" of Cross Lutheran Church, perhaps because she attends the Wednesday worship and outreach services rather than the Sunday services. Tr. 708. Pastor Townsend de Lopez, however, identified Ms. Thompson as an officially "enrolled member" given her active attendance and participation in the work of the parish. *Id.* at 187. Ms. Thompson is one of the "core members" of the Wednesday worship group. *Id.*

Act but would be barred from voting in Wisconsin in 2014 if Act 23 goes back into effect. *Id.* at 707.

Cross Lutheran not only has members who are adversely affected by Act 23, it diverted time and resources away from other pressing priorities to attempting to help its members and the community at large overcome the burdens and obstacles created by Act 23. Churches have long been in the forefront of voting rights struggles, and Cross Lutheran has a long history of such involvement. As Pastor Townsend de Lopez emphasized, her church has a "biblical" obligation to "stand up for the people who are the poor and the marginalized," including those facing obstacles to voting under Act 23. *Id.* at 366.

> Q. Does Act 23 require Cross Lutheran Church to take any action?
>
> A. Biblically, yes. It's our moral and ethical duty.
>
> &ast; &ast; &ast;
>
> Q. Is there any specific provision in Act 23 that requires Cross Lutheran to do something?
>
> A. I would say that the law of the state probably does not, but the law of God does.

*Id.* at 378.

Pursuant to these scriptural duties, Cross Lutheran Church has diverted staff time and resources to helping its enrolled members and members of the broader community obtain their birth certificates and other documentation required to get a state ID; helped these people obtain the state IDs from the DMV; brought in outside speakers to provide training and guidance in navigating the requirements of Act 23; and contributed funds to the voter education efforts by

MICAH[6] to help spread the word about the new requirements imposed by Act 23.  *Id.* at 375-77, 382-83.  The Church will divert the necessary resources to engage in these efforts again if Act 23 goes back into effect.  *Id.* at 377.

### C.    Milwaukee Area Labor Council, AFL-CIO

The Labor Council represents 32,000 dues-paying union members who belong to 122 affiliate unions.  *Id.* at 342.  Over half of the union members represented by the Labor Council are African-American or Latino, and many face obstacles that make them especially vulnerable to Act 23 (*e.g.*, many of them move often, lack reliable transportation, have low incomes and limited job flexibility, confront language barriers, etc.).  *Id.* at 342, 358.  Annie Wacker, the Labor Council's Vice President, testified that, "given the make-up of the Milwaukee Area Labor Council and its membership," the Council believes it has members who have been adversely affected by Act 23's requirements and will be again if the law goes back into effect.  *Id.* at 347, 352, 356-58.[7]

Acting on this belief that its members were at risk, the Council diverted scarce funds and staff time away from other activities in 2011-12 (including its activities in opposition to 2011 Wisconsin Act 10) to focus on counteracting the adverse effects of Act 23 on its members and

---

[6]  MICAH stands for Milwaukee Inner-City Churches Allied in Hope, and is an interfaith-based social justice organization made up of 34 Milwaukee churches, including Cross Lutheran.  Tr. 364, 570.

[7]  Ms. Wacker was not able to name specific union members who had been harmed by Act 23 because (a) she does not work directly with rank and file members, who instead interact primarily with the Labor Council's Chief Operating Officer, Sheila Cochran; and (b) Ms. Wacker was substituting as the Labor Council's organizational witness because Ms. Cochran had a family medical emergency.  Tr. 357-58.  Given the racial and socioeconomic demographics of its *22,000 members*, it is inconceivable the Labor Council does not include individual members who lack Act 23 ID and face a variety of potential hurdles in seeking it.  That is why the Labor Council has diverted its scarce resources so as to help its members overcome these hurdles.  There is no requirement for the Labor Council to name individually harmed union members in these circumstances.  *See Disability Rights Wis.*, 522 F.3d at 802; n. 4 *supra.*

others.  *Id.* at 343.  Among other things, the Labor Council produced and distributed 10,000 copies of a special educational newsletter titled *Inside Voter ID* in Feb. 2012 (*see* LULAC Ex. 397) at an estimated expense of $3,600 in printing costs and staff salaries; prepared other articles for its monthly newspaper; printed flyers and sent out "E-notifications" about voter ID; developed a speakers' bureau; hosted meetings and coordinated activities with other interested organizations; and trained volunteers to educate and assist union members and others in dealing with Act 23's changes.  Tr. 343-48, 353-55.  Ms. Wacker emphasized that, although the Labor Council has fewer resources now than it did in 2011-12, it would "absolutely" feel obligated to engage in similar voter outreach and education activities again if Act 23 goes back into effect. *Id.* at 349.

### D.      League of Young Voters Education Fund

The League is a Section 501(c)(3) organization that works to get young non-college African-Americans and Latinos between the ages of 18 and 35 "involved in the electoral process" so they can help promote "systemic change in our communities."  Tr. 486.[8]  Although many of its efforts are directed toward voter registration and GOTV activities, the League is also involved in antiviolence work, gun ownership legislation, and urban gardening and other inner-city employment programs.  *Id.* at 490-91.  Given the core purposes of the League of Young Voters, it was a "no-brainer" that the League would need to divert resources away from its

---

[8] As Rosalynn Wolfe, the League's present Wisconsin Director, explained:  "[T]he whole point of the League of Young Voters is to make sure that we give young people the skills that they need to go out and make their communities a better place to live.  We do that through a variety of ways, from giving them training on organizing via social media and person to person. We give them training on how to deal with politicians, training on the voting process, the importance of it, the history of it, and then giving them higher level skills like power mapping and creating strategic field plans so that they understand how to navigate the political system and then get other folks involved in it and build up their base and movement from there from ground up."  Tr. 521-22.

programmed activities so as to focus on helping young voters of color overcome the numerous barriers imposed by Act 23 and navigate their way through various unfamiliar and sometimes unfriendly bureaucracies to obtain the required voter IDs. *Id.* at 489.

> Getting folks involved in the process is what we do. Many of the people in our community don't trust the process. However, many decisions that are made have huge impacts in our community, such as the voter ID law. So when this law was passed, there was no question of should we do it. It's how are we going to get this done.

> \*     \*     \*

> What . . . we as an organization do is work to get underrepresented populations involved in the electoral process. A change to the election law and the process in which we engage requires us to have to do work as being a responsible organization and adhering to our mission to inform the constituencies that we work with and target about the changes.

*Id.* at 493, 508-09.

Jayme Montgomery Baker, the League's Wisconsin State Director during 2011 and 2012, testified in detail regarding the organization's diversion of substantial staff time and resources in attempting to help its members and constituents overcome the significant logistical, financial, and bureaucratic challenges imposed by Act 23. These activities included conducting surveys of young voters of color to ascertain Act 23's impacts on them; organizing a community coalition to assist eligible voters in navigating and surmounting the many hurdles created by Act 23; creating and distributing 15,000 "Voter ID flyers" to educate young voters about Act 23; using email and social media to reach young voters and help them understand and navigate the voter ID maze; renting 15-passenger vans to provide transportation to the DMV for those who needed to obtain a state ID to vote; helping young voters to obtain birth certificates where required by Act 23; providing liaison and advocacy services in dealing with the DMV and other government agencies; and extensive other speaking and educational activities. *Id.* at 489-501. Ms. Montgomery Baker's testimony detailed and quantified the additional League expenses and

15

diversions of League resources caused by Act 23 (at least $75,000 to $80,000 in diverted expenses), as well as the League activities that otherwise would have been funded. *See id.* at 500-01.

Rosalynn Wolfe, who became the League's Wisconsin State Director in December 2012, confirmed that the League continues to view Act 23 as a major threat to its mission of getting young people to the polls. *Id.* at 516-30. She emphasized that, given the League's "main goal" of getting young people "civically engaged," it was the group's "duty" to help its constituents in overcoming the "barriers" imposed by Act 23. *Id.* at 518. "So we would have to pick up where the coalition that Jayme and the League left off" if Act 23 went back into effect, and [w]e'd have to limit some of the work that we're doing now in order so we'd have the funds to continue those activities that the coalition started in 2011." *Id.* at 520.

The League began charging annual dues a year ago and now has over 100 dues-paying members along with many additional active members who contribute in other ways, such as helping with office work and community outreach. *Id.* at 521. Given the staggering numbers of young African-Americans and Latinos in Milwaukee County who lack drivers' licenses or state IDs, the League unquestionably has dues-paying members who face additional barriers to voting as the direct consequence of Act 23. *See* pp. 19-31 *infra.* The League therefore has associational (derivative) as well as organizational standing, without having to "name names" of its dues-paying members.[9]

_____

[9] Here, too, there is no requirement that the League "name names" of members who have been adversely affected by Act 23. *See* n. 4 *supra.* Note, however, that the League did identify by name a member who had lacked an acceptable ID and required help to get one. Tr. 501, 509-10.

## E.     The Defendants' Other Continuing "Standing" and Related Objections Are Baseless.

Defendants continue to challenge plaintiffs' standing on the grounds that Act 23 does not *itself* "compel" or "require" them to do anything.[10]  There is no such requirement for an organization to have standing.  The leading Supreme Court decision recognized the Article III standing of a civil rights organization named Housing Opportunities Made Equal ("HOME"), whose mission was "to make equal opportunity in housing a reality."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 368 (1982).  HOME claimed that alleged racial steering practices "frustrated [its] counseling and referral services, with a consequent drain on resources."  *Id.* at 369.  Though no law "required" or "compelled" HOME "to do anything" — to borrow defendants' words, *see* n. 10 *supra*, the Supreme Court held "there can be no question that the organization has suffered injury in fact," including "concrete and demonstrable injury to the organization's activities" and the "consequent drain on the organization's resources."  *Id.* at 379.

Likewise, the Seventh Circuit and other courts have squarely held that an organization involved in the electoral process has standing to challenge state election laws that cause the organization to divert its resources away from its usual voter registration and GOTV activities to deal with the adverse effects of the laws on those activities.[11]  These and many other decisions

---

[10]  *See*, *e.g.*, Tr. 159, 195, 352, 378, 508-09, 515; *see esp. id.* at 509 (asked of League of Young Voters:  "There's nothing in Act 23 that requires you to do something to the extent that if you didn't do it you'd be violating Wisconsin state law, did it?").

[11]  *See*, *e.g., Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (Posner, J.) (Indiana voter ID law "injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote"), *aff'd*, 553 U.S. 181, 189 n.7 (2008); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir.) (Georgia voter ID law injured the NAACP by requiring it to "divert resources from its regular [voter registration and GOTV] activities to educate and assist voters in complying with the statute that requires photo identification"; "the NAACP 'cannot bring to bear limitless resources' and the diversion of its resources to address the requirement of a photo identification will cause its 'noneconomic goals

have repeatedly rejected defendants' argument that organizational standing exists only if the challenged law "requires" or "compels" the organization to act; such an argument "*finds no support in the law*."[12]

It is ironic — to put it mildly — that defendants continue to argue that plaintiffs lack standing because they are not *required* to help the State implement Act 23, while at the same time repeatedly admitting at trial that their implementation plan, such as it is, depends heavily on the voluntary assistance of organizations like the four plaintiffs in this case.[13] It takes real chutzpah for the defendants to challenge the need for plaintiffs' diversions of time, money, and other resources to dealing with the consequences of Act 23 while at the same *relying* on those diverted resources in attempting to implement the Act's onerous and confusing provisions.

---

to suffer'") (citation omitted), *cert. denied*, 129 S. Ct. 2770 (2009); *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008) (NAACP and other civil rights organizations had Article III standing to challenge Florida's imposition of new voting requirements because they "reasonably anticipate[d] that they [would] have to divert personnel and time to educating volunteers and voters on compliance with [the new requirements] and to resolving the problem of voters left off the registration rolls on election day").

[12] *Browning*, 522 F.3d at 1166 (emphasis added). An organization claiming associational standing in a voting rights case must show that defending and expanding the franchise for its members and others is "germane" to its mission. *Disability Rights Wis.*, 522 F.3d at 801-02. Voting rights issues have long been highly "germane" to the missions of churches, unions, and civil rights organizations, all of which have played crucial roles for many generations in the fight to obtain and preserve the franchise for all Americans. *See, e.g.,* Michael J. Klarman, FROM JIM CROW TO CIVIL RIGHTS: THE SUPREME COURT AND THE STRUGGLE FOR RACIAL EQUALITY, passim (2004); Patricia Sullivan, LIFT EVERY VOICE: THE NAACP AND THE MAKING OF THE CIVIL RIGHTS MOVEMENT, passim (2009).

[13] The GAB has a statutory duty to "[e]ngage in outreach to identify and contact groups of electors who may need assistance in obtaining or renewing a document that constitutes proof of identification for voting … and provide assistance to the electors in obtaining or renewing that document." 2011 Wisconsin Act 23, §95 (creating Wis. Stats. § 7.08(12)). Since the Legislature did not give GAB sufficient resources to accomplish this identification-and-assistance obligation itself, the GAB has relied heavily on community organizations to identify and assist groups of voters less likely to have Act 23-compliant ID. *See* Tr. 863-64, 922-23 (Kennedy) *see also id.* at 901 ("with the limited resources we have we have to work through groups that can leverage the information we have") (Kennedy); *id.* at 1667-68 (Hein); *id.* at 1903, 1911, 1920 (Coakley).

Defendants also appear to argue that the four organizational plaintiffs fall outside the "zone of interests" protected by the Voting Rights Act.  *See, e.g.,* Tr. at 158-59, 195, 352-53, 378, 508-09, 525-26.  But as the Court emphasized in its Sept. 17 Decision and Order, "it strikes me as obvious that at least some of the organizations fall within that zone."  Dkt. 84 at 5.  The evidence adduced at trial demonstrates that not just "some," but *all* of the plaintiff organizations fall within that zone: "they are organizations  concerned with advancing voting rights, their members are individuals that the Voting Rights Act was designed to protect, and the legislative history of the Act explicitly states that organizations representing the interests of injured voters were intended to be granted rights to sue."  *Id.*; *see* S. REP. NO. 94-295, at 40 (1975) (an "aggrieved person" under 42 U.S.C. § 1973a(a) is "any person injured by an act of discrimination.  It may be an individual *or an association representing the interests of injured persons.*") (emphasis added).

## II.  Act 23 Disproportionately Impacts Voters of Color

The evidence demonstrates that the burdens of Act 23 fall much more heavily on voters of color than on white voters.  There is simply no credible argument to the contrary.  The racially disproportionate impacts of Act 23 are confirmed by multiple independent studies using a variety of different methodological approaches in evaluating many years of data.  This section summarizes (1) the evidence of disproportionate racial impacts presented by plaintiffs' expert Leland Beatty; (2) the numerous independent studies that corroborate and bolster Mr. Beatty's conclusions; and (3) the State's own "free ID" data confirming the huge racial and ethnic disparities in Act 23's impacts.

## A. Leland Beatty's "Matching" Analyses of GAB and DOT Data Demonstrate Significant Racial Disparities.

Leland Beatty is a highly successful consultant and political demographer, and works for both corporate and political clients, including for candidates in Wisconsin. Tr. 623-642. He has years of experience and expertise including in statistical analysis, analysis of voter behavior, of state voter files, and of data from state driver's license files. Tr. 625-33. In this case, Mr. Beatty analyzed the GAB's list (or database) of registered voters in Wisconsin and compared it with the DMV's list (or database) of Wisconsin residents who have a current driver's license and/or state-issued photo identification. *Id.* at 647. He identified over 300,000 registered Wisconsin voters who have neither a driver's license nor a state-issued photo ID card matching their voter record. *Id.* at 654-55, 686.[14] These are the two overwhelmingly predominant forms of photo identification used to cast a ballot under Act 23.[15] Mr. Beatty then also analyzed the racial makeup of the group of voters lacking a matching driver's license or state ID — something the

---

[14] Mr. Beatty identified over 356,000 registered voters lacking these forms of ID in 2012, and over 317,000 in 2013. Tr. 654-55, 686, 710; LULAC Ex. 2 at 10; LULAC Ex. 817, ¶6. As testified, these two data points cannot be extrapolated to suggest an overall trend in ID possession. Tr. 689. Moreover, part of the reduction was simply because some driver's license and ID holders were not included in the data provided in 2012. *Id.* at 689-90.

[15] Although defendants criticize Mr. Beatty's analysis for not considering other forms of identification allowed by Act 23 (including passports, tribal ID cards, some expired driver's licenses, or active military IDs), *see* Tr. 710-713, Mr. Beatty emphasized that driver's licenses and state-issued ID cards are the predominant forms of ID for voting, Tr. 713. Other forms of ID are unlikely to affect significant numbers of voters because "the unmatched skewed so heavily to low income and elderly groups, which are the lowest likelihood to have passports and military IDs." Tr. 681. This was borne out by testimony in this case of voters who lacked any form of qualifying identification. *Id.* It was further confirmed by Professor Barreto, who found that only an "extremely small" number of people — less than 0.3% — possess only a form of ID other than a driver's license or state ID card. Tr. 299-300. *See also* Part II-B-2 *infra*; Tr. at 1511-12 (Prof. Hood) (conceding, given Barreto's data, that even including other forms of identification, and using Hood's lower estimates of voters without ID, the number of estimated voters without ID is still over 150,000).

State's expert, Professor M.V. "Trey" Hood III, inexplicably did not even attempt. *Id.* at 645, 682, 686, 1512-13. (This is, after all, a case about race.)

Beatty's results were striking. He determined that "Hispanic voters, Asian voters, and African-American voters [in Wisconsin are] substantially more likely to be without a matching driver's license or state ID than white voters." *Id.* at 645; LULAC Exs. 2 at 2-3, 817 ¶¶3, 9. Specifically, Mr. Beatty determined that, based on the 2012 data, African-American voters in Wisconsin were 1.7 times as likely as white voters to lack a driver's license or state ID that matches their voter registration file. Tr. 646, 658; LULAC Ex. 2 at 10. And for Latino voters the data were even more lop-sided, showing that Latino voters in Wisconsin were 2.6 times as likely as white voters to lack a driver's license or state ID card that would allow them to vote under Act 23. *Id.* Data from 2013 also showed the persistence of a large racial disparity: Compared to white voters, registered African-American voters were 1.4 times as likely to lack a driver's license or state ID card, and registered Latino voters were 2.3 times more likely to be without such photo identification. *See id.* at 686; LULAC Ex. 817 ¶¶4, 9. And these statistics do not account for Wisconsin's 700,000 *unregistered* voters.

Mr. Beatty's analysis tracked the requirements that Act 23 would place on Wisconsin voters. He looked to see whether the identifying information in the DMV database — including the name on the identification — matched the information in the voter registration file. *Id.* at 677. In other words, Mr. Beatty performed a matching analysis that followed as closely as possible what would be required under Act 23. *Id.* Mr. Beatty asked the same question the poll worker asks: Does the identifying information on the identification match the voter file?[16]

_____

[16] Pursuant to Wis. Stats. § 6.79, "[t]he [polling] officials shall verify that the name on the proof of identification presented by the elector conforms to the name on the poll list or separate

Mr. Beatty ran three levels of matching analysis. *See id.* at 648; LULAC Ex. 2 at 8-9. These were based on the voter's name and identifying information, because he knew that a person can have an ID under Act 23, but if the name (and photo) on the ID does not match their voter record then the voter will be at the mercy of the poll worker, as defendants' expert conceded.[17]

Given this approach, Mr. Beatty did not*, as Professor Hood did, rely on the "state identification number" contained in the voter registration file. *See* Ex. 202 at 2-4. Rather, Mr. Beatty quickly determined that "different people could have the same number" and that "it was not a unique identifier," and he therefore rejected using it to "match" registered voters to the DMV files. Tr. 716. Professor Hood, by contrast, assumed that registered voters had a driver's license or state ID card if there was an "identification number" listed in their voter file. This was true in Professor Hood's analysis even if the DMV record with a matching identification number contained name information that did *not* match the voter file, LULAC Ex. 202 at 2-3, and even if the DMV files had no record at all corresponding to that identification number. *Id.* at 4.

Unlike Professor Hood, however, Mr. Beatty did *not* include as "matches" over 85,000 voter records with a state ID number where "the personal identification information," *i.e.,* the voter's name, "did not match." Tr. 672-73; LULAC Ex. 202 at 2-3. Nor did Mr. Beatty include the over 106,000 voters who Professor Hood assumed had identification because the voter

---

list and shall verify that any photograph appearing on that document reasonably resembles the elector."

[17] *See* Tr. 1587 (Hood) ("Q. [] if the name and identifying information on the ID does not match the name and identifying information in the voter record that's a problem for a voter under Act 23, correct? A. Well, I don't know if it's going to be a problem or not. That's sort of an implementation issue. Q. It's up to the poll worker, right? A. Yes. I think in that case it would be.").

registration file included an identification number, even though the DMV's records contained no records corresponding to those numbers.  Tr. 674.  Finally, Mr. Beatty also did not "double count" individuals who possess *both* a driver's license and a state ID card, *id.* at 649-50, because although the State argues that individuals are not *supposed* to possess both, Mr. Beatty's analysis showed that about 30 percent of state ID card holders also have a driver's license.  *Id.* at 690, 739.

For the over 300,000 registered Wisconsin voters who Mr. Beatty thus identified as having neither a driver's license nor a state ID card matching their voter record, he then analyzed the racial makeup of this group.  Tr. at 654-55, 686.  The voter file itself did not contain data on the race of individual voters.  To analyze the racial composition, Mr. Beatty therefore "hired the best in the field" to fill in that missing information.  *Id.* at 718.  He retained Ethnic Technologies ("Ethnic"), a company whose primary business is to provide the ethnicity (or race) of individuals named in a database that includes the names and information about the location of residence, *id.* at 599, as the Wisconsin voter ID data provided by Mr. Beatty did.  *Id.* at 656-57.  Based on that information, Ethnic used its software and database, applying recognized naming conventions and demographic data to provide data on the race of the identified voters.

The result was that among Wisconsin's registered voters, based on the State's 2013 data, Mr. Beatty found that African-Americans are at least 40% more likely than whites to lack a driver's license or state ID that matches their voter file.  LULAC Ex. 817 at 2; Tr. 686.[18]  The numbers for Latinos are even more alarming.  Latino registered voters are nearly *two and a half times more likely* than whites to lack a driver's license or state ID that matches their voter file.

_____

[18]  The State's expert, Professor Hood, testified in another case that a similar disparity in rates of qualifying ID ownership in South Carolina was statistically significant.  Tr. 1576-77.

