IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

LEAGUE OF UNITED LATIN AMERICAN CITIZENS
(LULAC) OF WISCONSIN; CROSS LUTHERAN CHURCH;
MILWAUKEE AREA LABOR COUNCIL, AFL-CIO;
and WISCONSIN LEAGUE OF YOUNG VOTERS
EDUCATION FUND;

        Plaintiffs,

v.                                                                             Case No. 2:12-cv-185-LA

JUDGE DAVID G. DEININGER, JUDGE MICHAEL BRENNAN,
JUDGE GERALD C. NICHOL, JUDGE THOMAS BARLAND,
JUDGE THOMAS CANE, KEVIN J. KENNEDY, and
NATHANIEL E. ROBINSON, all in their official capacities,

        Defendants.

## *LULAC* PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY PERMANENT INJUNCTION PENDING APPEAL

        The arguments in defendants' motion to stay the permanent injunction pending appeal are an improper caricature of this Court's decision and the massive trial record supporting the Court's factual and legal determinations. According to defendants, this Court "aims to give itself the power of a second Wisconsin Governor," is "out of touch" on both the facts and the law, is attempting to exercise "carte blanche to ignore the plain language of Section 2," and is "attempt[ing] to exercise jurisdiction that the Court does not have." Mot. 6, 14.

        The reality, of course, is otherwise. None of defendants' arguments survives scrutiny, and some of them already have been repeatedly considered and rejected by this Court. The Court's April 29th decision, order, and judgment are grounded on an extensive factual record. Its legal analysis is based on a thorough review of governing precedent and faithfully reflects the

language, purposes, and remedial scope of Section 2. Defendants will not succeed on their "statutory standing," statutory construction, and scope-of-relief objections to this Court's decision, and they meet none of the other criteria required to stay the Court's permanent injunction pending appeal.

## ARGUMENT

I. **THIS COURT RULED CORRECTLY, AND WILL BE UPHELD, ON THE "STATUTORY STANDING," STATUTORY CONSTRUCTION, AND SCOPE-OF-RELIEF ISSUES RAISED IN DEFENDANTS' MOTION TO STAY.**

Defendants raise only three objections to the Court's resolution of the Section 2 claim in *LULAC v. Deininger*. They will not prevail on any of those objections.

### A. This Court Correctly Ruled That The *LULAC* Plaintiffs Are "Aggrieved Person[s]" Under 42 U.S.C. § 1973a(a).

For the third time in nine months, defendants object to the "standing" of the four organizational plaintiffs in the *LULAC* case. They raise no objections to the Court's detailed findings about the factual bases of these plaintiffs' standing; nor do they object to any of the Court's determinations that all four of these plaintiffs have both "organizational" and "associational" standing under Article III to pursue their Section 2 claim; nor do they appear to challenge the Court's conclusion that plaintiffs fall comfortably within the "zone of interests" intended to be protected by Section 2. *See* Op. at 40-48; *see also* n. 1 *infra*. Instead, defendants' sole objection to the *LULAC* plaintiffs' "standing" is that they supposedly are not "aggrieved person[s]" within the meaning of 42 U.S.C. § 1973a(a), arguing that only voters can be "aggrieved persons." *See* Mot. 2, 15-18.

This argument is no more persuasive the third time. As this Court has now twice ruled, an "aggrieved person" under § 1973a(a) presumptively includes an organization pursuant to the Dictionary Act, 1 U.S.C. § 1, unless the context requires otherwise. *See* Op. at 47. There is

2

Case 2:12-cv-00185-LA   Filed 06/02/14   Page 2 of 20   Document 138

nothing in the context of § 1973a(a) that limits "aggrieved persons" to only voters themselves. To the contrary, the key legislative history "confirms that Congress intended to confer a right to sue on organizations seeking to protect the voting rights of their members and others." Op. at 47; *see also* Sept. 17, 2013 Decision and Order, at 3-5 (Dkt. 84); S. REP. NO. 94-295, at 40 (1975) ("An 'aggrieved person' [under 42 U.S.C. § 1973a(a)] is any person injured by an act of discrimination. It may be an individual *or an association representing the interests of injured persons.*") (emphasis added).

Defendants claim this Court abused its discretion by relying on this clear legislative history because the statutory language is so "plain" in "context" that there is no ambiguity justifying resort to the legislative history and other tools of statutory construction. The sum total of their "contextual" analysis is as follows: "Organizations have no right to vote. People do." Mot. at 17; *see also id.* at 18 ("'Persons' in 42 U.S.C. § 1973a cannot mean organizations because organizations have no right to vote").

