# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**RUTHELLE FRANK, et al., on behalf of themselves and all others similarly situated,**
          **Plaintiffs,**

      **v.**                              **Case No. 11-CV-01128**

**SCOTT WALKER, in his official capacity as Governor of the State of Wisconsin, et al.,**
          **Defendants.**

---

**LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) OF WISCONSIN, et al.,**
          **Plaintiffs,**

      **v.**                              **Case No. 12-CV-00185**

**JUDGE DAVID G. DEININGER, et al.,**
          **Defendants.**

---

## DECISION AND ORDER

In this decision and order, I address the defendants' motion for a stay pending appeal of my order of April 29, 2014, in which I permanently enjoined the defendants from conditioning a person's access to a ballot on that person's presenting a form of photo identification.  See Fed. R. Civ. P. 62(c) & Fed. R. App. P. 8(a)(1).  The standard for granting a stay pending appeal mirrors that for granting a preliminary injunction.  In re A & F Enterprises, Inc. II, 742 F.3d 763, 766 (7th Cir. 2014).  Stays, like preliminary injunctions, are necessary to mitigate the damage that can be done during the interim period before a legal issue is finally resolved on the merits.  The goal is to minimize the costs of error.  Id.  To determine whether to grant a stay, I must consider the moving party's

likelihood of success on the merits, the irreparable harm that will result to each side if the stay is either granted or denied in error, and whether the public interest favors one side or the other. Id. As with a motion for a preliminary injunction, a "sliding scale" approach applies; the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa. Id.

## A. Likelihood of Success on the Merits

On appeal, the defendants argue that I misinterpreted the law applicable to the plaintiffs' claims under the Fourteenth Amendment and Section 2 of the Voting Rights Act. In general, the law applicable to such claims is unsettled, and thus I acknowledge that the defendants have some likelihood of success on the merits. However, having considered the specific arguments that the defendants raise in their motion for a stay, I conclude that their likelihood of success on the merits is low. I discuss these arguments below, as well as the defendants' argument that the scope of the injunction is too broad.

### 1. Fourteenth Amendment

In their motion for a stay pending appeal, the defendants initially argued that my disposition of the plaintiffs' Fourteenth Amendment claim is likely to be reversed because I made three errors: (1) deciding the claim when my disposition of the plaintiffs' claim under the Voting Rights Act made it unnecessary to do so, Mot. to Stay at 7; (2) enjoining the law as to all voters when I found that the law placed an unjustified burden on only a subgroup of voters, id. at 8; and (3) giving insufficient weight to the state's interest in preventing or deterring voter-impersonation fraud, id. at 9–10. In a recent letter, the defendants raise a fourth argument: that the decision of the Wisconsin Supreme Court in Milwaukee Branch

of the NAACP v. Walker, 2014 WI 98, __ Wis. 2d __, indicates that "Act 23 is lawful." Letter of Aug. 1, 2014, at 1. I address each argument in turn.

First, in my original order, I acknowledged that, given my resolution of the plaintiffs' claim under the Voting Rights Act, I could have declined to resolve the Fourteenth Amendment claim. Dec. & Order at 2–3. But as I explained, the two claims overlap substantially, in that many of the factual findings I made at the conclusion of a nearly two-week trial were relevant to both claims, and therefore it would have been inefficient to resolve the claim under the Voting Rights Act but not the claim under the Fourteenth Amendment. Id. The defendants do not fully develop their argument that this approach constituted reversible error; instead, they merely assert in conclusory fashion that the decision to address the Fourteenth Amendment claim was error. Mot. to Stay at 7. Thus, I see no reason to think that the defendants are likely to succeed on this argument on appeal.

The defendants' second argument is that I should not have enjoined the photo-ID requirement in its entirety because I found that many Wisconsin voters already have a qualifying ID and thus will not experience unjustified burdens. The defendants suggest that I should have fashioned some other remedy that was limited to the voters who will experience the unjustified burdens that I identified. Mot. to Stay at 8. But as I explained in my original order, there is no practicable way to remove the unjustified burdens on the voters who do not currently possess an ID without enjoining the photo ID requirement as to all voters. Dec. & Order at 38–39. Indeed, the defendants did not, in their post-trial brief, identify any practicable remedy short of enjoining Act 23 in its entirety, and they do

not, in their motion for a stay pending appeal, identify any such remedy. Thus, I conclude that the defendants are not likely to succeed on this argument.