*Id.*  Put another way, the data show that 8.3% of registered white voters lack a matching driver's license or state ID, as opposed to 11.5% of registered African American voters and 19.2% of registered Latino voters.[19]  These are statistically significant racial gaps of 3.2 percentage points between whites and African-Americans, and 10.9 percentage points between whites and Latinos.

| License and State ID Records, by Race | | | | |
|---|---|---|---|---|
| Race | Total Voters | Total Voters Matched to DL / ID Record | Total Unmatched to DL / ID Record, Race Identified | Share of Race Without Matching DL / ID |
| ASIAN | 44,310 | 38,919 | 5,391 | 12.2% |
| BLACK | 199,398 | 176,519 | 22,879 | 11.5% |
| HISPANIC | 62,490 | 50,498 | 11,992 | 19.2% |
| INDIAN | 17,934 | 16,797 | 1,137 | 6.3% |
| WHITE | 3,049,615 | 2,795,218 | 254,397 | 8.3% |
| Total | 3,373,749 | 3,077,953 | 295,796 | 8.8% |

LULAC Ex. 817 at 2, ¶9 (summarizing 2013 data); *see also* LULAC Ex. 2, ¶45 (2012 data).

As a result of the disparities that Mr. Beatty's analysis reveals, African American and Latino voters are more likely to be unable to vote, to face additional burdens as they attempt to register and vote, and to have their ability to vote determined in the discretion of individual poll workers, who will decide whether they may participate in Wisconsin's elections.  And they are more likely to be denied the vote outright by Act 23.

Defendants argue that the reliability of Ethnic's results is unknown or unproven, and that its method for determining the likely race or ethnicity of an individual has not been sufficiently

---

[19]  As yet another way to describe the racial gap, although African-Americans represented 5.3% of the registered voters in Wisconsin shown in the 2012 data, they were 7.8% of the registered voters lacking a matching driver's license or state ID.  Although Latino voters represented 1.6% of the registered voters, they were 3.6% of the registered voters lacking a matching driver's license or state ID.  LULAC Ex. 2 at 3, ¶ 9.

explained. Defendants are wrong on all counts. There is abundant record evidence before the Court establishing the soundness of Mr. Beatty's analysis and the reliability of his use of Ethnic.

*First*, the method that Ethnic used to determine, with a high degree of accuracy, the race or ethnicity of individuals in the voter database is plainly established in the record and not difficult to understand. As John Mas, a former employee of Ethnic who continues to do business with it, testified, "the premise" is that Ethnic looks at a person's first and last names and can reliably infer information about their ethnicity. *See* Tr. 606. Attorney Kawski himself demonstrated this for the Court when he greeted witness Ray Cizewski with the observation that this was "another Polish name." *Id.* at 543. In addition, Ethnic then "look[s] at a person's name in reference to where they live." *Id.* at 607-08. Or, as Mr. Mas explained, "if you know where they live you can know that Bruce Lee if he lived in Chinatown more than likely would be Chinese or Stan Lee if he lived in Riverdale, New York was Jewish." *Id.* at 608.[20]

Of course what Ethnic does is a "more sophisticated implementation" of these principles. *Id.* at 606, 608. But the fact that the inner workings of Ethnic's software are not before the Court hardly makes the method a "secret" or beyond the Court's comprehension. *See id.* at 2136-37. Nor does the Court need a detailed exposition of the software that analyzes database records names against 900,000 known last names and 165,000 known first names, applying 3,600 separate rules, *id.* at 607, 618, for the Court to accept the unrebutted testimony and evidence establishing both the method used by Ethnic and its reliability.

---

[20] Defendants elicited further testimony about this kind of analysis from Professor Barreto, who explained that "if you have an individual who lives in a census bloc . . . and that census bloc is 95 percent Hispanic, then the geocoding information would give you a probability of .95 that any randomly selected respondent from that census bloc is Hispanic . . . You would then perhaps in this case look at the person's last name. If they had a Spanish surname that would then give you more confidence." Tr. 330-31. This is precisely what Ethnic does.

25

*Second*, the record before the Court demonstrates that Ethnic's process is highly reliable. Mr. Beatty himself testified that in his political demographic and statistical work, it is his preference to use Ethnic's data, Tr. 634, which is "highly superior and very reliable." *Id.* at 635. Use of such data is "a standard practice in the field of elections analysis." LULAC Ex. 202 at 6. Mr. Beatty also testified that he has worked with Ethnic on many occasions, that he has a "long-standing relationship" with the firm, that it provides "superior results" on which he can rely, and that he can " establish the reliability of Ethnic Technologies' method." Tr. 638, 719, 725.

Further, Mr. Beatty provided and explained to defendants more than a year prior to trial several published scholarly articles that address the reliability of both the general principles and of Ethnic's work specifically, including a published study by the National Cancer Institute. *See id.* at 660-62; Ex. 202 at 6-7; Exs. 211-15.[21] Defendants simply did not, or could not, submit any rebuttal evidence, but the lack of evidence from defendants does not make Ethnic's work "secret." Tr. 2136. Rather, it tends to prove that Ethnic's work is both accepted and reliable.

Mr. Mas also testified about the success and reputation of Ethnic's race-identification data. Tr. 594-622. Mr. Mas established, for instance, that other long-term and continuing clients who rely on Ethnic's racial data include many of the largest and most successful organizations in the country that compile and administer databases, including the U.S. Census Bureau and the Social Security Administration, and in the private sector market leaders including Experian,

---

[21] *See* Jessica T. DeFrank, J. Michael Bowling, Barbara K. Rimer, Jennifer M. Gierisch, & Celette Sugg Skinner, *Triangulating Differential Nonresponse by Race in a Telephone Survey*, 4 PREVENTING CHRONIC DISEASE: PUBLIC HEALTH RESEARCH, PRACTICE, AND POLICY 1 (2007) (LULAC Ex. 212). To the extent defendants may criticize the reported error in identifying African-American voters in the NCI study, both Mr. Mas and Mr. Beatty established that significant improvements have been made in Ethnic's identification of African-Americans since that time. Tr. 621-22, 661. Moreover, the reported error was to *underreport* African-Americans. *Id.* at 742. In other words, even if that error were at work here, an even larger number of registered voters who lack state-issued identification would turn out to be African-American, and the racial disparity would be even greater. *Id.* at 742-43.

Acxiom, and Nielsen/Knowledge Base. Tr. 598, 600-04. Mr. Mas testified that Ethnic reports publicly and to these clients "about 96 percent accuracy" in its race identification. *Id.* at 610. These organizations rely on that accuracy and the reliability of Ethnic's race data as the factual basis for high-stakes government and business decisions, and they find it sufficiently reliable that they are long-term, repeat users of Ethnic's data. *Id.* at 602-04.

*Finally*, while defendants must concede that the above evidence about Ethnic is before the Court, they may attempt to fabricate a "mystery" as to what Ethnic did specifically *in this case*, or to argue that plaintiffs should have called an additional expert to "offer[] opinions . . regarding what Ethnic did to process Mr. Beatty's data." *Id.* at 2137. But plaintiffs *did* call such an expert — Mr. Beatty. He explained, both in writing and in his detailed testimony to the Court, why he chose Ethnic, why he trusted that firm, what Ethnic did with the data he provided, and how his results based on that data are consistent with other studies. See Part II-B *infra*. Both Mr. Mas and Mr. Beatty also emphasized how Ethnic's race data has become *more* reliable in recent years, as the company continues to refine its process. *Id.* at 621-22, 661.

**B.** **Mr. Beatty's Findings Are Corroborated By, and Consistent With, Many Other Studies Using a Variety of Methodologies and Involving Many Years of Data.**

Mr. Beatty's analyses of the State's own current driver's license, state ID, and voter registration data are consistent with other studies of the racial gaps in possession of Wisconsin photo ID. Indeed, all the evidence before the Court regarding relative rates at which voters of color possess photo identification corroborates Mr. Beatty's results and confirms the disproportionate impact that Act 23 will have on voters of color. There is no contrary evidence.

**1.** **The 2012 Barreto survey.**

Professor Mark A. Barreto's spring 2012 survey of eligible voters in Milwaukee County further reinforces Mr. Beatty's conclusions about the racial disparities in possession of Act 23

27

ID.  Barreto found that 7.3 % of eligible white voters, 13.2 % of eligible African-American

voters, and 14.9 % of eligible Latino voters reported lacking any form of an "accepted, non-

expired, photo ID."  Barreto & Sanchez Rep., Frank Ex. 600 at 34 Table 1; *see* Figure 6 from

same reprinted below.  Moreover, Barreto's survey found that only 0.3% — three-tenths of one

percent — of respondents who had an acceptable Act 23 ID had something *other* than a

Wisconsin driver's license or state ID.  Tr. 299-300.  In other words, nearly everyone who

satisfied the requirements of Act 23 did so because they possessed either a driver's license or

state ID, and the effect of the other forms of ID, upon which defendants place such great

emphasis in their defense of Act 23, were negligible.  *Id.*  Barreto's survey results reinforce Mr.

Beatty's expert opinion that Act 23's impacts can accurately be determined without focusing on

the various miscellaneous forms of Act 23 ID.  *See id.* at 681 (Beatty) (number of registered

voters without driver's licenses or state IDs "skewed so heavily to low income and elderly

groups, which are the lowest likelihood to have passports and military IDs, it seems unlikely that

they would make a huge difference").



Figure 6: Milwaukee Couty - Percent of eligible voters without any accepted photo ID, by Race/Ethnicity

### 2.    Analysis of 2012 Hood Data.

Defendants' expert, Professor Hood, criticized Mr. Beatty's matching analysis and

offered his own counter-analysis purporting to show that somewhere between 4.98% and 8.41%

of registered Wisconsin voters in the GAB voter file did not "match" to a record in the driver's license or state ID database (depending on which match criteria Hood used), Tr. 1427-29, as opposed to the 8.8% measured by Mr. Beatty.  LULAC Ex. 817, ¶9.  Professor Hood did not even attempt an analysis of the racial composition of his set of unmatched registered voters,  *see* Tr. 682, 1512-13, even though he admitted that "once a determination's been made of who may lack an Act 23 ID, we would want to try to divide that data up by race and ethnicity."  *Id.* at 1419 (emphasis added).  As Mr. Beatty demonstrated, however, when the voters identified by Professor Hood as "unmatched" in 2012 were analyzed, they revealed  an even *greater* racial disparity than Beatty's own data.  Tr. 683.  Beatty's analysis showed that, using Hood's matching numbers, 4.4% of registered white voters lacked a Wisconsin driver's license or photo ID, while 9.0% of registered African-American voters and 9.7% of registered Latino voters lacked such ID.  *See* LULAC Ex. 202, ¶¶14-17;Tr. 683-84.  Thus, under Prof. Hood's matching analysis, registered voters of color were more than twice as likely as white voters to be without a driver's license or photo ID, as Mr. Beatty summarized in the table below.  *See*  Tr. 684.

| Hood Match Scheme:  Share Without DL_ID Match by Race | | | |
|---|---|---|---|
| Race | Total | No DL_ID Match | Share Without Match |
| African American | 172,251 | 15,431 | 9.0% |
| Hispanic | 51,974 | 5,035 | 9.7% |
| White | 2,945,663 | 128,353 | 4.4% |
| Other/Unknown | 84,601 | 15,431 | 18.2% |

LULAC Ex. 202, ¶16.  In other words, "[a]lthough [Hood's] matching method produced a smaller number of voters without matching driver's license or ID, the disparity by race was significantly worse."  Tr. 684.

### 3. Other scholarly studies of voter ID impacts outside of Wisconsin.

As plaintiffs' expert Dr. Barry Burden discussed, a growing number of peer-reviewed published studies "have already demonstrated that [voter ID] laws have a disparate impact on minorities." Burden Decl. ¶ 57. These studies have used various methodologies — including telephone surveys, analyses of Census data, and matching of DMV and voter registration databases . *Id.* They include studies showing that voters of color are less likely than white voters to possess the required IDs to vote, as well as studies showing that voter ID requirements "lowered voter turnout disproportionately among Blacks and Latinos." *Id.*; *see also* Tr. 1329-42 (Dr. Burden summarizing published research); LULAC Ex. 2, ¶¶46-60.[22]

### 4. The 2005 U.W.-Milwaukee study.

A widely cited 2005 study by the University of Wisconsin-Milwaukee showed that, while only 17% of voting-age whites statewide lacked a current driver's license in 2002 (including revoked and suspended licenses), fully 55% of voting-age African-American men, 49% of voting-age African-American women, 46% of voting-age Latino men, and a striking 59% of voting-age Latina women lacked a driver's license. *See* pie charts on following page.[23] Voting-age African-Americans and Latinos in Wisconsin were thus more than *three times* as likely as voting-age whites to lack a driver's license. The conclusions drawn by Mr. Beatty are consistent

---

[22] As Dr. Burden pointed out, even Prof. Hood's own studies of the Georgia voter ID law "demonstrate that Blacks and Latinos were less likely than Whites to have driver's licenses, even after controlling for income, age, and residential differences." Burden Decl. ¶ 57 & n.63 (discussing M.V. Hood III and Charles S. Bullock, *Worth a Thousand Words? An Analysis of Georgia's Voter Identification Statute*, 36 AMERICAN POLITICS RESEARCH 555 (2008)); *see also* Tr. 669 (Beatty: noting that Hood's Georgia analysis found that Latinos were "[t]wice as likely" as whites to lack required ID, whereas Beatty's Wisconsin analysis found that Latinos were 2-1/2 times as likely as whites to lack acceptable ID).

[23] John Pawasarat, THE DRIVER LICENSE STATUS OF THE VOTING AGE POPULATION IN WISCONSIN (U.W.–Milwaukee Employment and Training Institute, June 2005) (LULAC Ex. 58). The pie charts appear on page 4 of this report.

with the 2005 U.W.-Milwaukee study, though Beatty's are based on more current data (2012-13

vs. 2002) and focus more narrowly on *registered* voters, as opposed to the voting-age population.



LULAC Ex. 58 at 4.

### 5. 2012 American Automobile Association Data.

As Dr. Burden also discussed, a new study by the American Automobile Association

Foundation for Traffic Safety reveals that, whereas 67% of white 18-year olds have driver's

licenses, only 37% of African-American 18-year olds and 29% of Latino 18-year-olds are

licensed — "a disparity that holds even after controlling for racial and ethnic income

differentials."[24]

---

[24] Burden Decl. ¶ 59 & n.67; *see also* Tr. 1331-32; American Automobile Ass'n Foundation for Traffic Safety, *Timing of Driver's License Acquisition and Reasons for Delay among Young People in the United States, 2012*, at 11 Table 3 (July 2013).

**C.    The DMV's Own "Free ID" Data Strongly Reinforce the Racially Disproportionate Impacts of Act 23.**

Another way of measuring Act 23's impacts is to evaluate the Wisconsin residents who seek the "free ID" required by that law to vote.  Although the DMV does not keep track of the number of people who *unsuccessfully* seek the "free ID," it does track the racial breakdown of those who succeed in obtaining such IDs.  These DMV data strongly corroborate Mr. Beatty's conclusions, and demonstrate that Beatty's analysis if anything *understates* the racially disproportionate impacts.

The DMV data show that nearly *half* of all of the "free" state IDs issued since Act 23 took effect on July 1, 2011, have been obtained by African-Americans and Latinos.  Specifically, although African-Americans constitute only 5.4% of Wisconsin's voting age population, they have obtained 37.3% of the photo IDs issued since Act 23 took effect.  Similarly, although Latino voters constitute only 2.7% of our State's voting age population, they have obtained 8.0 % of the photo IDs issued pursuant to Act 23.  LULAC Ex. 814 at 16, Table 7.  The racial disparities among "free" ID recipients in Milwaukee County are even more staggering — African-Americans and Latinos constitute 31.1% of the voting age population in that county but have obtained 75.7% of the free IDs since Act 23 took effect.  *Id.* at 19, Table 9.

Defendants' own data thus prove plaintiffs' claims: if nearly *half* of all people who have obtained the "free" ID since Act 23 took effect are African-American or Latino (over *three-quarters* in Milwaukee County), it is reasonable to conclude that a large, "statistically significant" percentage of the total voting age population who lack acceptable ID are African-

Americans or Latinos — certainly much larger than their combined 8.1% of Wisconsin's voting age population. That is the only plausible conclusion to be drawn from these data.[25]

Table 7. Racial/Ethnic Breakdown for Free State ID Cards Issued by Wisconsin DMV

| Race/Ethnicity | Frequency | Percentage |
|---|---|---|
| White | 87,229 | 50.5% |
| Black | 64,447 | 37.3% |
| Hispanic | 13,853 | 8.0% |
| Asian | 2,701 | 1.6% |
| Indian | 4,375 | 2.5% |
| Total | 172,607 | 100% |

Source: Figures calculated by author from data provided by the Wisconsin DMV.

Table 9. Racial/Ethnic Breakdown for Free State ID Cards Issued by Wisconsin DMV in Milwaukee County through September 2013

| Race/Ethnicity | Frequency | Percentage |
|---|---|---|
| White | 16,314 | 22.0% |
| Black | 47,651 | 64.4% |
| Hispanic | 8,365 | 11.3% |
| Asian | 932 | 1.3% |
| Indian | 767 | 1.0% |
| Total | 74,030 | 100% |

Source: Figures calculated by author from data provided by the Wisconsin DMV.

## III.    Act 23 Imposes Substantial Burdens That Disproportionately Deny and Abridge the Voting Rights of African-Americans and Latinos.

Defendants argue that a "bare statistical showing" of racially disproportionate impacts is insufficient to establish a Section 2 violation. Tr. 2134. But plaintiffs have never relied on "bare" statistics alone. Rather, the evidence demonstrates that Act 23 imposes *substantial* burdens on many voters who lack acceptable ID, that those burdens are imposed in a racially

---

[25] Defendants otherwise must argue that, although nearly half of all "free" photo IDs have been issued to African-Americans and Latinos, it is still somehow possible that Act 23 falls evenly across racial lines, but that African-Americans and Latinos are much *more* successful than whites in navigating the "bureaucratic gauntlet" and obtaining the required IDs. There is no plausible evidence of such a *reverse* racial impact.

disproportionate manner, that those burdens interact with social and historical conditions so as to accentuate and amplify the racially disproportionate impacts even further, and that those burdens will lead to the actual and ongoing disfranchisement of voters of color.

A.    **Section 2 Prohibits the Racially Disproportionate Imposition of Measures That Make It More Difficult To Vote, Not Just Those That Make It "Impossible" To Vote.**

One of the defendants' recurrent arguments is that Act 23 rarely prevents voters *absolutely* from obtaining a state ID; if they devote enough time, spend enough money, make enough phone calls, and stand in DMV lines long enough, they probably can track down the documentation necessary to convince a DMV employee to give them the required ID. Defense counsel argued:

> Even if the Court accepts all of the plaintiffs' expert testimony and declarations in this case regarding statistics and data and estimates, plaintiffs have not shown that those Wisconsin voters who currently lack a form of Act 23 ID *can never, ever obtain a form of Act 23 ID*. … It is not enough to show that minorities are less likely to have a form of Act 23 ID when those voters are *fully capable of getting a form of Act 23 ID*.

Tr. 2134, 2142 (emphasis added); *see also id.* at 27-28, 33, 2134 ("This entire case turns on a question of whether those that currently lack a form of Act 23 ID also cannot get a form of Act 23."); *id.* at 2138 (issue is whether "minorities cannot obtain a qualifying ID").

Defendants are wrong on both the facts and the law. There was extensive testimony from voters, community leaders, clergy, groups that work with voters, and state officials that Act 23's voter ID requirements have *in fact* resulted in the outright denial of many citizens' right to vote. A disproportionate number of these disfranchised voters are African-American and Latino. The evidence demonstrates that the economic, documentary, bureaucratic, and logistical burdens imposed by Act 23 make it realistically *impossible* for many citizens to obtain

the voter ID needed to cast a ballot, and thereby result in the outright denial of their right to vote.  *See* Part III-C, *infra at 45-68*.

Moreover, Section 2 does not guard only against those burdens that make it literally *impossible* to cast a vote — it prohibits burdens that "deny *or abridge*" (defined as "reduce," "diminish," or "shorten"[26]) the right to vote.  42 U.S.C. §1973(a) (emphasis added).  Section 2 requires that the voting process be "*equally open*" to participation by voters of color, and prohibits rules and procedures that result in voters of color having "*less opportunity* than other members of the electorate to participate in the political process."  *Id.* §1973(b) (emphasis added).  Section 2 prohibits the disproportionate imposition of "*procedural hurdles*" and "*significant inconvenience[s]*" on voters of color, regardless of whether some, many, or even most of those voters might be able to surmount those hurdles and inconveniences if they try hard enough.  1965 H. REP. 10 (emphasis added); 1981 H. REP. 17 (emphasis added); *see also Harman v. Forssenius*, 380 U.S. 528, 541-42 (1965) (Twenty-Fourth Amendment's identical "deny or abridge" prohibition forbids imposing a "material requirement," "erect[ing] a real obstacle to voting," or adopting "a cumbersome procedure" for those failing to pay a poll tax); *Lane v. Wilson*, 307 U.S. 268, 275 (1939) (Fifteenth Amendment's "deny or abridge" prohibition outlaws "onerous procedural requirements" that, while racially neutral on their face, "effectively handicap exercise of the franchise by [African-Americans] although the abstract right to vote may remain unrestricted as to race").

The legislative history reinforces the conclusion that Section 2 outlaws both actual denials of the right to vote as well as measures that make it materially more difficult to vote, even if some, many, or even most voters are able to overcome those burdens.  For example,

---

[26]  BLACK'S LAW DICTIONARY 6 (8th ed. 2004); MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 4 (10th ed. 2000).

Congress sought through the 1982 amendments to put an end once and for all to the racially disproportionate imposition of "inconvenient location[s] and hours of registration" and voting. 1981 H. REP. 14. Various jurisdictions had continued after the 1965 Act to change times and locations to make it more difficult for voters of color to appear for registration and voting. Officials in one city moved the polling place from the "centrally located" City Hall 10-12 blocks to the north "in a predominantly white area," which imposed "a significant inconvenience to the city's minority voters" who were concentrated elsewhere, with the "effect of deterring participation by some minority voters in elections." *Id.* at 17 (emphasis added). Voters of color in another community described the experience of having to travel to distant white neighborhoods to vote as "like having the polls at a country club." *Id.* The 1982 amendments to Section 2 were intended to outlaw such practices regardless of whether voters were capable of overcoming the additional obstacles; what matters is "equal *access*" and "equal *opportunity to participate*." 1982 S. REP. 30 (emphasis added).[27]

Based on the legislative history, Justice Thomas has strongly endorsed the use of Section 2 "to protect access to the ballot" against a variety of potential voter *suppression* measures, including "all manner of registration requirements, the practices surrounding registration (including the selection of times and places where registration takes place and the selection of registrars), the locations of polling places, the times polls are open, the use of paper ballots as opposed to voting machines, and other similar aspects of the voting process that might be manipulated to deny any citizen the right to cast a ballot and have it properly counted." *Holder v. Hall*, 512 U.S. 874, 922 (1994) (Thomas, J., concurring in the judgment); *see also id.* at 917 ("Congress was concerned in this section with any procedure, however it might be denominated,

---

[27] *See also* 1981 HOUSE HEARINGS 60-61, 536, 1530-31, 1609-10, 1841, 1949, 1952-54, 2014.

that regulates citizens' access to the ballot — that is, any procedure that might erect a barrier to prevent the potential voter from casting his vote"); *Chisom v. Roemer*, 501 U.S. 380, 408 (1991) (Scalia, J., dissenting) ("If . . . a county permitted voter registration for only three hours one day a week, and that made it *more difficult* for blacks to register than whites, blacks would have *less opportunity 'to participate* in the political process' than whites, and § 2 would therefore be violated[.]") (emphasis added).