This is the same as arguing that organizations are not protected by the Religious Freedom Restoration Act ("RFRA") because organizations do not "exercise" religion; "people do." Yet the Seventh Circuit recently held that even for-profit organizations fall within the scope of the RFRA, which prohibits the federal government from placing substantial burdens on "*a person's* exercise of religion," except where the challenged burdens are the "least restrictive means of furthering … [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b) (emphasis added). The Seventh Circuit followed precisely the same analysis used by this Court, looking first to the Dictionary Act and then to the challenged statute's "broader contextual purpose."

3

*Korte v. Sebelius*, 735 F.3d 654, 673-75 (7th Cir. 2013). Far from being "out of touch" with controlling precedent, this Court carefully followed it.[1]

It is difficult to understand why defendants continue to raise a "statutory standing" argument that cannot affect the outcome. As this Court observed, whether the *LULAC* plaintiffs have standing "has little practical significance, as the plaintiffs in the *Frank* case unquestionably have standing to pursue a claim for injunctive relief under Section 2, and only one plaintiff with standing is needed." Op. at 40 (citations omitted).[2] Defendants justify continuing to press this point by reasoning that this Court relied heavily on the factual and expert testimony presented by the *LULAC* plaintiffs, which "has now *infected the Court's entire final ruling*." Mot. at 15-16 (emphasis added). According to defendants, "none of the *LULAC* experts or other *LULAC* witnesses should have been permitted to testify or present evidence at trial," and "subtracting that *LULAC* evidence from the trial record — for example Leland Beatty's testimony — would make the Court's final ruling quite hollow." *Id.* But even if defendants' statutory standing objections had any merit (which they do not), this argument is foreclosed by their trial stipulation

---

[1] Aside from their "plain language" objections, defendants do not challenge in any respect this Court's determinations that the *LULAC* plaintiffs "obvious[ly]" fall within the zone of interests protected by Section 2; "they are organizations concerned with advancing voting rights, their members are individuals that the Voting Rights Act was designed to protect, and the legislative history of the Act explicitly states that organizations representing the interests of injured voters were intended to be granted rights to sue." Dkt. 84 at 5; *see also* Op. at 47-48 ("The evidence adduced at trial establishes that all four *LULAC* plaintiffs are organizations representing the interests of individuals whose voting rights are burdened by Act 23. Therefore, I find that all four *LULAC* plaintiffs fall within the zone of interests of Section 2 and are aggrieved persons within the meaning of Section 2.").

[2] *See also Ezell v. City of Chicago,* 651 F.3d 684, 696 n. 7 (7th Cir. 2011) ("Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not."); *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd,* 553 U.S. 181, 189 n.7.

that all evidence admitted in each case would be deemed admitted in both cases. *See* Trial Tr. vol. 1 at 7 (Dkt. 115); Trial Tr. vol. 6 at 1708 (Dkt. 120).[3]

### B. This Court Correctly Construed Section 2.

Defendants claim the Court violated the "plain language and meaning" of Section 2 because the statute relies on a "results based" test, "while the Court's test is based upon likelihood." Mot. at 2, 11-12. They assert this Court "focus[ed] not on causation but on mere likelihood," and "repeatedly relied upon likelihoods rather than results or causation." *Id.* And they quote one phrase from the Court's 90-page decision in isolation in arguing that this Court's "new test" and "novel interpretation" somehow violate the "plain language" of Section 2. *Id.* at 12-14.

To the extent defendants mean to suggest that Act 23 does not directly "cause" or "result" in the outright denial of the right to vote on a racially disproportionate basis, this Court's decision and the massive trial record document how Act 23 makes it *impossible* as a practical matter for many people to vote; how it imposes significant burdens on many other voters that predictably deter, discourage, and ultimately depress their turnout; and how these adverse impacts fall much more heavily on voters of color than on whites, and are much more difficult for voters of color to overcome, as the result of historic and ongoing race discrimination. *See* Op. at 22-39, 60-61, 68.[4]

---

[3] We agree with defendants' underlying premise — that the *LULAC* evidence was devastating to their arguments and demonstrated that Act 23 is an unnecessary, overreaching, arbitrarily administered, and racially discriminatory measure that denies and abridges the right to vote on multiple grounds. But the *Frank e*vidence was similarly and independently overwhelming in demonstrating that Act 23 is a forbidden racially discriminatory voter suppression measure. This Court's decision and permanent injunction are supported by both the *LULAC* and the *Frank* records, whether considered separately or in combination.