The defendants' third argument is that my "application of the Anderson/Burdick balancing test was incorrect"[1] because I "gave insufficient weight to the legitimate and important state interests that the Supreme Court recognized in Crawford."[2] Mot. to Stay at 9. Specifically, the defendants contend that I gave insufficient weight to the state's interest in preventing and deterring voter-impersonation fraud. They argue that Crawford establishes that a state has a "legitimate and important interest" in preventing and deterring voter-impersonation fraud even in the absence of evidence that such fraud has occurred. Mot. to Stay at 9. I agree that Crawford generally establishes that a state has a legitimate and important interest in preventing or deterring voter-impersonation fraud, even in the absence of evidence that such fraud has occurred. But Crawford does not hold that a court may not consider the evidence (or lack thereof) that such fraud has occurred when deciding how much weight to assign to that particular interest under the Anderson/Burdick balancing test. If the evidence shows that voter-impersonation fraud is prevalent, then the state's interest in preventing and deterring such fraud may be "sufficiently weighty to justify" the burdens placed on the rights of individual voters. Crawford, 553 U.S. at 191 (quoting Norman v. Reed, 502 U.S. 279, 288–89 (1992)). But if the evidence shows that voter-impersonation fraud is rare or nonexistent, then the state's interest is assigned less weight. In the present case, the evidence showed that virtually no voter-impersonation fraud occurs

---

[1]Anderson v. Celebrezze, 460 U.S. 780 (1983); Burdick v. Takushi, 504 U.S. 428 (1992).

[2]Crawford v. Marion County Elec. Bd., 553 U.S. 181 (2008).

in Wisconsin and that it is unlikely to become a problem in the foreseeable future. For these reasons, I determined that the state's interest in preventing or deterring voter-impersonation fraud was insufficiently weighty to justify the burdens Act 23 placed on a substantial number of voters. The defendants have not shown that this application of the Anderson/Burdick balancing test was erroneous.

The defendants remaining argument concerning the Fourteenth Amendment claim is that the Wisconsin Supreme Court's decision in Milwaukee Branch of the NAACP v. Walker, establishes that Act 23 is lawful. In their letter to me, the defendants do not expand on this argument, but in their appellate filings, they argue that the state supreme court's construction of an administrative regulation "will eliminate the potential financial burden that many voters who lack a birth certificate might experience when obtaining a free ID card from the DMV." Consol. Reply Br. of Defendants-Appellants at 5. To explain the defendants' argument, I must first briefly discuss the relevant part of NAACP v. Walker.

The Wisconsin Supreme Court began its discussion of the administrative regulation at issue here by noting that, at the state trial-court level, the plaintiffs provided evidence that they were required to make payments to government agencies to obtain certain primary documents, such as birth certificates, that the division of motor vehicles ("DMV") requires them to produce in order to obtain free state ID cards for voting. NAACP, 2014 WI 98, ¶¶ 50 & 52, ___ Wis. 2d ___. The court then determined that the DMV's requiring a person to produce a document that he or she cannot obtain without making a payment to a government agency resulted in a severe burden on the right to vote. Id. ¶¶ 60–62. In an effort to eliminate this severe burden, the court construed a regulation of the Wisconsin Department of Transportation that granted the administrator of the DMV discretion to issue

state ID cards to persons who could not produce a birth certificate or other specifically identified document as proof of name and date of birth. Id. ¶¶ 66–71. That regulation states that if a person is "unable" to provide a birth certificate or other specifically identified document, and such documents are "unavailable" to the person, the person may make a written petition to the administrator of the DMV for an exception to the requirement to produce a birth certificate or similar document. Wis. Admin. Code § Trans 102.15(3)(b) & (c).[3] Under the Wisconsin Supreme Court's construction of this regulation, a person is "unable" to provide a birth certificate or similar document, and such documents are "unavailable" to the person, "so long as [the person] does not have the documents and would be required to pay a government agency to obtain them." NAACP, 2014 WI 98, ¶ 69.