 None of these examples imposed an absolute barrier to voting — they simply made it "*more difficult*." *Chisom*, 501 U.S. at 408 (Scalia, J., dissenting) (emphasis added). Moving polling places to inconvenient neighborhoods and setting polling hours at inconvenient times obviously are not absolute voting prohibitions — if someone really wants to vote, he or she *could* in theory just travel further or take time off from work. Yet measures like these are illegal under Section 2 because they make it "more difficult" to vote. *Id.* The "barriers" and "hurdles" imposed by Act 23 are far more onerous than simply making people take time off from work or travel across town.

In addition, federal courts that reviewed state voter ID laws under Section 5's preclearance procedures prior to *Shelby County v. Holder*, 133 S.Ct. 2612 (2013), distinguished between those ID laws that "impose[d] only minor inconvenience'" and made voting "marginally more difficult," on the one hand, and those that imposed "material burden[s]" and "major inconvenience," on the other. *South Carolina v. United States*, 898 F. Supp. 2d 30, 40-42 (D.D.C. 2012); *Florida v. United States*, 885 F. Supp. 2d 299, 346 (D.D.C. 2012). Although Section 5 is not presently operative in the wake of *Shelby County*, the analysis of the "spectrum of stringency" in these cases is highly instructive here, *South Carolina*, 898 F. Supp. 2d at 46, and follows logically from the "calculus of voting" analysis discussed in Part III-B *infra*.

Finally, several courts have concluded in recent years that Section 2 forbids the disproportionate use of faulty voting technology in voting districts with large populations of voters of color, which subjects these voters to a greater statistical *risk* that their ballots will not be properly counted and thereby "diminishe[s]" their equal opportunity to participate in the political process. *Black v. McGuffage*, 209 F. Supp. 2d 889, 897 (N.D. Ill. 2002). Section 2 is violated by such statistical disparities even where the faulty technology properly counts the vast majority of votes cast by people of color (*i.e.*, 95% or more).[28] These cases demonstrate that, even where most voters of color will probably be able to cast ballots that are counted, Section 2 is nevertheless violated if there is a "statistically significant" greater "*risk*" that voters of color will be prevented from doing so, which "*could* … significantly diminish[]" their participation in the political process. *Id.* (emphasis added). As shown below, the lessons of history, political science, and modern demographic research demonstrate that the substantial additional burdens imposed by Act 23 will result in an entirely predictable diminution in voting by those voters of color who disproportionately must navigate its requirements to obtain the required state ID.

### B. The Calculus of Voting and the Spectrum of Costs Imposed Under Act 23.

As U.W.-Madison Political Science Professor Barry C. Burden described in his expert report and at trial, the so-called "calculus of voting" is "the dominant framework used by

___

[28] *See Black v. McGuffage,* 209 F. Supp. 2d at 893 (Section 2 claim stated where optical scan ballots had "average residual vote rate" of less than 1%, whereas "punch card ballots" — used disproportionately in minority areas — had rate of over 4%); *see also Stewart v. Blackwell*, 444 F.3d 843, 877-79 (6th Cir. 2006) (Section 2 violated by disparate use of faulty punch card technology in minority voting areas, resulting in minority voters being "disproportionately denied the right to have their ballots counted properly"); *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (per curiam) (allegations that "minority voters disproportionately reside in punch-card counties" and thereby face greater risk than white voters that their votes will not be counted state claim for relief under Section 2); *Common Cause Southern Christian Leadership Conference of Greater Los Angeles v. Jones*, 213 F. Supp. 2d 1106, 1110 (C.D. Cal. 2001) (Section 2 violated where "racial minorities are disproportionately denied the right to vote because their votes are uncounted in disproportionate numbers as a result of the voting mechanism that they are [being] supplied").

scholars to study voter turnout." Burden Decl. ¶ 6 (LULAC Ex. 811); *see* Tr. 1278-83. This

calculus is frequently expressed using the equation *PB - C*, in which "*P* represents the

probability of one's vote determining the outcome, *B* represents the net psychological benefit of

seeing one's preferred candidate win, and *C* represents the 'costs' of voting," which include

"the administrative and other barriers to registering and casting a ballot." Burden Decl.

(LULAC Ex. 811) ¶ 6. As Dr. Burden explained:

> This framework suggests that for many individuals the decision to vote is made
> "on the margins." Small changes in benefits or costs may alter the likelihood of
> voting dramatically. Costs are especially consequential for less educated
> individuals and non-habitual voters for whom the complications of registering,
> finding the polling place, finding time to vote are frequently quite costly. The
> decision to vote is sensitive enough to costs that even Election Day weather has
> been shown to depress turnout.

*Id.*; *see also* Tr. 1279-80; *Crawford*, 472 F.3d at 951 ("The benefits of voting to the individual

voter are elusive . . . , and even very slight costs in time or bother or out-of-pocket expense deter

many people from voting, or at least from voting in elections they're not much interested in.").

     In applying the calculus of voting to this case, it is important to recognize that the "costs"

imposed by Act 23 do not fall evenly across the electorate, but rather along a spectrum of

impacts ranging from the "nonexistent" to the merely "inconvenient" to the "very difficult" to

the "insurmountable." Although some of the voters who are burdened by Act 23 will have the

resources and determination to overcome those burdens, a predictable portion will not — they

either will fail, give up along the way, or not even bother to try.[29] As repeatedly shown at trial,

Act 23 makes it *impossible* as a practical matter for many people to vote. *See* Part III-C *infra*.

---

[29] This is not simply a matter of prediction. The Court heard testimony from several
witnesses that Act 23 actually kept people from voting in the Feb. 2012 primary, the only
election in which it has been enforced. *See* p. 45 & n.33 *infra*.

And it imposes significant burdens on many other voters that deter, discourage, and ultimately depress their turnout.  *See id.*

At the lowest end of the spectrum of costs imposed by Act 23 are the millions of eligible voters — disproportionately white — who already possessed a Wisconsin driver's license or state ID on July 1, 2011, when Act 23 took effect.  Many of these voters were able to obtain their original licenses and IDs without *ever* having to present a certified birth certificate or similar evidence of their "legal presence."[30]  Assuming that their names and birthdates on these "products" match those in their voter registration files, these voters will never need to incur *any* costs under Act 23, including having to locate and present a certified birth certificate.  They can renew their current driver's licenses and state IDs through a "streamline[d] process" in which they merely need to complete an application, pay a $34 renewal fee, and present their current license or ID.  Tr. 1126 (Boardman); *see id.* at 1094.

In the words of the DMV website, these voters "can renew *just as you have done in the past*."[31]  In the bureaucratic terms of the Wisconsin Administrative Code, an applicant for renewal need only present "[s]atisfactory proof of *identity*" — defined to include current

---

[30]  Prior to 1990, for example, new applicants for driver's licenses or state IDs were able to prove their name and date and place of birth through a much longer list of "primary documents," and those without any such documentation could simply "certify" this information and present two "supporting documents" from a long and diverse list (including various public and private IDs, bills, bankbooks, credit cards, family records, school transcripts, and the like).  *See* Wis. Admin. Code § Trans 102.15(2) (Reg., Jan. 1984, No. 337).  Proof requirements have gradually increased over time, but even as of 2002 a first-time applicant for a Wisconsin driver's license or state ID could avoid having to find a certified copy of his birth certificate by presenting, among many other forms of proof, any "operator's license or identification card of another jurisdiction that is valid or expired 4 years or less."  Wis. Admin. Code § Trans 102.15(3)(a) (Reg., Nov. 2002, No. 563).

[31]  http://www.dot.wisconsin.gov/drivers/drivers/renew/license-renewal.htm (emphasis added).  The same "streamlined" renewal procedures are available for those who held state IDs as of July 1, 2011, regardless whether those ID holders had ever submitted their birth certificates and other papers.  *See* http://www.dot.wisconsin.gov/drivers/drivers/apply/idcard.htm.

Wisconsin driver's licenses and IDs — whereas "original" applicants must also present "[s]atisfactory proof of [that] person's name and date of birth" as well as "citizenship" — defined so as to require most applicants to present a birth certificate or passport. Wis. Admin. Code § Trans 102.15(2)-(4) (emphasis added).

Thus, millions of Wisconsin voters will never need to locate or produce their birth certificates in order to vote in Wisconsin, simply because they already had a Wisconsin license or ID when Act 23 was enacted and were grandfathered from the new requirements that took effect on July 1, 2011. This amounts to a lifetime exemption from Act 23's requirements for millions of voters, a disproportionate number of whom are white. *See* pp. 19-33 *supra.*[32]

Those voters who did not have a Wisconsin driver's license or state ID as of July 1, 2011 must navigate the new voter ID regime imposed by Act 23. Defense counsel claimed that the Act 23 process is "simple and straightforward," and was implemented "seamlessly" by the DOT and GAB. Tr. 29-30. The evidence is overwhelmingly to the contrary. GAB election officials admitted that the process imposed by Act 23 is "incredibly complex," "complicated," and "confusing," and requires "significant lead time" for voters to pull together their relevant documentation. *Id.* at 1153 (Lowe); *id.* at 1641, 1643-44, 1661 (Hein). Diane Lowe, GAB's "lead election specialist," described Act 23's photo ID and birth certificates requirements as

---

[32] Applicants seeking to renew their current driver's licenses and IDs are given the option to obtain "REAL ID-compliant cards," which are scheduled in the distant future to be required under *federal* law to fly commercially and enter certain federal facilities. http://www.dot.wisconsin.gov/drivers/drivers/realid/. If an applicant for renewal chooses to obtain a REAL-ID compliant card now, he must follow the procedures for a new applicant and present proof of name, birthdate, and "legal status." But this is solely a matter of federal law and individual choice; as far as the State is concerned, "[y]ou can renew just as you have done in the past," without these heightened proof burdens, and then use the renewed driver's license or ID card to vote. http://www.dot.wisconsin.gov/drivers/drivers/renew/license-renewal.htm.

creating a frequently "vicious circle," with birth certificates being required to obtain photo IDs but photo IDs being required in many States to obtain a birth certificate. *Id.* at 1162-63.

The complexity of Act 23's requirements and exceptions is perhaps best illustrated by the following draft diagram prepared by a GAB "election specialist" to illustrate "how the law actually operates." *Id.* at 1168. Defense counsel acknowledged that this "flowchart … is extremely confusing even by my standards." *Id.* at 1177. The GAB understandably never used this diagram because "[i]t's certainly a mess" and was deemed to be too "complicated" to use with the public. *Id.* at 1709.



The GAB's replacement diagram is set forth below. According to Ross Hein, the GAB's election administrator, "[w]e found that that was a much more easily understandable format." *Id.* at 1711. Yet like its predecessor, this chart almost comically demonstrates how cumbersome and unintelligible Act 23's processes are, especially for voters who have had only limited education or whose first language is not English. The chart resembles a challenging board game that is governed by a complex set of rules.



As shown in the chart, given the way the proof requirements for each of these criteria have been crafted, the only way most applicants will be able to establish their "Legal Presence" is through presentation of a certified birth certificate. And unless an applicant has a driver's license from another state, presenting a certified birth certificate usually will be the only way he can establish his "Name & Date of Birth" — even though there are a myriad of other ways by which people routinely are allowed to prove who they are and when they were born.

Among those who must navigate this process, the lucky ones will already have a birth certificate and the other underlying documentation needed to apply for a state ID. They will

need to arrange to go to one of the DMV offices located around the State, in person, during often-limited weekday business hours, complete the necessary application, and obtain their ID (assuming there are no questions or problems regarding their documentation, such as inconsistencies in names).

The burdens escalate from there. Next on the spectrum are those who were born in Wisconsin but lack a certified copy of their birth certificate. They will need to file a Wisconsin Birth Certificate Application (DHS Form F-05291) with the State Vital Records Office, submit various identification, and pay a $20 search fee. *See* Frank Ex. 28. If they are able to obtain their Wisconsin birth certificates — and if their certificates contain no errors or omissions — these voters then must go through the DMV application process discussed above.

After these people come the many voters who were born out of state, and who must deal with distant and often dysfunctional bureaucracies to retrieve their birth certificates and/or the underlying forms of identification needed to obtain birth records. All States charge for certified birth certificates, and there have been numerous well-documented and recurrent problems in seeking out-of-state birth certificates in order to obtain Act 23 ID needed to vote — ranging from the many African-American senior citizens who were born in the South and migrated to Wisconsin, to those Latinos born in Puerto Rico whose birth certificates were invalidated *en masse* in 2010, to those who must deal with unfriendly, unresponsive, and error-prone distant bureaucracies throughout the country. In some instances it is literally impossible to obtain a birth certificate, and the voter is then barred from voting unless she knows to pursue the secretive MV 3002 "extraordinary proof" petition procedure, is able to navigate its stringent requirements, and is fortunate enough to find a sympathetic DMV supervisor (or a friend in high office willing to ask the DOT for help). *See* pp. 63-65 *infra.*

This spectrum of costs and burdens encountered by Wisconsin voters bears directly on the calculus of voting described by Dr. Burden: the greater the costs encountered by a particular voter, the lower the probability of his voting. *See* Burden Decl. ¶¶ 6-7. And this is not just a matter of academic theory or statistical prediction — the Court repeatedly heard evidence at trial that Act 23 had *actually* suppressed the vote in the February 2012 primary election and *will* deny citizens their right to vote if allowed to go back into effect.[33] The following subsection analyzes the major recurring barriers that voters encounter in attempting to obtain Act 23 ID.

## C. Act 23 Imposes Substantial Barriers That Deny and Abridge the Right To Vote.

### 1. Act 23 Requires Voters To Spend Money To Exercise Their Right To Vote.

A State may not "require[] voters to pay a tax or a fee to obtain a new photo identification" in order to exercise their right to vote. *Crawford*, 553 U.S. at 198 (citing *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 666 (1966) (State may not "make[] the affluence of the voter or payment of any fee an electoral standard")). Thus it is constitutionally imperative

---

[33] *See, e.g.,* Tr. 153-54 (Yolanda Adams: five Urban League trainees failed to vote in the Feb. 2012 primary because of "the transportation issues and the cost" of procuring the underlying documentation needed for a state ID); *id.* at 172-73 (Carmen Cabrera: voter ID law caused "low turnout" and "confusion" in Feb. 2012 primary); *id.* at 376-77 (Pastor Michelle Townsend de Lopez: recounting "frustrations … of individuals who were not able to vote either because they didn't have … the proper documentation, and normally because they either did not know or it was going to take too long in order to get it in order to come back and be able to vote. … So they missed their voting opportunity."); *id.* at 416-17 (Anita Johnson: encountered "many people" who lacked Act 23 ID and did not attempt to vote "because they didn't want the hassle"); *id.* at 433, 436 (Kenneth Lumpkin's Racine newspaper "monitored the number of people that was being turned around" at the polls in Feb. 2012, "and it was substantial"; "we already see a pattern of people that would normally go out and vote that we have interviewed that they just feel it's too difficult now"); *id.* at 2063 (Maribeth Witzel-Behl, City of Madison clerk: 42 voters were unable to cast a regular ballot in the Feb. 2012 election because they lacked Act 23 ID; 28 left the polling place without voting provisionally, and only 5 of the 16 provisional ballots were ultimately counted); Robinson Dep. at 75, 77 (then-Administrator of GAB's Elections Division was "aware of voters who actually were turned away at the polls" in the Feb. 2012 primary because of "name mismatches" between their voter ID and registration list).

that a State requiring voter ID really issue it for "free." *Crawford*, 553 U.S. at 198. The Indiana

voter ID statute that was upheld on a facial challenge in *Crawford* included several mechanisms

by which a voter could avoid having to pay any money for underlying documentation necessary

to obtain the required ID. *See id.* at 185-86 & n.2, 199-201. Thus, an Indiana voter need not pay

money to obtain vital records in order to vote.[34]

In contrast, Act 23 requires Wisconsin voters who did not possess qualifying ID as of

July 1, 2011 to obtain a birth certificate in order to prove their name, date of birth, and "legal

presence." Though the ID is touted as "free" for people who need it to vote, voters have no

ability under Act 23 to avoid having to pay money to obtain the birth certificates and other vital

records necessary to seek that "free" ID. The evidence adduced at trial conclusively established

that, whatever its scope and operation, the secretive MV 3002 special petition procedure does

*not* allow voters to avoid having to pay for a birth certificate. Kristina Boardman, the DMV's

Deputy Administrator (and former Director of the DMV's Bureau of Field Services),

acknowledged that "the law does not allow any sort of exception for indigency" or excuse a

voter from having to pay for vital records necessary to obtain the "free" ID, even where the

voter literally "has to make a choice between paying for his child's dinner and getting a birth

certificate" needed to vote. Tr. 1119-20.[35]

---

[34] The same is true in Arizona, where a voter can avoid having to pay for a birth certificate by presenting any two of many diverse kinds of non-photo ID. *See Gonzalez*, 677 F.3d at 404 & n.31. The Arizona law is thus materially different from Act 23 and does *not* require the payment of money to obtain a birth certificate in order to vote. *See id.* at 407-08.

[35] Moreover, in order even to be eligible to *petition* for an exemption under Wis. Admin. Code § 102.15(3)(b), the applicant must first seek to obtain his birth records from his birth state, and then have that State attest that it cannot provide a certified birth certificate. *See* Frank Ex. 38. Thus, the applicant must pay search fees, mailing expenses, and other costs before he can even petition for an exemption — assuming he is even told about this procedure. *See* pp. 63-65 *infra.*

Thus, unlike the Indiana statute at issue in *Crawford*, Act 23 conditions the right to vote on payment of a fee for documentation that the voter, by definition, does not otherwise need. That is a significant and illegal burden on the right to vote under the Voting Rights Act. *See Texas v. Holder*, 888 F. Supp. 2d 113, 144 (D.D.C. 2012) (Voting Rights Act requires "that any underlying documents to obtain [voter] ID are truly free of charge"), *vacated on other grounds*, 133 S. Ct. 2886 (2013); *see also* 1965 H. REP. 20 ("voting rights are not to be encumbered by *any* fiscal exaction") (emphasis added); 1965 S. REP. 33-34 ("the franchise must not be impaired because of economic status"). There is extensive evidence that the imposition of this expense actually suppressed the vote when Act 23 was in effect and would have the same result if allowed to go back into effect.[36]

### 2. African-Americans and Latinos Face Disproportionate Burdens In Seeking Their Birth Certificates.

"Birth certificates are more costly (both in time and dollars) to acquire if a person was born outside the county [in which he votes] and especially if born in another state or in a foreign country," because it is more difficult "to retrieve a birth certificate from a more distant bureaucracy." Burden Decl. ¶ 60. These additional costs of dealing with "more distant bureaucrac[ies]" fall far more heavily on voters of color than on white voters. "[W]hereas 75% of White Wisconsinites were born in the state, only 59% of Blacks and just 43% of Latino residents were born in Wisconsin." *Id.* The burdens fall with especially unforgiving force on senior voters of color; African-Americans did not begin moving in large numbers to Wisconsin until the 1950s and thereafter, and substantial Latino migration into the State did not begin until

---

[36] *See, e.g.,* Tr. 406 (Johnson) (describing voters she encountered who "had to make their choice, do I go and get this ID to vote or do I feed my children"); *id.* at 431 (Lumpkin: "And when the choice is made whether or not to pay $33 for an ID or to put some food on the table, I think any of us can kinda guess which way people will go").

even later.  There are simply not that many African-American or Latino senior citizens in Wisconsin who were born here.[37]

Many older voters of color face yet another hurdle under Act 23:  They never had an officially issued birth certificate in the first place.  As late as 1950, nearly a quarter of nonwhite births in rural areas went officially unregistered (as opposed to 11.1% of rural white births).[38] The original lead plaintiff in this litigation, the late Bettye Jones, was one such African-American child.  She was born at home in 1935 in Jackson, Tennessee.  *See* LULAC Ex. 393 at 19.  No state or local agency ever recorded her birth or issued an appropriate certificate.  She moved to Cleveland, Ohio when she was twelve and became a lifelong dedicated voter and civil rights activist there.  She first voted in 1956 and continued voting throughout her adult life. When she unexpectedly died on October 31, 2012, she was only days away from her eagerly

---

[37]  Although Milwaukee had a small African-American population prior to 1950, "it did not receive large influxes of African-American population from either of the migrations during or immediately after the wars [*i.e.*, World Wars I and II]."  Greg J. Carman, WALL OF EXCLUSION: THE PERSISTENCE OF RESIDENTIAL RACIAL SEGREGATION IN METROPOLITAN MILWAUKEE 2 (2011) (Dkt. 37, Ex. 39).  The "explosive growth" and "massive increase" of the African-American population did not occur until the last half of the 20th century, "largely attributable to the migration of southern African Americans to Milwaukee." *Id.* at 45-46 (Dkt. 60, Ex. 80).  This migration of southern African-Americans to Milwaukee is documented and analyzed in Carmen, ch. 2 ("The Migration of Southern African Americans to Milwaukee and Their Settlement in the Inner Core"); and Paul Geib, *From Mississippi to Milwaukee: A Case Study of the Southern Black Migration to Milwaukee, 1940-70*, 83 J. NEGRO HISTORY 229 (1998) (Dkt. 60, Ex. 81).  The Latino population did not begin arriving in Wisconsin until even later.  *See* Burden Decl. ¶ 20.  Thus, most older voters of color in Wisconsin necessarily were born outside of the State.

[38]  *See* S. Shapiro, *Development of Birth Registration and Birth Statistics in the United States*, 4:1 POPULATION STUDIES: A JOURNAL OF DEMOGRAPHY 86, 98-99 (1950) (Dkt. 37, Ex. 13).  Nationwide, 94% of white births were registered as opposed to only 81.5% of "nonwhite" births.  *Id.*  Another study asserts that Southern States did not begin to undertake systematic efforts to register African-American births until *after* the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), and then only as "a means of tabulating illegitimacy rates" in African-American births for use in opposing desegregation efforts.  Anders Walker, *Legislating Virtue: How Segregationists Disguised Racial Discrimination as Moral Reform Following Brown v. Board of Education*, 47 DUKE L. J. 399, 416 (1997) (Dkt. 37, Ex. 14).