[4] As this Court found, it has been "impossible" for some voters of color who lack IDs to obtain them. *See* Op. at 60 n.34 (discussing the experiences of Alice Weddle, Eddie Lee

5
Case 2:12-cv-00185-LA   Filed 06/02/14   Page 5 of 20   Document 138

Defendants also persist in ignoring that Section 2 outlaws not just those burdens that make it literally *impossible* to cast a vote — it prohibits burdens that "deny *or abridge*" (defined as "reduce," "diminish," or "shorten"[5]) the right to vote. 42 U.S.C. § 1973(a) (emphasis added). Section 2 requires that the voting process be "*equally open*" to participation by voters of color, and prohibits rules and procedures that result in voters of color having "*less opportunity* than other members of the electorate to participate in the political process." *Id.* § 1973(b) (emphasis added). The Voting Rights Act prohibits the disproportionate imposition of "*procedural hurdles*" and "*significant inconvenience[s]*" on voters of color, regardless of whether some, many, or even most of those voters might be able to surmount those hurdles and inconveniences if they try hard enough. H.R. REP. NO. 439, at 8 (1965) (emphasis added); H.R. REP. NO. 97-227, at 17 (1981) (emphasis added); *see also Harman v. Forssenius*, 380 U.S. 528, 541-42 (1965) (Twenty-Fourth Amendment's identical "deny or abridge" prohibition forbids imposing a "material requirement," "erect[ing] a real obstacle to voting," or adopting "a cumbersome procedure" for those failing to pay a poll tax); *Lane v. Wilson*, 307 U.S. 268, 275 (1939) (Fifteenth Amendment's identical "deny or abridge" prohibition outlaws "onerous procedural requirements" that, while racially neutral on their face, "effectively handicap exercise of the

---

Holloway, Jr., Rickey Davis, Shirley Brown, Melvin Robertson, Rose Thompson, and Sim Newcomb); *see also id.* at 25. Act 23 imposes substantial burdens and "practical obstacles" on many additional voters of color, with the predictable result that a "large number" of them will be deterred from voting. *Id.* at 29, 61; *see also id.* at 32-33 n.17 (describing the efforts of Bettye Jones to obtain a Wisconsin photo ID with the assistance of her daughter Debra Crawford; finding that "Jones only received a state ID card because her daughter made multiple inquiries and took Jones to two different DMV service centers"). Not only must "a disproportionate share of the Black and Latino populations … shoulder an additional burden in order to exercise the right to vote under Act 23," they are much more likely to face "additional hurdles" in obtaining the required photo ID than encountered by white voters. *Id.* at 61-62; *see also id.* at 59-68.

[5] BLACK'S LAW DICTIONARY 6 (8th ed. 2004); MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 4 (10th ed. 2000).

franchise by [African Americans] although the abstract right to vote may remain unrestricted as to race"). Far from imposing a "new test" or "novel interpretation" (Mot. 12-13), this Court's application of Section 2 is faithful to these decisions and to the language and purposes of Section 2.[6]

### C. The Scope of This Court's Permanent Injunction Is Appropriate.

Defendants' objections to the scope of the Court's permanent injunction are unfounded. Defendants contend that, now that they have filed a notice of appeal, "*any action by the district court is a nullity*," including any effort by this Court to construe, enforce, or modify its injunction. Mot. at 5-6 (emphasis added). But the Federal Rules of Civil Procedure expressly provide that a district court "may suspend, modify, restore, or grant an injunction" while its

---

[6] This case is hardly "unique" or the "first of its kind," as defendants contend. Mot. at 14. For example, federal courts that reviewed state voter ID laws under Section 5's preclearance procedures prior to *Shelby County* repeatedly condemned state laws that imposed "material burden[s]" and "major inconvenience[s]" in a racially disproportionate manner. *South Carolina v. United States*, 898 F. Supp. 2d 30, 40-42 (D.D.C. 2012); *Florida v. United States*, 885 F. Supp. 2d 299, 346 (D.D.C. 2012); *Texas v. Holder*, 888 F. Supp. 2d 113, 126 (D.D.C. 2012), *vacated on other grounds*, 133 S. Ct. 2886 (2013). Although Section 5 is not presently operative in the wake of *Shelby County*, the analysis of the "spectrum of stringency" in these cases is highly instructive here, *South Carolina*, 898 F. Supp. 2d at 46, and follows logically from the "calculus of voting" analysis adopted in the Court's decision. *See* Op. at 37-38, 61 (applying calculus of voting analysis as described by Prof. Burden, Prof. Levine, and Judge Posner in *Crawford*). Similarly, numerous federal courts have held that Section 2 forbids the disproportionate use of faulty voting technology in voting districts with large populations of voters of color, which subjects these voters to a greater statistical *risk* that their ballots will not be properly counted and thereby "diminishe[s]" their equal opportunity to participate in the political process. *Black v. McGuffage*, 209 F. Supp. 2d 889, 897 (N.D. Ill. 2002); *see also Stewart v. Blackwell*, 444 F.3d 843, 877-79 (6th Cir. 2006); *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (per curiam); *Common Cause Southern Christian Leadership Conference of Greater Los Angeles v. Jones*, 213 F. Supp. 2d 1106, 1110 (C.D. Cal. 2001). Even Justices who have criticized the application of Section 2 in vote *dilution* cases have emphasized that it prohibits procedures that make it "more difficult" for voters of color than for whites to register and vote. *Chisom v. Roemer*, 501 U.S. 380, 408 (1991) (Scalia, J. dissenting); *see also Holder v. Hall*, 512 U.S. 874, 917, 922 (1994) (Thomas, J., concurring in the judgment). Defendants make clear their disagreement with Justice Scalia's analysis and this Court's reliance on it (*see* Mot. at 13-14), but his analysis is correct and on point.