---

[3]The full text of § Trans 102.15(3)(b) & (c) provides as follows:

(b) If a person is unable to provide documentation under [§ Trans 102.15(3)(a)], and the documents are unavailable to the person, the person may make a written petition to the administrator of the division of motor vehicles for an exception to the requirements of par. (a). The application shall include supporting documentation required by sub. (4) and:

    1. A certification of the person's name, date of birth and current residence street address on the department's form;

    2. An explanation of the circumstances by which the person is unable to provide any of the documents described in par. (a); and

    3. Whatever documentation is available which states the person's name and date of birth.

(c) The administrator may delegate to the administrator's subordinates the authority to accept or reject such extraordinary proof of name and date of birth.

Under the Wisconsin Supreme Court's construction of this regulation, then, a person is entitled to petition for an exception to the birth-certificate requirement if the person cannot obtain a birth certificate without paying a fee to a government agency. But this does not mean that the person will be able to obtain a free state ID for voting without producing a birth certificate. This is so because, under the regulation at issue, a person must still provide "[w]hatever documentation is available which states the person's name and date of birth," Wis. Admin. Code § Trans 102.15(3)(b)3., and then the administrator, in his or her discretion, may accept or reject "such extraordinary proof of name and date of birth," id. § Trans 102.15(3)(c). There is no guidance in the regulation that indicates what kind of documentation might constitute "extraordinary proof of name and date of birth" or what factors the administrator should consider when exercising his or her discretion to determine whether the documentation the person has produced constitutes extraordinary proof. In NAACP, the Wisconsin Supreme Court did not provide any guidance to the administrator concerning the meaning of "extraordinary proof" or set forth any standard that might guide the exercise of the administrator's discretion. Instead, the court offered this cryptic instruction: "the administrator, or his or her designee, shall exercise his or her discretion in a constitutionally sufficient manner." 2014 WI 98, ¶ 70.

Another problem is that it is not clear how members of the public who need to obtain a free state ID will learn that the DMV now has discretion to issue IDs to persons who cannot obtain birth certificates without paying fees to government agencies. At the trial in this case, the plaintiffs demonstrated that the DMV does not publicize its exception procedure, which involves using Form MV3002, because the DMV wants to minimize exceptions. Dec. & Order at 32–33 n. 17. In light of this evidence, I concluded that a

7

person who might need an exception is more likely to give up trying to get an ID than to be granted an exception. Id. at 32–36 & n.17. Nothing in the supreme court's decision requires the DMV to do a better job of informing the public that the MV3002 procedure exists.

Thus, from the mere fact that a person may petition for an exception to the birth-certificate requirement if the person cannot obtain a birth certificate without paying a fee to a government agency, it does not follow that the person will actually obtain a free ID card without producing a birth certificate, and so the defendants have not shown that the Wisconsin Supreme Court's construction of § Trans 102.15(3)(b) and (c) "will eliminate the potential financial burden that many voters who lack a birth certificate might experience when obtaining a free ID card from the DMV." Consol. Reply Br. of Defendants-Appellants at 5. In any event, having to pay a fee to obtain a birth certificate is only one of many burdens that a person who needs to obtain an ID for voting purposes might experience. See Dec. & Order at 29–36. So even if I assumed that the supreme court's construction of § Trans 102.15(3)(b) and (c) eliminates the burden of having to pay a fee to obtain a birth certificate or similar document, I could not conclude that the burdens Act 23 places on the right to vote have been lessened to such a degree that the state's interests are now sufficient to justify them. Accordingly, the state supreme court's decision does not significantly increase the defendants' likelihood of success on the Fourteenth Amendment claim.

## 2.    Section 2 of the Voting Rights Act

The defendants argue that my disposition of the plaintiffs' Section 2 claim is likely to be reversed for two reasons: (1) I incorrectly determined that the LULAC plaintiffs have

8

"statutory standing," and (2) my interpretation of how Section 2 applies in a "vote denial" case was erroneous. I have already addressed the statutory-standing argument twice and will not discuss it further, except to note that even if the defendants prevail on this argument on appeal, they will not succeed in reversing my disposition of the Section 2 claim, as the <u>Frank</u> plaintiffs unquestionably have statutory standing.[4]