48

awaited opportunity to vote for the reelection of our Nation's first African-American President. Tr. 72-79.  As her daughter Debra Crawford testified, Bettye and her husband, Wilton Jones, Sr., "emphatically" taught their children that voting "was more than a right."  *Id.* at 59.  It was a "responsibility" as well.  *Id.*  "And that people had fought and died and lost blood for us to have the right to exercise that right to vote here in the United States of America, and that we had a responsibility to exercise our civil responsibility as citizens to vote."  *Id.*[39]

After her husband died in 2011, Mrs. Jones moved to Brookfield, Wisconsin to live with her daughter Debra.  One of Mrs. Jones's first priorities was to get qualified to vote in the various upcoming 2012 Wisconsin elections.  She quickly learned that she needed a qualifying photo ID in order to vote under Act 23 and that her Ohio driver's license would not work. When she went to the Waukesha County DMV to apply for her voter ID in December 2011 she was turned away because she did not have a certified birth certificate — even though she had an official confirmation from the Tennessee Department of Heath, Office of Vital Records that "a thorough search ha[d] been made for a certificate" of birth for her, but that "[n]o record was found"; and even though she had a current Ohio driver's license bearing her photo along with many other forms of ID and confirmations of her identity.  LULAC Ex. 393 at 1; *see* Tr. 60-63.

Debra Crawford testified in detail about the four-month effort she and her mother made in searching for proof that would satisfy the Wisconsin DMV as to her mother's name, date of birth, and "legal presence."  This "frustrating," "arduous," and "expensive" process included multiple trips to DMV offices; paying $51.50 to a private firm called "VitalChek" to conduct

---

[39] Ms. Crawford added, "I can't tell you how important [voting] was for my mother.  It started way back when she was able to be involved in the Civil Rights Act.  This was something they were involved in as we integrated neighborhoods, we integrated school systems, we integrated church systems.  My parents were always on the front line, and they were always exercising their right to vote along the way.  It was a sense of civic responsibility and pride and dignity and something that she was very committed to."  Tr. 77-78.

another unsuccessful search for a Tennessee birth certificate for Mrs. Jones; numerous emails, faxes, and telephone calls to various government offices in Tennessee and Ohio in search of school records, voting records, and other evidence for use in applying for a Delayed Certificate of Birth from Tennessee; and "multiple trips to notaries . . . during the search process." *Id.* at 62, 69, 78; *see also id.* at 67 ("Oh, I cannot even express the amount of time, energy, and frustration it required.").

Ms. Crawford carefully kept track of the emails, receipts, fax cover sheets, instructions, application forms, notes, and other materials generated during this process, many of which were presented in chronological order in LULAC Ex. 393. She accumulated literally "a canvas bag" full of "folders and all kinds of support documentation" in seeking to preserve her mother's right to vote. Tr. 73. She estimated that she and her mother spent in excess of $100 and 40-50 hours of time between December 2011 and April 2012 trying to meet Act 23's requirements. *Id.* at 76-77. Debra testified that her mother "[a]bsolutely" could not have undertaken these searches by herself. *Id.* at 77.

Mrs. Jones was "very concerned" that, "for the first time in her adult life she would not be able to vote" — the first time since the Eisenhower-Stevenson election in 1956. *Id.* at 63-64. According to Ms. Crawford:

> [M]y mother was on a daily basis really trying to understand whether or not she was going to be able to vote in this upcoming election. It was a source of extreme concern for her which she verbalized on an ongoing basis: Does this mean I'm not going to be able to vote in the upcoming election?
>
> *       *       *
>
> She was getting increasingly frustrated. . . . [S]he made many comments that this was affecting her humanity. She talked about the fact that this was about civil rights under the law. And she also talked about how she couldn't believe that in 2012 we were still fighting the same issues she and Dad were fighting back in 1965 where we were kids in the living room watching them gather with neighbors around this whole issue of voter rights.

*Id.* at 70, 78.

After Mrs. Jones still had not received a Delayed Certificate of Birth from Tennessee despite several months of effort, Ms. Crawford contacted the Wisconsin DOT in mid-April again pleading for an exemption for her mother. LULAC Ex. 393 at 46. A DOT official responded that "[t]he supervisor at the DMV station you go to has the authority to make exceptions *however I doubt one would be made for not having either the birth certificate or passport*." *Id.* (emphasis added). Despite this discouraging response, Ms. Crawford decided to plead her mother's case directly to a supervisor, but chose to avoid her Waukesha County DMV and instead took her mother and the "canvas bag" full of documentation to a more friendly DMV office in Milwaukee County. *Id.* at 73, 75. In addition to all of the documents relating to her mother, Ms. Crawford had to give the supervisor her own birth certificate, driver's license, and proof of residency. *Id.* The supervisor decided, without any explanation, that Ms. Crawford "had given sufficient evidence of the proof of [her] mother's identity" and allowed Mrs. Jones to obtain a Wisconsin driver's license. To this day, Ms. Crawford has no idea why an exception was made.[40]

Lorene Hutchins and her daughter, Katherine Hutchins Clark, recounted similar problems. Mrs. Hutchins is a 93-year-old African-American woman who was born in rural Mississippi but moved her young family to Milwaukee over 60 years ago so that her children could go to "better schools" and have "better opportunities." *Id.* at 949. Mrs. Hutchins

---

[40] Before trial, defense counsel charged that Mrs. Jones "had qualifying ID all along" and "did not even live in Wisconsin at the time of her death and was, thus, not qualified to vote Wisconsin." Dkt. 77 at 2. The evidence at trial demonstrated that all these allegations are false. Mrs. Jones had no qualifying ID at the time this case was filed in February 2012; spent several months, over $100, and considerable time in trying to obtain the underlying documentation needed to obtain her Wisconsin ID; was living with her daughter Debra in Brookfield at the time of her unexpected death on Oct. 31, 2012; and was both qualified and registered to vote here at the time of her death. *See* Tr. 81-82; LULAC Ex. 396 (Mrs. Jones's Wisconsin death certificate).

"remembers the time when she couldn't vote in Mississippi," *id.* at 968, and emphasized her

belief that "if you don't vote, you don't count." *Id.* at 956. She also regularly volunteered to

work at the polls for at least 20 years. *Id.* at 955. "It was just something I wanted to do because

I wanted to be sure that when somebody said their voice — their vote did not count that I could

say yes, it did because I counted your vote." *Id.* at 956.

When Act 23 passed, Mrs. Hutchins learned that she might not be able to vote any

longer because she had stopped renewing her driver's license when she stopped driving and

therefore did not have a qualifying ID. She also did not have the certified birth certificate she

would need to get a state ID. Mrs. Hutchins was born at home in the Jim Crow South, and was

never issued a birth certificate. *Id.* at 948-49. She and her daughter Katherine described the

"very complicated" two-month odyssey they undertook in order to obtain a birth certificate so

that Mrs. Hutchins could get a qualifying voter ID. *Id.* at 953. That process included, among

other steps:

- Making multiple trips to the DMV and standing in long lines (Mrs. Hutchins uses a walker). *See id.* at 964-65, 970.

- Attempting to get a birth certificate from Mississippi. Mrs. Hutchins could not obtain her own birth certificate because she did not have an acceptable photo ID — a common Catch-22 encountered in seeking out-of-state birth certificates. *Id.* at 966; *see* p. 55 *infra*. There was, however, a provision allowing Mrs. Clark to apply to obtain her mother's certificate, but this required Mrs. Clark to pay $25 and produce a variety of corroborating evidence Tr. 966.

- Attempting to get a *corrected* birth certificate from Mississippi. The first Mississippi birth certificate they received was inadequate because it did not have Mrs. Hutchins' first name, only her last. So they were required to have "some more conversations" with Mississippi vital records personnel; to complete "some more forms" seeking a "corrected birth certificate;" to pay additional fees to have the correction made and then to receive a corrected certificate; and to prove again that Mrs. Hutchins was Mrs. Clark's mother. *Id.* at 967.

Mrs. Hutchins ultimately *was* able to obtain a corrected birth certificate from Mississippi,

which in turn enabled her to obtain a state ID from Wisconsin. But she emphasized that none of

this would have happened without the significant time and money her daughter devoted to the process. *Id.* at 952-53. She worries that many other senior voters of color in Wisconsin face the same challenges, "[b]ecause most of us that migrated to the Northern States do not have birth certificates," and many will simply give up and "will not vote because it's too much effort to try to get a voter ID." *Id.* at 956.

The testimony adduced at trial revealed that the stories of Mrs. Jones and Mrs. Hutchins are unfortunately not unusual. Consider these voters of color without birth certificates who testified at trial:

- Alice Weddle, age 59, and Rose Thompson, age 80, already have been discussed above in connection with Cross Lutheran Church. Each was born in Mississippi; each attempted to obtain her birth certificate from that State; and each was told that there is no record of her birth. Neither has any idea how she would go about seeking a voter ID without her birth certificate. *See* Tr. 37, 700, 704-05; *see also* pp. 11-12 *supra.*

- Shirley Brown, age 75, was never issued a Louisiana birth certificate but did obtain a letter from her Parish School Board confirming her name, birth date, and parents' names. The DMV rejected that official letter and told her that she could not obtain a voter ID without a birth certificate. *See* Tr. 209-12. Her son Kenneth testified that he helped his mother attempt to get a Louisiana birth certificate, but received a certificate with his aunt's name rather than his mother's and "wasn't able to get through to anybody" to correct the error. *Id.* at 213-17.

- Eddie Lee Holloway, Jr., age 55, has an Illinois birth certificate that mistakenly reads "Eddie Junior Holloway." After visits to two DMV offices, he was told that he would need to amend his Illinois birth certificate at an estimated cost of $400 to $600, which he cannot afford ("I don't have four to 600 cents"). *Id.* at 47. He attempted but failed to get the supporting documentation he would need to apply for an amended birth certificate. *See id.* at 41-55.

- Rickey Davis, age 55, an honorably discharged Army sergeant, lost his Tennessee birth certificate in a fire several decades ago. The DMV will not give him a state ID to vote unless he obtains a replacement birth certificate from Tennessee, and he does not know how to navigate the Tennessee bureaucracy to seek such a record. *See id.* at 87-94.

- Melvin Robertson, age 84, was one of the rare African-Americans of his generation who was born in Milwaukee. But when he attempted to obtain his birth certificate so that he could get a voter ID, he and his advocate, Anita Johnson of Wisconsin Citizen Action, were told that there was "no record of Mr. Robertson's birth." *Id.* at 401. He

was told he would need to obtain a "delayed birth certificate," which would cost $25 and require him to track down his elementary school records from nearly 80 years before. *Id.* at 401-02. Mr. Robertson does not have the resources to pursue this option, and would be barred from voting if Act 23 went back into effect. *Id.* at 402.

The record amply documents that these witnesses are only the tip of the iceberg. It was sad but unsurprising how many community service witnesses and public officials who testified could each identify at least a few voters of color who do not have the ID required under Act 23 and have no reasonable prospect of being able to obtain that ID.[41]

Latino voters often face equally formidable obstacles under Act 23. Attorney Luis Garza, who served as LULAC-Wisconsin's Director in 2011-12, testified about one disabled 88 year-old client of Mexican-American heritage who lives in Racine. *Id.* at 186. The client was born in Cotulla, Texas, in 1925 but was never issued a birth certificate. Mr. Garza worked for several months on a pro bono basis with this client to gather the "baptismal records, school records, even a couple of deeds to land that his parents bought" in order to establish "that he actually existed, that he actually was born," and thus might ultimately able to obtain a "free" ID. *Id.*

Wisconsin's growing Puerto Rican community faces even greater hurdles under Act 23: the Commonwealth of Puerto Rico annulled all birth certificates of people born there prior to

---

[41] *See, e.g.,* Tr. 372 (Pastor Townsend de Lopez) ("a lot" of older parishioners born in the "deep South" either have no birth certificate or have an inaccurate certificate that requires correction, and lack the means to overcome these obstacles); *id.* at 397-400 (Johnson) (in speaking to over 5,000 people in 68 Milwaukee churches, she encountered "many, many" senior African-Americans who did not have Act 23 ID or the birth certificate necessary to obtain that ID, or the means of obtaining a birth certificate); *id.* at 431-34 (Lumpkin) (describing the "large elder population" of African-Americans in Racine who were born in the Jim Crow South and lack birth certificates as well as the means to acquire such records); *id.* at 541-42 (Ciszewski) (recounting situations in which clients were simply unable to obtain birth certificates despite best efforts or were unable to obtain required amendments to birth certificates); *id.* at 578 (Rev. Brisco) (Act 23 was "very detrimental and punitive to our community"; "[w]e were able to help a lot of people, but we weren't able to help all people"); *id.* at 747 (former Rep. Grigsby) ("most common" constituent concerns about Act 23 were "people who had elderly family members who could not obtain birth certificates or didn't — were not mobile so they could not go through the process to what it takes to get a state ID or a driver's license").

2010.  Thus, Wisconsin voters who were born in Puerto Rico must, unless they already have an Act 23-compliant ID, obtain a replacement birth certificate, which requires the payment of money, the Catch-22 of having to present a government photo ID, and dealing long distance with the Puerto Rico Department of Health Demographic Registry — all simply to vote in Wisconsin.[42]

Moving beyond the special challenges faced by voters born in the Jim Crow South and Puerto Rico, plaintiffs also presented substantial evidence that the process of obtaining an out-of-state birth certificate is often difficult, expensive, and time consuming.  Ray Ciszewski, a remarkable good Samaritan who has spent the past seven years helping poor people obtain their birth certificates for various purposes, spoke with great credibility and authority about the "very costly" burdens that Act 23 imposes on some people.  Tr. 544.  He estimated that he has helped between 600 and 700 people obtain their birth certificates from throughout the country and abroad, and has tried but failed to get birth certificates for about another 170 individuals.  *Id.* at 532.  About 75% of the people he has helped have been African-American.  *Id.* at 533.  Mr. Ciszewski identified the major hurdles that he has repeatedly encountered in working to obtain birth certificates from distant bureaucracies:

- **Cost.**  Birth certificates cost money, as much as $32 in Massachusetts.  It is challenging and sometimes impossible for some people to bear this expense.  Tr. 534-37.

- **"Catch-22."**  Most states require a photo ID in order to gain access to one's birth certificate, a situation that Mr. Ciznewski described as "the catch-22 situation" or "the ring" — "If you don't have the ID, you can't get a birth certificate.  If you don't have a birth certificate, you don't get the ID."  *Id.* at 538.  Sometimes there are alternative proof options, but they are narrow and strictly enforced.  *Id.*

---

[42] *See, e.g.*, Tr. at 131 (Collazo-Santiago); *id.* at 168, 170-75 (Cabrera); *id.* at 185-86 (Garza); *id.* at 468-69 (Turja); *id.* at 811-12 (Rep. Zamarripa); *id.* at 1096-97, 1115 (Boardman); *id.* at 1856 (Miller).

- **Miscommunications with distant bureaucrats.** Mr. Ciznewski has often been in situations in which agency officials ask for excessive proof or interpret their regulations in a "very strict" manner. *Id.* at 540. "We might send them exactly what they're asking for on their list and for some reason or another they'll reject it" and ask for "additional" or "secondary" documentation, some of which is hard to locate. *Id.* at 538.

- **Repeated agency errors.** States often return birth certificates with wrong, misspelled, and even missing names. *Id.* at 542. The "amendment" process that must then be pursued to correct these errors imposes further costs because "we have to try to dig back into the person's childhood, get some official certified records that'll satisfy the state." *Id.*

Mr. Ciznewski works with his *pro bono* clients and distant state agencies to overcome these problems, and he is often successful in ultimately obtaining an appropriate birth certificate. But he estimates that, even with all of his assistance, experience, and dogged persistence, over *twenty percent* of his clients have ultimately been unable to get a proper birth certificate for one reason or another. *Id.* at 542. One can only imagine how much higher the failure rate must be for those people who do not have a Ray Ciznewski working on their behalf.

### 3. Act 23 Imposes Additional Unique and Unlawful Burdens on Wisconsin's Latino Voters.

The evidence demonstrates that Act 23 places a host of unique and unlawful burdens on the Latino population, which Dr. Burden described as "probably the fastest growing demographic" in Wisconsin. *Id.* at 1323.

**Lack of Spanish-language forms and explanatory materials.** Although 55% of Wisconsin Latinos live outside of Milwaukee County, that county remains the only county in the State to make Spanish-language ballots and election materials available to Latino voters. *See id.* at 1296-97. And Milwaukee County only began offering Spanish materials *for the first time last year.* Sadly, the State cannot even take credit for that step — in 2012 the U.S. Department of Justice had to step in and require that Milwaukee County provide those materials under the Voting Rights Act. *See id.* at 1295-96; *see also id.* at 193 (Garza). Had the

Department of Justice not intervened, it seems likely that Milwaukee County would have continued to follow the rest of Wisconsin's 71 other counties and provide no Spanish-language ballots and election materials to its Latino citizens to this day. By way of example, Dr. Burden explained that despite Spanish being the primary language in 15% of households in Kenosha, making that city one of the largest Spanish-speaking populations in Wisconsin, the websites for the Kenosha County and City of Kenosha clerks' offices and all of the materials posted there are in English only. *Id.* at 1296-97.

Seen through the lens of the calculus of voting, the unavailability of Spanish-language ballot materials imposes "a massive cost that would have to be paid by a person whose primary language is Spanish" because "[i]t will obviously be more difficult for a native Spanish speaker to navigate the electoral system if materials are not available in that language." *Id.* at 1297. That analysis was supported by the testimony of every Latino leader who testified, all of whom emphasized that Act 23's ID requirements were especially confusing to Latino voters who primarily speak and read in Spanish.[43]

_____

[43] *See, e.g.,* Tr. 133 (Collazo-Santiago: Latinos would confront language barriers at the DMV); *id*. at 167, 169 (Cabrera: "[L]anguage barrier is a big [challenge]. Most information that's out there unfortunately is in English. So a lot of nonprofit organizations like ours have to take it upon ourselves, you know, to educate people where certain institutions perhaps should play a greater role in doing that" because "[t]here's a constituency out there that is not maybe as, for lack of a better term, sophisticated, you know, that they might need a little bit more education perhaps in their native language."); *id*. at 189 (Garza: Language barrier "exacerbated by the confusion that was created by Act 23.") *id*. at 358 (Wacker: Labor Council made sure to print informational flyers about Act 23 in Spanish and English because many of their member unions had Latino members who needed the information in Spanish); *id*. at 374 (Pastor Townsend de Lopez: Latinos faced difficulty complying with Act 23 because information was not available to them in Spanish); *id*. at 777, 779 (Rep. Zamarripa: "I believe that my Latino voters, especially those that may have a language barrier that may struggle with their English or that may be Spanish preference, I think that they struggled a bit more to have all the information in front of them around voter ID" and "I have many eligible voters, U.S. citizens who absolutely have the right to vote but who prefer to speak in Spanish who can be easily intimidated or embarrassed or discouraged from voting on election day because of that.").

57

**Inadequate GAB outreach to the Latino community.**  At trial, several Latino leaders, including Rep. JoCasta Zamarripa, who sits on the Wisconsin Assembly's Committee on Campaigns and Elections, testified that they had either never heard of or were only "vaguely familiar" with the State's much ballyhooed "Bring it to the Ballot" campaign to educate voters about Act 23's photo ID requirement.[44]  In fact, not only had these Latino leaders not heard of the campaign, they testified that in the many months of meetings, one-on-one conversations, and other outreach to educate Latino voters about Act 23, they never once saw or heard of anyone from the State conducting outreach to the Latino community.[45]

The GAB's website and the Bring it to the Ballot video series were not in Spanish, and the State's voter education campaign did not use any Spanish-language media — TV, radio, or print.[46]  Instead, the State largely sat back and counted on plaintiffs and other organizations to perform yeoman's work in reaching out to their members and the Latino community writ large

---

[44]  Tr. 812 (Rep. Zamarripa: Bring it to the Ballot campaign "vaguely familiar"); *see also id.* at 169, 176 (Cabrera: "not at all" aware of any effort by the State to educate Latinos about the voter ID requirement; never heard of Bring it to the Ballot campaign).

[45]  *See, e.g.,* Tr. 128, 135-36 (Collazo-Santiago: never saw anyone representing the State of Wisconsin at any of the many member and one-on-one meetings she attended about the changes brought about by Act 23); *id.* at 169 (Cabrera:  unaware of any effort by the State to educate Latinos about Act 23); *id.* at 187-90 (Garza: unaware of any effort by the State to educate Latinos about Act 23, including making Latinos aware that they could obtain a free ID for voting purposes.  Act 23 "was enacted with very little publicity focused on the Latino or other non-English speaking community languages — or non-English speaking communities."), *id.* at 812 (Rep. Zamarripa: burden of educating Latino voters on the changes brought about by Act 23 fell to "[m]any groups, nonprofit organizations, usually progressive folks" and elected officials like herself).

[46]  *See, e.g.,* Tr. 188-89 (Garza: No state involvement in articles in Spanish language newspapers *Spanish Journal* and *El Conquistador* discussing Act 23); *id.* at 153 (Adams: unaware of any State outreach through Spanish language television, radio, or print media); *id.* at 1649 (Hein: not all outreach materials printed in Spanish even though intended for use in Milwaukee and statewide).

in an attempt to mitigate Act's 23 disfranchising effects. *See* Part I-E *supra*. At best, defendants presented this Court with a few pages of Spanish language outreach materials, which appear to have been only randomly available and were totally unfamiliar to any of the Latino leaders and community workers whose jobs involved educating Latino voters about Act 23.