permanent injunction is being challenged on appeal. Fed. R. Civ. P. 62(c); *see also United States v. Articles of Food and Drug*, 441 F. Supp. 772, 774 (E.D. Wis. 1977) ("the Court in its discretion may suspend or modify the operation of the injunction during the pendency of the appeal [and] retains full jurisdiction and authority to enforce the terms of its decree pending appeal"); *Vac-Air v. John Mohr & Sons*, 54 F.R.D. 580, 581 (E.D. Wis. 1972) (noting district court's continuing authority over injunction even after appeal is filed).[7]

Nor is this Court's injunction overbroad in any other respect. A "federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from defendant's conduct in the past." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132 (1969); *see also Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 504 (7th Cir. 2008) (affirming injunction broader than specific allegations of complaint where "there was a likelihood that [defendant] would act further to thwart the Union's efforts"). Courts routinely go beyond the four corners of the specific challenged statutory provisions to enjoin future efforts to commit the same disapproved *conduct*.[8] This Court's decision to enjoin not Act

---

[7] *See also A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1099 (9th Cir. 2002) (after appeal is taken Rule 62(c) authorizes district court to "continue supervising compliance with the injunction"); *Maid of Mist Corp. v. Alcatraz Media LLC*, 2010 WL 1687810, at *13 (N.D. Ga. Apr. 26, 2010) (noting district court's continuing authority to enforce injunction during appeal); *Georgine v. Amchem Prods., Inc.*, 1995 WL 422792, at *6 (E.D. Pa. July 12, 1995) (same); *Research Corp. v. Pfister Assoc. Growers, Inc.*, 310 F. Supp. 1377, 1379 (N. D. Ill. 1970) ("this court has full power and jurisdiction to enforce its injunctive order pending appeal"). *See generally* 11 C. Wright, A. Miller, *et al.*, FEDERAL PRACTICE & PROCEDURE § 2904 (3d ed. 2004) (discussing district court's continuing authority to supervise injunction during appeal).

[8] *See, e.g., Northeast Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 589, 599 (6th Cir. 2012) (affirming injunction enjoining not just particular statute but general practice of rejecting provisional ballots cast in the wrong precinct); *United States Student Ass'n Found. v. Land,* 546 F.3d 373, 379 (6th Cir. 2008) (refusing to stay injunction against not just specific statute but general practice of "cancelling or rejecting a voter's registration based upon the return of the voter's original voter identification card as undeliverable"); *United States v. Texas,* 252 F.

8
Case 2:12-cv-00185-LA   Filed 06/02/14   Page 8 of 20   Document 138

23 but the underlying practice of "conditioning a person's access to a ballot, either in-person or absentee, on that person's presenting a form of photo identification" (Dkt. 128), is consistent with these authorities, well within its discretion, and necessary to adequately safeguard the rights of Wisconsin voters of color.

The Court's discussion of potential amendments to Act 23 must be understood in the context of what happened during trial and while the case was under submission. On Nov. 14, 2013, near the end of the two-week trial to this Court, the Wisconsin Assembly adopted an amendment to Act 23 that would have allowed a voter who was unable to obtain the required photo ID due to "indigency" or other limited excuses to cast a "challenged ballot" upon completing a form and then filing an affidavit, subject to follow-up "investigat[ion]" by election officials.[9] Defense counsel repeatedly brought this pending legislation up in their arguments and witness questioning, claiming that the supposedly imminent amendment was "definitely relevant to the issue of whether Act 23 would be upheld."[10] Later, while the case was under submission to this Court, Governor Walker announced that he would call a special session of the Wisconsin Legislature to "modify" Act 23 in the event the law was enjoined.[11]

---

Supp. 234, 255 (W.D. Tex. 1966) (enjoining not just specific statute but general practice of "requiring the payment of a poll tax as a prerequisite to voting").