With respect to my interpretation of Section 2, the defendants argue that I am likely to be reversed because my interpretation "would potentially invalidate other laws not reasonably subject to challenge, such as voter registration laws." Mot. to Stay at 11. The defendants argue that my interpretation has the potential to invalidate voting practices that are unquestionably legitimate (or, in their words, "not reasonably subject to challenge") if they have disproportionate impacts on the poor, as a greater percentage of minorities than whites are poor, and this is due to the history of discrimination against minorities. The suggestion is that my interpretation will lead to an absurd result by invalidating laws that Congress, in passing Section 2, could not have intended to invalidate. But what unquestionably legitimate voting practice is likely to have a disproportionate impact on the poor? In their motion to stay, the defendants point to voter registration, but they do not explain how voter registration is likely to have a disproportionate impact on the poor. In their appellate filings, the defendants point to "all existing voting practices that require in-person voting" by giving the following example:

---

[4]The defendants suggest that if it is determined on appeal that the <u>LULAC</u> plaintiffs lack statutory standing, then any evidence presented by the <u>LULAC</u> plaintiffs will need to be "subtracted" from the evidence at trial. Mot. to Stay at 16. However, at trial, the defendants stipulated that any evidence offered by the <u>LULAC</u> plaintiffs would also be considered evidence offered by the <u>Frank</u> plaintiffs, and vice versa. Tr. at 7.

> [A]ssume that a plaintiff could prove that minority voters are less likely to own automobiles than white voters. Further assume that this is because minorities are more likely to be poor and that the higher rate of poverty among minorities is the result of historical or current societal discrimination. Under the district court's analysis, all existing voting practices that require in-person voting may constitute a violation of Section 2 because in-person voting is more difficult without an automobile.

Consol. Reply Br. at 18. Here, however, the final premise of the defendants argument—that in-person voting is more difficult without an automobile—is likely false. Based on the evidence presented at trial, I can conclude that lower-income minorities, especially those who do not own automobiles, are likely to live in urban areas, where it is easier to walk to a polling place than to drive. So it is very difficult to envision a plaintiff using disparities in rates of automobile ownership as a basis for challenging an existing voting practice that requires a person's presence at the polls.

In any event, even if it could be shown that an unquestionably legitimate voting practice would have a disproportionate impact on the poor, and therefore on minorities, that practice would not necessarily be invalidated under my interpretation of Section 2. As I noted in my original decision, if the voting practice was clearly necessary to protect an important state interest—an interest that is not "tenuous"—that voting practice could be sustained even if it has a disproportionate impact on minorities. Dec. & Order at 67–68. Any voting practice that could be described as "unquestionably legitimate" or "not reasonably subject to challenge" will almost certainly be clearly necessary to protect an important state interest. Consequently, I conclude that there is no merit to the defendants' argument that my interpretation of Section 2 will lead to results that Congress did not intend.

The defendants also argue that it was error for me to cite Justice Scalia's dissenting opinion in <u>Chisom v. Roemer</u>, 501 U.S. 380 (1991), in the course of interpreting Section 2. The defendants make the obvious point that a dissent has no precedential value. But I did not cite Justice Scalia's dissent for its precedential value. I cited it because it illuminates the plain meaning of Section 2: it shows that I am not the only jurist to have read the text of Section 2 and come to the conclusion that it means that a state may not adopt a voting practice that makes it more difficult for minorities to vote than whites. The defendants also note that Justice Scalia's dissent was part of a "vote dilution" case, not a vote-denial case. But even though that is true, it does not alter the fact that the example Justice Scalia gave—a county's making it more difficult for Blacks to register to vote than whites—involved vote denial rather than vote dilution. Indeed, Justice Scalia himself described his example as involving a "<u>nondilution</u> § 2 violation[]." <u>Chisom</u>, 501 U.S. at 408 (emphasis in original). So the dissent is instructive on the meaning of Section 2 as applied to a vote-denial claim.