**Lack of Spanish-language speakers.** Despite Act 23's burdensome and unnecessary requirement that all voters obtain a state-issued photo ID in order to receive a ballot and have their vote counted, Wisconsin DMVs remain completely unprepared to serve Spanish-speaking customers. Carmen Cabrera testified that when the Spanish Center brought Latinos to the DMV to obtain an ID, she and her colleagues had to "faciliat[e] the entire process because unfortunately there was nobody at DMV capable of doing that." Tr. 171. She went on to describe a DMV barren of any Spanish-language signs or forms, and no DMV personnel assigned to assist non-English speaking customers. *Id.* "[B]asically they give you a form which is in English and then they send you on your way." *Id.*

**Cultural and socioeconomic barriers.** Latinos also face particular cultural and socioeconomic barriers that hamper their ability to obtain an Act 23-compliant ID. For example, many Latinos do not own cars and thus depend on public transportation, which hampers their ability to obtain an ID because the DMVs are often not located near bus routes.[47] This makes getting to the DMV and back a time-consuming endeavor, and because DMVs are

---

[47] *See, e.g.,* Tr. 132 (Collazo-Santiago: "A large percentage of the Latino community relies on public transit. So that's a big obstacle" because "[t]here's very few [DMVs] here so the lack of locations in the Milwaukee area becomes a burden and how many of them are actually on a bus line as well."); *id.* at 151-52 (Adams: Many Latinos faced transportation issues because they did not have enough money to take the bus to the DMV and "[i]n Kenosha the DMV is out in the county and it is anywhere between an hour and a half-day wait."); *id.* at 1302 (Dr. Burden: "Latinos in Wisconsin are more likely to use public transportation or to walk as a means to get around the city. That means they're less likely to own a vehicle, less likely to drive, less likely to own a driver's license.")

only open during normal business hours, means that these otherwise eligible voters are forced to take significant time off of what are often low wage jobs without pay in order to exercise their constitutional right to vote, a severe burden to them and their families.[48]  Further, as several witnesses testified, the Latino community is particularly transient, making them less likely than other groups to possess all of the documentation necessary to obtain a driver's license or state ID.[49]  Finally, Act 23 has exacerbated fears in the Latino community about dealing with government bureaucracy, further discouraging them from participating in the political process.[50]

Dr. Burden summarized these cumulative impacts by explaining that Act 23 is "layered on top of the existing disparities and makes them more severe by adding additional costs that are going to be more difficult for those at the lower end of the [socioeconomic] spectrum to participate" because "[i]f you add burden on top of [existing socioeconomic disparities] that puts more demands on their income, maybe to pursue the kind of documents they would need

---

[48] *See, e.g.,* Tr. 132 (Collazo-Santiago: "the biggest [burden] obviously is the financial impact going out of your way and losing anywhere between an hour and a half a day of pay is a big deal for folks"); *id.* at 167 (Cabrera: Latinos face transportation issues in getting to the polls, registering, and obtaining qualifying ID).

[49] *See, e.g.,* Tr. at 132 (Collazo-Santiago:  "[T]here's a large percentage of the Latino community that's transient so they move a lot.  So having all the proper documentations readily accessible for them becomes a big burden."); *id.* at 352, 358 (Wacker: Labor Council members who work in the building trades are transient and move often).

[50] *See, e.g.*, Tr. at 778-79 (Rep. Zamarripa: Act 23 "discourages many underrepresented groups from voting because it just — it encourages — it discourages folks from heading out because they don't know if they have — they don't even know if they have the appropriate — they may have the appropriate identification, but, again, they've gotten bits and pieces of news around the law and they just error on the side of caution if you will and then which means they don't cast a vote on election day because they'd rather play it safe."); *id.* at 167 (Cabrera: "You know, there's not one specific factor.  I would say there's many.  Obviously, the language barrier, not understanding, you know, the system, transportation, and just something as basic as the mechanics of knowing how to vote.  There are still people that never been to a polling location, they don't know the system, how, you know, actually to, you know, connect the little arrow.").

under Act 23, it will exacerbate not reduce the racial disparities that already exists." Tr. 1313-

14. Carmen Cabrera described Act 23's impacts on the Latino community:

> It's been, what can I say, it's like another blow to us. You know, being faced with so many challenges in life, you know, poverty, unemployment, violence in our community, and here we go again. Now it's like such a simple act as, you know, being able to participate in a democracy where people should have an opportunity to — you know, to get engaged and have a voice especially in our communities, you know, and to bring about changes, and I just think that this is so unnecessary. And that it put a real big burden on us, you know, on our community, on us.

Tr. 173-74.

### 4.    Act 23 Is Administered In An Arbitrary, Discriminatory, Needlessly Burdensome, and Poorly Publicized Manner.

The evidence shows that voters who are required to obtain an Act 23 ID — a group that is disproportionately African-American and Latino, and that includes plaintiffs' members and constituents — encounter many additional bureaucratic problems and challenges on a recurring basis. In many instances voters cannot overcome these burdens and would be denied their right to vote if Act 23 were allowed to go back into effect. In other instances these burdens would discourage and deter voters from even trying to obtain ID or vote. These significant deterrents to obtaining the Act 23 ID needed to vote include:

- Inconvenient DMV locations and hours, long lines and delays, and transportation costs.[51]

---

[51] *See, e.g.,* Tr. at 132 (Collazo-Santiago); *id.* at 151-52 (Adams) ("In Kenosha the DMV is out in the country and it is anywhere between an hour and a half-day wait"; identified voters who did not have the money to pay for transportation and certified birth certificate); *id.* at 160 (Adams) ("I've been living in Kenosha all my life and there is no best time to go to the DMV. You always have a long wait."); *id.* at 358 (Wacker); *id.* at 406 (Johnson); *id.* at 430-33 (Lumpkin: detailing logistical problems in getting to Racine County DMV, located 3-5 miles outside of town and open weekdays only till 4:30 p.m.); *id.* at 453-54, 459 (Turja); *id.* at 496-97 (Montgomery Baker: League of Young Voters had to transport about 150 people to DMVs to apply for their voter IDs); *id.* at 748-49 (Rep. Grigsby on what she was told by constituents about transportation difficulties: "I have to take the bus, I have to take two buses, maybe even three buses to get to the DMV to vote or take a bus to get to — you know, to get my birth certificate

- DMV provision of incorrect and/or insufficient information to voter ID applicants.[52]

- Arbitrary and inconsistent DMV application of the law and use of discretion.[53]

- The frequent need to deal with multiple different bureaucracies (often in different states) in order to gather the necessary underlying vital records, get the DMV to accept those records, and then be able to cast a ballot, thus multiplying the costs, delays, and other burdens.[54]

- Frequent errors, omissions, and changes in birth certificates and other vital records, and the resulting need to pursue collateral administrative or judicial proceedings in one's home state to correct these problems.[55]

---

and then take a bus to get my driver's license and then take a bus to vote and — you know, let's not start about buses."); *id.* at 790-91 (Rep. Zamarripa); *id.* at 893, 904-06 (Kennedy); *id.* at 1083-84, 1115-17 (Boardman); *id.* at 1614-15 (William Trokan: accompanied 88 year-old father who uses a walker to DMV to seek a voter ID, where they stood in line for an hour and a half); *id.* at 1654-57 (Hein); *id.* at 1848 (Miller); *id.* at 1800-01 (defense witness Diane Hermann-Brown describing the process of obtaining Act 23 ID for her mother: "It was a pain to go through, I'm sorry.").

[52] *See, e.g.,* Tr. at 92-94 (Davis) ; *id.* at 106-09 (Winslow); *id.* at 129 (Collazo-Santiago); *id.* at 498 (Montgomery Baker); *id.* at 964-65 (Clark); *id.* at 1098-1102 (Boardman); *id.* at 1685-97 (Hein).

[53] *See, e.g.,* Tr. at 74-75 (Bettye Jones was turned away by the Waukesha DMV but accommodated at Milwaukee DMV); *id.* at 459 (Turja); *id.* at 498-99 (Montgomery Baker) (there was "definitely" inconsistency among DMV agents, and League of Young Voters sought to steer applicants to DMV agents who were "willing to help and support"); *id.* at 1121-22 (Boardman) (acknowledging inconsistencies among supervisors in resolving birth certificate naming issues); *id.* at 1839-41, 1891-92 (Miller).

[54] *See, e.g.,* Tr. at 43-52 (Eddie Holloway dealt with government agencies in Milwaukee as well as Springfield and Decatur, Illinois, in search of his birth records); *id.* at 55-83 (Debra Crawford dealt with agencies in Wisconsin, Tennessee, and Ohio in seeking voter ID for her mother); *id.* at 952-53, 963-69 (Katherine Clark dealt with agencies in Wisconsin and Mississippi in seeking voter ID for her mother); *see also id.* at 401-02, 705.

[55] *See, e.g.,* Tr. at 45-51 (Eddie Holloway, Jr.'s Illinois birth certificate has "Holloway" and "Junior" transposed, and DMV would not accept it without correction); *id.* at 542 (Ciszewski) ("There's a number of birth certificates that need to be amended . . . . To go through an amendment process, we have to try to dig back into the person's childhood, get some official certified records that'll satisfy the state."); *id.* at 966-67 (Lorene Hutchins' Mississippi birth certificate was missing her first name and required correction at additional expense); *see also* LULAC Ex. 393 at 21 (Tennessee Vital Records advised Debra Crawford that "[i]t is not very unusual to find that the birth name [on a birth certificate] may be different than that which was submitted, or that the birth year may even be different").

- The huge number of local election officials in Wisconsin — 1852 municipal clerks and deputies, about one-sixth of the total number nationwide — which magnifies the risk of individual mistake and caprice.[56]

- Inadequate outreach to communities of color, and failures to adequately publicize and explain the new requirements to voters of color.[57]

One of the most disturbing examples of DOT's arbitrary and capricious administration of Act 23 is its secretive and standardless "extraordinary proof" petition process created pursuant to Wis. Admin. Code Trans. § 102.15(3)(b). The prescribed petition is set forth in DOT Form MV 3002 — but that form is not available to the general public either over the Internet or at DMV offices, and is "only available upon request," and then only if a supervisor decides to provide it. Tr. 1680-81 (Hein); *see* Frank Ex. 38. This process is *not* available to help voters who cannot afford to pay for their birth certificates or other underlying documentation; it is *not* available to the many people who have errors or inconsistencies in their birth certificates that must be corrected because of Act 23's requirements; it does *not* excuse having to navigate distant out-of-state bureaucracies, and indeed requires a certification from the birth state that no birth certificate is available. Tr. 1119-21; *see* pp. 46-47 *supra*. The Administrator of the DMV has delegated his approval authority to 35 field office supervisors as well as an uncertain number of regional managers, "team leaders," and various "central office" personnel in Madison. Tr. 1121.

According to Kristina Boardman, the DMV's Deputy Administrator, this small group of DMV insiders and supervisors may grant or deny "extraordinary" petitions for relief from Act 23's proof requirements "on a case-by-case basis," subject to no "written policies," guidelines,

---

[56] *See, e.g.,* Tr. at 888, 894 (Kennedy); Robinson Dep. at 74 ("[t]his is a new sweeping law with a lot of nuances," and caused confusion among "poll workers who do not do this as a matter of their daily jobs, just a few times a year depending on even or uneven year") (Frank Ex. 635).

[57] *See, e.g.,* Tr. 172 (Cabrera); *id.* at 190 (Garza); *id.* at 376 (Townsend de Lopez); *id.* at 399 (Johnson); *id.* at 429-30 (Lumpkin); *id.* at 501 (Montgomery Baker).

or consultation requirements.  *Id.* at 1121-22.  "If they feel comfortable based on the documentation presented authorizing the exception they can do that independently" without consulting with anyone; "[e]ach case is very different and needs to be decided on its own merits."  *Id.*  The entire process is unpublicized; the necessary Form MV 3002 petitions are not publicly available; front-line DMV workers are not trained or even told about this upper-level discretion; and voters who are having problems meeting Act 23's proof requirements must know to ask for a supervisor and request a Form MV 3002 or else they will be turned away.[58]

Many good citizens — *none* suspected of potential voter fraud — have been forced to spend substantial time and money in search of their birth records without ever being told about this "extraordinary proof" petition procedure and Form MV3002.  One can only speculate how many voters gave up trying to obtain an Act 23 ID because they were never informed of this "extraordinary" process.  What is clear is that the process is administered in an arbitrary and needlessly costly manner — one that predictably results in the suppression of voting by those who are forced to bear its burdens.  It also lends itself to favoritism.  There were several disturbing references in the testimony to this exceptions process being used to accommodate legislators, executive branch officials, and favored constituents in getting exemptions and approvals that would not otherwise have been granted.[59]  Thus, far from easing the bureaucratic

---

[58]  *See* Tr. 473-74 (Turja); *id.* at 817-21 (Krueger); *id.* at 1122-24, 1129-31 (Boardman); *id.* at 1678-79 (Hein); *id.* at 1859-60, 1869-73, 1877-78, 1893-94 (Miller).

[59]  *See, e.g.,* Tr. 99-101 and 109-12 (Genevieve Winslow and her son Jeffrey, who contacted Rep. Tim Carpenter and persuaded him to intervene successfully with DOT); *id.* at 118-23 (Marian Simon, whose mother was told by a DMV representative that she would need to obtain a corrected birth certificate from Cook County, Illinois to resolve naming discrepancies, contacted Sen. Chris Larson, who contacted DOT and persuaded a DOT "regional director of operations" to reverse the agent's decision and accept the tendered birth certificate); *id.* at 1124-29 (Kristina Boardman *re* constituent who complained to Gov. Walker and then received special dispensation from rules governing use of expired documents); *id.* at 1615-21 (William Troken: after DMV supervisor told World War II veteran with spelling discrepancies in his birth records that he

burdens imposed by Act 23, the "extraordinary proof" petition process accentuates them and makes the entire process even more arbitrary and unfair.

### 5. Act 23 Lacks the Many "Ameliorative Provisions" Found In Other Voter ID Laws.

Throughout trial, defense counsel and their expert, Prof. Hood, repeatedly attempted to compare Act 23 to voter ID laws in other States that have been upheld by the courts, especially those in South Carolina, Georgia, and Indiana.  Tr. 26-27, 1411-12, 1438-40, 1444-49, 2138-39. But those laws contain many safeguards that Act 23 lacks, and in fact help demonstrate that Act 23 imposes multiple unreasonable and unnecessary burdens on voters without qualifying ID.

**South Carolina.**  The three-judge district court that upheld South Carolina's voter ID law in 2012 emphasized that it contains many "ameliorative provisions" that are "central" to its passing muster under the Voting Rights Act.  *South Carolina v. United States,* 898 F. Supp. 2d 30, 37, 42, 46  (D.D.C. 2012).  Most important, the South Carolina law contains an "extremely broad," "sweeping," and "expansive" exemption for voters with a "reasonable impediment" to obtaining an official photo ID.  *Id.* at 37, 40, 43, 48.  This exemption allows registered voters without the required ID to still vote so long as they fill out an affidavit at the polling place attesting to their identity and indicating the reason they have not been able to obtain an official ID.  *Id.* at 32, 35.[60]  Acceptable reasons include "religious objection," "lack of transportation," "disability or illness," "lack of birth certificate," "work schedule," "family responsibilities," and

---

would need to obtain corrected birth certificate, his son contacted Rep. Carpenter, who contacted DMV and persuaded the agency to reconsider).

[60] Voters filling out a "reasonable impediment affidavit" cast a "provisional" rather than a "regular" ballot, but the three-judge federal court emphasized that "the word 'provisional' is a bit of a misnomer in this instance.  These ballots must be counted and will be counted, at least so long as the voter does not lie when he or she fills out and signs the reasonable impediment affidavit.  Counting the reasonable impediment ballots will not differ in substance from the counting of absentee ballots."  898 F. Supp. 2d at 41.

any "other reasonable impediment." *Id.* at 41. "Any reason that the voter *subjectively* deems reasonable will suffice, so long as it is not false." *Id.* at 36. The South Carolina law also ensures that a sufficient number of notaries will be present at the polls, that they "may not charge the voter," and that they "will *not* be able to require photo ID in order to notarize the affidavit (which otherwise would render the provision a circular absurdity)." *Id.* at 38 (emphasis added).[61] South Carolina also demonstrated that the affidavit process had been designed so that it would "not become a trap for the unwary, or a tool for intimidation or disenfranchisement of qualified voters." *Id.* at 40.

The three-judge court held that the "sweeping reasonable impediment provision" and other safeguards "eliminate[] any disproportionate effect or material burden that South Carolina's voter ID law otherwise might have caused." *Id.* The court emphasized that "all citizens may still vote" with the same non-photo IDs they used before "so long as they state the reason for not having obtained a photo ID." *Id.* Wisconsin Act 23 contains *none* of these "ameliorative provisions."

**Georgia.** The Georgia law provides that voters lacking a driver's license or passport can obtain a voter ID card at no charge by "producing evidence that the voter is registered to vote in Georgia and by swearing an oath that the voter does not have another acceptable form of identification." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1346 (11th Cir.), *cert. denied sub nom. NAACP v. Billups*, 556 U.S. 1282 (2009). Nothing more is required; a voter is not required to attempt to track down her birth certificate as a condition to qualifying for the "free" ID. Nor does Georgia require a photo ID for mail-in absentee voting. The Georgia ID

---

[61] Moreover, under South Carolina law "notaries are not permitted to screen voters based on the notaries' evaluations of voter capacity," and notarized signatures are *not* required "if a notary is unavailable." 898 F. Supp. 2d at 38.

law is thus not remotely comparable to Act 23, and Professor Hood's various studies of the purported impacts of Georgia's voter ID law on that State (*see* Hood Decl. ¶¶ 35-39) have no relevance to the impacts of the very different Act 23 in the very different State of Wisconsin. *See* Tr. 1600-03 (Hood).

**Indiana.** The Indiana voter ID law allows for a broader range of acceptable photo IDs than Act 23, and provides multiple ways to avoid having to spend money to purchase vital records in order to vote. *Crawford*, 533 U.S. at 185-86 & n.2 (citation omitted). These "mitigat[ion]" provisions were crucial to the Court's conclusion that the Indiana law did not *on its face* impose "'excessively burdensome requirements' on any class of voters." *Id.* at 199, 202 (citation omitted).[62]

Wisconsin's law provides *none* of these safeguards. Its list of acceptable forms of photo ID is far narrower than many other States'. A voter who lacks one of these forms of photo ID may cast a provisional ballot, but that ballot will be counted only if she produces an acceptable form of ID within three days. And the "free" state photo ID may only be obtained (with limited exceptions) if the voter knows to ask to receive it for free, *see,* p. 46, *supra,* and presents an original certified birth certificate or passport. No other state ID law that has been upheld by the

---

[62] Other federal court decisions upholding voter ID laws have likewise involved measures that contain many "ameliorative provisions" lacking in Act 23. *South Carolina*, 898 F. Supp. 2d at 46, 48. For example, the Arizona law upheld by the Ninth Circuit requires voters to present *either* a photo ID *or* two different forms of identification that bear the name and address of the elector, which may include such non-photograph-bearing documents as utility bills, bank statements, or insurance cards. *Gonzalez*, 677 F.3d at 404 & n.31 (en banc) (citation omitted). Similarly, the Albuquerque, New Mexico voter ID law upheld by the Tenth Circuit allows for a broad range of acceptable photo identification, and provides for free "voter photo identification cards" upon the presentation of two forms of non-photo ID (including Social Security cards, bank statements, utility bills, and many other forms of proof of identity). Voters unable to present acceptable documentation even from this broadly inclusive list may still obtain their voter IDs simply by filling out an affidavit that they are who they say they are. *American Civil Liberties Union of New Mexico v. Santillanes*, 546 F.3d 1313, 1322-24 (10th Cir. 2008).

courts is remotely this burdensome and unforgiving.  And there is absolutely no evidence

suggesting that those other state laws are any less effective in addressing potential voter fraud

than Wisconsin's Act 23.

**IV.    The "Totality of Circumstances" Analysis Confirms That the Substantial Racially
Disproportionate Burdens Imposed By Act 23 Violate Section 2.**

A challenged voting requirement violates Section 2 "if, based on the totality of

circumstances," it is shown to *result* in voters of color "hav[ing] less opportunity to participate

in the political process and to elect representatives of their choice."  42 U.S.C. § 1973(b).  This

assessment is guided by a series of "objective factors" spelled out in the authoritative 1982

Senate Judiciary Committee Report.  *See* 1982 S. REP. 28-29.[63]  This so-called "Senate

Factors" analysis strongly reinforces the conclusion that Act 23 "interacts with social and

historical conditions to cause an inequality in the opportunities enjoyed by" white voters and

voters of color.  *Thornburg v. Gingles*, 478 U.S. 44, 46 (1986).  As Dr. Burden demonstrated,

"[c]onsidering the 'calculus of voting' generally and related research on how election practices

affect turnout among Blacks and Latinos in particular, it is clear that multiple 'Senate factors'

indicate how Act 23 will predictably and disproportionately depress Black and Latino voting."

Burden Decl. (LULAC Ex. 811) ¶ 8; *see id.* ¶¶ 9-57; Tr. 1287-1345.

**A.    Wisconsin's African-American and Latino Voters Bear the Effects of
Discrimination in Housing, Education, Employment, Health, and Other
Areas That Hinder Their Ability To Participate Effectively in the Political
Process and To Surmount the Additional Burdens Imposed By Act 23.**

It is ironic that this litigation seeking to enforce the Voting Rights Act of 1965 —

enacted in the months following the violence in Selma, Alabama, and elsewhere throughout the

---

[63]    The Supreme Court has pointed to the 1982 Senate Report as "the authoritative source for
legislative intent" of the 1982 amendments.  *Thornburg v. Gingles*, 478 U.S. at 43 n.7; *see id.* at
43-46.

South — is venued in Milwaukee, which was known as the "Selma of the North" during the 1960s and 1970s.[64] Wisconsin's African-American and Latino citizens have historically been concentrated in Milwaukee and a few other southeast Wisconsin cities; nearly two-thirds of all Wisconsin African-Americans live in the City of Milwaukee, and three-quarters live in just four cites (Milwaukee, Racine, Kenosha, and Beloit). Nearly half of Wisconsin Latinos live in Milwaukee, Racine, Kenosha, and Madison. Milwaukee has often been labeled one of America's "most segregated cit[ies]," with one of the lowest rates of African-American suburbanization and one of the highest rates of "hypersegregation" *anywhere*.[65] Compared to many other cities throughout the United States, where African-Americans live in both urban areas and at least some of the surrounding suburbs, virtually all African-Americans living in Milwaukee County live in the city itself. The urban concentration of African-Americans and Latinos in Wisconsin is strikingly illustrated by following map based on 2010 Census data:[66]

---

[64] *See* Patrick D. Jones, THE SELMA OF THE NORTH: CIVIL RIGHTS INSURGENCY IN MILWAUKEE (2009); *see also* Burden Decl. ¶ 25; Tr. 1300-01, 1303.

[65] Burden Decl. ¶¶ 21-23; Greg J. Carman, WALL OF EXCLUSION: THE PERSISTENCE OF RESIDENTIAL RACIAL SEGREGATION IN METROPOLITAN MILWAUKEE 8 (2011) (Dkt. 37, Ex. 39); Douglas S. Massey & Nancy A. Denton, AMERICAN APARTHEID: SEGREGATION AND THE MAKING OF THE UNDERCLASS 74-78 (1993) (*re* "hypersegregation") (Dkt. 37, Ex. 40).