[9] P. Marley & J. Stein, "Assembly approves changes to voting hours, ID Law," *Milwaukee Journal Sentinel* (Nov. 15, 2013) (reporting that Wisconsin Assembly approved measures "intended to overcome legal challenges to the state's stalled law requiring proof of identity at polls"); *see also* 2013 Assembly Bill 493 (as amended). Although this Court need not address the issue now, the *LULAC* plaintiffs believe this bill would not have cured any of the numerous problems with Act 23 established at trial.

[10] *See* Trial Tr. vol. 6 at 1468 (Dkt. 120) (direct of Prof. Hood); *see also* Trial Tr. vol. 3 at 798 (Dkt. 117) (cross of Rep. Zamarripa); Trial Tr. vol. 5 at 1373 (Dkt. 119) (cross of Prof. Burden).

[11] *See, e.g.*, M. Spicuzza, "Gov. Scott Walker says he would call voter ID special session," *Wisconsin State Journal* (Mar. 12, 2014) (Gov. Walker said he "would call lawmakers

It was in this context that the LULAC plaintiffs expressed concern in their post-trial briefing that "there is a real possibility that the parties will disagree whether any amendment to Act 23 meets the[] stringent standards for mooting the need for continuing the injunction issued by this Court." Dkt. 112, at 103.

> Act 23 violates Section 2 in multiple and significant ways that cannot be remedied through a legislative tweak here or additional narrow exemption there. This Court should make clear in its opinion and permanent injunction that Act 23 is being enjoined on multiple grounds, and should expressly retain jurisdiction to consider any requests by defendants to lift the injunction on the grounds that future amendments to Act 23 allegedly remedy the varied and significant Section 2 violations established on this record.

*Id.* at 1-2; *see also id.* at 103.

This Court expressly adopted the *LULAC* plaintiffs' suggestion. *See* Op. at 69. It identified so many ways in which Act 23's photo ID requirement caused such significant and widespread denial and abridgement of voting rights that it would be difficult if not impossible to remedy the violations by any amendment to the law, and therefore it enjoined the *practice* of requiring the production of an official photo ID rather than a particular version of Act 23 itself. *See* Op. at 68; Judgment, Dkt. 128. The Court also provided that, "[s]hould the State of Wisconsin enact legislation amending the photo ID requirement, and should the defendants believe that, as amended, the photo ID requirement no longer violates Section 2, they may file a motion for relief from the permanent injunction." Op. at 69. The Court added that, "[i]f an election is imminent at the time that the defendants file their motion, I will schedule expedited proceedings on the motion." *Id.*

---

into special session to modify Wisconsin's voter photo identification requirements if courts don't uphold the current measure"); P. Marley, "Walker to call special session if courts rule against voter id," *Milwaukee Journal Sentinel* (Mar. 11, 2014) (same).

10

Far from "aim[ing] to give itself the power of a second Wisconsin Governor" (Mot. at 5), this Court followed well-established judicial practice and precedent, and responded appropriately to defendants' arguments about the supposedly imminent legislative amendment of Act 23. As the Court recognized, there was a very good chance that any such amended statute would be of "the same type or class as unlawful acts which the court has found to have been committed." *Zenith Radio*, 395 U.S. at 132; *see* Op. at 69. Contrary to defendants' apparent premise, the State may not engineer the termination of this long-running litigation simply by amending Act 23 to add new procedures that might address some but far from all of the flaws identified in the Court's detailed findings and conclusions. "[I]f that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect." *Northeastern Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993).

That of course is not the law. Rather, "[w]hen a challenged policy is repealed or amended mid-lawsuit — a 'recurring problem when injunctive relief is sought' — the case is not moot if a substantially similar policy has been instituted or is likely to be instituted." *Smith v. Executive Director of Indiana War Memorials Comm'n*, 742 F.3d 282, 287 (7th Cir. 2014) (numerous citations omitted); *see Hatchett v. Barland*, 816 F. Supp. 2d 583, 593 (E.D. Wis. 2011) (Wisconsin Legislature's amendment of challenged campaign finance statute did not "*clearly rectif[y] the statute's alleged defects*," and therefore did not moot the litigation) (emphasis added, citation omitted).[12] Moreover, the determination as to whether an amendment