The defendants also argue that I should have upheld Act 23 under Section 2 because Act 23 does not cause any of the racial disparities I identified, such as the disparity in poverty rates for whites and minorities and the resulting disparity in ID-possession rates. But although Act 23 does not cause these disparities, it clearly <u>interacts</u> with them in a way that makes it harder for minorities to vote. And it is this interaction with the effects of discrimination that produces a discriminatory result.[5] <u>Thornburg v. Gingles</u>,

---

[5]Some of the classic practices used to prevent minorities from voting—literacy tests and poll taxes—did not, by themselves, cause the underlying disparities that allowed the practices to effectively suppress minority voting. Literacy tests did not cause illiteracy; they exploited the fact that, because of the effects of discrimination, Blacks were less likely to

478 U.S. 30, 47 (1986) ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." (Emphasis added)).[6] The Ninth Circuit has specifically rejected the idea that a voting practice that produces a disproportionate racial impact may survive scrutiny under Section 2 so long as the voting practice, by itself, is not responsible for any underlying racial disparities. See Farrakhan v. Washington, 338 F.3d 1009, 1016–20 (9th Cir. 2003). As the court stated, "demanding 'by itself' causation would defeat the interactive and contextual totality of the circumstances analysis repeatedly applied by [other] circuits in Section 2 cases, as they also require a broad, functionally-focused review of the evidence to determine whether a challenged voting practice interacts with surrounding racial discrimination in a meaningful way or whether the practice's disparate impact 'is better explained by other factors independent of race.'" Id. at 1018 (quoting Smith v. Salt River Agric. Improvement & Power Dist., 109 F.3d 586, 591 (9th Cir. 1997)). The court continued:

> Certainly, plaintiffs must prove that the challenged voter qualification denies or abridges their right to vote on account of race, but the 1982 Amendments and subsequent case law make clear that factors outside the election system can contribute to a particular voting practice's disparate impact when those

---

be able to read than whites. Likewise, poll taxes did not cause poverty; they exploited the fact that, because of the effects of discrimination, Blacks were more likely to be poor than whites.

[6]Although Thornburg was a vote-dilution case, not a vote-denial case, the Court did not limit the language I have quoted to vote-dilution cases. Rather, the Court made clear that Section 2 applies to vote-denial cases as well as vote-dilution cases, id. at 478 U.S. at 45 n.10, and the quoted language identifies "the essence of a Section 2 claim," not the essence of a vote-dilution claim.

factors involve race discrimination. Therefore, under <u>Salt River</u> and consistent with both Congressional intent and well-established judicial precedent, a causal connection may be shown <u>where the discriminatory impact of a challenged voting practice is attributable to racial discrimination in the surrounding social and historical circumstances</u>.

<u>Id.</u> at 1019 (emphasis added).[7]  In other words, the question in a Section 2 case is whether the challenged practice magnifies or exacerbates an existing racial disparity caused by discrimination in other areas, thereby importing the effects of that discrimination into the electoral process.  In the present case, the evidence showed that discrimination in areas such as employment, housing, and education caused higher poverty rates for minorities than for whites, with the result that a greater percentage of the minority population lacks a photo ID and will have more difficulty obtaining an ID.  Act 23 thus imports the effects of discrimination in these areas into the electoral process and produces a discriminatory result.

The defendants also contend that my interpretation of Section 2 is incorrect because my interpretation "focuses not on causation but on mere likelihood."  Mot. to Stay at 12. This is in reference to the following language in my opinion: "Section 2 protects against a voting practice that creates a barrier to voting that is more likely to appear in the path of a voter if that voter is a member of a minority group than if he or she is not."  Dec. & Order at 52.  The defendants argue that my interpretation focuses on whether a voting practice "<u>could potentially</u> create more difficulty for minorities to vote than non-minorities," rather

---

[7]In <u>Farrakhan v. Gregoire</u>, 623 F.3d 990 (9th Cir. 2010), the en banc court found that the voting practice at issue in the <u>Farrakhan</u> case I cited in the text—a felon disenfranchisement law—did not violate Section 2.  However, the court did not disturb the holding that a Section 2 analysis requires consideration of factors external to the challenged voting mechanism itself.  <u>See</u> 623 F.3d at 995 (Thomas, J., concurring).