[66] Source of map: U. Mich. Population Studies Center, Social Science Data Analysis Network (SSDAN), *Census Scope: Segregation Results from 2010*, http://censusscope.org/dev/content/segregation-results-2010. The map is compiled from 2010 Census redistricting data. The Court may take judicial notice of census data. *See, e.g., Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571-72 (5th Cir. 2011) (census data "an appropriate and frequent subject of judicial notice").



| American Indian | Asian | Black | Hispanic | White |
|---|---|---|---|---|
| 50.0% or less | 50.0% or less | 50.0% or less | 50.0% or less | 50.0% or less |
| 50.1 to 85.0% | 50.1 to 85.0% | 50.1 to 85.0% | 50.1 to 85.0% | 50.1 to 85.0% |
| 85.1% or more | 85.1% or more | 85.1% or more | 85.1% or more | 85.1% or more |

Given this unusually heavy degree of urbanization, it is not surprising that Wisconsin's African-Americans and Latinos tend to use public transportation more and to own cars, drive, and possess driver's licenses much less often than other members of the electorate — even more so than in other parts of the country. *See* Burden Decl. ¶ 24. The inevitable result, as many studies have confirmed, is that African-Americans and Latinos disproportionately lack the IDs required to vote. *See* pp. 19-33 *supra.*

More broadly, by virtually every measure, African-Americans and Latinos in Wisconsin have suffered from, and continue to suffer from, the effects of discrimination in areas such as housing, education, employment, income, health care, criminal justice, and others that affect their ability to participate in the political process and result in their disproportionately lacking the identification Act 23 requires in order to vote. *See* Burden Decl. ¶¶ 19-41. Wisconsin's

racially segregated residential patterns, for example, are in large measure the legacy of generations of public and private discrimination. Racially restrictive covenants were used widely throughout Wisconsin, and were not outlawed by the Wisconsin Legislature until 1951, three years after the U.S. Supreme Court had ruled such covenants unlawful under the Fourteenth Amendment in *Shelley v. Kraemer*, 334 U.S. 1 (1948).[67] In 1968, this Court found that race continued to be "a factor of almost transcendent significance" in residential patterns in Milwaukee and its suburbs, and that "racial discrimination on the part of sellers and landlords or those whose opinions influence their actions is responsible for the Negroes' inability, except in rare instances, to leave the inner city."[68] In addition, Milwaukee's suburban communities in the latter half of the last century used various legal tools, such as municipal incorporation standards and racially exclusionary zoning practices, to discourage African-Americans from moving to the suburbs. *See* Burden Decl. ¶ 22; Carmen, WALL OF EXCLUSION 156-203.

"Education disparities . . . are substantial and enduring." Burden Decl. ¶ 34. The gaps between Black-White and Latino-White high school graduation rates "are approximately twice as large in Wisconsin as they are nationwide." *Id.* The Black-White gaps in educational achievement scores in Wisconsin are among the worst in the nation. The Black-White gap in fourth-grade reading scores is the *second* worst in the nation; the Black-White gap in eighth-grade reading scores is the *worst*, bar none. *See id.* ¶35. These gaps are at least in part the legacy of years of official discrimination; the federal courts repeatedly found as late as 1978 that public officials had undertaken a variety of actions and practices "with the intent and for the

---

[67] Joseph A. Ranney, *Looking Further Than the Skin: A History of Wisconsin Civil Rights Law* (State Bar of Wisconsin website) (Dkt. 37, Ex. 41).

[68] *Otey v. Common Council of City of Milwaukee*, 281 F. Supp. 264, 270 (E.D. Wis. 1968) (footnote omitted).

purpose of creating and maintaining a segregated school system" in Milwaukee — nearly a quarter century after *Brown v. Board of Education*, 347 U.S. 483 (1954).[69]

African-American unemployment is much higher in Wisconsin than nationwide, and there is a much larger racial gap in employment in this State than nationally. Burden Decl. ¶ 28. The poverty rate in Wisconsin is 11% for whites, 38% for Latinos, and 39% for African-Americans; these gaps are much greater than the national average. *Id.* ¶ 30. There also are "glaring" racial disparities in such indicators as infant mortality, traffic stops, and incarceration rates, all of which are also indicators of discrimination against, and official indifference toward, racial minorities. *Id.* ¶ 38; *see also id.* ¶¶ 33, 36-38, 40-41; Tr. 1307-13.

As a result of "substantial and enduring racial disparities" in all of these different areas, Burden Decl. ¶ 41, Wisconsin's African-Americans and Latinos already are less likely to register and vote than whites. "Black and Latino voter turnout in Wisconsin has long lagged behind that of Whites." *Id.* ¶ 9. There was parity between African-American and white turnout in 2008 and 2012 as the result of a surge in the African-American vote resulting from President Obama's historic races for the White House. *Id.* In the off-year 2010 general election, the racial gap reverted to its historic proportions — a 9-point Black-White turnout gap and a 15.9-point Latino-White gap. *Id.*; *see also* Tr. 1284-87.

The "substantial and enduring racial disparities" discussed above also mean that African-Americans and Latinos will face more challenges than whites in attempting to deal with the additional hurdles imposed by Act 23. African-Americans and Latinos who lack qualifying ID are more likely than whites to have to obtain birth certificates from other states or foreign

---

[69] *Amos v. Bd. of School Directors of City of Milwaukee*, 408 F. Supp. 765, 792-93 (E.D. Wis. 1976), *aff'd sub nom. Armstrong v. Brennan*, 539 F.2d 625 (7th Cir. 1976), *rev'd,* 433 U.S. 672 (1977), *on remand, Armstrong v. O'Connell*, 451 F. Supp. 817, 827 (E.D. Wis. 1978).

countries, more likely to move frequently, and more likely to be wary of interacting with the state election system. Burden Decl. ¶¶ 60-62. Thus, imposing increased costs and barriers to voting disproportionately on African-Americans and Latinos will predictably depress turnout from these groups. *See id.* ¶¶ 7-8, 39, 41, 57, 60, 68; Tr. 1280, 1282-83, 1352-53, 1377-78. And the evidence is not just predictive: Several of the witnesses testified at trial about how Act 23 *actually* suppressed voting by people of color not only in Milwaukee, but in communities like Racine and Kenosha as well. *See* p. 45 & n.33 *supra*.

### B. There Has Been a Long History of Official Discrimination in Wisconsin Suppressing the Ability of Minorities To Participate In the Democratic Process, and Minorities Have Long Been Underrepresented in Wisconsin Elective Offices.

"Wisconsin has a long history of election practices that facilitate discrimination" in registration and voting. Burden Decl. ¶ 14; *see id.* ¶¶ 14-18; Tr. 1292-98. For example, from 1913 until 2006, Wisconsin voters were only required to register before voting if they lived in counties with over 5,000 residents, as the vast majority of African-Americans and Latinos always have. As a result, Wisconsin registration requirements disproportionately burdened African-Americans and Latinos, creating a "system of unequal election practices" never addressed by state courts or legislators until it was outlawed by the passage of the federal Help America Vote Act ("HAVA"), 42 U.S.C. §§ 15301-15545, in 2006. Burden Decl. ¶¶ 16-17.

Similarly, despite the State's burgeoning Latino population, ballots in Spanish were never provided anywhere in Wisconsin until February 2012, when the U.S. Department of Justice ordered Milwaukee County to provide such ballots in order to comply with the Voting Rights Act. *Id.* ¶ 18; *see also* pp. 56-57 *supra*. Here again, federal intervention was necessary to eliminate a state-imposed barrier to registration and voting. And even now, even though 55%

of Latinos live outside Milwaukee, no other Wisconsin county provides Spanish language ballots.  *See* Burden Decl. ¶¶ 18, 55; Tr. 1295-96, 1324-25.[70]

African-Americans and Latinos also are underrepresented in both federal and state elective offices in Wisconsin.  Wisconsin has never had a U.S. Senator from a racial minority group, nor any member of the U.S. House of Representatives who was a person of color until the election of Congresswoman Gwen Moore from the Fourth Congressional District in 2004.  She remains the only person of color ever elected to Congress from Wisconsin.  The only person of color ever elected to statewide office was Vel Phillips, who served as Wisconsin Secretary of State from 1979-83.  Only in recent years did African-Americans achieve significant representation in the State Legislature, but Latinos remain "vastly underrepresented." Burden Decl. ¶ 52.  And Milwaukee has yet to elect a person of color as mayor, although it is a "majority-minority" city.  *Id.*  "The state's history of underrepresentation of these groups has contributed to their lower levels of electoral participation."  *Id.* ¶ 53; *see LULAC*, 548 U.S. at 436-38.

    **C.**    **There Has Been a Significant Lack of Responsiveness on the Part of Wisconsin's Elected Officials To the Particularized Needs of African-Americans and Latinos, Both in General and With Respect To the Passage of Act 23 In Particular.**

The "lack of responsiveness" by elected officials to the "particularized needs" of Wisconsin's African Americans and Latinos, 1982 S. REP. 29, is demonstrated by the "severe" racial disparities discussed above in such areas as housing, education, employment, income, health, criminal justice, and others.  Burden Decl. ¶ 54.  "Many of these disparities are more

---

[70] As Dr. Burden summarized, "[w]hen government has intervened to address the needs of Blacks and Latinos, it was seldom the state legislature and governor who acted.  Instead, state courts, federal courts, and the federal government were frequently the actors who forced the state to respond."  Burden Decl. ¶ 55.

severe than in the rest of the country and have worsened over time." *Id.* In several areas — *e.g.*, the racial gaps in rates of employment, poverty, infant mortality, school test scores, high school graduation rates, and incarceration — Wisconsin ranks near or even at the bottom. *See* pp. 68-73 *supra.* While they argue that these disparities are not the *result* of official nonresponsiveness, defendants offer no other explanation for why Wisconsin has failed to ameliorate conditions that other States have addressed much better. Wisconsin's "lack of responsiveness" also is illustrated by the numerous instances in which federal intervention has been required to remedy state and local government shortcomings in such areas as school and residential segregation, voter registration practices, and (just last year) the provision of Spanish-language ballots. *See* pp. 56-57, 70-73 *supra.*

This traditional lack of responsiveness by white elected officials was on particular display during the consideration and enactment of Act 23 itself. *See* Burden Decl. ¶¶ 64, 68. Legislators repeatedly were warned that Act 23 would disproportionately burden and disfranchise African-Americans, Latinos, and other voters of color. Rep. Tamara Grigsby, an African-American Representative from Milwaukee (18th Assem. Dist.), bluntly stated at one hearing that, "[t]o be candid, this bill targets people like me and the constituents I represent." Frank Ex. 589 (T. Grigsby, Testimony Before the S. Comm. On Transportation and Elections (Jan. 26, 2011)). "Everyone sitting in this room knows what this bill does and knows who it will harm." *Id.* Legislators also were presented with statistical and other evidence of the racially disproportionate burdens the legislation would impose, prominently including the findings of the 2005 U.W.-Milwaukee study demonstrating that dramatically larger percentages of eligible

voters of color lack a Wisconsin driver's license than do white voters.[71]  Defendants have

presented no research or data that were introduced in the legislative record (nor at this trial) to

rebut this evidence.  As one witness before the Legislature emphasized, "[t]here is no dispute of

the fact that the number of African Americans who lack a valid Wisconsin driver's license is

very disproportionate to the percentage of African Americans in the population.  So, based on

statistics, it is certain that the law will have a disproportionate impact on minority populations."[72]

Many alternatives were proposed to lessen the needlessly harsh impacts of the legislation.

Some changes were adopted.  For instance, the bill was amended to add tribal ID cards and

certain forms of student ID cards to the acceptable forms of identification, thus responding to

concerns raised about voting access by Native Americans and students.[73]  But proposals to

address the articulated concerns of African-Americans and Latinos were consistently rejected.

*See* Tr. 785 (Rep. Zamarripa: "there was a sub[stitute Amendment] that addressed some of the

college ID concerns, but that was all.  Nothing that would have addressed people of color."); *id.*

at 787-794 (reviewing amendments responsive to the concerns of voters of color, none of which

---

[71]  See, e.g., Tr. 782-785 & LULAC Ex. 773 at 128 (Rep. Zamarripa reviewing submissions
to the Assemb. Comm. On Election & Campaign Reform Hr'g on 2011 AB 7 (Apr. 27, 2011)
(including citation by Sen. Nikiya Harris (then Milwaukee Co. Supervisor) to the 2005 Pawasarat
study discussed at pp. 30-31 *supra*) (also on file with the Court at Dkt. 37-43); see also Tr. 1334
(Burden); LULAC Ex. 801 at 2 & n.6; LULAC Ex. 773 at 124 (Kozlowski testimony); Leg.
Reference Bureau, Wisconsin Briefs: Voter ID, Brief LRB-06-WB-4 at 2 (2006) (on file with the
Court at Dkt. 37-45 and available at http://legis.wisconsin.gov/lrb/pubs/wb/06wb4.pdf)
(summarizing 2005 Pawasarat data); LULAC Ex. 773 at 135-36 (Shavers/ACLU testimony)
(same).

[72]  Testimony of NAACP-Milwaukee Branch in Opp'n of S. Bill 6 at 1 (Jan. 26, 2011) (on
file with the Court at Dkt. 37-47 and *available at*
https://legis.wisconsin.gov/lc/comtmats/old/11files/sb0006_20110127104538.pdf at 16-17).

[73]  *Compare* 2011 A.B. 7 at §§ 1-11 & Analysis by Legislative Reference Bureau (explaining
identification requirement as originally introduced, which did not allow voting with a student ID,
passport, or tribal ID card) *with* 2011 Act 23 at § 1 (defining acceptable identification as Act 23
was passed, including passports, tribal ID cards, and certain student identifications).

were passed).[74]  Similarly, proposals for outreach and mitigation measures that might have

lessened the unnecessary impacts on African-American and Latino voters were rejected by the

legislative majority.[75]

Not surprisingly, every African-American and Latino member of the Wisconsin

Legislature voted against Act 23.  *See id.* at 795.  On the other hand, every member of the

Legislature voting in favor of Act 23 was white — the entire GOP caucus joined by three

Democratic Assemblymen but no Democratic Senators.[76]  Thus did voters of color  receive the

Legislature's dark message of discouragement: that the State of Wisconsin is willing to sacrifice

voters of color in the interest of preventing in-person voter fraud that the State's own witnesses

admit is not a significant problem (or protecting the incumbency of those who advocate that

supposed interest).  *See LULAC*, 548 U.S. at 441 (rejecting protection of incumbents as a

---

[74]  Kevin Kennedy, on behalf of the GAB, repeatedly recommended adoption of an affidavit-of-identity alternative to the state ID requirement, which would "provide a viable alternative to voters who may have difficulty securing the required identification or who may not have it at the time of voting."  LULAC Ex. 773 at 8; Tr. at 785-87; *see also* Tr. 788-90 & LULAC Exs. 639, 640 (Assembly Amendment 24 proposing affidavit of identity introduced and "laid on the table").  Director Kennedy likewise urged unsuccessfully that the list of acceptable IDs be expanded to include other identification cards issued by the Wisconsin or federal government. LULAC Ex. 773 at 2.

[75]  For example, numerous amendments were introduced, including to require at least one DMV examining station in each county to keep weekend and evening hours; to provide mobile and temporary examining stations with extended hours in impoverished communities; to require clear written disclosure that state ID cards requested for voting purposes are free; to address the concerns of homeless voters unable to meet strict residency requirements; to waive fees for issuance of birth certificates; and to guarantee time off from work for voters who need to resolve ID problems for voting.  All of these and other potentially ameliorative proposals were "laid on the table" by the majority.  *See, e.g.*, Assembly Amendments 5, 7, 9, 11, 12, & 20 and roll call votes on same, *available at* https://docs.legis.wisconsin.gov/2011/proposals/ab7 (also on file with the Court at Dkt. 37-55 through 37-60); *see also* Tr. 787-95 (reviewing consideration and rejection of amendments).

[76]  *See* LULAC Ex. 579, Assemb. Roll Call on 2011 AB 7, http://legis.wisconsin.gov/2011/data/votes/av0331.pdf (May 11, 2011) (suspending rules to immediately message); S. Roll Call on 2011 AB 7 (May 19, 2011) (concurring).

legitimate justification when it is done by excluding minority voters because they are likely to vote against the office holder); *accord Garza v. County of Los Angeles*, 918 F. 2d 763, 778-79 (9th Cir. 1990).

### D. Voting in Wisconsin Is Racially Polarized, Political Campaigns Have Long Been Characterized By Racial Appeals, and Act 23 Appears To Be Targeted Against the Growing Voting Power of People of Color.

"Racial polarization in voting patterns is sizable and enduring in Wisconsin," and does not appear to be "dissipating with time." Burden Decl. ¶ 12; *see* Tr. 1286-92. The "Black-White gap" in partisan voting was 37 percentage points in the 2008 presidential election, 39 points in the 2004 presidential election, 44 points in the 2010 Wisconsin gubernatorial election and again in the 2012 U.S. Senate campaign, 46 points in the 2012 presidential election, and an astonishing 51 points in the 2012 gubernatorial recall election. Burden Decl. ¶¶ 11-12. The Latino-White gap is also substantial, and larger than elsewhere in the United States. For example, Senator Kerry received 79.8% of the Wisconsin Latino vote in the 2004 presidential general election, "with no sign of the surge of support for [President] Bush that apparently took place in some other Hispanic areas of the country." Robert Booth Fowler, WISCONSIN VOTES: AN ELECTORAL HISTORY 229 (2008) (Dkt. 37, Ex. 61). According to exit polls, the Latino-White gap in partisan voting was 18 percentage points in the 2012 presidential election. Burden Decl. ¶ 11.[77]

Ever since Alabama Gov. George Wallace's strong showing in the 1964 Wisconsin Democratic Presidential Primary "astounded" national political pundits and demonstrated that "racism could magnetize votes in the North as well as in the South," Wisconsin has been a

---

[77] Racially polarized voting patterns appear in not only in multi-party elections, but also in party primary elections in which partisan allegiances cannot explain the differences in voters' choices. Burden Decl. ¶ 13.

fertile ground for racially tinged political appeals.[78]  This Court viewed and heard testimony about the infamous "Reuben Lee Mitchell" TV attack ad run against incumbent Wisconsin Supreme Court Justice Louis Butler in his 2008 campaign — an ad condemned by the Wisconsin Judicial Campaign Integrity Committee and many others as being "in the offensive, race-baiting style reminiscent of the Willie Horton spot from the 1988 presidential race."  *See* Burden Decl. ¶¶ 44-47.  Similarly, in a blatant appeal to anti-Latino prejudice, one candidate in the 2006 gubernatorial campaign aired TV ads criticizing "illegal aliens" who were taking advantage of "welfare," "subsidized home loans," and "in-state tuition breaks" at UW System schools, "while Wisconsin kids are being turned away."  *Id.* ¶ 48.  Appeals like these both reflect racial polarization and serve to reinforce it.  *Id.* ¶ 49.

Even more recently, an anonymous source funded 85 billboards in the closing days of the 2012 presidential election, nearly all of them concentrated in neighborhoods dominated by people of color in the Milwaukee metropolitan area.[79]  A map of the billboards' placement looks like a target used in shooting practice, with Milwaukee the bull's-eye.  *See* below.[80]

---

[78]  Theodore H. White, THE MAKING OF THE PRESIDENT — 1964, at 233-34 (1965) (Dkt. 37, Ex. 62); *see also* Rick Perlstein, BEFORE THE STORM: BARRY GOLDWATER AND THE UNMAKING OF THE AMERICAN CONSENSUS 318-21 (2001) (Dkt. 37, Ex. 63).

[79]  "The sponsor was later revealed to be Stephen Einhorn, an investment banker and major donor to Republican candidates."  Burden Decl. ¶ 50.

[80]  The map appears as Map 1 on page 39 of Prof. Levine's revised expert report in the *Frank* litigation.  *See* Frank Ex. 578.



The billboards carried the message "**VOTER FRAUD is a FELONY!**" and "**3 1/2 YRS & $10,000 FINE**."  Some of them also included a picture of young people of color behind bars with the balloon statement "**We Voted Illegally**."  The billboards were widely condemned as "a blatant attempt to suppress the minority vote," and rightly so.  *See* Burden Decl. ¶ 50.

The voting strength of people of color is rapidly growing in Wisconsin.  In particular, the growth in the Latino vote "is creating the most influential shift in Wisconsin politics, an astonishing 74% increase within the decade."[81]  Act 23 on an objective level is highly "suspect" because the incumbent party has adopted new voting restrictions that fall disproportionately on voters of color who tend overwhelmingly to favor the opposition party.  *LULAC*, 548 U.S. at

---

[81]  Dominique Paul Noth, *Latino Growth Could Flip State Politics — But Will It?*, Milwaukee Labor Press (Feb. 13, 2002) (Dkt. 37, Ex. 64); *see also* Tr. 147 (Adams) (explaining that LULAC diverted resources toward helping people comply with Act 23 because "we were very, very worried that — you know, we had that big increase in voters from Hispanics and then we were afraid that that was going to be lost with the new ID requirements"); *id.* at 1323 (Burden) ("Latinos are a fast-growing segment of the population, probably the fastest-growing demographic").

441.  The Supreme Court has condemned this kind of "troubling blend of politics and race" and held that it "cannot be sustained" under Section 2.  *Id.* at 442; *see also id.* at 440 ("In essence the State took away the Latinos' opportunity because Latinos were about to exercise it.").  Section 2 outlaws "incumbency protection" measures like Act 23 that come at the expense of voters of color who only recently have begun to achieve Section 2's goal of "overcoming prior electoral discrimination."  *Id.* at 442.

**E.    The Policy Underlying Act 23 Is "Tenuous," Markedly Departs From Historic Wisconsin Practices and Traditions, Lacks "Fairness," and "Needlessly Impairs" the Voting Rights of African-American and Latino Voters.**

The Senate Report also instructs courts to consider "whether the policy underlying" the challenged law is "tenuous" or "markedly departs from past practices or from practices elsewhere," factors "that bear[] on the fairness of [the law's] impact."  1982 S. REP. 29 & n.117.  In other words, does the purported policy underlying the challenged voting practice justify the effect on voters of color?, *see LULAC*, 458 U.S. at 441; *Gingles*, 478 U.S. at 45, or does it "impair[] the voting power of minorities more than it has to[?]," *Barnett*, 141 F.3d at 701 (Posner, J.).  If the challenged practice "needlessly impairs a minority group's voting power," that further supports the conclusion that it violates Section 2.  *Barnett*, 141 F.3d at 702.

Act 23 flunks all of these considerations.  The policy underlying the law is illusory and the adverse impact on voters of color is incontestable.  Under the circumstances, the law's "troubling blend of race and politics" cannot be sustained.  *LULAC*, 548 U.S. at 442.