---

[12] *See also Lamar Advertising of Penn, LLC v. Town of Orchard Park,* 356 F.3d 365, 378 (2d Cir.2004) (a "plaintiff's claims will not be found moot where the defendant's amendments are merely superficial or the law, after amendment, suffers from similar infirmities as it did at the outset"); *Perez v. Texas,* 970 F. Supp. 2d 593, 602-03 (W.D. Tex. 2013) (rejecting motion to dismiss Voting Rights Act claim for mootness where Texas Legislature had enacted a new

to a challenged practice moots the litigation is appropriately made by a district court in the first instance. "The district court must determine" what has changed and what has not; "[t]his done, the district court must next assess whether the new practice has completely cured the injury of which the [plaintiffs] originally complained." *Rembert v. Sheahan*, 62 F.3d 937, 942 (7th Cir. 1995). This Court's provisions for the expedited consideration of any amendments to Act 23 that might be enacted — provisions that were invited by and in response to defendants' own arguments — are fully consistent with established procedures and principles of sound judicial administration.

Finally, there is no merit to defendants' effort to invoke the Supreme Court's recent decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013). *See* Mot. at 5. That decision struck down the coverage formula in Section 4 of the Voting Rights Act used to determine which jurisdictions are subject to Section 5 pre-clearance. The Court emphasized that efforts to remedy "racial discrimination in voting" must "speak[] to *current conditions*," not conditions that existed in prior generations. *Id.* at 2631 (emphasis added); *see also id.* at 2629. This Court's decision fully meets that requirement — it made extensive factual findings about the *current* impacts of Act 23 and the *current* obstacles faced by voters of color, demonstrated how those impacts and obstacles violate the Voting Rights Act, and tailored its remedy to address *current* realities.

*Shelby County* has nothing whatsoever to do with the proper scope of injunctive relief necessary to remedy a violation established under Section 2. In fact, the Court in *Shelby County* emphasized that its decision "in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2" and that, under *that* provision, "*any racial discrimination*

---

version of challenged redistricting plans "*in an attempt to curb this particular litigation*"; "the new plans may disadvantage Plaintiffs to a lesser degree, but they disadvantage them in the same fundamental way," and the State "has not conceded the illegality of the conduct and has steadfastly maintained that its actions did not violate Plaintiffs' rights") (emphasis added).

*in voting is too much.*" *Id.* at 2631 (emphasis added); *see also id.* at 2619 (Section 2 "is not at issue in this case"). Thus, *Shelby County* undermines, and in no way supports, defendants' argument that Act 23 is lawful because "the vast majority of Wisconsin voters" — "more than 90%" — already have qualifying ID, so that the burdens of the law are borne by fewer than 10% of registered voters (a group that consists disproportionately of voters of color). Mot. at 7-8. "*[A]ny racial discrimination in voting is too much.*" 133 S. Ct. at 2631 (emphasis added).

## II. ALL OF THE OTHER RELEVANT FACTORS WEIGH STRONGLY IN FAVOR OF KEEPING THIS COURT'S PERMANENT INJUNCTION IN PLACE PENDING APPEAL.

Under the "'sliding scale' approach," because defendants have no likelihood of success on the merits of their claims, this Court need not even consider "the balance of harms." *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014). But the considerations that enter into that balancing — "the irreparable harm that will result to each side if the stay is either granted or denied in error, and whether the public interest favors one side or the other," *id.* — all tilt decisively in plaintiffs' favor and against any stay of this Court's permanent injunction pending appeal.

**Defendants' lack of irreparable harm.** Defendants have done nothing to challenge the Court's detailed findings that the alleged "harm" supposedly deterred by Act 23 — voter impersonation fraud — simply does not occur in Wisconsin. They do not dispute the Court's factual determination that, after more than two years of litigation, they "*could not point to a single instance of known voter impersonation.*" Op. at 12 (emphasis added). Nor do they dispute that "virtually no voter impersonation occurs in Wisconsin and it is exceedingly unlikely that voter impersonation will become a problem in Wisconsin in the foreseeable future." *Id.* at 11; *see also id.* at 13 ("The evidence introduced by the plaintiffs confirms that voter-impersonation fraud does not occur in Wisconsin."). Nor do they challenge this Court's

determination that, far from "promoting confidence in the integrity of the electoral process," the enactment and attempted implementation of Act 23 have badly damaged Wisconsin democracy and undermined public confidence in the electoral process in many respects. *Id.* at 17-22. Because defendants failed to show any benefit from implementing Act 23, they cannot claim to suffer any harm from the law being enjoined pending appeal.