than on whether it actually creates more difficulty for minorities to vote than non-minorities. Mot. to Stay at 13 (emphasis in original). This is wrong. Under my interpretation, a voting practice violates Section 2 only when it <u>actually</u> creates more difficulty for minorities to vote. And I found that Act 23 actually creates more difficulty for minorities to vote than non-minorities, in that Act 23 will prevent or deter a greater percentage of minorities from voting than whites. Dec. & Order at 61–63. The phrase "more likely than whites" (and related phrases) refers to the fact that although not every minority will be deterred or prevented from voting, a greater percentage of minorities will be deterred or prevented from voting than whites. Perhaps what the defendants mean to argue is that a voting practice does not violate Section 2 unless it prevents or deters <u>every</u> member of a racial group from voting. But there is no support for this narrow view of Section 2. The text states that a violation of Section 2 occurs when the political process is not "equally open to participation" by members of a minority group in that its members "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). If a voting practice will prevent or deter a greater percentage of minorities from voting than whites, the political process is not "equally open to participation" by minorities, in that they will not have the same opportunity as whites to participate in the political process and to elect representatives of their choice.

Finally, the defendants argue that because my conclusion that Act 23 violates Section 2 depends on the premise that a greater percentage of minorities than whites are poor, I have turned income or wealth into a protected class. That is incorrect. I concluded that Act 23 produces a discriminatory result because it interacts with the effects of racial discrimination, including higher poverty rates for minorities than for whites. If the reason

14

a greater percentage of minorities than whites in Wisconsin are poor were unrelated to racial discrimination, then showing that minorities are more likely than whites to be poor would not have been sufficient to show that Act 23 produces a discriminatory result. Thus, the root cause of Act 23's disproportionate impact is discrimination on account of race, not income or wealth.

### 3. Scope of Injunction

The defendants' final argument is that I issued a permanent injunction that is impermissibly broad, in that I enjoined the defendants from enforcing any requirement to produce a photo ID to gain access to a ballot, not simply the photo-ID requirement embodied in Act 23. Importantly, however, I stated that if the State of Wisconsin enacted a new photo-ID law, the defendants could file a motion for relief from the permanent injunction, and that I would schedule expedited proceedings on any such motion, if necessary. Dec. & Order at 69. The defendants contend that I would have no jurisdiction to hear such a motion while an appeal from the order granting the original injunction was pending, because ordinarily a district court loses jurisdiction over a case between the time a notice of appeal is filed and the time the mandate issues. However, Federal Rule of Civil Procedure 62(c) states that while an appeal from an order granting an injunction is pending, the district court may modify the injunction. Moreover, to the extent there were any doubt over whether I would have jurisdiction to consider a motion to modify the injunction, the procedure outlined in Federal Rule of Civil Procedure 62.1 and Federal Rule of Appellate Procedure 12.1 would apply. These rules provide that if a timely motion is made in the district court for relief that the district court lacks authority to grant because an appeal is pending, the district court may inform the court of appeals that it would grant the

motion (or that the motion raises a substantial issue), and then the court of appeals may remand the case to the district court for a ruling on the motion. Thus, if the State of Wisconsin enacts a new photo-ID law, the defendants are not precluded from seeking relief from the present injunction.

With respect to the question of whether I erred in enjoining the defendants from enforcing any photo-ID requirement, not just Act 23, I first note that even if this were error, it would not be grounds for staying my order pending appeal. If the court of appeals concludes that the injunction is impermissibly broad, the court will not reverse my order in its entirety. Rather, the court will vacate the injunction and remand with instructions to enter an injunction limited to Act 23. See PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1272 (7th Cir. 1995) (stating that court of appeals will "restrict the breadth" of an overbroad injunction). Thus, the argument that the injunction is too broad does not support the defendants' motion for a stay pending appeal. At best, it is an argument that supports modifying the injunction pending appeal, which the defendants have not asked me to do.

In any event, the defendants have not shown that I erred in enjoining them from enforcing any photo-ID requirement, not just Act 23. An injunction "must . . . be broad enough to be effective, and the appropriate scope of the injunction is left to the district court's sound discretion." Russian Media Group. LLC v. Cable America, Inc., 598 F.3d 302, 307 (7th Cir. 2010). To make an injunction effective, a district court may enjoin "similar conduct reasonably related to" the violation established in the litigation. EEOC v. AutoZone, Inc., 707 F.3d 824, 841 (7th Cir. 2013). In the present case, I concluded that to render the injunction effective, it was necessary to enjoin similar conduct reasonably related to the enforcement of Act 23. While the present case was under consideration, the