**1.    Act 23 Markedly Departs From Historic Wisconsin Practices.**

The Court heard testimony from several witnesses demonstrating that, in Dr. Burden's words, Act 23 is a "dramatic change" in the law and "an abrupt departure from a century of voting practices in Wisconsin."  Burden Decl. ¶ 56; *see* Tr. 1339 ("The law is a dramatic break

with Wisconsin history.").  With this one law, Wisconsin has moved "from being one of the states most accommodating of voting access to one of the least."  Burden Decl. ¶ 56.  Many of the witnesses who testified at trial emphasized the "radical" changes imposed by Act 23. [82]  This departure from longstanding historical tradition is a warning sign that the new law is unfair and has only tenuous justification.

Defendants have argued that the Wisconsin Supreme Court has always recognized that the fundamental right to vote is subject to *reasonable* regulation in order to protect the integrity of the electoral system.  So it has, but the very cases defendants cite emphasize that this state power "does not extend *beyond what is reasonable*" (*State ex rel. McGrael v. Phelps*, 128 N.W. 1041, 1047 (Wis. 1910) (emphasis added)) or authorize rules that "*needlessly harass or disfranchise any one*."  *State ex rel. Small v. Bosacki*, 143 N.W. 175, 176 (Wis. 1913) (emphasis added).  Whether intentionally or through benign indifference, Act 23 goes far "beyond what is reasonable" to prove that one is who she says she is, thus "needlessly harass[ing] or disfranchis[ing]" a substantial number of voters.  *Id.*  It also goes far beyond anything that Wisconsin ever has done before in terms of limiting the forms of acceptable proof of identity and requiring extra effort in documenting one's date and place of birth.  And as discussed above, Act 23 is one of the most rigid and unforgiving voter ID laws in the Nation.  That marks a *radical* change in our State's political traditions.

---

[82]  Tr. 963, 969 (Katherine Hutchins Clark:  Act 23 was a "radical change" and departure from Wisconsin's "very progressive" tradition of "encouraging more people to vote"); *see also id.* at 80 (Garza: "Wisconsin, since I've been here in '76, has enjoyed a very open electoral process, an election process, and this has changed the complexion significantly.").

### 2. In-Person Voter Impersonation Fraud Is Virtually Nonexistent in Wisconsin.

Wisconsin's purported justification for Act 23 is demonstrably false. Voter fraud is extremely rare, and voter *impersonation* fraud — the only danger purportedly addressed by Act 23 — is essentially nonexistent. The State certainly presented no evidence of it to this Court. There is, accordingly, no legitimate reason to impose Act 23's significant and disproportionate burdens on Wisconsin citizens' right to vote.

According to Dr. Lorraine C. Minnite, a nationally recognized expert on "the incidence and effect of voter fraud in American elections," Minnite Decl. ¶ 1 (LULAC Ex. 68), there is no strong evidence that voter fraud is occurring or is a problem. Tr. 989; *see also* Minnite Supp. Rep. ¶ 2 (LULAC Ex. 812) ("fraud committed by voters either in registering to vote or at the polls on Election Day is exceedingly rare.").[83] Her book, THE MYTH OF VOTER FRAUD (2010), focuses extensively on allegations of various types of voter fraud in Wisconsin and concludes that they are "unsupported by evidence" and have "no basis in fact." *Id.* Not one witness at trial contradicted her or testified that he or she knew of any real, verifiable, systemic, or widespread voter impersonation in Wisconsin. Witnesses testified that, at most, there were no more than a handful of reported incidents of voter impersonation (none of which were proven to be actual fraud, as opposed to poll-worker error) out of millions of votes cast — a ratio so small that Dr. Minnite called it "statistically zero." Tr. 1013.

---

[83] Dr. Minnite defines voter fraud as the "intentional corruption of the voting process by the voter," distinguishing it from fraud committed by other electoral actors, such as poll workers or politicians, and from unintentional corruption, such as by errors or mistakes. Minnite Decl. ¶ 12-15. "I use the narrower definition of voter fraud to estimate the scale of the problem of voters corrupting the electoral process because the contentious policy solution to what has been called voter fraud is to impose new costs on voters (i.e., require them to present government issued photographic identification in order to vote), rather than say, change the way ballots are handled or counted by election officials …. [M]y definition is appropriate for what I am studying, the individual behavior of voters." Minnite Supp. Rep. ¶ 23.

Dr. Minnite reviewed Wisconsin-related allegations of voting fraud, including the results of numerous official investigations of voting integrity conducted from 2000 to 2013. Tr. 1032; Minnite Supp. Rep. ¶ 7. In addition, Dr. Minnite analyzed indictments available from the Administrative Office of U.S. Courts, conducted interviews with the U.S. Attorney for the Eastern District of Wisconsin, the Executive Director of the Milwaukee Board of Election Commissioners, several attorneys representing most of the 14 people indicted in Milwaukee by the federal government after the 2004 election, and two of the indicted voters, and sent questionnaires to every county district attorney in the United States asking each about the different kinds of voter fraud he or she had seen between 2004-2005. *See* Minnite Decl. ¶ 27; Tr. 1061. Based on this extensive review, Dr. Minnite concluded:

> The scrutiny from federal, state, and local law enforcement and elections officials produced several reports, an intensive review of voter registration practices in a number of Wisconsin cities, many recommendations for improving election administration and voter registration procedures, several later-vetoed photo identification bills in the state legislature, a variety of other legislative proposals, and *very little conclusive evidence of voter fraud.*

Minnite Decl. ¶ 31 (emphasis added).

Between 2008 and 2013, for example, the Election Fraud Task Force, a joint effort between the federal and Wisconsin state prosecutors and law enforcement, obtained only 31 convictions for voter fraud out of the 3.5 million votes cast over three federal elections, a ratio of one conviction per 121,000 votes, or .0000082 convictions per vote. Minnite Supp. Rep. ¶¶ 8-9; Tr. 1035-1036. (The task force covered 12 Wisconsin counties. *See* Tr. 1036.)

Further evidence of the "exceedingly rare" nature of in-person voter impersonation fraud is found in the results of a nationwide joint task force looking at the 2002 and 2004 elections, during which over 200 million votes were cast. The joint task force resulted in only 40

indictments of voters nationwide, 26 of whom pleaded or were found guilty, despite "vigorous prosecution by the Bush Administration."  Minnite Decl. ¶ 37; Tr. 1011-1012.[84]

Allegations of fraud in Milwaukee during the 2004 presidential election also proved to be unfounded:  a joint task force that investigated these allegations found that nearly all of the alleged cases were simply the result of errors.  *Id.* at 1024-26.  As Dr. Minnite testified:

> I think to sum it up the results were that the problems that were reported on in the press which you might call irregularities that had to do with, for example, more ballots being counted in a ward than numbers of people signing in, problems with same day registration cards missing addresses and things like that, that those were due to problems with election administration and not fraud.

*Id.* at 1026; *see generally* Minnite Decl. ¶¶ 21-41.  With so few examples of voter fraud over the past 13 years, Dr. Minnite thus concluded that "[t]here is very little available evidence suggesting that voters are intentionally corrupting the electoral process." Minnite Decl. ¶ 43.

More importantly for this case, of the various types of voter fraud (including voting twice, voting in the wrong place, or voting by people with felony convictions ), Act 23 only purports to address one narrow category:  in-person voter impersonation fraud. *Id.* at 1340.  This type of voter fraud is virtually non-existent.  *Id.* at 1041-42.  In fact, Dr. Minnite was able to identify only *one* case of in-person voter impersonation fraud in Wisconsin over the last decade, a case that had very unusual and possibly absolutely unique facts.  Id. at 1041.[85]  Moreover, it

---

[84] The (Milwaukee) *Journal Sentinel*, which had reported on irregularities and discrepancies that it had found in the Milwaukee registration records during the 2004 presidential elections, opined that "Republicans are quick to jump on the discrepancies, real or imagined, in voting data in Milwaukee as proof of widespread fraud in the big city.  In their minds, the *Journal Sentinel's* findings fit that pattern.  A more plausible explanation, however, is that the findings reflect the unfortunate tendency of voting systems throughout America to err."  Minnite Decl. ¶ 22.

[85] The case involved a husband who voted his wife's absentee ballot after she died.

may not even have been prevented by Act 23.  *Id.* at 1041-42.[86]  Thus, if Act 23 is to be justified

on the basis of voter fraud in Wisconsin, it must rest on a single case of voter impersonation

fraud that is both an outlier in its facts and may not have actually been prevented by Act 23.

Moreover, the fact that Act 23 only addresses voter impersonation fraud reinforces the

tenuousness of the law.  While other types of voter fraud are also so rare that in Dr. Minnitte's

words the incidence is "statistically zero" there are at least small handfuls of those cases, for

example 14 indictments in Milwaukee from the 2004 election.  However, the Legislature chose

to address the type of fraud of which there has been but a single case, rather than these other

more numerous types.  As Dr. Minnite testified, "[p]art of the tenuousness of the law . . . is that it

didn't attack the areas where we know that fraud would be more likely and easier to commit, and

instead focused on this one area where voter fraud is rare and difficult."  *Id.* at 1340-41.  As Dr.

Burden explained:

> If there is fraud taking place on any scale, it's going to be more likely to happen
> with absentee ballots and with voter registration, but that's not where this law
> targeted its efforts in an effort to stop voter fraud.  Absentee ballots and voter
> registrations have been largely outside government purview without all of the
> protections that are in place in a polling place.  And when those things do happen
> they're often caught in advance because they happen before the election anyway.
> But nonetheless, that's where more of that kind of nefarious activity you would
> think would be happening.

*Id.* at 1341.

Defendants have argued, however, that the reason there have been so few examples of

voter fraud is that it is difficult to detect.  Tr. 1062, 2036.  Yet Dr. Minnite demonstrated that

voter fraud is not "a special kind of mysterious, invisible crime that we can't seem to find," but is

similar to other types of fraud, such as citizenship fraud, Social Security fraud, false claims and

---

[86]  While Act 23 generally requires those voting absentee to submit a copy of valid photo ID
with their absentee ballot there are exceptions, and the husband may have had access to a valid
photo ID of his wife.

statements, counterfeiting, postal, Internet, and wire fraud, and tax evasion, and just as detectable. *Id.* at 1014-1016. Defendants were unable to explain why voter fraud is less detectable given the significant resources the joint federal/state taskforces brought to bear on attempting to find it. *Id.* at 1012, 1027, 1062-1065.

Even defendants' own witnesses were equivocal about whether or not voter fraud is hard to detect. When Michael Sandvick, a former Milwaukee police officer, was asked at trial whether or not voter fraud was hard to detect, he answered, "[t]here are different types of voter fraud. Some of them are hard to detect and some of them are not." *Id.* at 2036. When asked what types are hard to detect, he gave only one example: someone using a fake address to vote, a type of fraud that would not be remedied by Act 23. He did not mention voter impersonation. *Id.*; *see also id.* at 1041.

Even if defendants were right that in-person voter impersonation fraud is harder to detect than other kinds of fraud, they have not pointed to any evidence that it occurs in Wisconsin. Bruce Landgraf, a Milwaukee Country assistant district attorney of 25 years, testified about six examples of fraud that he had prosecuted, and not one was in-person voter impersonation fraud or would have been prevented by Act 23. *Id.* at 2057. In fact, he testified that over the past several major elections, there have been only 10 to 12 complaints of voter impersonation in each election; in each, about 10 were resolved with an innocent explanation and only one or two remained unexplained or unresolved. There was never any evidence that any of those one or two instances per election were actually fraud or in-person voter impersonation fraud. *Id.* at 2057. And Mr. Sandvick testified that any time he investigated a case of purported in-person voter impersonation fraud, he found it to be poll worker error instead. *Id.* at 2039.

87

By contrast, Dr. Minnite's conclusion that such fraud is "exceedingly rare" is in accord with the conclusions of other witnesses. As GAB staff counsel Shane Falk explained, "there's fraud in Wisconsin but not the type that was specifically the basis for doing Act 23," and those who allege that fraud exists are "never able to back it up." *Id.* at 1635. Similarly, Dr. Burden testified that "voter impersonation at the polls is … extremely rare, non-existent." *Id.* at 1340.

> Q. It is your expert opinion, as I understand it, that voter impersonation is not a problem in the State of Wisconsin; is that correct?
>
> A. That's right.
>
> Q. And therefore, that elected officials who attempt to justify legislation on the basis of preventing voter impersonation are making unsubstantiated allegations of voter fraud; is that correct?
>
> A. Yes. They're largely allegations but without evidence.

*Id.* at 1389-90.

Not only does the empirical evidence demonstrate that widespread in-person voter impersonation fraud is a "myth," but logic confirms it. Under the rational choice model of behavior, in which people weigh the costs and benefits of their actions before acting, it does not make any logical sense for anyone to actually attempt to perpetrate in-person voter impersonation fraud. The potential costs are too high — money, time, effort, and, perhaps most importantly, imprisonment — and the potential benefits too low — one additional vote for a preferred candidate and one fewer for an opposing candidate. *See id.* at 1017-19; 1341-42. As Professor Burden explained:

> You could think of voter impersonation in terms of cost and benefits. The costs I've already mentioned are severe. Criminal penalties, as the billboards in Milwaukee indicated, are $10,000 and 3 years in jail. The benefits, if you get away with it, are that one additional vote is cast in someone else's name. Unlikely to affect most elections.

88

*Id.* at 1341-42. And as Mr. Ciszewski, the volunteer whose efforts to assist people with getting birth certificates are described at pp. 55-56 *supra*, put it when asked about what would stop someone from impersonating him at the polls, "Why would people want to do that?" *Id.* at 546.

The evidence at trial makes very clear that it is actually quite difficult to steal someone's vote. Robert Spindell, a Milwaukee City election commissioner, at first claimed that it would be "easy" to steal someone's vote (*id.* at 2001-2), but then conceded that someone attempting to steal a resident's vote would need to know that person's (a) name; (b) registration status; (c) polling location; (d) address; and (e) voting status (*i.e.*, whether or not that person had voted). In addition, the perpetrator would have to be certain that the poll workers did not recognize either him or the person whose vote he was going to steal. *Id.* at 2007-9. Finally, in order to justify the effort and risk of stealing another person's vote, the perpetrator would have to know who the other person was going to vote for, because it makes no sense to steal the vote of someone planning to vote for the same candidate. And given the penalties for getting caught, the perpetrator would have to have a high degree of confidence that the margin of victory was going to be so thin as to justify the risks of stealing a single vote. *See, e.g., id.* at 1017-19; 1341-42. It is no wonder, then, that in-person voter impersonation fraud rarely happens.

The fact that in-person voter impersonation fraud is unlikely to occur makes Act 23's *only* justification not just tenuous, but false. The State certainly has "legitimate and important interests in protecting the integrity of elections, promoting citizen confidence in the election process, and detecting, deterring, and preventing voter fraud" (*id.* at 2126), but it may not invent a bogey-man and then impose substantial burdens on voters of color in order to fight it.

In addition, the State put on no evidence concerning levels of voter confidence in Wisconsin and no evidence to suggest that Act 23 would increase it. *Id.* at 2106. Indeed, as Dr.

Burden explained, there is expert research and scholarship concluding that there is "zero relationship" between requiring voter ID and building public trust and confidence in voting.[87] Paradoxically, the State's insistence that Act 23 is necessary to protect the integrity of the election process in fact *undermines* its putative rationale that Act 23 is necessary to promote voter confidence. As Dr. Burden emphasized, "public officials who make unsubstantiated allegations of voter fraud unnecessarily undermine voter confidence in the electoral system," a point echoed by GAB Director Kevin Kennedy in a letter to the Speaker of the Wisconsin State Assembly: "Speaking frankly on behalf of our agency and local election officials, absent direct evidence I believe continued unsubstantiated allegations of voter fraud tend to unnecessarily undermine the confidence that voters have in election officials and the results of the election."[88]

---

[87] Tr. 1385. Indeed, the article that Dr. Burden cited suggests that "those subject to photo ID requirements believe, if anything, that fraud is *more* prevalent." Stephen Ansolabehere & Nathaniel Persily, *Vote Fraud in the Eye of the Beholder: The Role of Public Opinion in the Challenge to Voter Identification Requirements*, 121 HARV. L. REV. 1737, 1756 (2008) ("The data demonstrate no relationship between either individual-level or aggregate rates of voter identification and perception of fraud. The correlations between beliefs about Voter Fraud and Vote Theft and the incidence of voter identification are very small and statistically indistinguishable from zero in both samples . . . In none of the regressions do the measures of the incidence of the use of voter identification exhibit any significant relationship to any of the measures of beliefs about vote fraud. The strongest association arises with Impersonation, and the coefficient has the wrong sign (meaning that those subject to photo ID requirements believe, if anything, that fraud is more prevalent). Whether the state or local election administration frequently asks for voter identification or not seems to have no relationship to individuals' beliefs about the frequency of Fraud or Impersonation.") (emphasis added).

[88] Tr. 1387-89 (Dr. Burden's testimony that "For black and Latino voters who may have lower levels of confidence and trust, [Act 23] may be yet another way in which they feel as though they're burdened by the voting process and that their votes will be scrutinized in a way that's problematic."); *see* Burden Decl. ¶ 62-63; *see also* Tr. 578-79, 582-583 (Rev. Brisco's testimony that Act 23 would exacerbate the lack of trust that African American and Latino communities already have in the system); *id.* at 951 (Mrs. Hutchins' testimony that Act 23 is "just something, you know, to keep us from voting."); *id.* at 396 (Ms. Johnson's testimony that Act 23 was designed to confuse voters and to impose obstacles for people to vote); *id.* at 492-93 (Ms. Montgomery Baker's testimony that many in the African American community do not have trust in the political process); *id.* at 89-90 (Rickey Davis: "would feel stripped" if prevented from

The bottom line is that none of the State's rationales for enacting Act 23 are supported by evidence or logic. Mr. Ciszewski summed up the relationship between Act 23 and in-person voter impersonation fraud very well: "To me, this whole ID business turned out to be a costly solution where there was no problem. It was a solution looking for a problem." *Id.* at 544.

### 3. Act 23's Harsh and Disproportionate Measures Go Far Beyond What Might Reasonably Be Necessary to Address Concerns About Potential Voter Fraud.

Against the backdrop of a non-existent voter fraud problem, the State's sole purported justification for Act 23, Wisconsin did not simply enact a voter ID law. It enacted one of the most severe and unforgiving versions of voter ID in the Nation, with provisions far more onerous than other voter ID laws that have been reviewed by the courts, both in the narrowness of its range of acceptable forms of ID and in its nearly complete lack of any safety valve to "mitigat[e]" situations in which the ID requirements "impose a special burden on [some citizens'] right to vote." *Crawford*, 533 U.S. at 199 (Stevens, J.); *see also South Carolina v. United States,* 898 F. Supp. 2d at 46, 48 (emphasizing importance of "ameliorative provisions" that made South Carolina voter ID law "significantly more friendly to voters without qualifying photo IDs"). Why are Act 23's stringent provisions — among the harshest in the country — *necessary* to adequately guard against the specter of voter fraud? As the 1982 Senate Report emphasized, a challenged election law is "tenuous" if it "markedly departs . . . from practices elsewhere." 1982 S. REP. 29 & n.117. Defendants continue to avoid addressing these issues.

---

voting by Act 23); *id.* at 772, 774, 778 (Rep. Zamarripa's testimony that voter ID laws discourage people in the Latino communities from voting); *id.* at 758-61 (Rep. Grigsby's testimony that billboards warning that "Voter Fraud is a Felony" were placed predominantly in African American communities so as to intimidate African Americans into not voting); *id.* at 435-36 (Mr. Lumpkin's testimony that some people who normally voted now feel that it is too difficult because of Act 23).

And if the stringent certified birth certificate requirements under Act 23 are truly necessary to police against potential voter fraud, why are they not applied to the millions of Wisconsin voters who already held Wisconsin driver's licenses and state IDs when Act 23 took effect?  As discussed above, many of those voters who had a state driver's license or ID on July 1, 2011 never had to submit birth certificates to obtain their licenses and IDs in the past, and will not be required to do so in the future — they are indefinitely (if not permanently) "grandfathered" from having to meet these proof requirements.  *See* pp. 40-41 *supra.*  Why are new applicants a fraud risk if they do not present their birth certificates, but not current license or ID holders who never had to satisfy such standards in the past?  This massive under-inclusiveness — exempting potentially millions of voters from the birth certificate requirements that supposedly are necessary to prevent voter fraud — further demonstrates that the purported anti-fraud justifications for Act 23 are extremely tenuous at best.

The GAB's Executive Director, Defendant Kevin Kennedy, repeatedly emphasized during the legislative process that, because of the "stricter" procedures and requirements in Act 23 not imposed by other States, Act 23 would be "unnecessarily cumbersome," "place[] an unnecessary strain on the administration of elections," and "put additional stress on an already overburdened system."  *See* LULAC Ex. 794 at 3; LULAC Ex. 795 at 3; *see also* LULAC Exs. 797-98.  Act 23 obviously "impairs the voting power of minorities more than it has to" and "needlessly impairs" their opportunities to participate in the political process.  *Barnett*, 141 F.3d at 701-02.

### F.    Act 23 Interacts With These Factors To Cause An Inequality of Voting Opportunities Based On Race.

There is a direct "causal connection" between Act 23 and the denial and abridgement of minority voters' "opportunity . . . to participate in the political process."  *Gonzalez*, 677 F.3d at

405 (en banc) (citation omitted); 42 U.S.C. § 1973(b).  The Senate Factors analyzed above interact with Act 23 in a variety of ways to build upon prior racial discrimination and then perpetuate and amplify that discrimination into the future.  The stark racial disparity in possession of driver's licenses and state IDs results from generations of discrimination against African-Americans and Latinos, who are much more likely than whites to live in urban areas (and thus have less need to drive) and to be poor (and thus unable to afford to drive).

Having been disproportionately subjected to the burdens of Act 23, African-Americans and Latinos also will face much greater challenges than whites in overcoming those burdens and obtaining the required IDs.  As the result of the historic and current socioeconomic factors discussed above, voters of color face greater challenges in being able to afford the additional costs imposed by Act 23, in obtaining the required birth certificates (often from distant out-of-state sources), and in navigating through multiple agency bureaucracies.  *See* Burden Decl. ¶¶ 41, 60-62, 68.  These are not minor inconveniences or the necessary burdens of modern life.  These pointless burdens merely perpetuate the effects of past discrimination.

The "tenuous" justifications for Act 23, the ready availability of numerous less restrictive alternatives, and the sharp departure from historic Wisconsin practices reinforce the racially discriminatory *results* (if not purpose) of this legislation.  The racially polarized voting, continued racial appeals, and growing influence of voters of color also suggest that Act 23 may be more about suppressing their votes than combating real fraud.