Unable to point to any evidence of *actual* irreparable harm, defendants argue for a *per se* rule that irreparable injury occurs *whenever* a federal court enjoins a state law. *See* Mot. at 18-19. But the cases they cite in support of that sweeping claim do not go nearly that far. Each identified actual, concrete harms that would occur if the state law remained enjoined while on appeal. *See, e.g., Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (pointing to "an ongoing and concrete harm to Maryland's law enforcement and public safety interests" caused by the injunction; "in the absence of a stay, Maryland would be disabled from employing a valuable law enforcement tool" pending appeal); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox. Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) (absent a stay pending appeal, California would be unable to regulate important aspects of motor vehicle manufacturers' relationships with their dealers, including potential unfair practices).

The Seventh Circuit has emphasized that "an injunction [of a state statute] is appropriate if the usual criteria for a stay pending appeal are satisfied," thereby requiring a consideration of the interests allegedly served by the challenged statute and their comparative importance. *Cavel Intern., Inc. v. Madigan*, 500 F. 3d 544, 546 (7th Cir. 2007) (enjoining state statute pending appeal was especially appropriate where "[t]he object of the statute is totally obscure" and the harms it allegedly prevents are "remote from the vital interests of most Illinois residents," so that "a brief delay in its enforcement . . . will not create a perceptible harm"). The State of Wisconsin

has been conducting fair, orderly elections for 166 years without requiring voters to present an official photo ID to obtain and cast a ballot. Thus, it is leaving this Court's permanent injunction in place that preserves the status quo pending appeal, and letting Act 23 go into effect that would wreak havoc on that status quo. *See, e.g., LTD Commodities, Inc. v. Perederij*, 699 F.2d 404, 406 (7th Cir. 1983) ("it is the last uncontested status preceding the controversy which is to be maintained by the court"); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1332 (7th Cir. 1980) ("status quo" for purposes of challenged law was "the regulatory situation which existed *prior* to the effective date of the challenged [law]") (emphasis added).

**Plaintiffs' irreparable harm.** On the other hand, plaintiffs, their members, and the eligible voters they represent would face irreparable harm if Act 23 were allowed to go back into effect while the appeals proceed. The denial and abridgement of the constitutionally protected right to vote is, by definition, an irreparable injury that warrants injunctive relief. The "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (right to vote is "regarded as a fundamental political right, because preservative of all rights"). Preventing eligible voters like the members and constituents of the *LULAC* plaintiffs from voting would inflict "harms that cannot be recompensed." *Shannon v. Jacobowitz*, 301 F. Supp. 2d 249, 258 (N.D.N.Y. 2003).[13]

---

[13] *See also, e.g., Association of Community Organizations for Reform Now v. Scott*, No. 08-cv-4084, 2008 WL 2787931, at *7 (W.D. Mo. July 15, 2008); *Spencer v. Blackwell*, 347 F. Supp. 2d 528, 537 (S.D. Ohio 2004); *Bay County Democratic Party v. Land*, 347 F. Supp. 2d 404, 435-36 (E.D. Mich. 2004); *Hoblock v. Albany Cnty. Bd. of Elections*, 341 F. Supp. 2d 169, 176 (N.D.N.Y. 2004), *remanded on other grounds*, 422 F.3d 77 (2d Cir. 2005); *Charles H. Wesley Educ. Found., Inc. v. Cox,* 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004), *aff'd*, 408 F.3d 1349 (11th Cir. 2005).

This Court has found, and defendants have not disputed in their motion to stay, that Act 23 would impose "substantial barrier[s]" and "practical obstacles" that would "deter a substantial number of eligible voters from casting a ballot." Op. at 22, 29, 38. Although some of these voters could obtain their IDs if they persevered long enough and jumped through enough bureaucratic hoops, others would be "unable" from a practical standpoint to surmount these obstacles and would find it "impossible" to obtain the necessary proofs. *Id.* at 24-25, 60 n.34. Moreover, these irreparable harms would fall disproportionately on voters of color, who in turn would face "additional hurdles" in trying to overcome these barriers and obstacles. *Id.* at 61. The result is that Act 23 would deny and abridge the voting rights of a disproportionate number of African-American and Latino voters. The enforcement of Act 23 would "undermine the public's confidence in the electoral process" in these and a number of additional respects.[14] Defendants' motion is silent on all of these injuries to plaintiffs and the public interest.