Wisconsin Assembly adopted an amendment to Act 23, and the state's governor announced that he would call a special session of the legislature to modify Act 23 in the event that the courts did not uphold it. Now, it is possible that the state could make changes to Act 23 that result in its surviving scrutiny under the Voting Rights Act and the Fourteenth Amendment. However, given the evidence presented during the trial, it seemed doubtful that the kind of changes being discussed at the time would have had that result. Thus, to prevent the defendants from circumventing the injunction by enforcing a new photo-ID requirement that continued to place unjustified burdens on a substantial number of voters and that produced a discriminatory result, I enjoined the defendants from enforcing any photo-ID requirement, not just Act 23 as it then existed, until such time as it could be determined whether the new law removed the unjustified burdens and discriminatory result. In my discretion, I determined that an injunction of this breadth was necessary to render the relief afforded to the plaintiffs effective.

The defendants contend that, although a district court has authority to enjoin a defendant from engaging in conduct that is similar to the conduct found to be unlawful in the litigation, I abused my discretion by imposing a remedy that could be likened to the preclearance requirement of Section 5 of the Voting Rights Act, which the Supreme Court addressed in Shelby County v. Holder, __ U.S. __, 133 S. Ct. 2612 (2013). But the preclearance requirement of Section 5 prevents a covered jurisdiction from enforcing any changes to state election law until they have been precleared by the federal government. Id. at 2624. The injunction I issued allows the State of Wisconsin to enforce any changes to its election law that it wants, so long as the law at issue does not require a person to present a photo ID as a condition to receiving a ballot. Nothing in Shelby County suggests

17

that once a specific voting practice has been shown to be unlawful under Section 2, a court may not enjoin a state from adopting a similar voting practice without first seeking relief from the injunction. Thus, the defendants' reliance on Shelby County is misplaced.

## B. Irreparable Harm and the Public Interest

The other factors that I must consider when deciding whether to stay an injunction pending appeal are the irreparable harm that will result to each side if the stay is either granted or denied in error, and whether the public interest favors one side or the other. The irreparable harm that will result to the defendants if the stay is denied in error is tied to the interests the defendants put forward to justify Act 23 in the first place: preventing in-person voter-impersonation fraud and promoting public confidence in the integrity of the electoral process. But as I found in deciding this case on the merits, there is virtually no in-person voter-impersonation fraud in Wisconsin, and there is no evidence that laws such as Act 23 promote public confidence in the integrity of the electoral process. Thus, if a stay pending appeal is denied in error, the defendants would suffer very little irreparable harm—almost certainly no in-person voter-impersonation fraud will have occurred during the time that the appeal was pending, and the public's confidence in the integrity of the electoral process will not have declined.

On the other side of the balance, the irreparable harm that the plaintiffs would suffer if a stay were granted in error would be significant. To begin with, some of the named individual plaintiffs, including Shirley Brown and Eddie Lee Holloway, Jr., would be unable to vote during any election that occurred while the stay was in effect, as they lack a photo ID and have been unable to obtain a photo ID. Similarly, many members and individuals represented by the organizational plaintiffs in the LULAC case would be prevented or

18

deterred from voting because of Act 23. Finally, under the public-interest factor, I take into account the fact that a large number of individuals who are not parties to this case and who might not be represented by any of the <u>LULAC</u> organizations would also be prevented or deterred from voting if Act 23 were reinstated pending appeal.

In short, in balancing the potential for irreparable harm to each party, I reiterate my finding that "it is absolutely clear that Act 23 will prevent more legitimate votes from being cast than fraudulent votes." Dec. & Order at 38. Thus, the balance of the harms weighs against a stay pending appeal.

**C.    Sliding Scale**

Having found that the defendants' likelihood of success on appeal is low, that the defendants would suffer very little irreparable harm if a stay pending appeal were denied in error, and that the plaintiffs and members of the public would suffer significant irreparable harm if a stay pending appeal were granted in error, I conclude that, under the sliding-scale approach, I should not stay the permanent injunction pending appeal.

**CONCLUSION**

For the reasons stated, **IT IS ORDERED** that the defendants' motion for a stay pending appeal is **DENIED**.

Dated at Milwaukee, Wisconsin, this 13th day of August 2014.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge

19