Most important, the additional hurdles and burdens imposed by Act 23 predictably will suppress voting by those who are subject to its restrictions, a disproportionate number of whom are African-Americans and Latinos.  *Id.* ¶¶ 8, 41, 68.  Indeed, they did exactly that in the February 2012 elections in which Act 23 was implemented.  *See* p. 45 & n.33 *supra.*  Just like

the old Jim Crow laws, Act 23 predictably will suppress voter turnout among people of color and result in those voters having "less opportunity than other members of the electorate to participate in the political process." 42 U.S.C. § 1973(b). It is difficult to imagine a stronger, more proximate "causal connection between the challenged voting practice and a prohibited discriminatory result." *Gonzalez*, 677 F.3d at 405 (citation omitted).

In sum, the additional burdens and hurdles imposed by Act 23 predictably will suppress voting by those who are subject to its restrictions, a disproportionate number of whom are African-American or Latino. Under the "calculus of voting," Act 23 will interact with social and historical conditions to impose greater burdens on voting by African-American and Latino voters, who already bear heavier burdens and derive fewer benefits from voting than white voters. The "totality of circumstances" analysis thus reinforces the conclusion that Act 23 causes voters of color to have less opportunity to participate in the political process — a prohibited discriminatory result — in violation of Section 2.

## V.  Act 23 Is the Functional Equivalent of the Jim Crow Voter Suppression Measures Outlawed By Section 2.

Section 2 must be applied in light of the evils it was intended to reach, and "should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination" in voting. *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (citation omitted). If the Court has any doubts that Act 23 violates Section 2, it should consider the nature and operation of the various Jim Crow voter suppression measures that the Voting Rights Act and its amendments were enacted to prohibit. It is striking how many important functional similarities Act 23 shares with these voter suppression laws of earlier generations.

**Racially neutral on face but racially disproportionate in impact.** The old Jim Crow laws avoided any explicit mention of race (otherwise, they would have been *per se* illegal under

the Fifteenth Amendment), and instead focused on other characteristics that in the circumstances of those times served as a proxy for race — such as whether the voter could read and write, had a satisfactory "[u]nderstanding of the duties and obligations of citizenship," was regularly employed, or owned a minimum amount of property.[89]  The goal was to find attributes to target so that the burdens and restrictions imposed by the new requirements would fall disproportionately on African-Americans, thereby suppressing if not entirely eliminating their vote without classifying explicitly on the basis of race.  In our day, driver's licenses and state IDs are held disproportionately by whites, so a voting qualification that turns on the possession of such documentation falls disproportionately on voters of color.  *See* pp. 19-33 *supra.*  That was widely understood at the time Act 23 was enacted, and in fact the Wisconsin Legislature was repeatedly told that the voter ID bill for this reason would fall far more heavily on voters of color than on white voters — and refused to enact any ameliorative provisions.  *See* pp. 75-78 *supra.*

**Allegedly no outright prevention of voting.**  Defendants repeatedly argued at trial that voters of color can obtain the required photo ID if they try hard enough, and that only a handful of "bizarre and atypical" Wisconsin voters can "never, ever" obtain ID under Act 23.  Tr. 2133-34.  Not only do these arguments ignore the evidence that significant numbers of voters of color will be disfranchised, but they are  familiar from a century ago: If an African-American was prevented from voting by a literacy or "understanding" test, he could study harder so he could pass the test next time.  If he was impoverished and unable to pay a poll tax, he could get a job

---

[89]  1965 H. REP. 11-13); 1965 S. REP. 3-4, 9-12; V.O. Key Jr., SOUTHERN POLITICS IN STATE AND NATION 555-77 (1949, rev. ed. 1984)  (Dkt. 37, Ex. 16); J. Morgan Kousser, THE SHAPING OF SOUTHERN POLITICS: SUFFRAGE RESTRICTION AND THE ESTABLISHMENT OF THE ONE-PARTY SOUTH, 1880-1910, at 56-62 (1974) (Dkt. 37, Ex. 22); Gunnar Myrdal, AN AMERICAN DILEMMA: THE NEGRO PROBLEM AND MODERN DEMOCRACY 1325 n.34 (1944) (Dkt. 60, Ex. 70); Michael J. Klarman, FROM JIM CROW TO CIVIL RIGHTS: THE SUPREME COURT AND THE STRUGGLE FOR RACIAL EQUALITY 28-39 (2004) (Dkt. 37, Ex. 20)

and save his money.  If polling times and places were inconvenient, and voting was really important to him, he could find the time, travel further, try harder, and take whatever additional steps were required of him.  Section 2 and its 1982 amendments were intended to eliminate these defenses, and to prohibit the disproportionate imposition of "procedural hurdles" and "significant inconvenience[s]" on voters of color, *regardless* whether some, many, or even most of those voters are able to surmount those hurdles and inconveniences if they try hard enough.  1965 H. REP. 10; 1981 H. REP. 17; *see* Part III-A *supra.*

**Required payment to vote.**  The poll tax was widely used until the 1960s to suppress the African-American vote.  As the 1965 House Report observed, "[i]t is obvious that the poll tax has a heavier economic burden on Negroes than on Whites because Negroes generally have smaller incomes out of which to pay."  1965 H. REP. 21.[90]  That income disparity continues today, nearly a half century after the 1965 Act.  *See* p. 72 *supra.*  One requirement of the Voting Rights Act is that "voting rights are not to be encumbered by *any* fiscal exaction" required as a condition of being able to cast a regular ballot.  1965 H. REP. 20 (emphasis added); *see also* 1965 S. REP. 33-34 ("the franchise must not be impaired because of economic status").  For that reason, the Act requires not only that a required voter ID card *itself* be "free," but "that any underlying documents required to obtain that ID are [also] *truly free of charge*."  *Texas v. Holder*, 888 F. Supp. 2d at 144 (emphasis added).

Act 23 flunks this requirement and must be enjoined on that basis alone — it requires the payment of money for a birth certificate in order to obtain the ID required to vote.  *See* Part III-C-1 *supra.*  It is striking how many witnesses at trial explicitly compared Act 23 to a poll tax in

---

[90]  *See also* 1965 H. REP. 20 ("[T]he poll tax clearly was conceived in discrimination.  Its purpose — to keep Negroes from the franchise — is its fatal infirmity."); Key, SOUTHERN POLITICS 578-618; Myrdal, AMERICAN DILEMMA 481-83; Kousser, SHAPING OF SOUTHERN POLITICS 63-72.

both spirit and effect — both those who had to pay the money in order to vote and those who helped to administer the voter ID law and saw its impacts close up (including a senior GAB attorney and the current DMV Deputy Administrator).[91]

**Reliance on burdensome bureaucratic procedures and red tape.** One of the hallmarks of the old Jim Crow laws was that they imposed "burdensome," "vague, arbitrary, hypertechnical [and] unnecessarily difficult" requirements and a variety of bureaucratic "procedural hurdles" on the voters subject to their provisions, which all too often fell disproportionately on voters of color. 1981 H. REP. 14; 1965 H. REP. 10, 13. The application process for voters of color became "a test of skill" and the "engine of discrimination" characterized by long delays in service, red tape, the need to make repeated visits to multiple government offices to obtain and maintain voting eligibility, arbitrary and unpublicized agency actions, "procedural hurdles," and other "bureaucratic monstrosities."[92] All of these same

---

[91] *See, e.g.*, Tr. 416 (Anita Johnson: "As I spoke to the senior citizens, one woman said to me, 'I fought for the right to vote and now I have to pay for an ID to vote. I will not be voting.' And I was like, oh, no, we still need for you to vote. We still need for you to get that ID. Don't stop voting because you now have to pay for an ID."); *id.* at 578-79, 582-83 (Rev. Brisco: "We had a whole other demographic that believed this was a poll tax, this was something that they had seen before, that they had heard about before, and they weren't going to engage in it. … It's another punitive measure that they have witnessed through history that is a poll tax that they believe,  and they really stand out against it. …  [I]t was perceived as a poll tax because the majority of our individuals in our communities have ties to the South. And if you have ties to the South, you know the restrictions and you know the punitive things that were put on the voter."); *id.* at 792-93 (Rep. Zamarripa:  "voter ID is a poll tax for voters"); *id.* at 1111 (DOT official Kristina Boardman: requiring someone to amend their birth certificate in order to vote "could be costly" and "could essentially be called a poll tax"); *id.* at 1625-28 (GAB staff counsel Shane Falk: requiring someone to purchase their birth certificate in order to vote is "an additional fee they have to pay and it's something that's specifically required to actually vote. One could conclude it's a poll tax.").

[92] 1965 H. REP. 8 (internal punctuation and citations omitted); 1965 S. REP. 10 (citations omitted); Kousser, SHAPING OF SOUTHERN POLITICS 50; *see also* Kousser at 48 (discussing "rules and regulations and other barriers to the ballot which make it impossible for poor people and working people to register with ease") (citation omitted); Myrdal, AMERICAN DILEMMA 484 ("A tricky registration blank must be filled out: Whites will be given assistance, and their

complaints have repeatedly been made about the Act 23 ID process as administered by the Wisconsin DOT.  *See* Part III-C-4 *supra.*

      **Bureaucratic "discretion" and standardless decisionmaking.**  Poorly publicized rules and procedures, and the vesting of broad discretion in the hands of local bureaucrats, were integral features of many voter suppression laws of earlier generations.  These contrivances allowed local officials to go easy on those they liked (for whatever reason) while turning away those they disliked (for whatever reason) — discretion that repeatedly was exercised against voters of color.[93]  Even prior to the Voting Rights Act of 1965, the Supreme Court and lower federal courts had repeatedly held that the Fifteenth Amendment forbids voting qualifications and procedures that are "*so ambiguous, uncertain, and indefinite in meaning that they confer upon [local registrars] arbitrary power to register or to refuse to register whomever they*

---

errors adjusted or overlooked; Negroes will not be allowed even the most trivial incompleteness or error, and are given no assistance.").  Kousser concluded (at 48) that "[t]he key disfranchising features of the Southern registration laws were the amount of discretion granted to the registrars, the specificity of the information required of the registrant, the times and places set for registration, and the requirement that a voter bring his registration certificate to the polling place."  One contrivance used during the Jim Crow era to turn prospective African-American voters away was to demand particular forms of identification they were unlikely to have (*e.g.,* Social Security cards, voter registration certificates, etc.).  *See* 1981 HOUSE HEARINGS 775-76 (Social Security cards) (Dkt. 37, Ex. 26); *id.* at 2014 (requirements to provide registration receipts and "copiously detailed information"); Minnite Decl. ¶ 7 (registration certificates); Kousser, SHAPING OF SOUTHERN POLITICS 49 (registration certificates).

[93]  One historian of the period concluded that "the amount of discretion granted to registrars" was one of the "key disfranchising factors" of the Jim Crow-era voter suppression laws. Kousser, SHAPING OF SOUTHERN POLITICS 48; *see also id.* at 59 ("When asked whether Christ could register under the good character clause, a leader of the Alabama convention replied, 'That would depend entirely on which way he was going to vote.'"); Michael Perman, STRUGGLE FOR MASTERY: DISFRANCHISEMENT IN THE SOUTH, 1888-1908, at 29 (2001) (Dkt. 60, Ex. 69) ("registrars were given almost unlimited discretion in interpreting and administering the qualifying tests"); Myrdal, AMERICAN DILEMMA 1325 n.34 ("I can keep the President of the United States from registering, if I want to.  God, Himself, couldn't understand that sentence.  I, myself, am the judge."); *see also id.* at 484 ("Even professors at Tuskegee and other Negro universities have been disfranchised by failing to pass these tests."); Samuel Issacharoff, Pamela S. Karlan & Richard H. Pildes, THE LAW OF DEMOCRACY: LEGAL STRUCTURE OF THE POLITICAL PROCESS 117-20 (rev. 2d ed. 2002) (Dkt. 60, Ex. 71).

*please.*"  *Davis v. Schnell*, 81 F. Supp. 872, 877-78 (S.D. Ala.) (three-judge district court) (emphasis added) ("understand and explain" provisions were unconstitutional because they conferred unchecked discretion on local bureaucrats to determine "those who may vote and those who may not" — a "'naked and arbitrary power to give or withhold consent'") (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 366 (1886)), *aff'd*, 336 U.S. 933 (1949); *see also Lassiter v. Northampton County Bd. of Elections*, 360 U.S. 45, 53 (1959) (voting qualifications that vest "great discretion" in local registrars are impermissible because they "may be employed to perpetuate that discrimination which the Fifteenth Amendment was designed to uproot").

Yet Wisconsin claims the same kind of "naked and arbitrary power to give or withhold consent" in administering Act 23.  As detailed above, DOT's poorly publicized "extraordinary petition" proof procedure allows a small number of agency officials and supervisors to grant or deny exceptions to the Act 23 proof requirements "on a case-by-case basis," subject to "no written policies" and no consultation requirements, resting on nothing more than whether they "*feel comfortable based on the documentation presented authorizing the exception*," in which case they can do so "independently" and subject to no appeal.  Tr. 1121-22 (Boardman) (emphasis added); *see* pp. 63-65 *supra*.  This "ambiguous, uncertain, and indefinite" exemption process, and the "arbitrary power" it confers on DOT officials and supervisors to determine who may and may not vote, is reason enough to strike Act 23 down under Section 2.  *Davis v. Schnell*, 81 F. Supp. at 877-78.

**Act 23's fatal "grandfather clause" provision.**  In the days of Jim Crow, the existing electorate (disproportionately white) would often attempt to exempt itself from the application of newly imposed registration and voting requirements — a sure-fire sign that race discrimination was afoot.  These efforts to "grandfather" the existing electorate from new registration and

voting burdens included loopholes like "grandfather clauses," "good moral character" provisions, and laws allowing property owners (who were overwhelmingly white) to be exempt from literacy and related requirements.  1965 H. REP. 2-5, 8.[94]

Even apart from the Voting Rights Act, the Supreme Court has repeatedly held over the past century that the Fifteenth Amendment bars States from imposing new requirements and standards on new voters while "carving out" the *existing* electorate from those new burdens; such *prospective* voting requirements operate to favor white voters (who disproportionately make up the incumbent electorate) over voters of color (who are disproportionately absent from the existing electorate).  *Guinn v. United States*, 238 U.S. 347, 364 (1915) (striking down Oklahoma law imposing a new literacy test but "carving out" people entitled to vote as of January 1, 1866 from having to take the test).  In other words, "granting voting privileges for life" to *current* voters and "shelter[ing]" them from "new burden[s]" imposed on *new* voters "partakes too much of the infirmity of the 'grandfather clause' to be able to survive."  *Lane v. Wilson*, 307 U.S. 268, 276 (1939); *see also Lassiter*, 360 U.S. at 50 (exempting existing voters from newly imposed literacy requirements would give "members of the white race … preferential privileges of the ballot contrary to the command of the Fifteenth Amendment").

Act 23 suffers from precisely the same  defect.  By its terms, voters who already held a Wisconsin driver's license or state ID on July 1, 2011 (or who held such a license or ID that had expired within the eight years preceding that date) may indefinitely renew their licenses and IDs without ever having to go to the expense and bother of tracking down their birth certificates and other qualifying documentation that those without current licenses or state IDs must produce.  *See* pp. 40-41 *supra.*  By permanently "carving out" and "shelter[ing]" those who already hold

_____

[94]  *See also* Key, SOUTHERN POLITICS 555-77; Kousser, SHAPING OF SOUTHERN POLITICS 56-62; Myrdal, AMERICAN DILEMMA 483-84.

driver's licenses and state IDs from the new proof requirements, Act 23 thus functions as a forbidden grandfather clause because it shields the (predominantly white) existing electorate from the expenses and burdens that will fall disproportionately on African-American and Latino voters. *Guinn*, 238 U.S. at 364; *Lane*, 307 U.S. at 276.

## VI. Plaintiffs Meet All Other Requirements For the Entry of Broad Permanent Injunctive Relief.

Plaintiffs readily meet all other requirements for the entry of broad permanent injunctive relief. *See, e.g.*, *ADT Security Services, Inc. v. Lisle-Woodridge Fire Protections Dist.*, 672 F.3d 492, 498 (7th Cir. 2012) (permanent injunction requires that plaintiffs demonstrate "(1) success, as opposed to a likelihood of success, on the merits; (2) irreparable harm; (3) that the benefits of granting the injunction outweigh the injury to the defendant; and, (4) that the public interest will not be harmed by the relief requested") (internal quotations and citations omitted).

The denial and abridgement of the constitutionally protected right to vote is, by definition, an irreparable injury that warrants injunctive relief. The "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (right to vote is "regarded as a fundamental political right, because preservative of all rights"). Preventing eligible voters like the members and constituents of the organizational plaintiffs from voting inflicts "harms that cannot be recompensed." *Shannon v. Jacobowitz*, 301 F. Supp. 2d 249, 258 (N.D.N.Y. 2003).[95]

---

[95] *See also, e.g., Association of Community Organizations for Reform Now v. Scott*, No. 08-cv-4084, 2008 WL 2787931, at *7 (W.D. Mo. July 15, 2008); *Spencer v. Blackwell*, 347 F. Supp. 2d 528, 537 (S.D. Ohio 2004); *Bay County Democratic Party v. Land*, 347 F. Supp. 2d 404, 435-36 (E.D. Mich. 2004); *Hoblock v. Albany Cnty. Bd. of Elections*, 341 F. Supp. 2d 169, 176 (N.D.N.Y. 2004), *remanded on other grounds*, 422 F.3d 77 (2d Cir. 2005); *Charles H. Wesley*

The public interest and balance of equities also favor permanent injunctive relief. The competing claims of injury are not comparable; baseless claims of in-person voter fraud cannot outweigh the certain denial and suppression of voting by people of color that Act 23 will cause. As the Sixth Circuit concluded in analogous circumstances:

> Because the risk of actual voter fraud is miniscule when compared with the concrete risk that [the State's] policies will disenfranchise eligible voters, we must conclude that the public interest weighs in favor of [preliminary injunctive relief]. The preliminary injunction eliminates a risk of individual disfranchisement without creating any new substantial threats to the integrity of the election process.

*U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388-89 (6th Cir. 2008).[96]

Some state legislative leaders appear to be awaiting this Court's decision before making any revisions to Act 23; the apparent intent is to keep any revisions to Act 23 to the bare minimum to (arguably) remedy the violations of Section 2 that justify this Court's injunction. But the evidence and law demonstrate that the voter ID provisions of Act 23 violate Section 2 in

---

*Educ. Found., Inc. v. Cox,* 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004), *aff'd*, 408 F.3d 1349 (11th Cir. 2005).

[96] This Court's authority to enter a permanent injunction is not affected by the temporary injunction issued on state constitutional grounds by the Circuit Court of Dane County, Wisconsin in *Milwaukee Branch of the NAACP v. Walker*, No. 11-CV-5492 , 2012 WL 739553 (Wis. Cir. Ct. Mar. 6, 2012). On November 20, 2013, the Wisconsin Supreme Court took direct jurisdiction over Wisconsin's appeal of that injunction and ordered that it be heard together with the appeal from a Wisconsin Court of Appeals order reversing the injunction against Act 23 entered in *League of Women Voters of Wisconsin Educ. Network, Inc. v. Walker*, 348 Wis.2d 714, 2013 WI App. 77, 834 N.W.d 393 (2013). *See* Order entered November 20, 2013 by the Clerk of the Supreme Court of Wisconsin. As this Court recognized in scheduling the trial of this matter, there is a real possibility that the Wisconsin Supreme Court will vacate the *NAACP* temporary injunction, and Wisconsin has to date refused to agree that it would stay enforcement of Act 23 following any such action by the Wisconsin Supreme Court for a period sufficient to allow this Court to rule on the merits of this case in an orderly fashion. Under these circumstances, there is a real and immediate controversy between the parties over the Section 2 claims presented here, and the Court should proceed forthwith to the merits of this lawsuit and the entry of appropriate injunctive relief.

many significant ways, and that the Court should make clear that it is enjoining those provisions on multiple grounds because of the many significant burdens Act 23 imposes.

The Court also should make clear that it will schedule appropriately expedited briefing and resolution of any claim by defendants or the State itself that future amendments to Act 23 may have mooted the permanent injunction issued by this Court. Any such amendment would impact the injunction's continued vitality only if it "clearly rectifies the statute's alleged defects." *Hatchett v. Barland*, 816 F. Supp. 2d 583, 593 (E.D. Wis. 2011), *quoting Rembert v. Sheahan*, 62 F.3d 937, 940-41 (7th Cir. 1995). Thus, "legislative correction of a challenged statute" does not moot the controversy "unless it is absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur." *Zessar v. Keith*, 536 F.3d 788, 794 (7th Cir. 2008). Given the multiple ways in which Act 23 disproportionately burdens or abridges the rights of voters of color, there is a real possibility that the parties will disagree whether any amendment to Act 23 meets these stringent standards for mooting the need for continuing the injunction issued by this Court. To ensure that any such disagreement is resolved in a prompt and orderly fashion, plaintiffs respectfully ask the Court to make clear that the parties should present any such issue to this Court for appropriate resolution.

Finally, if the Court has any questions when it decides the merits as to the need for or scope of permanent injunctive relief, the Court should hold a hearing to review developments and consider additional relief.

## CONCLUSION

For the reasons set forth above and in the record before this Court, plaintiffs respectfully request that this Court enter a permanent injunction against the implementation and enforcement

Case 2:12-cv-00185-LA   Filed 12/20/13   Page 115 of 117   Document 112

of the voter ID provisions of 2011 Wisconsin Act 23, together with the other relief set forth in

the accompanying proposed Order and Permanent Injunction.

Dated:  December 20, 2013

Respectfully submitted,

/s/ Charles G. Curtis, Jr.

Penda D. Hair
James Eichner
Denise D. Lieberman
Leigh M. Chapman
Advancement Project
Suite 850
1220 L Street, N.W.
Washington, D.C.  20005
Phone:  (202) 728-9557
Email:  phair@advancementproject.org
jeichner@advancementproject.org
dlieberman@advancementproject.org
lchapman@advancementproject.org

Arnold & Porter LLP
Suite 620
16 North Carroll Street
Madison, Wisconsin  53703
Phone:  (608) 257-1922
Email:  charles.curtis@aporter.com

John C. Ulin
Marco J. Martemucci
Arnold & Porter LLP
44th Floor
777 South Figueroa Street
Los Angeles, California  90017
Phone:  (213) 243-4000
Email:  john.ulin@aporter.com
marco.martemucci@aporter.com

Carl S. Nadler
Ethan J. Corson
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
Phone: (202) 942-6130
Email:  carl.nadler@aporter.com
ethan.corson@aporter.com

Nathan D. Foster
Arnold & Porter LLP
370 17th Street, Suite 4400
Denver, Colorado  80202
Phone: (303) 863-1000
Email:  nathan.foster@aporter.com

Daniel Ostrow
Arnold & Porter LLP
399 Park Avenue
New York, New York  10022
Phone: (212) 715-1000
Email:  daniel.ostrow@aporter.com

105