These irreparable harms would be greatly magnified by any attempt at this late date to implement and enforce Act 23 in time for Wisconsin's August 2014 primary or the November general election. In enacting Act 23, the Legislature itself recognized that a substantial transition period would be necessary to educate the public, allow voters time to obtain the necessary IDs (including the underlying documents needed to obtain those IDs), and train DMV personnel and local poll workers. *See* 2011 Wis. Act 23 § 144(2). The trial record demonstrates that this nine-month transition and implementation effort in 2011-12 was woefully inadequate to establish

---

[14] This Court has found that, in addition to deterring and in many instances preventing eligible voters from casting a ballot, Act 23 also "undermine[s]" public confidence in the integrity of our democracy by creating a "false perception that voter-impersonation fraud is widespread," "needlessly undermining the public's confidence in the electoral process," and "causing members of the public to think that the photo ID requirement is itself disenfranchising voters and making it harder for citizens to vote, thus making results of elections less reflective of the will of the people." Op. at 18, 20. Defendants make no attempt to address or refute these findings regarding the additional harms imposed by Act 23.

uniform and fair procedures, train government workers and election volunteers, educate the public (including through appropriate Spanish-language outreach efforts), assist eligible voters in documenting their identities and obtaining the required IDs, and otherwise ensure an orderly implementation of the new requirement.[15] Now, with only about two months to go before the primary and five months before the general, it would be impossible to conduct the statutorily required public education campaign and implement Act 23 in a fair, orderly, effective, and lawful manner in time for those elections.[16]

**The public interest and "balance of harms."** This Court already has determined the balance of harms: "It is absolutely clear that Act 23 will prevent more legitimate votes from being cast than fraudulent votes." Op. at 38. The competing claims of injury are not remotely comparable; baseless claims of in-person voter impersonation fraud cannot outweigh the certain denial and suppression of voting by people of color that Act 23 will cause. As the Sixth Circuit concluded in analogous circumstances:

> Because the risk of actual voter fraud is miniscule when compared with the concrete risk that [the State's] policies will disenfranchise eligible voters, we must

---

[15] *See, e.g.,* Op. at 30 (findings *re* inconvenient DMV hours and locations); *id.* at 32 n.17 (findings *re* failure of DMV to publicize the MV3002 procedure); *id.* at 35-37 & n.20 (findings *re* successful attempts by various public officials to intervene on behalf of their constituents to obtain state ID cards from the DMV); *see also* Plaintiffs' Post-Trial Brief in Support of Declaratory and Permanent Injunctive Relief at 56-59 (Dkt. 112) (detailing lack of Spanish-language forms and explanatory materials, and lack of adequate outreach to Latino community); *id.* at 61-65 (detailing additional arbitrary and burdensome bureaucratic hurdles and mistakes in the 2011-12 implementation of voter ID).

[16] *See, e.g., Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase."); *Reynolds v. Sims*, 377 U.S. at 585 ("In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanical complexities of state election laws, and should act upon and rely upon general equitable principles."); *Page v. Bartels*, 248 F.3d 175, 198 (3d Cir. 2001) (court must consider "potentially disruptive effects" of its decision on the "electoral process").

> conclude that the public interest weighs in favor of [injunctive relief, which] eliminates a risk of individual disenfranchisement without creating any new substantial threats to the integrity of the election process.

*U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388-89 (6th Cir. 2008).

## CONCLUSION

For the reasons set forth above, in this Court's previous decisions, and in the record before this Court, defendants' motion to stay this Court's Apr. 29, 2014 permanent injunction pending appeal should be denied.

Dated:  June 2, 2014

Penda D. Hair
James Eichner
Denise D. Lieberman
Leigh M. Chapman
Advancement Project
Suite 850
1220 L Street, N.W.
Washington, D.C.  20005
Phone:  (202) 728-9557
Email:  phair@advancementproject.org
jeichner@advancementproject.org
dlieberman@advancementproject.org
lchapman@advancementproject.org

Respectfully submitted,

/s/ Charles G. Curtis, Jr.
Arnold & Porter LLP
Suite 620
16 North Carroll Street
Madison, Wisconsin  53703
Phone:  (608) 257-1922
Email:  charles.curtis@aporter.com

John C. Ulin
Marco J. Martemucci
Arnold & Porter LLP
44th Floor
777 South Figueroa Street
Los Angeles, California  90017
Phone:  (213) 243-4000
Email:  john.ulin@aporter.com
marco.martemucci@aporter.com

Carl S. Nadler
Ethan J. Corson
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
Phone: (202) 942-6130
Email:  carl.nadler@aporter.com
ethan.corson@aporter.com

Nathan D. Foster
Arnold & Porter LLP
370 17th Street, Suite 4400
Denver, Colorado  80202
Phone: (303) 863-1000
Email:  nathan.foster@aporter.com

Daniel Ostrow
Arnold & Porter LLP
399 Park Avenue
New York, New York  10022
Phone: (212) 715-1000
Email:  daniel.ostrow@aporter.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 2, 2014, I caused the foregoing document to be electronically filed with the Clerk of Court using CM/ECF, which will deliver it to all counsel of record.

*/s/ Nathan D. Foster*